## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA

| | |
|---|---|
| PLYMOUTH COUNTY RETIREMENT SYSTEM, Individually and on Behalf of all Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> CARTER'S, INC., FREDERICK ROWAN II, JOSEPH PACIFICO, MICHAEL D. CASEY, and CHARLES WHETZEL, JR., <br><br> Defendants. | Civil Action No.: <br> 1:08-CV-2940-JOF |

## REPLY MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE PLAINTIFF'S AMENDED CLASS ACTION COMPLAINT

Randall W. Bodner
Christopher G. Green
William J. Dunn
Ropes & Gray LLP
One International Place
Boston, MA 02110-2624
(617) 951-7000

Russell L. Lippman
Ropes & Gray LLP
1211 Avenue of the Americas
New York, NY 10036-8704
(212) 596-9000

J. Marbury Rainer
Patrice Russell Walker
Parker Hudson Rainer & Dobbs
285 Peachtree Center Avenue, N.E.
1500 Marquis II Tower
Atlanta, GA 30303
(404) 420-5564

*Attorneys for Defendants Carter's, Inc.,*
*Frederick Rowan II, Joseph Pacifico,*
*Michael D. Casey, and Charles Whetzel, Jr.*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................... ii

PRELIMINARY STATEMENT ......................................................... 1

ARGUMENT .................................................................................... 3

I.  THE ALLEGED MISSTATEMENTS ARE NOT
    ACTIONABLE UNDER THE PSLRA SAFE HARBOR
    FOR FORWARD-LOOKING STATEMENTS ............................. 3

    A.  The Alleged Misstatements Are Each Forward-Looking and
        Accompanied By Meaningful Cautionary Language ........................... 3

    B.  Plymouth Cannot Avoid the PSLRA Safe Harbor ................................ 9

        1.  The Defendants' Forward-Looking Statements and Projections
            About OshKosh's Future Performance Were Accurate ............... 10

        2.  The Confidential Witnesses Do Not Supply Any
            "Then-Current Facts" That Rendered Defendants'
            Forward-Looking Statements False When Made ........................ 16

II. PLYMOUTH'S SCIENTER ARGUMENTS ARE NOT
    SUPPORTED BY THE CASE LAW OR THE PLEADINGS .................... 23

    A.  Plymouth Fails to Plead "Actual Knowledge"
        of Falsity by Any Individual Defendant ................................................ 23

    B.  Plymouth Continues to Distort the Defendants' Stock Sales ............... 24

    C.  The Absence of Any "Dumping" of Stock Following the
        Stock Repurchase Program Refutes Any Inference of Scienter .......... 27

III. PLYMOUTH'S THEORY OF "PARTIAL"
     DISCLOSURES IS TORTURED ................................................. 28

CONCLUSION ................................................................................. 31

# TABLE OF AUTHORITIES

**Page(s)**

<span style="font-variant: small-caps;">CASES</span>

*Alaska Elec. Pension Fund v. Adecco S.A.*,
   434 F. Supp. 2d 815 (S.D. Cal. 2006) ................................................................. 17

*Amalgamated Bank v. Coca-Cola Co.*,
   No. Civ. A. 1:05-CV-1226, 2006 WL 2818973
   (N.D. Ga. Sept. 29, 2006) ............................................................................... 5, 7

*Bryant v. Avado Brands, Inc.*,
   187 F.3d 1271 (11th Cir. 1999) ........................................................................ 23

*City of Austin Police Ret. Sys. v. ITT Educ. Servs., Inc.*,
   388 F. Supp. 2d 932 (S.D. Ind. 2005) ............................................................... 21

*Cole v. Health Mgmt. Associates, Inc*.,
   No. 2:07cv00484-FtM-UA-DNF, 2009 WL 2713178
   (M.D. Fla. July 17, 2009) ................................................................................. 29

*Frazier v. VitalWorks, Inc.*,
   341 F. Supp. 2d 142 (D. Conn. 2004) ............................................................... 27

*Grossman v. Novell, Inc.*,
   120 F.3d 1112 (10th Cir. 1997) ........................................................................ 10

*Harris v. Ivax Corp.*,
   182 F.3d 799 (11th Cir. 1999) ................................................................... 8, 9, 22

*In re Airgate PCS, Inc. Sec. Litig.*,
   389 F. Supp. 2d 1360 (N.D. Ga. 2005) ............................................................... 5

*In re BISYS Sec. Litig.*,
   397 F. Supp. 2d 430 (S.D.N.Y. 2005) ............................................................... 27

*In re eSpeed, Inc. Sec. Litig.*,
   457 F. Supp. 2d 266 (S.D.N.Y. 2006) ......................................................... 25, 27

*In re Keyspan Corp. Sec. Litig.*,
   383 F. Supp. 2d 358 (E.D.N.Y. 2003) .................................................................27

*In re Oxford Health Plans, Inc. Sec. Litig.*,
   187 F.R.D. 133 (S.D.N.Y. 1999) ........................................................................25

*In re PEC Solutions, Inc. Sec. Litig.*,
   No. 03-CV-331, 2004 WL 1854202
   (E.D. Va. May 25, 2004) ....................................................................................30

*In re Petco Animal Supplies Inc. Sec. Litig.*,
   No. 05-CV-0823-H (RBB), 2005 WL 5957816
   (S.D. Cal. Aug. 1, 2005) ....................................................................................17

*In re PetSmart, Inc. Sec. Litig.*,
   61 F. Supp. 2d 982 (D. Ariz. 1999) ....................................................................18

*In re Spectrum Brands, Inc. Sec. Litig.*,
   461 F. Supp. 2d 1297 (N.D. Ga. 2006) ...............................................................19

*Kane v. Madge Networks N.V.*,
   No. C-96-20652-RMW, 2000 WL 33208116
   (N.D. Cal. May 26, 2000) ...................................................................................18

*Malin v. XL Capital Ltd.*,
   499 F. Supp. 2d 117 (D. Conn. 2007)..................................................................26

*Miller v. Champion Enters., Inc.*,
   346 F.3d 660 (6th Cir. 2003) ................................................................................8

*No. 84 Employer-Teamster Joint Council Pension Trust Fund
   v. Am. West Holding Corp.*, 320 F.3d 920 (9th Cir. 2003)..................................25

*Parnes v. Gateway 2000, Inc.*,
   122 F.3d 539 (8th Cir. 1997) ..............................................................................18

*S.E.C. v. Merchant Capital, LLC*,
   483 F.3d 747 (11th Cir. 2007) ..........................................................................4, 9

*Skubella v. Checkfree Corp.*,
  No. 1:07-CV-796-TWT, 2008 WL 1902118
  (N.D. Ga. Apr. 25 2008) ...................................................................................7

*Southland Securities Corp. v. Inspire Ins. Solutions, Inc.*,
  365 F.3d 353 (5th Cir. 2004) ..............................................................................8

*Teamsters Local 175 v. Clorox Co.*,
  353 F.3d 1125 (9th Cir. 2004) ............................................................................8

*Tellabs Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007).......................................................................................3, 23

*Theoharous v. Fong*,
  256 F.3d 1219 (11th Cir. 2001) ..........................................................................5

*Zishka v. Am. Pad & Paper Co.*,
  No. 3:98-CV-0660-M, 2000 WL 1310529
  (N.D. Tex. Sep. 13, 2000).................................................................................25

## STATUTES

15 U.S.C. § 77z-2(i) .........................................................................................5

15 U.S.C. § 78u-5(c)(1) ...............................................................................4, 8, 9

## OTHER AUTHORITIES

Federal Rule of Civil Procedure 9(b)..................................................................18

H.R. Conf. Rep. 104-369 (1995), reprinted in 1995 U.S.C.C.A.N. 730 ..................8

iv

The Defendants respectfully submit this Reply Memorandum of Law in Support of Defendants' Motion to Dismiss the Complaint.

## PRELIMINARY STATEMENT

Plymouth concedes that it is "*not* alleging accounting fraud" relating to Carter's write down of the fair market value of OshKosh's goodwill at the end of the alleged Class Period.  Pl.'s Opp'n at 38.  Plymouth further concedes that it is not alleging that Defendants made any misstatements *of historical fact* during the alleged Class Period.  *Id.* at 10.  Rather, Plymouth retreats in its Opposition to the narrow, untenable argument that, notwithstanding Defendants' accurate disclosure of financial data to the market throughout the Class Period, Defendants nonetheless made false or misleading material statements about the "growth prospects of OshKosh." *Id.* at 38-39.

But the Defendants' alleged misstatements were forward-looking statements that were accompanied by meaningful cautionary language and thus fall squarely within the protection of the Private Securities Litigation Reform Act ("PSLRA") safe harbor.  Acknowledging that Defendants' purported misstatements about OshKosh's growth prospects "implicat[e] the future," Plymouth nonetheless attempts to except the Defendants' statements from the PSLRA safe harbor by arguing that their statements were "made with then-current knowledge that

OshKosh sales were decreasing, and that customers were already reacting negatively to their chosen design strategy." *Id.* at 30. But the plain language of the PSLRA and the Eleventh Circuit's decision in *Harris v. Ivax Corp.*, 182 F.3d 799 (11th Cir. 1999), make clear that where, as here, a "[forward-looking] statement is accompanied by 'meaningful cautionary language,' the defendants' state of mind is irrelevant," and the statement is not actionable. *Id.* at 803.

Moreover, the forward-looking statements that Plymouth cherry picks and quotes in isolation were accurate when considered in their full context and in conjunction with the numerous accompanying cautious and negative statements regarding OshKosh's performance and future growth prospects. The sole support for Plymouth's assertion that Defendants were aware of "then-current facts" that somehow rendered their forward looking statements false is the purported opinions and anecdotal observations of terminated former employees who serve as so-called confidential witnesses. But the opinions and observations are not supported by any *facts*, let alone pled with the required particularity.

Nor does the Complaint establish that the Defendants had any motive to defraud. Plymouth clings to a series of gross distortions regarding the Individual Defendants' stock sales – all in an effort to impute an improper motive. But Plymouth's calculations, purporting to provide the percentage of shares that

Defendants sold during the Class Period, are wildly inaccurate because they ignore the Defendants' stock option holdings.  *See* Defs.' Br. at 42-44.  Further distorting the Defendants' stock sales, Plymouth continues to compare Defendants' sales in the *18-month* Class Period to the much shorter *one-year* period that preceded it. When these misleading distortions are corrected, there can be no inference of scienter, much less one "at least as compelling as any opposing inference" under *Tellabs Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007).

Finally, Plymouth's argument on loss causation – that OshKosh's purportedly diminishing "growth prospects" were actually revealed to the market three separate times over the course of the 18-month Class Period – utterly undermines Plymouth's core contention that OshKosh's allegedly "true" growth prospects were hidden from investors throughout the Class Period.

## ARGUMENT

I.  **THE ALLEGED MISSTATEMENTS ARE NOT ACTIONABLE UNDER THE PSLRA SAFE HARBOR FOR FORWARD-LOOKING STATEMENTS**

### A.  **The Alleged Misstatements Are Each Forward-Looking and Accompanied By Meaningful Cautionary Language**

Given Plymouth's concession in its Opposition that this action is predicated solely on statements about the future and OshKosh's "growth prospects," the statutory safe harbor of the PSLRA precludes the action.  The PSLRA makes

explicit that a defendant "shall not be liable with respect to any forward-looking statement . . . to the extent that":

> (A) the forward-looking statement is—
>
>> (i) identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement . . . .

15 U.S.C. § 78u-5(c)(1).  The statute is straightforward.  A statement falls within the statutory safe harbor and is not actionable if: (i) the statement is "forward-looking"; and (ii) is accompanied by "meaningful cautionary statements."  Where (as here) a statement has both features, it is not actionable because, as the Eleventh Circuit has held consistent with the plain text of the PSLRA, the statements are "immaterial as a matter of law."  *S.E.C. v. Merchant Capital, LLC*, 483 F.3d 747, 768 (11th Cir. 2007) (cautionary language rendered forward-looking projections "immaterial as a matter of law").  Plymouth attempts to avoid the preclusive effect of the PSLRA safe harbor by asserting – albeit half-heartedly – that Defendants' predictions about OshKosh's future "growth prospects" somehow are "not forward-looking statements" or were not accompanied by cautionary language.  Pl.'s Opp'n at 24-25, 33-34.  Neither assertion is supportable.

As to the contention that statements about future growth prospects are somehow not "forward-looking," the PSLRA defines a forward-looking statement to include a "statement containing a projection of revenues," "a statement of the plans and objectives of management for future operations," and "a statement of future economic performance."  15 U.S.C. § 77z-2(i).  This Circuit has accordingly held (as have numerous others) that statements regarding a company's growth potential are classic forward-looking statements under the PSLRA.  *See Theoharous v. Fong*, 256 F.3d 1219, 1226 (11th Cir. 2001) (statements "pertain[ing] to future economic performance . . . were forward-looking"); *In re Airgate PCS, Inc. Sec. Litig.*, 389 F. Supp. 2d 1360, 1372 (N.D. Ga. 2005) (statements are forward-looking so long as they "implicat[e] events in the future").  The alleged misstatements in the Complaint are nearly identical to ones specifically held by the Eleventh Circuit to be non-actionable.[1]  There is simply no

---

[1] *See* Defs.' Br. at 18-19; *see also Harris*, 182 F.3d at 804-05 (holding as forward-looking statements that company's "[r]eorders are expected to improve," its "fundamental business and its underlying strategies remain intact," and it is "well positioned"); *Amalgamated Bank v. Coca-Cola Co.*, No. Civ. A. 1:05-CV-1226, 2006 WL 2818973, at *5-8 (N.D. Ga. Sept. 29, 2006) (ruling as forward-looking statements that company was "confident [it] would meet its 11%-12% annual EPS growth target", that marketing programs were "growing," and that new initiatives were "expected to lead to growth"); *Airgate*, 389 F. Supp. 2d at 1372 (ruling as forward-looking statement "we expect to generate positive earnings").

credible argument that statements concerning OshKosh's future "growth prospects" are not "forward-looking" within the meaning of the PSLRA.

Plymouth's contention that there were no "meaningful cautionary statements" identifying risk factors that could cause actual results to differ materially from projections is also utterly inaccurate. That contention ignores the specific risk factors disclosed in Carter's annual reports, which were incorporated by reference into each of the earnings conference calls that Plymouth alleges contained misstatements. At the outset of each earnings call, the Defendants specifically warned investors that statements "other than those concerning historical information[] should be considered forward-looking statements," "that actual results may differ materially," and that investors should "refer to the Company's most recent annual report" for "a detailed discussion of factors that could cause actual results to vary from those contained in the forward-looking statements." *E.g.*, Declaration of Christopher G. Green in Supp. of Defs.' Mot. to Dismiss, dated July 17, 2009 ("Green Decl.") Ex. 4 (2/22/06 Earnings Call) at 1. These statements embody the very warning that numerous courts in this Circuit

6

have held constitutes meaningful cautionary language with respect to a company's future growth prospects.[2]

The risk factors contained in Carter's annual reports addressed the precise future events that ultimately came to pass.  In Carter's 2005 annual report on Form 10-K, released on March 15, 2006 (at the beginning of the alleged Class Period), Carter's specifically warned of the risk that the integration of OshKosh might not be as successful as planned, causing Carter's operating results to suffer:

> We may fail to realize the cost savings and other benefits that we expect from synergies and other cost reduction initiatives.  Since the due diligence phase of the [OshKosh] Acquisition we have been developing specific plans and timelines for integrating the OshKosh business. We may encounter difficulties during the integration process.  If we do not achieve our integration plans and the benefits and synergies we had anticipated, this could have an adverse effect on our operating results.

Green Decl. Ex. 5 (FY2005 Form 10-K) at 11.  As noted in Defendants' Opening Brief, the targeted warnings that Carter's provided to investors were far more specific than those previously held sufficient to constitute meaningful cautionary

---

[2] *See, e.g.*, *Skubella v. Checkfree Corp.*, No. 1:07-CV-796-TWT, 2008 WL 1902118, at *8 (N.D. Ga. Apr. 25 2008) (warning in press release "that the risks and uncertainties [presented] in the company's periodic reports 'could cause actual results to differ materially from plans and projections'" was meaningful cautionary language); *Amalgamated*, 2006 WL 2818973, at *6  (warning on conference call that forward-looking statements "should be considered in conjunction with the cautionary statements that are contained in our earnings release and . . . the company's most recent form 10-K" was meaningful cautionary language).

language in the Eleventh Circuit.  *See* Defs.' Br. at 22.  Indeed, it is difficult to imagine how the Defendants could have been any more precise and meaningful in the warnings they provided.[3]

Given the forward-looking nature of Defendants' alleged misstatements, and the meaningful cautionary language that accompanied them, Plymouth's allegation that the Defendants' statements about the future were "made with then-current knowledge" of decreasing sales and negative customer feedback, Pl.'s Opp'n at 30, is irrelevant as a matter of law.  The PSLRA unambiguously states that a statement is not actionable if it is "a forward-looking statement . . . accompanied by meaningful cautionary statements."  15 U.S.C. § 78u-5(c)(1).  Thus, in *Harris v. Ivax Corp.*, 182 F.3d 799 (11th Cir. 1999), the Eleventh Circuit held (as have a majority of the Circuits that have considered the issue)[4] that under the plain text of

---

[3] Carter's specifically warned investors of the very event that marks the end of the Class Period, *i.e.*, the disclosure of the goodwill impairment relating to OshKosh.  *See* Defs.' Br. at 21 (citing to FY2006 Form 10-K, which discusses the risk of a goodwill impairment resulting from the difficulty in projecting cash flow and other future financial metrics at OshKosh); *see also id.* at 22 (citing to 2/21/07 Form 8-K disclosing similar risk).  Although Plymouth has now abandoned its impairment theory, Pl.'s Opp'n at 38, this risk factor highlights the substance and precision of Carter's cautionary statements.

[4] *See Southland Securities Corp. v. Inspire Ins. Solutions, Inc.*, 365 F.3d 353, 371 (5th Cir. 2004); *Teamsters Local 175 v. Clorox Co.*, 353 F.3d 1125, 1131-32 (9th Cir. 2004); *Miller v. Champion Enters., Inc.*, 346 F.3d 660, 671-72 (6th Cir. 2003); *see also* H.R. Conf. Rep. 104-369, at 44 (1995), reprinted in 1995 U.S.C.C.A.N.

the PSLRA, "if a [forward-looking statement] is accompanied by 'meaningful cautionary language,' the defendants' state of mind is irrelevant." *Harris*, 182 F.3d at 803. Although the Defendants here had no knowledge of contrary facts, as detailed below in Section I.B.2, *Harris* holds that such predictive statements are not material, and thus not actionable as a matter of law, regardless of the Defendants' knowledge of any contrary facts. *See Merchant Capital,* 483 F.3d at 768 (holding that cautionary language in offering documents "rendered the projections immaterial as a matter of law, even if they were misrepresentations").

Thus, because the alleged misstatements in the Complaint are plainly forward-looking, and because those statements are accompanied by meaningful cautionary language, that is the end of the analysis required under the PSLRA and *Harris*. *See* 15 U.S.C. § 78u-5(c)(1) (PSLRA language); *Harris*, 182 F.3d at 803.

### B.    Plymouth Cannot Avoid the PSLRA Safe Harbor

Plymouth's allegations that the Defendants' forward-looking statements were "made with then-current knowledge that [i] OshKosh sales were decreasing, and [ii] that customers were already reacting negatively to their chosen design strategy" are insufficient to remove Defendants' statements from the protection of

---

730, 743 ("The first prong of the safe harbor requires courts to examine only the cautionary statement accompanying the forward-looking statement. Courts should not examine the state of mind of the person making the statement.").

the PSLRA safe harbor, not only because such allegations are irrelevant under Eleventh Circuit law, but also because they are simply unsupported by any particularized facts. A full reading of the Defendants' forward-looking statements and projections – not just cherry-picked snippets stripped of their factual and substantive context – shows that they were consistent with the known facts and even proved to be accurate. *See Grossman v. Novell, Inc.*, 120 F.3d 1112, 1120 (10th Cir. 1997) ("[S]tatements must be analyzed in context when determining whether or not they are materially misleading.").

> 1.     The Defendants' Forward-Looking Statements and Projections
> <u>About OshKosh's Future Performance Were Accurate</u>

Starting with the very first earnings call made within the alleged Class Period, on February 22, 2006, during which Carter's reported the fourth quarter 2005 results, Carter's made clear that the OshKosh turnaround effort was facing challenges. When discussing "OshKosh's wholesale business in the first half [of 2006]," Mr. Casey, Carter's Chief Financial Officer, explained that "the best thing we could say about it is that we have stopped the decline that they have had in their wholesale business probably over the past three or four years." Green Decl. Ex. 2 at 1 (citing 2/22/06 Earnings Call). Carter's management went on to forecast that they "expect OshKosh will be dilutive in the first half of 2006" and that they were "plan[ning] the first half flat as [they] continue to cleanup the OshKosh wholesale

distribution channel." *Id.* at 2.  And Mr. Rowan, Carter's Chief Executive Officer, warned: "It's important to realize that [the OshKosh brand] will take some time to reach the potential." *See id.* at 1; Am. Compl. ¶¶ 53-60.  He specifically cautioned investors not to have unrealistic expectations about OshKosh's turnaround.  *See* Green Decl. Ex. 2 at 1.

Notwithstanding these cautious (if not negative) forecasts and warnings, Plymouth claims that investors listening to this earnings call were somehow misled about OshKosh's "growth prospects."  Purporting to support that contention, Plymouth latches on to a forecast for the second half of 2006 – looking six to nine months out from the time of the call – that OshKosh could turn around and achieve "double-digit" sales growth.  That forecast, according to Plymouth, was a purportedly false and misleading statement because Defendants "knew from advance wholesale orders that sales would decrease, not increase by 'double digits'" *See* Pl.'s Opp'n at 26-28 (citing Am. Compl. ¶¶ 53, 55, 57-59).  But as set forth below in Section I.B.2, the Complaint pleads no facts – literally none – to support their allegation that Defendants "knew" in February 2006, that double-digit growth in the second half of 2006 was not attainable.  Moreover, when read in the context of OshKosh's expected "dilutive" and "flat" performance in the near term and Defendants' guarded statements regarding a turnaround, the Defendants'

forward-looking statements about OshKosh's growth prospects were plainly not false or misleading.

Two months later, on an earnings call held on April 26, 2006 (reporting Q1 2006 results), Carter's announced that it was revising its forecasts given OshKosh's continuing troubles. Carter's projected that there would not likely be double-digit growth, but rather, sales would likely be "flat" for the second half of 2006. *See* Green Decl. Ex. 2 at 3 (citing 4/26/06 Earnings Call); Am. Compl. ¶ 62. Mr. Rowan reminded investors "[w]e are looking together to 2 or 3 year plans for growth," and he again reiterated that the turnaround was "going to take some time." *See* Green Decl. Ex. 2 at 3. Mr. Casey further emphasized that the turnaround process would take "a couple of years." *Id.* at 4.

Ignoring the downward revision of forecasts for the second half of 2006 and the cautionary statements that accompanied that downward revision, Plymouth seizes upon snippets of encouraging words in which Defendants referred to OshKosh's "progress" and "excellent feedback from . . . accounts" and argues that they somehow misled investors about OshKosh's "growth prospects." *See* Pl.'s Opp'n at 28 (citing Am. Compl. ¶ 62). But those optimistic snippets could not conceivably have "misled" investors given their context.

12

Only three months later, on July 26, 2006, Carter's reported its earnings for the second quarter of 2006. Armed with additional information, Carter's once again downwardly revised its guidance for the second half of the year. Carter's announced that, rather than OshKosh sales being "flat" for the remainder of 2006, Carter's now expected OshKosh wholesale sales to be *down*. Green Decl. Ex. 2 at 4-5 (citing 7/26/06 Earnings Call). Carter's stock price fell 12% on this news. Despite that development, Plymouth nonetheless maintains that investors were misled on the call about OshKosh's "growth prospects" – not, however, about the "second half of 2006," but rather about "spring '07 bookings." Pl.'s Opp'n at 28. In the face of an expected (and announced!) sales decline for the rest of 2006, how could any reasonable investor be misled into thinking that OshKosh's "growth prospects" were anything but uncertain? But Plymouth alleges no facts – not a single one – showing how Defendants somehow knew in July 2006 that their expectations for OshKosh in spring 2007 were supposedly "false."

Each of the earnings calls that followed on October 25, 2006 (reporting Q3 2006 results), February 21, 2007 (reporting Q4 2006 results), and April 25, 2007 (reporting Q1 2007 results), provided investors with further negative earnings guidance and cautious prognosis for OshKosh's growth prospects. Yet, as with the statements above, Plymouth improperly cherry picks optimistic words from those

calls, ignores their factual and substantive context, and alleges that they were somehow misleading.[5]

Not only does Plymouth ignore substantive context, but it also completely ignores the actual numerical forecasts of OshKosh's "growth prospects." A review of Carter's sales guidance, revised as more information developed, shows that the Company's estimates of OshKosh's future performance were not just reasonable, but they also proved to be materially accurate. The chart below shows that Carter's projections of OshKosh's sales – taken from the very same transcripts of earnings calls cited by Plymouth – closely track the eventual and actual quarterly sales results:

---

[5] On the October 25, 2006 earnings call, Defendants noted that "[Q4 2006] sales will be $93 million, down 11%," Green Decl. Ex. 2 at 6, but Plymouth purports to be misled by statements regarding "executing the right strategies" and the "opportunity to turn the OshKosh business around," Pl.'s Opp'n at 29. On the February 21, 2007 earnings call, Defendants noted that Q1 2007 sales were "projected to be $67 million, down 5% from 2006" and that "spring selling is off to a slow start," Green Decl. Ex. 2 at 7, 8, but Plymouth purports to be misled by statements regarding "position[ing] OshKosh for bigger things" and "continued growth," Pl.'s Opp'n at 29-30. On the April 25, 2007 earnings call, Defendants projected Q2 2007 sales "to be down 5%" because "selling of Spring product is below our expectations," Green Decl. Ex. 2 at 10, but Plymouth purports to be misled by the (true and unchallenged) statement that "summer bookings . . . were up 20% to last year" over a three-week period, Pl.'s Opp'n at 30.

| Fiscal Quarter | OshKosh Net Sales – Guidance (in millions) | OshKosh Net Sales – Actual (in millions) |
|---|---|---|
| 1Q2006 (Jan. 1 – Mar. 31) | $70.0 (released 2/22/06) | $71.0 (released 4/25/06) |
| 2Q2006 (Apr. 1 – June 30) | $71.0 (released 4/26/06) | $71.1 (released 7/26/06) |
| 3Q2006 (July 1 – Sept. 30) | $94.0 (released 7/26/06) | $88.5 (released 10/25/06) |
| 4Q2006 (Oct. 1 – Dec. 31) | $102.0 (released 7/26/06) $93.0 (revised 10/25/06) | $94.8 (released 2/20/07) |
| Total Fiscal 2006 | $350.0 (released 2/22/06) $340.0 (revised 4/26/06) $330 to $338 (revised 7/26/06) $323.0 (revised 10/25/06) | $325.5 (released 2/28/07) |
| 1Q2007 (Jan. 1 – Mar. 31) | $67.0 (released 2/21/07) | $70.8 (released 4/24/07) |
| 2Q2007 (Apr. 1 – June 30) | $67.5 (released 4/25/07) | $59.1 (released 7/24/07) |

*See* Defs.' Br. at 11-12; Green Decl. Ex. 2.

In sum, nowhere in the Complaint or in its Opposition does Plymouth establish that Defendants' forward-looking statements and projections about OshKosh's "growth prospects" were false. Indeed, the documents incorporated in the pleadings establish precisely the opposite. The Defendants were clear about the risks attendant to the turnaround of OshKosh; they were clear all along that

they faced challenges; they revised forecasts as the turnaround effort unfolded and as more facts become available; and their forecasts and projections – far from misleading – were responsible and proved to be accurate. There simply was no fraud, and cherry-picked snippets taken out of context, which at most can be described as cautious optimism, cannot give rise to a securities fraud action.[6]

2.    The Confidential Witnesses Do Not Supply Any "Then-Current Facts" That Rendered Defendants' Forward-Looking Statements False When Made

Plymouth's Opposition contains a chart at pages 26-30 of purported opinions and anecdotal observations of confidential witnesses that supposedly "demonstrat[es] why [Defendants'] misrepresentations were based on knowledge of then-current facts" about (i) declining advance sales orders and (ii) negative customer feedback. Pl.'s Opp'n at 26-30 (citing to Am. Compl. ¶¶ 48-50, 55, 73). But these supposed observations fail to advance any particularized facts to support Plymouth's conclusory assertions. Before detailing the fatal deficiencies of each Confidential Witness, certain dispositive defects common to all of them bear emphasis:

_____

[6] As Defendants' Opening Brief sets forth in detail, the kinds of alleged misstatements that Plymouth ultimately relies upon, in the absence of any plausibly misstated *facts*, are immaterial statements of puffery and corporate optimism that are not actionable under controlling legal principles. Defs.' Br. at 29-31.

First, as a threshold matter, the confidential witnesses are four former, low-level employees whose duties were limited in scope (in a Company that employs as many as 8,000 people at any one time). None of them has or ever had direct personal knowledge of OshKosh's business as a whole, much less Carter's company-wide financial forecasts. Mere anecdotal opinion cannot, as a matter of law, be the basis for a securities fraud suit.[7]

Second, none of the confidential witnesses alleges any facts establishing that there were "clear decreases in advance wholesale orders," Pl.'s Opp'n at 1, let alone particularized facts quantifying the number of purportedly reduced orders, what (if any) percentage decrease there was, when (if ever) that decrease became known, and whether (if at all) it had any impact (let alone a material impact) on OshKosh's wholesale business, much less on Carter's business as a whole.[8] That

---

[7] *See Alaska Elec. Pension Fund v. Adecco S.A.*, 434 F. Supp. 2d 815, 826 (S.D. Cal. 2006) (declining to credit allegations attributed to confidential witnesses who "appear to be low-level employees" and as to whom the complaint failed to supply any basis for knowledge regarding "the Company's worldwide financial statements")*; In re Petco Animal Supplies Inc. Sec. Litig.*, No. 05-CV-0823-H (RBB), 2005 WL 5957816, at *21 (S.D. Cal. Aug. 1, 2005) (agreeing with defendant that "the anecdote of a single store . . . is insufficient to support Plaintiffs' broad claim of an effect on the stock price in any particular quarter").

[8] Moreover, in failing to allege the amount of the alleged advance wholesale decline, Plymouth also fails to allege the materiality of the purportedly concealed information. Notably, the Complaint addresses advance sales figures and negative customer reaction solely in the OshKosh *wholesale segment*, which accounted for a

is all missing.[9]  Left with the bare assertion that there were "clear decreases in advance wholesale orders," *id.*, the Complaint fails to meet the particularity requirements of the PSLRA and Rule 9(b).  *See, e.g.*, *Kane v. Madge Networks N.V.*, No. C-96-20652-RMW, 2000 WL 33208116, at *8 (N.D. Cal. May 26, 2000) (dismissing complaint where "nowhere do plaintiffs allege what good-faith earnings projections *would* have been, nor do they present the facts that would go into making such projections.").

Third, as to the purported "negative customer feedback," not a single fact is pled that shows that *customers*, as opposed to two or three isolated OshKosh employees, were reacting negatively to changes in OshKosh designs. The Complaint cites to confidential witnesses and unnamed "employees" who were

mere 6.1% of Carter's FY 2007 sales.  Thus, for instance, even if the 45% decrease in OshKosh wholesale sales for the second quarter of 2007, which was disclosed on the last day of the alleged Class Period, were disclosed at an earlier point in time, the result to Carter's net sales would have only been a decrease of approximately 1.6% based on the aggregate sales figures in Carter's 2007 Form 10-K.  See Green Decl. Ex. 32 (FY2007 Form 10-K) at 19.  Inaccuracies of 1-2% are not material to a Company's business as a matter of law.  *See Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 547 (8th Cir. 1997) (2% not material); *In re PetSmart, Inc. Sec. Litig.*, 61 F. Supp. 2d 982, 994 (D. Ariz. 1999) (1.8% not material).

[9] Similarly, Plymouth alleges that wholesale customer Macy's West "was not carrying any OshKosh clothing at all" by fall 2006.  *See* Pl.'s Opp'n at 6, 8, 28, 32; Am. Compl. ¶ 73.  But nowhere does the Complaint allege any facts to establish any impact, much less a material impact, to Carter's business of any reduced orders from Macy's West (which no longer even exists).

allegedly of the opinion that "rather than 'fixing' OshKosh, Carter's was making the OshKosh product worse."  Am. Compl. ¶ 49; Pl.'s Opp'n at 5-6.  But missing is any factual allegation concerning *customers'* views.  There are no allegations as to *what* the customer feedback was, *when* it was purportedly received, to which products it related, and what (if any) impact it had on OshKosh's business or "growth prospects," let alone Carter's business as a whole.  *See In re Spectrum Brands, Inc. Sec. Litig.*, 461 F. Supp. 2d 1297, 1310 (N.D. Ga. 2006) (holding "anecdotal" confidential witness allegations insufficient to state a claim).

Finally, nowhere in the Complaint is there any fact-based allegation that any Individual Defendant knew about any purported "decreases in advance wholesale orders" or "negative customer feedback."  And because the confidential witness allegations are, on their face, purely anecdotal, they do not allege with particularity how, when, or even whether Carter's management knew of "decreases in advance wholesale orders" or "negative customer feedback" that somehow rendered their forward-looking statements false when made.  Plymouth's Opposition concedes this defect, and admits that the Complaint is not "assert[ing] that the confidential

19

witnesses 'knew' what the Individual Defendants 'knew.'" *See* Pl.'s Opp'n at 42. The Opposition does not explain, however, why that defect is not dispositive.[10]

As to the additional deficiencies specific to each confidential witness:

<u>CW1.</u> – The Complaint relies on CW1, a former low-level manager at OshKosh, for the proposition that "Carter's was aware by the summer of 2006 at the latest, that the fall OshKosh line would be a failure in sales terms." Am. Compl. ¶ 48. CW1 also purportedly observed that "Carter's 'played around' with the styling of the OshKosh brand by placing more 'needles, bells and whistles' into the product in order to position OshKosh at a higher price point," which "backfired on Carter's, as it became evident during 2006 that OshKosh sales were slumping." *Id.* These allegations are entirely conclusory and are unadorned by any *facts*.

Furthermore, the timing of CW1's own alleged observations undermines Plymouth's claim. CW1 opines that Defendants were aware "by the summer of 2006 at the latest" that the fall OshKosh line would be a failure. And yet the Complaint acknowledges that, in an earnings call *on July 26, 2006*, Carter's disclosed to the market "CW1's conclusion that the Fall 2006 OshKosh redesign

---

[10] Plymouth's failure to plead "actual knowledge" is dispositive not only of its efforts to escape the PSLRA safe harbor, but also of its attempt to plead scienter. As described below, it falls well short of pleading a "cogent and compelling" inference that the Defendants had knowledge of any purportedly contradictory "then-current" facts. *See infra* Section II.A (discussing scienter).

was a failure." *Id.* ¶ 69.  Thus, the alleged "truth" about OshKosh sales, which, according to CW1, was not known by the Defendants until the summer of 2006, was promptly revealed to the market on July 26, 2006.  CW1 accordingly does not establish that Defendants knew about any alleged "truth" during the Class Period *any earlier than when they disclosed those developments to the market.*

CW2. – The Complaint also cites to the observations of CW2, a former middle manager at OshKosh.  Carter's terminated CW2's employment in March 2006 – one month after the February 1, 2006 start of the alleged Class Period.  *See* Am. Compl. ¶ 49.  There is only one alleged misstatement prior to March 2006, and CW2 offers no specific allegations whatsoever concerning that purported misstatement.  There can be no factual basis for any observation by CW2 for the sixteen months of the Class Period following CW2's termination.[11]

CW3. – The Complaint relies on CW3, an assistant store manager, for the assertion that "after the acquisition, there was a noticeable deterioration of quality . . . and a corresponding increase in returns." *Id*. ¶ 49.  This view by a low-level employee in a single retail store (out of 157 OshKosh retail stores at the end

---

[11] *See City of Austin Police Ret. Sys. v. ITT Educ. Servs., Inc.*, 388 F. Supp. 2d 932, 942 (S.D. Ind. 2005) (finding defective confidential witness testimony that "fail[ed] to establish that the witnesses were employed during the class period or that the witnesses had personal knowledge of the facts they reported").

of 2006, *see* Green Decl. Ex. 32 (2007 Form 10-K), at 6), is deficient on its face because it is pure opinion and it supplies no facts particularizing the scope, nature, impact, or even existence of some supposed product problem. *See, e.g.*, *supra* n.7.

CW4. – Finally, the Complaint relies on CW4, a former OshKosh district manager, for the "observation that Carter's design changes lessened the quality and durability of OshKosh clothing, and . . . had a marked negative effect on actual sales." Am. Compl. ¶ 50. Apart from offering no detail about the size of any purported effect on sales, when (or if) such effect became known, or whether it had a material impact on OshKosh or Carter's business, CW4's observations are inadequate because CW4 was terminated by Carter's in March 2006, *see id.* ¶¶ 50, and the first Carter's-designed line of OshKosh product did not reach the shelves until fall 2006 – months after CW4 was terminated. *See id.* ¶ 49.

The purported observations of Plymouth's four confidential witnesses simply do not allege with any particularity that the Defendants were somehow aware of "then-current facts" that rendered any forward-looking statements false when made. Thus, even looking past the holding of *Harris,* the Defendants' forward-looking statements, which followed meaningful cautionary language, remain within the statutory safe harbor of the PSLRA and are not actionable.

22

## II.    PLYMOUTH'S SCIENTER ARGUMENTS ARE NOT SUPPORTED BY THE CASE LAW OR THE PLEADINGS

### A.    Plymouth Fails to Plead "Actual Knowledge" of Falsity by Any Individual Defendant

For the reasons set forth above (*see* Section I.B.), Plaintiff has not established that the Defendants had "actual knowledge" that their forward-looking statements about OshKosh's future "growth prospects" were false when made.  As noted above, not one of the confidential witnesses' allegations establishes that any Individual Defendant had any interaction with the confidential witnesses or possessed actual knowledge of the confidential witnesses' anecdotal opinions and generic observations.  *See* Am. Compl. ¶¶ 48-50.  Although it acknowledges these deficiencies, Plymouth argues that its concession is "of no moment" because "none of their testimony relies on such interactions."  Pl.'s Opp'n at 42.  Far from being "of no moment," the concession is dispositive.  Plymouth cannot establish "actual knowledge" by relying solely on confidential witnesses who do not – and cannot – provide specific facts giving rise to a "cogent and compelling" inference as to what the Individual Defendants actually knew.  What the Complaint lacks is precisely what the Supreme Court requires in *Tellabs*.  *See Tellabs*, 551 U.S. at 310.

In the absence of any allegations of actual knowledge or recklessness, Plaintiff relies solely on allegations of "motive and opportunity," which are

insufficient to plead scienter under Eleventh Circuit law, *see Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1285-86 (11th Cir. 1999), and in any event are defective in their own right.

### B. Plymouth Continues to Distort the Defendants' Stock Sales

In its Opposition, Plymouth again mischaracterizes the Defendants' stock sales in an effort to impute to the Individual Defendants some improper motive to defraud. Pl.'s Opp'n at 43-47. Plymouth distorts the sales in two respects: (i) Plymouth excludes vested and exercisable options from each Defendant's "total holdings" in an effort to show a higher percentage of sales during the Class Period; and (ii) Plymouth uses what courts have held to be an "unusually long" class period of 18 months to make it appear as if an unusual amount of stock was sold, and Plymouth then compounds that distortion by improperly comparing the stock sales in that 18-month period to only the prior 12 months.

As to the first distortion, the Defendants' Opening Brief exposed Plymouth's gross miscalculation of each Individual Defendant's "holdings," which improperly excluded hundreds of thousands of vested and exercisable stock options that each Individual Defendant retained.[12] Plymouth offers no basis in reason or case law to

---

[12] A vested or exercisable option may be exercised and sold at any point. Plymouth confuses this with unvested or non-exercisable options that are contingent upon some further time or event. *See* Pl.'s Opp'n at 44 (discussing

support its position that a defendant's "holdings" for purposes of scienter analysis should include only common stock. *See* Pl.'s Opp'n at 43-44.[13] Plymouth instead relies solely on a series of inapposite cases in which the court did not consider the impact of vested stock options because either such information was not available or the court was not asked to do so.[14] Those cases do not support Plymouth's untenable suggestion that vested and exercisable options should not be included in calculating a defendant's holdings. *See* Defs.' Br. at 42-45 (citing cases).

---

performance-based options). When, however, such unvested or non-exercisable options are included, the percentages of stock sold relative to total holdings decline even further. *See* Defs.' Br. at 44 n.19.

[13] Indeed, given that Plymouth has chosen to include Defendants' exercise of vested stock options as "sales" for the purpose of calculating Defendants' sales, there is no logical reason why options should not also be counted in determining the percentage of Defendants' total holdings that those sales constituted. Defs.' Br. at 42 (citing Am. Compl. ¶ 121 and Forms 4).

[14] *See No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. West Holding Corp.*, 320 F.3d 920, 939 n.16 (9th Cir. 2003) (deriving stock sale percentage from "common stock and exercised options" only, without indication as to whether defendants had further options or whether the court was asked to consider such options); *Zishka v. Am. Pad & Paper Co.*, No. 3:98-CV-0660-M, 2000 WL 1310529, at *1, 2 n.3 (N.D. Tex. Sep. 13, 2000) (dismissing an "undetailed and conclusory" complaint that did not present "admissible record evidence" from which the court could consider claims about impact of the defendants' stock options); *In re Oxford Health Plans, Inc. Sec. Litig.*, 187 F.R.D. 133, 140 (S.D.N.Y. 1999) ("[W]ithout more information, this Court cannot evaluate the true value of the options exercised by the Individual Defendants."). Although the *Oxford* case stated that "vested options are not shares," *id.*, this statement has been ignored by subsequent courts as mere dicta that contradicts the case's holding. *See In re eSpeed, Inc. Sec. Litig.*, 457 F. Supp. 2d 266, 291 n.184 (S.D.N.Y. 2006).

As to the second distortion, Plymouth chose an unduly long class period of 18 months, which has the effect of artificially exaggerating the Defendants' stock sales. As the court stated in *In re Vantive Corp. Securities Litigation*:

> [T]he plaintiffs have selected an unusually long class period of sixty-three weeks. It is obvious why they have done so; it is not because the allegations found elsewhere in the complaint support an inference of fraud throughout the class period, but because lengthening the class period has allowed the plaintiffs to sweep as many stock sales into their totals as possible, thereby making the stock sales appear more suspicious than they would be with a shorter class period.

283 F.3d 1079, 1092 (9th Cir. 2002) (internal citations omitted); *see id.* (describing a class period of 63 weeks as "unusually long"); *Malin v. XL Capital Ltd.*, 499 F. Supp. 2d 117, 150 (D. Conn. 2007) (describing as "exceedingly lengthy" a class period that lasted 102 weeks).[15] Plymouth compounds the distortion by continuing to compare the amount of sales in the 18-month Class Period to the 12-month period that preceded it. Such an apples-to-oranges comparison cannot give rise to any inference of improper motive. Defs.' Br. at 45-47. Plymouth fails to correct this misleading comparison in its Opposition. *See* Pl.'s Opp'n at 45-46. When

---

[15] The competing non-culpable inferences are especially strong in this case where the Class Period begins only a little over two years after Carter's initial public offering in October 2003. Prior to that time, the Individual Defendants had been unable to sell the hundreds of thousands of stock and stock options they had accumulated while Carter's was a privately held company. *See* Green Decl. Ex. 32 (FY 2007 10-K) at 1.

these distortions are corrected, the stock sales simply do not raise any suspicion, much less give rise to a "compelling" inference of scienter. *See* Defs.' Br. at 41-47.

Unable to advance a cogent (or even accurate) theory of "motive" based on Defendants' stock sales, Plymouth resorts to the contention that each Individual Defendant made a notable sum of money. But where, as here, the Defendants sold only 19% to 42% of their total holdings during the alleged (and protracted) Class Period, the dollar amount of the proceeds is irrelevant.[16]

### C.    The Absence of Any "Dumping" of Stock Following the Stock Repurchase Program Refutes Any Inference of Scienter

Plymouth asserts that the Individual Defendants devised the stock repurchase program in order to "*further* inflate [Carter's] stock price, leading to an even larger payoff when management dumped their stock, prior to the truth about OshKosh finally being revealed [in July, 2007]." Pl.'s Opp'n at 49-50. But the

---

[16] *See eSpeed*, 457 F. Supp. 2d at 290 ("It does not suffice to point in isolation to the combined proceeds of defendants . . . and claim that this 'patently significant' dollar amount alone establishes scienter."); *In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 445 (S.D.N.Y. 2005) ($60 million sold during Class Period did not establish motive); *Frazier v. VitalWorks, Inc.*, 341 F. Supp. 2d 142, 163 (D. Conn. 2004) ("The lesson from these cases is that dollar amounts cannot be considered in isolation.") (citations omitted); *In re Keyspan Corp. Sec. Litig.*, 383 F. Supp. 2d 358, 382-83 (E.D.N.Y. 2003) ($58 million sold during Class Period did not establish motive and was "misleading, given that it comprises two sets of sales six months apart").

Defendants did not "dump" their stock prior to the end of the alleged Class Period. Instead, they held between 58% and 81% of their total holdings. *See* Defs.' Br. at 42-45; Section II.B, *supra*. Nor was the amount of stock they sold after the initiation of the stock repurchase program disproportionate to what they sold before. *See* Am. Compl. ¶ 121 (chart of alleged Class Period stock trades). So if the stock repurchase program was a set-up to facilitate a "dumping" of shares, the Individual Defendants somehow forgot to follow through. There simply was no "dumping" of stock, and there can be no "cogent and compelling" inference that the Individual Defendants sought to mislead the market for their own gain.

## III.    PLYMOUTH'S THEORY OF "PARTIAL" <u>DISCLOSURES IS TORTURED</u>

Plymouth now argues in its Opposition that the Defendants' purported fraud was actually revealed over time in two so-called "partial" disclosures that took place on July 26, 2006 and February 13, 2007, with a third disclosure of the so-called "entire truth" on July 24, 2007. Pl.'s Opp'n at 14-15, 19-20, 50-54. But the disclosures on July 26, 2006 and February 13, 2007 were not "partial." Far from it. As information became available, Carter's revised its outlook and disclosed on July 26, 2006 that sales were projected to be down (rather than flat) for the remainder of 2006, *see* Green Decl. Ex. 2 at 5, and Carter's disclosed on February 13, 2007 that it was lowering its sales forecasts for all of 2007, *see* Green Decl. Ex.

2 at 6-7.  As to what information was supposedly withheld until July 24, 2007,

Plymouth argues:

> [T]he 'corrective truth' was not the impairment charge,
> per se, but also the concomitant announcement that
> OshKosh wholesale sales had plummeted 45% *from the
> same period* the prior year, and the acknowledgement by
> management, belatedly, that OshKosh had *no* growth
> prospects at all.  [Am. Compl.] ¶¶ 114-116.

Pl.'s Opp'n at 53 (bold emphasis added).  Plymouth acknowledges (indeed

explicitly concedes) that it is not alleging that the impairment charge should have

been recorded earlier or that the disclosure of that charge "corrected" any prior

falsity.  Instead, Plymouth says the "truth" – supposedly withheld from the

disclosures a year earlier – was a drop in sales of 45% *in the second quarter of

2007*.  How a development in the second quarter of 2007 could have been known –

let alone intentionally withheld from disclosure – as much as a year earlier is

unexplained.  Plymouth also argues that the additional withheld truth was that

"Oshkosh had *no* growth prospects."  *Id.*  But management did not say anything of

the sort, and has not ever done so.

In sum, Plymouth does not – and cannot – identify any information withheld

from the two earlier disclosures it cites.  As a result, Plymouth's characterization of

those disclosures as "partial" is a gross distortion and one without any basis in fact.

The July 2007 call simply disclosed new developments once that information

became known.  It did not "correct" any prior disclosure.  Nor did it "complete" any prior "partial" disclosures.  A disclosure of current or predicted earnings results is insufficient to establish loss causation where those results fail to correct any prior alleged misstatement.  *See, e.g.*, *Cole v. Health Mgmt. Associates, Inc.*, No. 2:07cv00484-FtM-UA-DNF, 2009 WL 2713178, at *11 (M.D. Fla. July 17, 2009) (Loss causation cannot be shown where a public statement "does not constitute a 'disclosure' that revealed 'true' facts which had previously been misrepresented or concealed").[17]

---

[17] Plymouth asserts that Defendants make "no mention of the volume of stock traded following the corrective disclosures alleged in the Complaint," which they allege was "much heavier . . . than the daily average during the class period."  Pl.'s Opp'n at 54.  But a stock price drop on high market trading volume frequently and naturally follows any company announcement that timely discloses new negative news to the market, which is all that occurred here and which by no means reveals any fraud.  *See, e.g.*, *In re PEC Solutions, Inc. Sec. Litig.*, No. 03-CV-331, 2004 WL 1854202, at *11 (E.D. Va. May 25, 2004) (declining to find loss causation as to purported corrective disclosure that "caus[ed] the stock to lose over 40% of its market value . . . on 17-times its average daily volume").

## **CONCLUSION**

For the reasons stated above and for the reasons stated in Defendants' Opening Brief, the Defendants respectfully request that this Court dismiss Plymouth's Amended Complaint with prejudice, in its entirety.

Dated: October 22, 2009

|  |  |
|---|---|
|  | By: /s/ Patrice Russell Walker |
| Randall W. Bodner (pro hac vice) | J. Marbury Rainer |
| Christopher G. Green (pro hac vice) | Ga. Bar No. 592225 |
| William J. Dunn | Patrice Russell Walker |
| Ropes & Gray LLP | Ga. Bar No. 266983 |
| One International Place | Parker Hudson Rainer & Dobbs |
| Boston, MA 02110-2624 | 285 Peachtree Center Avenue, N.E. |
| (617) 951-7000 | 1500 Marquis II Tower |
| RBodner@ropesgray.com | Atlanta, GA 30303 |
| Christopher.Green@ropesgray.com | (404) 420-5564 |
|  | jmr@phrd.com |
| Russell L. Lippman (pro hac vice) | pwalker@phrd.com |
| Ropes & Gray LLP |  |
| 1211 Avenue of the Americas |  |
| New York, NY 10036-8704 |  |
| (212) 596-9000 |  |
| Russell.Lippman@ropesgray.com |  |

*Attorneys for Defendants Carter's, Inc., Frederick J. Rowan, II, Joseph Pacifico, Michael D. Casey, and Charles E. Whetzel, Jr.*

## <u>CERTIFICATION OF COMPLIANCE WITH LR 7.1D, ND Ga.</u>

Counsel hereby certifies that, pursuant to LR 7.1D, ND Ga., this filing has been prepared in an approved font, namely Times Roman 14. Counsel hereby certifies that the margins are in compliance with LR 7.1D.

PARKER HUDSON RAINER
& DOBBS LLP

By: <u>/s/ Patrice Russell Walker</u>
Patrice Russell Walker

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have this day filed a copy of the within and foregoing **REPLY MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE PLAINTIFF'S AMENDED CLASS ACTION COMPLAINT** with the Clerk of Court using the CM/ECF system which automatically sent e-mail notification of such filing to the following attorneys of record, who are registered participants in the Court's electronic notice and filing system:

Alan I. Ellman, Esq.
Christopher J. Keller, Esq.
Jonathan Gardner, Esq.
Labaton Sucharow LLP
140 Broadway
New York, NY 10005

James M. Evangelista, Esq.
David J. Worley, Esq.
Page Perry LLC
Suite 1050
1040 Crown Pointe Parkway
Atlanta, GA 30338

Lionel Z. Glancy, Esq.
Michael G. Goldberg, Esq.
Glancy Binkow & Goldberg, LLP
Suite 311
1801 Avenue of the Stars
Los Angeles, CA 90067

This 22nd of October, 2009

/s/ Patrice R. Walker
Patrice Russell Walker