# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF GEORGIA

| | |
|---|---|
| In re<br>CARTER'S, INC.<br>SECURITIES LITIGATION | )   Civil Action No. 1:08-CV-2940-JOF<br>)<br>)<br>)   **FIRST AMENDED AND**<br>)   **CONSOLIDATED CLASS ACTION**<br>)   **COMPLAINT FOR VIOLATIONS**<br>)   **OF FEDERAL SECURITIES LAWS**<br>)<br>)   **JURY TRIAL DEMANDED**<br>) |

# TABLE OF CONTENTS

I. PRELIMINARY STATEMENT ...........................................................1

II. NATURE OF THE ACTION ...........................................................2

III. JURISDICTION AND VENUE ......................................................14

IV. PARTIES ..................................................................................15

    A.   Lead Plaintiff and Additional Plaintiff...............................15

    B.   Defendants .......................................................................16

         1.   The Company ...........................................................16

         2.   The Individual Defendants.........................................17

         3.   The Auditor Defendant .............................................20

V. CONTROL PERSON ALLEGATIONS............................................20

VI. CLASS ACTION ALLEGATIONS.................................................24

VII. FACTUAL ALLEGATIONS RELATING TO THE
ACCOMMODATIONS FRAUD.......................................................26

    A.   Background Facts ..............................................................26

    B.   Meaningless "Internal Controls" Over Financial Reporting .................27

    C.   A Tight-Knit, Tightly Controlled Executive Culture ...........................30

    D.   The Defendants Scapegoat the Sales Department ................................32

    E.   Defendants' Materially False and Misleading Statements and
Omissions Relating to the Accommodations Fraud.........................34

    F.   The Individual Defendants' Annual Cash Bonus Was Tied to
Carter's Earnings ..........................................................37

    G.   The Individual Defendants' Stock-Based Compensation ....................43

    H.   The Individual Defendants Ensure that Adjusted EPS Exceeds
Company Guidance.........................................................47

I.     The Truth Begins to Emerge ................................................................. 50

J.     The Full Truth about Accommodations is Revealed ............................ 52

K.     Post Class Period Events ..................................................................... 52

    1.     Carter's Restatement ................................................................... 52

        (a)     The Length and Materiality of the Restatement .............. 57

    2.     The Accommodations Fraud Prompts Government
        Investigations ............................................................................. 61

VIII.  CARTER'S MATERIALLY FALSE  ACCOUNTING AND
    FINANCIAL REPORTING .......................................................................... 61

A.     Overview of GAAP Requirements ...................................................... 61

    1.     Materiality .................................................................................. 64

B.     Carter's Class Period Financial Statements Violated GAAP ............... 65

    1.     Cookie Jar Accounting via Improper Booking of
        Accommodation Payments ........................................................... 67

    2.     Lack of Internal Controls ............................................................ 70

IX.  PwC'S ROLE IN THE ACCOMMODATIONS FRAUD .............................. 72

A.     PwC Was Not an Independent Auditor under the AICPA ................... 72

    1.     PwC Failed to Exercise Due Professional Care and
        Professional Skepticism .............................................................. 74

B.     PwC's Deficient Audits of Carter's Financial Statements ................... 77

    1.     PwC's Certifications .................................................................... 78

C.     Overview of GAAS ............................................................................. 86

D.     PwC's GAAS Violations ..................................................................... 88

E.     GAAS Required PwC to Consider Risk Factors as Part of Audit
    Planning .............................................................................................. 90

F.   Red Flags Recklessly or Deliberately Disregarded by PwC ................93

1.   Overstated Accounts Receivable ................................................93

2.   PwC's Inappropriate Relationship with Casey and North ..........94

3.   Material Overstatement of Earnings at the End of FY 2003 ........95

4.   Duration of the Fraud ...............................................................96

5.   Flux Balance Sheets .................................................................96

6.   Material Weaknesses in Internal Controls ................................97

X. FACTUAL ALLEGATIONS RELATING TO THE OSHKOSH FRAUD ....103

A.   Carter's Acquires OshKosh ...........................................................103

B.   Carter's Touts OshKosh As a Growth Story .....................................106

C.   The OshKosh Defendants Know That Their Plan to "Fix"
     OshKosh is Not Working ...............................................................111

D.   The OshKosh Defendants' Materially False and Misleading
     Statements and Omissions Relating to the OshKosh Fraud .............116

1.   February 22, 2006 Earnings Call ............................................116

2.   April 26, 2006 Earnings Call ..................................................120

     (a)   The Truth Begins to Emerge -- the July 2006
           Disclosure ....................................................................123

3.   July 26, 2006 Earnings Call ....................................................123

4.   September 19, 2006 Investor Conference .................................126

5.   October 25, 2006 Earnings Call ...............................................127

     (a)   The Individual OshKosh Defendants Begin
           Dumping their Stock ......................................................129

     (b)   The February 2007 "No Growth" Disclosure – a
           Further Partial Revelation of the Truth ........................131

6.     February 21, 2007 Earnings Call ...............................................133

(a)   The Share Repurchase Program......................................134

7.     March 14, 2007 Investor Conference Statements.....................136

8.     April 25, 2007 Earnings Call .................................................138

(a)   The Individual OshKosh Defendants Profit From Their Deception ..........................................................139

(b)   The OshKosh Defendants are Forced to Reveal the Truth Regarding OshKosh ..........................................141

E.   Post-Disclosure Events........................................................143

XI. ADDITIONAL SCIENTER ALLEGATIONS...............................................144

XII. APPLICABILITY OF PRESUMPTION OF RELIANCE UNDER THE AFFILIATED UTE DOCTRINE, AND/OR IN THE ALTERNATIVE, THE FRAUD ON THE MARKET DOCTRINE..........154

NO SAFE HARBOR .................................................................................156

LOSS CAUSATION/ECONOMIC LOSS ........................................................157

COUNT I Violation Of Section 10(b) Of  The Exchange Act And Rule 10b-5(b)  Promulgated Thereunder Against All Defendants.......................................158

COUNT II Violation Of Section 10(b) Of  The Exchange Act And Rule 10b-5(b)  Promulgated Thereunder Against The OshKosh Defendants.....................163

COUNT III Violation Of Section 10(b) Of  The Exchange Act And Rule 10b-5(a) and (c) Promulgated Thereunder Against All Defendants Except PwC...........................................................................................................168

COUNT IV Violation Of Section 20(a) Of  The Exchange Act Against the Individual Defendants.........................................................................170

COUNT V Violation Of Section 20(a) Of  The Exchange Act Against the Individual OshKosh Defendants ......................................................172

COUNT VI Violation of Section 20A of the Exchange Act  Against the Individual Defendants.........................................................................173

JURY TRIAL DEMANDED ............................................................................177

# I. **PRELIMINARY STATEMENT**

1.     Lead Plaintiff Plymouth County Retirement System ("Plaintiff" or "Plymouth"), by its undersigned attorneys, hereby brings this First Amended Class Action Complaint ("Complaint") against Carter's, Inc. ("Carter's" or the "Company"), Frederick J. Rowan, II ("Rowan"), Joseph Pacifico ("Pacifico"), Michael D. Casey ("Casey"), Andrew North ("North"), Charles E. Whetzel, Jr. ("Whetzel"), and PricewaterhouseCoopers LLP ("PwC").  The allegations herein are based on Plaintiff's personal knowledge as to its own acts and on information and belief as to all other matters, such information and belief having been informed by the investigation conducted by and under the supervision of its counsel, which included interviews of former employees of Carter's and other persons with knowledge of the matters alleged herein (some of whom have provided information in confidence; these confidential witnesses ("CWs") will be identified herein by number (CW 1, CW 2, etc.)), review and analysis of publicly available information, including United States Securities and Exchange Commission ("SEC") filings by Carter's, as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company, and consultations with experts.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity

for discovery.  On behalf of itself and the class it seeks to represent, Plaintiff
alleges as follows:

## II. **NATURE OF THE ACTION**

2.     This action is brought on behalf of a class of purchasers of Carter's
publicly traded securities (common stock and options) between March 16, 2005
and November 10, 2009, inclusive (the purchasers being the "Class" and the time
frame being the "Class Period").  Plaintiff seeks remedies under the Securities
Exchange Act of 1934, 15 U.S.C. §§ 78a *et seq*. (the "Exchange Act").

3.     Carter's designs, sources, and markets apparel for babies and young
children in the U.S. under various labels.  Carter's went public in an Initial Public
Offering ("IPO") on October 24, 2003.  The IPO was a huge success, resulting in a
30% increase in Carter's stock at the end of the first day of trading.

4.     The Complaint describes how the Individual Defendants, flush with
stock and stock options that were suddenly much more valuable after the IPO,
engaged in a fraudulent scheme to milk as much personal profit as they possibly
could from Carter's unsuspecting investors.  This scheme was two-pronged.  First,
the Individual Defendants, as described below, "smoothed" Carter's financials (in
violation of GAAP) to portray the false impression that Carter's was a company
capable of delivering consistent and predictable earnings, a quality prized by the
investing public as reflective of management's perceived skill and credibility.  In

order to pump up Carter's stock even more, however, the Individual Defendants (excluding North) sought a growth engine for the Company. To that end, Carter's acquired children's apparel manufacturer OshKosh B'Gosh, Inc. ("OshKosh") in July 2005, and the Individual Defendants (excluding North) spent the next two years relentlessly, and falsely (as described below), convincing the market that OshKosh was going to be a huge growth engine for Carter's.

5.     By early 2006, Carter's stock was up an incredible 61% from the time the OshKosh acquisition was announced. To capitalize on their scheme before the investing public realized that they had misrepresented OshKosh's future prospects, the Individual Defendants (excluding North) promptly sold massive amounts of their stock while Carter's share price remained artificially inflated by virtue of their misrepresentations. These Defendants even entered into an informal "buddy pact" with lower-ranking Carter's executives, discouraging them from exercising their options while the Defendants were actively engaged in their own insider selling. Worse, after Carter's stock price dropped following the first revelations in early 2007 that Carter's, and particularly the OshKosh operating unit, were not performing as the Individual Defendants had led investors to believe, the Individual Defendants temporarily halted their insider stock sales and caused Carter's to institute a $100M stock repurchase program in an effort to drive the Company's share price back up again. The Individual Defendants (excluding

North) then continued to falsely tout OshKosh's growth potential. After the share program had its desired effect, contributing to a 30% increase in Carter's stock price by April, 2007, the Individual Defendants (excluding North) dumped another huge amount of stock, profiting handsomely. In all, throughout a relatively short time period of suspiciously timed insider selling, the Individual Defendants sold more than 1.8 million shares, representing large percentages of their holdings, for a total of over $54 million in profits.

6.    The Defendants' two overlapping fraudulent activities during the Class Period misled and defrauded investors into believing that the Individual Defendants were credible, could deliver consistent and predictable earnings, and that OshKosh would propel Carter's future earnings growth. After the OshKosh house of cards finally collapsed in July 2007, forcing the Company to write off almost all the goodwill from the acquisition, the Individual Defendants continued the other prong of their scheme, involving the fraudulent "smoothing" of Carter's financials in blatant violation of GAAP, well into 2009, as described below.

7.    The Complaint alleges that Carter's and the Individual Defendants, over a strikingly long period of almost *six* years,[1] knowingly and recklessly

---

[1] Because Carter's also admitted, in its December 23, 2009 press release, to an "Accommodations adjustment" resulting in a material overstatement of its finances

manipulated the Company's financials in order to "smooth" the accounting of accommodation payments (also known as margin support payments) made by the Company to certain wholesale customers (the "Accommodations Fraud"). Through "smoothing," the Defendants were able to manipulate Carter's reported earnings upward in the event of an earnings shortfall, or "borrow" from earnings in the event of a surplus for use at a later date.

8.    A standard feature of the retail industry, the Company used accommodation payments to facilitate the sales of Carter's merchandise in its customer's stores.  The payments were charged against the all-important net sales figure from which *all* of Carter's financials derived, because they ultimately reduced the value of the net sale to the customer.  Instead of booking the payments in the same quarter as the sale to the relevant customer, as required by accounting rules, the Defendants cherry picked particular quarters in which to book the accommodation payments, thus giving themselves the flexibility to meet earnings guidance in a particular quarter, or to book charges in quarters that had a surplus of income to mask the cumulative payments.   In other words, the Accommodations Fraud was a classic example of "cookie jar" accounting.

---

at the end of 2003, the Accommodations Fraud (hereinafter defined) began prior to 2004.

9. As a result, Carter's financial statements prior to and during the Class Period were rendered materially false and misleading, a fact the Company admitted by restating its financials for fiscal years 2004 through 2008, and for the first two quarters of 2009. For 2007 and 2008, Carter's accounts receivable were overstated by an incredible 26% and 24%, respectively, demonstrating the extent to which the Defendants manipulated Carter's core financials to paint a misleadingly positive financial picture to unsuspecting investors.

10. Strikingly, the Company's restatement also reduced Carter's retained earnings by $3.1 million for accommodation payments for fiscal year 2003, indicating that the Accommodations Fraud had begun prior to Carter's IPO (which took place only in *late* 2003). The $3.1 million accommodations adjustment further suggests that the Individual Defendants' large stock and option holdings prior to the IPO, which were later sold through their insider trading, had been improperly obtained through the Accommodations Fraud in the first instance.

11. The Complaint details how Carter's glaring lack of internal controls, and its tight-knit executive culture, allowed the Defendants to perpetuate their multi-year scheme, with the Accommodations Fraud only coming to light after a new chief financial officer, Richard F. Westenberger ("Westenberger"), unwittingly discovered it. The Complaint further describes how the purportedly independent outside auditors – Defendant PwC – maintained a close relationship

with several members of executive management, including Defendant Casey, who was a former senior manager at Price Waterhouse LLP's Connecticut offices, and Defendant North, who was also a former employee in PwC's Connecticut offices. Not co-incidentally, Confidential Witness ("CW") testimony reveals that PwC's Connecticut office was responsible for auditing the Company. The Complaint also cites CW testimony describing how the Individual Defendants, in particular the former PwC employees Casey and North, would book the accommodations in a way to manipulate or control the earnings by quarter. According to a CW present at "clearance calls" with PwC, Casey and North spent hours capitalizing on the cozy relationship they enjoyed with their former colleagues, such that PwC either deliberately or recklessly ignored strikingly obvious red flags resulting from the manipulation of the accommodation payments. Additional CW testimony reveals that *both* the internal audit department and the external auditors, PwC, reported directly to Defendant North, a situation highlighting the complete absence of meaningful internal controls at the Company, and a lack of independence by the auditors.

12.    The Complaint also alleges that the majority of the Individual Defendants' annual cash income was tied directly to Board-issued guidance – a recognized risk factor for fraud under auditing guidelines. CW testimony shows

that the Individual Defendants were especially concerned with meeting their internal earnings targets.

13.   CW testimony also reveals that accommodation payments were a heated point of discussion at internal meetings because, absent their manipulation, Carter's would fail to meet Board-issued external guidance numbers, shattering the Defendants' carefully-built image that Carter's was a consistently good performer, and that they had the requisite management skills to keep the Company performing successfully.

14.   At the same time that the Defendants (excluding Defendants North and PwC, hereinafter referred to as the "OshKosh Defendants") were fraudulently manipulating Carter's core financials by improperly booking accommodation payments in the wrong periods, the OshKosh Defendants misled and defrauded investors concerning the growth prospects of children's apparel manufacturer OshKosh, a company that Carter's acquired in July 2005 (the "OshKosh Fraud"). The OshKosh Defendants perpetrated the OshKosh Fraud in order to artificially inflate, even further, the price of Carter's stock, and to line their own pockets with performance-based compensation related to the integration of OshKosh into Carter's, and through massive insider selling before the truth about OshKosh was publicly revealed.

15.    Carter's acquired OshKosh on July 14, 2005 for $312.1M.  Included in the purchase price was goodwill of $151M.  Although OshKosh had a recent history of operational difficulties, the OshKosh Defendants represented that it continued to have substantial brand recognition, and they had a definite plan to fix the brand, restore operating margins, and turn OshKosh into the growth engine that would drive Carter's profitability going forward.  Indeed, the amount of goodwill paid – over 48% of the total acquisition cost – was a strong signal to investors that the OshKosh brand represented substantial future value to Carter's.

16.    From the time the deal closed, the OshKosh Defendants pitched OshKosh as a huge growth opportunity.  They touted the due diligence and homework they had done to understand OshKosh prior to the acquisition, their ability to do exactly what was needed to fix the brand, and their plan to present a strong formula of core essential products on a much more competitive formula that OshKosh ever had, and increase OshKosh's operating margins to over 10% by 2007.  By August 2005, the OshKosh Defendants' statements about the growth potential at OshKosh had contributed to an astounding 50% rise in Carter's stock price.

17.    The OshKosh Defendants maintained their rosy outlook for OshKosh's contribution to Carter's throughout the duration of the OshKosh Fraud, touting their successful implementation of their turn-around plan, projecting

double-digit sales growth and improved margins and profitability, and announcing strong product acceptance.  Even in the face of sometimes disappointing news regarding OshKosh's current quarter's sales results, the OshKosh Defendants stayed relentlessly on-message describing the continued success of their turn-around plan and promoting the expected value of OshKosh to Carter's going forward.

18.     On July 24, 2007, Carter's was forced to announce a sudden reversal of fortune regarding the OshKosh segment of the business, after a new President of Retail who had joined Carter's in June 2007, and a management outsider, refused to sign off on the OshKosh Defendants' plans for OshKosh.  On that day, Carter's announced it was writing-down *all* of the remaining goodwill it booked for OshKosh at the time of the acquisition; some $142.9M, as well as a write-down of $12M on the separately-booked OshKosh trade name, and also announced a staggering 45% decrease in OshKosh wholesale figures.  The announcement was a concession by the OshKosh Defendants that OshKosh's growth prospects were essentially non-existent going forward.  Carter's stock price plummeted 8.5% in one day in response to the news.

19.     The Complaint alleges that the OshKosh Defendants systematically and consistently misrepresented the growth and profit opportunity of the OshKosh acquisition during the Class Period in order to artificially inflate the price of

Carter's stock (above the inflation already caused by the ongoing accommodation payments fraud). The Complaint details how the OshKosh Defendants knew or were extremely reckless in not knowing that their statements regarding the growth prospects for OshKosh were false and misleading when made, and cites CW testimony describing how the OshKosh Defendants knew OshKosh's likely sales prospects well in advance of their falsely optimistic public statements because Carter's received orders on its designs nine months in advance of actual sales. It also cites CW testimony that contrasts the OshKosh Defendants' optimistic public statements that OshKosh's Spring 2007 line was being received well with internal knowledge by fall of 2006 that the design strategy resulted in plummeting sales orders from wholesalers, and that at least one major wholesaler, Macy's West, decided not to carry the line at all.

20.    The Complaint also details how the OshKosh Defendants carried out their scheme in order to line their own pockets at the expense of Carter's shareholders. Specifically, in May 2005, the Company's Board of Directors approved a performance-based bonus plan for Defendant Rowan related to the integration of OshKosh. The integration bonus was to be based upon the achievement of predetermined financial and other goals from fiscal 2005 through the end of fiscal 2007. Ultimately, Carter's paid Rowan approximately $1.5

million under the plan before the truth about OshKosh was revealed by a management outsider.

21.    In addition, the OshKosh Defendants engaged in massive insider selling before the truth about OshKosh was publicly known, and entered into an informal "buddy pact" with lower-ranking Carter's executives, who were discouraged from exercising their own shares while the OshKosh Defendants were actively engaged in their selling.  Beginning in October 2006, Defendant Rowan began unloading hundreds of thousands of his own shares in Carter's.  In November 2006, Defendant Pacifico also began selling hundreds of thousands of his Carter's shares.  By the time Carter's was forced to announce, in July 2007, its surprising write-down of all of the goodwill booked for OshKosh and the 45% decrease in wholesale numbers, Rowan had sold 1,046,400 shares, netting $28.8 million; Defendant Casey had sold 161,200 shares ($4.9 million); Defendant Pacifico had sold 190,000 shares ($5.1 million); and Defendant Whetzel had sold 154,400 shares ($4.2 million).

22.    Plaintiff and the members of the Class were not so fortunate.  Carter's shares, which traded at one time at over $35 (split adjusted) during the Class Period, closed at a price of $22.75 on July 25, 2007 after the truth relating to OshKosh was revealed.  After the Individual Defendants had exhausted the OshKosh Fraud prong of their scheme, they *continued* to mislead Plaintiff and the

- 12 -

members of the Class about Carter's true stock price due to the ongoing

Accommodations Fraud.  As described below, the entire truth was not fully

revealed until Carter's announced its intent to restate almost six years' worth of

financials on November 9, 2009.  Until then, Carter's stock continued to trade at

artificially inflated values.

23.    The Accommodations Fraud began to be revealed on October 27,

2009, when the Company issued a press release announcing that it would delay its

third quarter earnings release in order to complete a review of its accounting for

margin support to its wholesale customers.  Carter's stock plummeted by 23% that

day on heavy trading (14.2 million shares), and Goldman Sachs, a prominent

analyst covering Carter's, suspended coverage of the Company following the

announcement, citing a lack of visibility with management and the Company.

24.    On November 9, 2009, after the market had closed, the Defendants

issued another press release stating that, following the accounting review, the

Company would restate its financials for fiscal years 2004-2008, and the first two

quarters of 2009.  This announcement triggered a further drop of 14% in Carter's

stock price, with 5.5 million shares traded in one day.  In comparison, the average

daily trading volume during the Class Period was approximately 753,000 shares.

25.    The November 9, 2009 announcement stated that the accounting

review was triggered by a disputed amount of margin support with a wholesale

customer, and claimed the accounting improprieties were a result of margin support commitments that "were not disclosed" to the Company's finance group.

26.    Contrary to the Defendants' professed ignorance of the margin support issue, the Complaint cites CW testimony demonstrating that the Individual Defendants were not only fully aware of the improper booking of the payments in the wrong time periods, but were the architects of the improper "smoothing" and manipulation of the Company's core financials.  CW testimony also details how the accommodation payments fraud was ultimately exposed, unwittingly, by the new CFO, Westenberger.  Westenberger, who began working at Carter's only in 2009, independently (*i.e.*, without the knowledge of the Defendants) tried to settle an accommodation payment dispute with Carter's largest wholesale customer, Kohl's, who then informed him of a significant outstanding accommodation payment owed by Carter's.  As a result, a shocked Westenberger insisted on disclosure and an accounting review.  In other words, the years-long numbers charade was only exposed, as with the OshKosh Fraud, when an outsider discovered it.

## III.  <u>JURISDICTION AND VENUE</u>

27.    The claims asserted herein arise under and pursuant to Sections 10(b), 20(a) and 20A of the Exchange Act [15 U.S.C. §§ 78j(b), 78t(a) and 78t-l] and

Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission ("SEC") [17 C.F.R. § 240.10b-5].

28.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1337 and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

29.    Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b); Carter's is headquartered in this District.

30.    In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## IV. <u>PARTIES</u>

### A.    <u>Lead Plaintiff and Additional Plaintiff</u>

31.    Lead Plaintiff Plymouth County Retirement System[2] ("Plymouth" or "Lead Plaintiff") represents more than 9,700 active and retired public employees of

---

[2]    On March 13, 2009 this Court appointed Plymouth as Lead Plaintiff in the case captioned *Plymouth County Retirement System v. Carter's Inc. et al*, Civil Action No. 1:08-cv-02940-JOF, filed on September 19, 2008 (the "Plymouth Action"). A second case, captioned *Mylroie v. Carter's, Inc. et al*, Civil Action No. 1:09-cv-03196-JOF, was filed on November 20, 2009 (the "Mylroie Action"), and this Court thereafter ordered the consolidation of the Plymouth Action and the Mylroie Action pursuant to Rule 42 of the Federal Rules of Civil Procedure.

Plymouth County, Massachusetts, and manages approximately $636 million in assets. As set forth in the certification attached to its January 19, 2010 Notice of Financial Interest, incorporated by reference herein, Lead Plaintiff purchased the common stock of Carter's at artificially inflated prices during the Class Period.

32.    Additional Plaintiff Scott Mylroie, as set forth in the certification previously filed in the Mylroie Action and incorporated herein by reference, purchased Company common stock at artificially inflated prices during the Class Period, incurring an estimated loss of $5,198.49.

## B.    **Defendants**

### 1.    **The Company**

33.    Defendant Carter's is a Delaware corporation, headquartered in Atlanta, Georgia. Carter's designs, sources, and markets apparel for babies and young children in the United States. It primarily offers its children wear products under the Carter's, Child of Mine, Just One Year, and OshKosh brand names. The Company markets its products to national department stores, chain and specialty stores, off-price sales channels, and discount retailers. As of December 29, 2007, it operated 228 Carter's and 163 OshKosh outlet and brand retail stores. Carter's securities are traded on the New York Stock Exchange under the ticker symbol "CRI". Carter's first offered its securities for sale to the public on October 24, 2003.

## 2.    __The Individual Defendants__

34.    Defendant Rowan was Chief Executive Officer ("CEO") of Carter's from 1992 to August 1, 2008, and served as Chairman of the Board from October 1996 to August 1, 2008.  Rowan was President of Carter's from 1992 to May 2004. Rowan was a direct and substantial participant in both the OshKosh and Accommodations Frauds, profiting from the sale of Carter's securities at artificially inflated prices throughout the Class Period and receiving substantial integration-based bonuses and other compensation that was artificially increased by the wrongful conduct set forth herein.  During the Class Period, Rowan sold approximately 1.2 million shares of Carter's stock, realizing $36.9 million in profits, and received an additional $1.5 million in bonuses as a result of the "successful" integration of OshKosh.  Rowan signed the Company's Forms 10-K for the Fiscal Years 2004, 2005, 2006, and 2007, and also signed the Company's Forms 10-Q for the first three quarters of 2005, the first three quarters of 2006, the first three quarters of 2007, and the first quarter of 2008.   Pursuant to Sections 302 and 906 of Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley" or "SOX"), Rowan certified the accuracy of the Company's Forms 10-K for Fiscal Years 2004, 2005, 2006, and 2007, as well as its Forms 10-Q for the first three quarters of 2005, the first three quarters of 2006, the first three quarters of 2007, and the first quarter of 2008.

35.    Defendant Pacifico was, during the Class Period, President of Carter's.  The Company abruptly announced Pacifico's departure effective on December 21, 2009.  Pacifico was a direct and substantial participant in both the OshKosh and Accommodations Frauds, profiting from the sale of Carter's securities at artificially inflated prices during the Class Period and receiving other compensation that was artificially increased by the wrongful conduct set forth herein.  During the Class Period, Pacifico sold approximately 190,000 shares of Carter's stock, recognizing more than $5 million in profits.  Pacifico participated on several conference calls with analysts, making false assertions about OshKosh's growth prospects.

36.    Defendant Casey was Executive Vice-President and Chief Financial Officer ("CFO") of Carter's, becoming CEO in August 2008 following Rowan's departure, and Chairman of the Board in September, 2009.  Casey was a direct and substantial participant in both the OshKosh and Accommodations Frauds, profiting from the sale of Carter's securities at artificially inflated prices throughout the Class Period and receiving other compensation that was artificially increased by the wrongful conduct set forth herein.  During the Class Period, Casey sold 163,000  shares of Carter's stock, recognizing nearly $4.5 million in profits.  Casey signed the Company's Forms 10-K for the Fiscal Years 2004, 2005, 2006, 2007 and 2008, and also signed the Company's Forms 10-Q throughout the Class

Period.    Pursuant to Sections 302 and 906 of Sarbanes-Oxley, Casey certified the accuracy of the Company's Forms 10-K for Fiscal Years  2004, 2005, 2006, 2007 and 2008 as well as its Forms 10-Q throughout the Class Period.

37.    Defendant Whetzel was, during the Class Period, Executive Vice-President, Chief Sourcing Officer.  Whetzel was a direct and substantial participant in both the OshKosh and Accommodations Frauds, profiting from the sale of Carter's securities at artificially inflated prices during the Class Period and receiving other compensation that was artificially increased by the wrongful conduct set forth herein.  During the Class Period, Whetzel sold approximately 308,000 shares of Carter's stock, recognizing nearly $8 million in profits.

38.    Defendant North was Vice President of Corporate Compliance until July 2007, when he became Carter's Vice President of Finance under CFO Casey. North acted as Interim Chief Financial Officer from August 1, 2008 until January 19, 2009, when he returned to his previous position as Vice President of Finance. North was a direct and substantial participant in the Accommodations Fraud, helping Casey orchestrate the booking of accommodation payments in improper time periods.  As interim CFO, North signed the Company's Forms 10-Q for the second quarter of 2008 and the third quarter of 2008.   Pursuant to Sections 302 and 906 of Sarbanes-Oxley, North certified the accuracy of the Company's Forms 10-Q for the second quarter of 2008 and the third quarter of 2008.

39.    Rowan, Pacifico, Casey, North and Whetzel are collectively referred to as the "Individual Defendants" and, along with Carter's, as the "Carter's Defendants".

40.    Rowan, Pacifico, Casey and Whetzel are collectively referred to as the "Individual OshKosh Defendants" and, along with Carter's, as the "OshKosh Defendants".

### 3.    The Auditor Defendant

41.    Defendant PwC was at all relevant times Carter's outside auditor, since at least the Company's initial public offering in October 2003 to the present. PwC provided audit-related services to the Company during this period, including the issuance of an unqualified opinion on the Company's 2005, 2006, 2007 and 2008 Forms 10-K regarding the Company's consolidated financial statements, and the sufficiency of the Company's internal controls over financial reporting, in each of those years.

## V. CONTROL PERSON ALLEGATIONS

42.    The Individual Defendants, because of their positions of control and authority as senior executive officers and directors of the Company, had access to the adverse undisclosed information about the Company's improper booking of accommodation payments and the Company's financials as a whole (including its operating plans, budgets and forecasts and reports of actual operations compared

thereto), through their access to internal corporate documents and information, conversations and associations with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof, and reports and other information provided to them in connection therewith with Carter's business.

43.    The OshKosh Defendants, because of their positions of control and authority as senior executive officers and directors of the Company, had access to the adverse undisclosed information about the OshKosh's business (including its operating plans, budgets and forecasts and reports of actual operations compared thereto), products and prospects through their access to internal corporate documents and information, conversations and associations with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof, and reports and other information provided to them in connection therewith.  OshKosh was a core business division of Carter's and was acquired to allow Carter's to develop its share of the newborn and young children's market segment.

44.    Each of the above officers of Carter's, by virtue of their high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning

each of Carter's divisions, including OshKosh and its business, operations, growth, financial statements, and financial condition, as alleged herein.

45.     The Individual Defendants participated in drafting, preparing, and/or approving the public statements and communications complained of herein and were aware of, or recklessly disregarded, the material misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature.

46.     The Individual Defendants, as senior executive officers and directors of the Company, were able to and did control the content of the various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period.  The Individual Defendants were provided with copies of the documents and statements alleged herein to be materially false and misleading prior to or shortly after their issuance or had the ability and opportunity to prevent their issuance or cause them to be corrected.  Accordingly, the Individual Defendants are responsible for the accuracy of the public reports, releases, and other statements detailed herein and are primarily liable for the misrepresentations and omissions contained therein.

47.     As senior officers and controlling persons of a publicly-held company whose securities were, during the relevant time, registered with the SEC pursuant to the Exchange Act, traded on the New York Stock Exchange and governed by the

provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's performance, operations, business, products, and prospects, and to correct any previously issued statements that were or had become materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based upon truthful and accurate information. The Individual Defendants' wrongdoing during the Class Period violated these specific requirements and obligations.

48.    Each of the Individual Defendants is liable as a primary participant in a wrongful scheme and course of business that operated as a fraud and deceit on purchasers of Carter's securities during the Class Period, which included the dissemination of materially false and misleading statements and concealment or omission of material adverse facts.  The scheme: (i) deceived the investing public regarding Carter's core financial statements, including key financial metrics such as net sales and earnings per share, by improperly booking accommodation payments in the wrong time periods; (ii) deceived the investing public regarding the operations, business, products and prospects of Carter's OshKosh division; and (iii) caused Plaintiff and other members of the Class to purchase Carter's securities at artificially inflated prices, which fell as the truth concerning OshKosh and the Accommodations Fraud ultimately became known.

- 23 -

49.    In making the statements complained of herein, the Individual

Defendants, who were all senior officers and controlling persons of Carter's, were

acting on behalf of the Company in the regular course of business.  Therefore, each

of the statements made by the Individual Defendants is attributable to the

Company.

## VI.  **CLASS ACTION ALLEGATIONS**

50.    Plaintiff brings this action as a class action pursuant to Federal Rule of

Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all purchasers

of the securities of Carter's (the "Class") between March 16, 2005 and November

10, 2009, inclusive (the "Class Period"), and who were damaged when the truth

about Carter's business was disclosed.  Excluded from the Class are Defendants,

the officers and directors of the Company, at all relevant times, members of their

immediate families and their legal representatives, heirs, successors or assigns and

any entity in which Defendants have or had a controlling interest.

51.    The members of the Class are so numerous that joinder of all

members is impracticable.  Throughout the Class Period, Carter's had more than

56 million shares of common stock outstanding that traded on the New York Stock

Exchange.  While the exact number of Class members is unknown to Plaintiff at

this time and can only be ascertained through appropriate discovery, Plaintiff

believes that there are hundreds or thousands of members in the proposed Class.

Record owners and other members of the Class may be identified from records maintained by Carter's or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

52.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

53.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

54.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether and to what extent the Company's financial statements failed to comply with GAAP during the Class Period;

(c)     whether PwC's audits of the Company's financial statements during the Class Period were conducted in accordance with GAAS and the standards of the PCAOB;

(d)    whether statements made (or omissions) by Defendants to the investing public during the Class Period misrepresented (or omitted) to state material facts about the business, operations and management of Carter's; and

(e)    to what extent the members of the Class have sustained damages and the proper measure of damages.

55.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## VII. **FACTUAL ALLEGATIONS RELATING TO THE ACCOMMODATIONS FRAUD**

### A.    **Background Facts**

56.    Based in Atlanta, Georgia, Carter's is a leading marketer of apparel for babies and young children in the United States.  Carter's designs, sources, markets, and manufactures a broad array of baby and children's apparel.  The Company distributes its products through the discount and department store channel as well as through Company operated stores. Carter's also distributes licensed products through mass channel stores such as Target and Wal-Mart.

Carter's went public in a successful IPO on October 24, 2003, with its stock price shooting up 30% in the first day of trading.

57.    Accommodation payments, also known as "margin support," are a standard business feature in the retail industry.  In its annual Form 10-K filings, Carter's explains that "in the normal course of business, [it] grant[s] certain accommodations and allowances to [its] wholesale and mass channel customers in order to assist [its] customers with inventory clearance or promotions."  Carter's filings further state that "[s]uch amounts are reflected *as a reduction of net sales* and are recorded based upon historical trends and annual forecasts."  In other words, like other companies in the retail industry, Carter's has arrangements with its customers such that it "supports" a certain amount of the customers' costs in selling Carter's products.  Because Carter's is, in effect, paying the customer to help sell its goods, the total net sale made to the customer is consequently lowered by the amount that Carter's has used to support the customer's costs.

## B.    Meaningless "Internal Controls" Over Financial Reporting

58.    CW 1 is a former Vice President of Investor Relations who worked at Carter's from 2003 through March 2009.  CW 1 reported directly to Casey, and was responsible for interfacing with investors, being the Company's spokesperson and presenting financial results to investors as well as analysts.  In this capacity, CW 1 attended many of the meetings where the preparation of the financial

statements and analyst calls were discussed.  In particular, CW 1 was required to attend frequent "budget" or "forecast" meetings, in which CW 1 said  "there was [sic] always heated conversations" about accommodations.  These budget meetings, in which the Individual Defendants regularly participated, occurred several times each quarter.

59.    CW 1 expressed severe discomfort with the lack of meaningful internal controls at the Company, noting that the lack of internal controls at Carter's was "the thing that I always, the longer and longer I stayed at the company there's some things that I started seeing and would question that seemed to be at least skirting the gray zone in terms of controls in the audit process and the accounting process."

60.    CW 2 was a former Manager of Financial Analysis at Carter's from October 2006 through December 2008.  In this capacity, CW 2 analyzed Carter's budgeting models, was responsible (among other things) for the reporting of financials, and helped prepare the presentation "books" of financials given to the Board of Directors at their meetings with management.  CW 2 reported to the Vice President of Finance, (North was VP of finance during CW 2's last six months at Carter's), who in turn reported to Carter's CFO.  Casey was Carter's CFO during CW 2's time at the Company.  CW 2 left Carter's because CW 2 "had a problem with not running the business honestly."

- 28 -

61.    CW 2 also expressed discomfort with the lack of internal controls over Carter's financial reporting.  As an example, CW 2 pointed to the control that Carter's financial executives exerted over both internal and the purportedly independent external auditors, PwC.  CW 2 explained that the Vice President of Finance would supervise both internal and external audit functions at Carter's.  CW 2 felt that, from a finance perspective it was completely inappropriate for audit to report to finance.  CW 2 noted that although this improper relationship was brought to executive management's attention so they "on paper" now have audit reporting to Carter's General Counsel, in reality both internal and external audit report to North, Carter's VP of Finance.  According to CW 2, "*Andy is the one that runs all of the auditing and gives the direction to auditing.*"  Even after the audit department was purportedly reporting to Brendan Gibbons, Carter's General Counsel, CW 2 witnessed North "still giving direction" to the audit team as their manager."

62.    CW 2 stated that in CW 2's entire time at the Company, CW 2 never saw a written policy regarding accommodations, but confirmed the importance management placed on accommodations, observing that "accommodations were always a big contention point when I was there.  Always." CW 2 also confirmed that "*number one [accommodations] were not tracked when I was there…number two they were not controlled.*  There was no control in place."

- 29 -

63.    In CW 2's capacity as Manager of Financial Analysis, CW 2 had access to the master spreadsheet detailing the Company's accommodation payments, which CW referred to as the "accommodations list."  CW 2 confirmed that North (and other top executives) had direct access to the same spreadsheet, which was stored on a shared drive.

## C.    A Tight-Knit, Tightly Controlled Executive Culture

64.    CW 1 described a tight-knit executive culture in which Rowan, during his time at the Company, and Casey were the dominant forces.  CW 1 described the Defendants' respective roles in the Company the following way: "Well Joe [Pacifico] was the one that obviously oversaw, Joe is the key guy that oversees sales and product.  But he was not one that really actively spoke to investors.  Mike [Casey] was really a primary person along with Fred.  Joe was the executor.  *Joe always said what Fred wanted him to say, even though Joe would point out that this is not reality*…You know, *Fred was a very domineering person* and if you didn't go along with what he wanted you were basically fired.  *So that's how that company had been run for over a decade.*  So in terms of a lot of the misrepresentations that were made out there it was predominantly Fred, and obviously to some degree Mike because, you know, he would reiterate it and…*Mike was very hands-on…there wasn't a thing that was done from a finance perspective without Mike reviewing it, editing it and approving it.*"

65.    CW 2 also described Carter's top executives as being "a very small, tight-knit group."

66.    According to CW 1, Casey ran the internal accounting group that actually calculated the numbers for the Company's SEC filings.  CW 1 stated that "in terms of actually, you know, punching in numbers and doing any of the filings that all fell under the accounting team….*Mike [Casey] was the sole person responsible for the accounting* and he was pretty tightly in control of that along with Andy North."  Further buttressing the tight control exerted by the executives, CW 1 stated that the majority of the personnel in the finance and accounting department at Carter's were, like North, Casey's former PwC colleagues.  One of these former colleagues was Christina DeMarvel, who was in charge of Carter's internal audit department and reported directly to North.

67.    CW 1 experienced "a lot secrecy" when dealing with the accounting department, and in particular with Casey and North.  CW 1 observed that "Andy and Mike never let you get close" and that even though he was Vice President of Investor Relations, CW 1 "could never get a straight answer" from them.

68.    CW 1 stated that Casey and North were the financial architects of the Accommodations Fraud:  "[B]ased on sitting in meetings, based on conversations that I've had with people, that in summary Mike threw in Andy North, VP of finance and certain people in the accounting team.  And I think it was mostly

directed through Andy North.  They would manipulate…*they would book the accommodations in a way to manipulate or control the earnings by quarter*, thus what we would call, his people would call it smoothing out or, you know, *pulling or pushing from one quarter to the other*."  CW 1 was aware that this "smoothing" of the Company's financials "occurred for a number of years."

69.    CW 1 observed that during management's frequent budget meetings, Casey and North "never wanted to really get close to the numbers."  North, in particular, "got very sensitive when you started probing on certain topics," including the accounting treatment of accommodation payments.

## D.    <u>The Defendants Scapegoat the Sales Department</u>

70.    Even though the Defendants, in their November 9, 2009 after-hours press release, claimed that the improper booking of accommodations was "a result of margin support commitments that were not disclosed to the Company's finance group," CW 1 reveals that to be yet another misrepresentation.  According to CW 1: "Mike [Casey] had purposely gotten rid of people that jeopardized himself. They've used the sales team as a scapegoat.  You know, anyone that would jeopardize himself he's gotten rid of.  He started with the head of sales [Joe Elles] and then they got rid of me….They've gotten rid of a lot of people in the sales organization…*I mean these guys had nothing to do with it*.  These guys, think about it logically – all they focus in on is getting the orders.  There's a simple form

they got to fill out and submit, you know, *after that they don't know what goes on with the accounting*.  They don't even care.  They're not accountants….I mean that stuff is very technical in nature.  So if anything, did certain people know that the way they were playing with the accommodations?  I think certain people if you talk to them, they had a number of conversations with Andy or Mike or their direct bosses, but I think a lot of that *was pushed back down from the top because they didn't want those expenses to hit during a certain period*."

71.    Contrary to the Defendants' public claim that the sales department was not informing the finance department about accommodation payments, CW 1 observed that it was actually the finance department that instructed the salespeople to improperly submit accommodation payment requests in the wrong time periods: "I was told by certain people in Sales that they were instructed by, it's my understanding with the blessing of Mike [Casey], to re-book the timing of when those accommodations should hit.  So meaning they were, sales was pretty straightforward, they get the accommodation request and they fill out the paperwork and put it in…And I remember a number of times that when the accommodations would come in too high *and it didn't meet the timing of when Mike wanted it*, because obviously it would cause the quarter [to] miss the street numbers, *or miss the numbers that the Board…was expecting*."

72.    According to CW 1, Casey would instruct senior sales people to rebook the accommodations in order to make the numbers for that particular quarter.  CW 1 also observed that Casey would often use North to instruct the sales people on improperly rebooking their accommodations.

73.    CW 2 also asserted that, regarding the improper booking of accommodation payments, "the entire management team is responsible.  It's not just, it's kind of not just one person because they all knew what was going on.  Every single executive."  Indeed, according to CW 2, "when Joe P[acifico] was president he was involved in setting up a lot of these accommodations."

74.    CW 1 explained the driving force behind the manipulation of Carter's financials: "[U]ltimately Mike, he did it because it was the one item that he really couldn't get his hands around *and he didn't want to be responsible for missing a quarter*.  Because he way vying for the CEO job.  And what's ironic was his number one agenda was accommodations."  In fulfillment of his ambition, Casey became Carter's CEO in August, 2008.

E.    **Defendants' Materially False and Misleading Statements and Omissions Relating to the Accommodations Fraud**

75.    The fraudulently booked accommodation payments rendered Carter's net sales for each reporting period in the Class Period materially false, because net sales that would normally be reduced by the appropriate accommodation payment amount were either artificially high (in periods where the Defendants "pushed" the

accommodation payments into another period) or low (in periods where the Defendants improperly "pulled," or booked, the payments).

76.    Because net sales is the basis for each core financial metric reported by Carter's, and relied on by investors, all of Carter's key financial metrics deriving from net sales – including year-to-date sales figures, year-over-year sales figures, and most importantly, earnings per share ("EPS") – were rendered materially false and misleading.  The false net sales figures also directly affected Carter's Accounts Receivable ("A/R") numbers – an inflated net sales figure that fails to reflect an accommodation payment results in a corresponding overstatement of A/R.  This is because the A/R, representing the amount outstanding from a *completed* sale, fails to reflect the true value of the sale, which should have been discounted by the accommodation amount.

77.    The chart below lists each false and misleading net sales figure reported, and signifies that *all* of Carter's core financials, which were based on net sales, were necessarily falsely reported on the same dates and occasions.

| Location | Date | False and Misleading Statements |
|---|---|---|
| **QUARTERLY AND ANNUAL REPORTS** | 3/16/2005 10K for FY 2004 | Net sales for FY 2004: $823.1M<br>Net sales for 4Q 2004: $232.7 M |
| | 4/26/2005 8K | Net sales for 1Q 2005: $206.2 M |
| | 4/28/2005 10Q | Net sales for 1Q 2005: $206.2 M |
| | 7/27/2005 8K | Net sales for 2Q 2005: $192.5 M |
| | 8/10/2005 10Q | Net sales for 2Q 2005: $192.5 M |
| | 9/28/2005 8K | Reciting 1Q 2005 net sales of $206.2M |
| | 10/26/2005 | Net sales for 3Q 2005: $372.2 M |

| Location | Date | False and Misleading Statements |
|---|---|---|
| | 8K | |
| | 11/10/2005 10Q | Net sales for 3Q 2005: $372.1 M |
| | 2/22/2006 | Net sales for 4Q 2005: $350.5 M |
| | 8K | Net sales for FY 2005: $1.1 B |
| | 3/15/2006 10K | Net sales for FY 2005: $1.12 B |
| | | Net sales for 4Q 2005: $350.5 M |
| | 4/25/2006 8K | Net sales for 1Q 2006: $296.4M |
| | 5/11/2006 10Q | Net sales for 1Q 2006: $296.4 M |
| | 7/26/2006 8K | Net sales for 2Q 2006: $277.6 M |
| | 8/9/2006 10Q | Net sales for 2Q 2006: $277.6 M |
| | 10/25/2006 8K | Net sales for 3Q 2006: $392.0 M |
| | 11/9/2006 10Q | Net sales for 3Q 2006: $392.0 M |
| | 2/13/2007 8K | Net sales for 4Q 2006: $377.5 M |
| | | Net sales for FY 2006: $1.343 B |
| | 2/21/2007 8K | Net sales for 4Q 2006: $377.5 M |
| | | Net sales for FY 2006: $1.3 B |
| | 2/28/2007 10K | Net sales for FY 2006: $1.34 B |
| | | Net sales for 4Q 2006: $377.5 M |
| | 4/24/ 2007 8K | Net sales for 1Q 2007: $320.1 M |
| | 5/10/2007 10Q | Net sales for 1Q 2007: $320.1 M |
| | 7/24/2007 8K | Net sales for 2Q 2007: $287.8 M |
| | 8/9/2007 10Q | Net sales for 2Q 2007: $287.8 M |
| | 10/23/2007 8K | Net sales for 3Q 2007: $410.9 M |
| | 10/29/2007 10Q | Net sales for 3Q 2007: $410.9 M |
| | 2/26/2008 8K | Net sales for 2Q 2007: $393.4 M |
| | | Net sales for FY 2007: $1.4 B |
| | 2/27/2008 10K | Net sales for FY 2007: $1.41 B |
| | | Net sales for 4Q 2007: $393.4 M |
| | 4/22/2008 8K | Net sales for 1Q 2008: $330.0 M |
| | 4/25/2008 10Q | Net sales for 1Q 2008: $330.0 M |
| | 7/22/2008 8K | Net sales for 2Q 2008: $301.7 M |
| | 8/6/2008 10Q | Net sales for 2Q 2008: $301.7 M |
| | 10/21/2008 8K | Net sales for 3Q 2008: $436.4 M |
| | 10/30/2008 10Q | Net sales for 3Q 2008: $436.4 M |
| | 2/24/2009 8K | Net sales for 4Q 2008: $422.0 M |
| | | Net sales for FY 2008: $1.5 B |
| | 2/27/2009 10K | Net sales for FY 2008: $1.49 B |
| | | Net sales for 4Q 2008: $422.0 M |
| | 4/28/2009 8K | Net sales for 1Q 2009: $356.8 M |
| | 4/30/2009 10Q | Net sales for 1Q 2009: $356.8 M |
| | 7/28/2009 8K | Net sales for 2Q 2009: $317.9 M |
| | 7/31/2009 10Q | Net sales for 2Q 2009: $317.9 M |

78.    All of Carter's reported financials during the Class Period were materially false and misleading because the Carter's Defendants intentionally booked accommodation payments in the wrong periods, in order to "smooth" Carter's financials and portray a misleadingly positive picture of the Company's (and management's) performance, thereby artificially inflating Carter's stock price and allowing the Carter's Defendants to reap enormous profits from sales of their stock options.  *See* ¶¶ 7, 8, 10, 11, 13, 14, 22-26, 56-115.  According to CW 1, a former Vice President of Investor Relations, the Defendants also orchestrated the improper financial booking to meet the Company's guidance, on which the majority of their annual cash income depended.  *See* ¶¶ 79-96.

## F.    **The Individual Defendants' Annual Cash Bonus Was Tied to Carter's Earnings**

79.    During the Class Period, the Company tied the annual cash bonuses given to the Individual Defendants to Carter's financial performance.  Carter's Compensation Committee has stated that "[o]ur practice is to make cash performance bonuses *a significant component* of our executive officers' total compensation," setting "bonus targets before the end of the first quarter of each fiscal year."  (Carter's Proxy Statement for fiscal year 2006).  In 2006, for example, the Individual Defendants could earn a cash bonus up to an astounding *200%* of their base salaries, depending on the financials achieved by the Company.

80.    The actual bonuses received were sometimes more than double the Defendants' base salaries.  For example, Carter's proxy form for 2004 revealed that "[d]uring fiscal 2004, our CEO, Frederick J. Rowan, II, received a base annual salary of $800,000….Mr. Rowan also participated in the annual incentive bonus program discussed above pursuant to which he received $2.1 million (compared to $896,250 in fiscal 2003) *primarily based upon the attainment of specified EBITDA performance levels by the Company for fiscal 2004* and execution of short and long-term strategic goals and leadership objectives."  Thus, the Individual Defendants had a strong incentive to manipulate the Company's financials for their own significant financial gain.

81.    In 2004, the Defendants' bonuses were based on Carter's EBITDA (Earnings Before Interest, Taxes, Depreciation, and Amortization), and in 2005 the bonuses were based on the Company's EPS.  For 2006 and 2007, the bonuses were based on adjusted EPS (adjusted for one-time, non-recurring events).  Both EBITDA and EPS were derived directly from the Company's fraudulently reported net sales, and as a result, the bases for determining the Individual Defendants' bonuses (and the bonuses themselves) were falsely manipulated during the Class Period.  In 2008, the Compensation Committee took the additional step of making net sales an explicit component in determining annual bonuses.

82.    CW 1 confirmed that the Individual Defendants were especially

concerned with accommodations during the "true-up" period in the last quarter of

the fiscal year, because their annual bonus determination hinged on whether the

Company had met or exceeded its financial targets for the year.  During

management's meetings, attended by CW 1 and the Individual Defendants, CW 1

observed that the Individual Defendants "wanted to make sure they met their

guidance numbers [because] it also pertained around [sic] bonuses."  CW 1 noted

that the amount in the Company's "bonus compensation pool" depended directly

on the Company's stated earnings for the year.  The Company's proxy forms

specifically set forth the basis for the Individual Defendants' annual bonus award.

83.    In its annual Proxy form for fiscal year 2004, the Company reported:

"The annual performance bonus for executive officers consists of a cash bonus

payment based upon both the Company's growth and profitability and individual

executive performance, in accordance with the Company's Amended and Restated

Annual Incentive Compensation Plan. Each year, the Compensation Committee

approves [EBITDA] targets for the Company and sets bonus targets for each of the

named executive officers. The Compensation Committee approves annual bonuses

for all eligible Employees, including the executive officers of the Company, *based*

*on whether the pre-approved EBITDA targets were met* and whether any other pre-

established performance criteria set by the Compensation Committee were achieved."

84.    Carter's annual Proxy form for 2005 stated: "The annual performance bonus for executive officers consists of a cash bonus payment based upon both the Company's growth and profitability and individual executive performance. In accordance with the Company's Amended and Restated Annual Incentive Compensation Plan, the Compensation Committee approves earnings per share ("EPS") targets for the Company and sets bonus targets for each of the named executive officers. The Compensation Committee approves annual bonuses for all eligible employees, including the executive officers, *based on whether the Company achieved its pre-approved financial targets* and whether any other pre-established performance criteria that may be set by the Compensation Committee were achieved."

85.    Carter's annual Proxy form for 2006 stated: "In accordance with our Amended and Restated Annual Incentive Compensation Plan (the "Incentive Compensation Plan"), which has been approved by our stockholders, *the Compensation Committee has selected earnings per share, as adjusted for unusual or non-recurring items, as the financial performance metric to determine the amount, if any, of annual performance bonuses to be paid* under our Incentive

Compensation Plan. Our Compensation Committee selected earnings per share because it believes it is closely aligned with the interests of our stockholders."

86.    Carter's annual Proxy form for 2007 stated: "In accordance with our Amended and Restated Annual Incentive Compensation Plan (the 'Incentive Compensation Plan'), for fiscal 2007, the Compensation Committee selected earnings per share, as adjusted for unusual or non-recurring items, as the financial performance metric used to determine the amount, if any, of annual performance bonuses to be paid to our named executive officers. Our Compensation Committee selected earnings per share because it believes it is closely aligned with the interests of our stockholders."

87.    Carter's annual Proxy form for 2008 stated: "In accordance with our Amended and Restated Annual Incentive Compensation Plan (the 'Incentive Compensation Plan'), for fiscal 2008, the Compensation Committee used three financial performance metrics to determine the amount, if any, of annual performance bonuses to be paid under our Incentive Compensation Plan: *net sales (weighted at 25%), adjusted earnings before interest and taxes ('adjusted EBIT') (weighted at 25%), and adjusted earnings per share ('adjusted EPS') (weighted at 50%).* Our Compensation Committee selected net sales, adjusted EBIT, and adjusted EPS as performance metrics because it believes they are key financial

measures that are aligned with the interests of our shareholders and help to measure the quality of our earnings."

88.    The following table sets forth the Individual Defendants' annual cash bonuses for 2004-2008.  Aside from 2007, the year that the OshKosh Defendants were forced to admit there was no growth opportunity in OshKosh and wrote down all the associated goodwill, and the only year in which the Defendants failed to meet their targeted EPS, the majority of the Individual Defendants' earnings came in the form of annual cash bonuses.  This is especially true for Casey and Rowan, the most senior executive officers.

| Defendant | Fiscal Year | Salary | Bonus/Non-Equity Incentive Plan Compensation |
|---|---|---|---|
|  |  |  |  |
| Michael D. Casey | 2008 | $540,385 | $651,000 |
|  | 2007 | $375,000 | -- |
|  | 2006 | $375,000 | $328,125 |
|  | 2005 | $375,000 | $656,250 |
|  |  |  |  |
| Frederick J. Rowan, II | 2008 | $497,615 | $790,500 |
|  | 2007 | $812,000 | -- |
|  | 2006 | $812,000 | $1,218,000 |
|  | 2005 | $812,000 | $2,936,000 |
|  |  |  |  |
| Andrew B. North | 2008 | $232,115 | $100,000 |
|  |  |  |  |
|  |  |  |  |
| Joseph Pacifico | 2008 | $642,308 | $403,000 |
|  | 2007 | $600,000 | -- |
|  | 2006 | $600,000 | $600,000 |
|  | 2005 | $600,000 | $1,200,000 |
|  |  |  |  |

| Charles E. Whetzel, Jr. | 2008 | $417,308 | $230,563 |
|---|---|---|---|
| | 2007 | $375,000 | -- |
| | 2006 | $375,000 | $328,125 |
| | 2005 | $375,000 | $706,250 |

## G.    The Individual Defendants' Stock-Based Compensation

89.    Under Carter's 2003 Amended and Restated Equity Incentive Plan (the "Plan"), the Individual Defendants were awarded millions of dollars in stock options as part of their compensation.  At least a portion of these stock options were "performance-based," vesting on the Company's achievement of certain defined performance objectives.

90.    In its Proxy form for fiscal year 2004, Carter's explained that: "Three types of stock options are currently outstanding under the plan: basic stock options, performance stock options, and rollover stock options. Basic stock options vest ratably over a five-year period, but immediately vest upon a change in control, as defined. Performance stock options were originally subject to performance criteria that have since been met.  As a result, performance stock options now vest ratably over a five-year period, but immediately vest upon a change in control, as defined. Rollover stock options are fully vested stock options that were issued prior to August 15, 2001."

91.    Adding more fuel to the Individual Defendants' desire to milk as much personal profit as possible from their overall fraudulent scheme was the

- 43 -

extremely large amount of options Carter's required them to own.  Carter's

required its named executives to own a certain multiple of their base salary in

Carter's stock – in 2007, for example, the minimum ownership guidelines required

Carter's "Chief Executive Officer and President to *own at least ten times their base*

*salary in Company stock* (or the intrinsic value of options to purchase Company

stock that were granted prior to the Company's 2001 acquisition). The minimum

ownership guidelines require[d] [Carter's] remaining named executive officers to

each *own five times their base salary in Company stock*."  (Carter's Proxy for fiscal

year 2007).

92.    In its Proxy for fiscal year 2008, Carter's summarized the options

granted to the Individual Defendants at that point.  Many of Rowan and Casey's

options were tied to growth in the Company's adjusted EPS.

> In March 2004, our Compensation Committee granted
> Mr. Casey, then our Chief Financial Officer, 200,000
> time-based stock options that vested in five equal, annual
> installments based on his continued employment with the
> Company.  In each of February 2006 and February 2007,
> our Compensation Committee granted Mr. Casey 12,000
> stock options and 12,000 shares of restricted stock, each
> of which vest in four equal, annual installments based on
> his continued employment with the Company.  In August
> 2008, following Mr. Casey's promotion to Chief
> Executive Officer, our Compensation Committee granted
> Mr. Casey 125,000 time-based stock options that vest in
> four equal, annual installments based upon Mr. Casey's
> continued employment with the Company.  Mr. Casey
> was also granted 75,000 performance-based shares of
> restricted stock. *Fifty percent of these shares will be*

*eligible to vest upon the Company's reporting of adjusted EPS growth in fiscal 2009 (over fiscal 2008) and in fiscal 2010 (over fiscal 2009) of at least 4%.* If this threshold earnings per share growth is achieved in fiscal 2009 and 2010, then these eligible shares will vest, in varying percentages, from 33% to 100%, based on the Company's compound annual growth rate in earnings per share from fiscal 2009 to 2010 ranging between 4% and 8%. The remaining 50% of these shares will then vest in equal amounts on December 31, 2011 and December 31, 2012 based on his continued employment with the Company. In March 2009, Mr. Casey was granted 100,000 time-based stock options and 50,000 shares of restricted stock, each of which vest in four equal, annual installments based on his continued employment with the Company. Pursuant to a Company policy, while employed by the Company, Mr. Casey shall not sell any of these vested restricted shares, other than to cover any associated tax obligations, until the fourth anniversary of the date of grant.

In September 2003, our Compensation Committee granted our former interim Chief Financial Officer and current Vice President of Finance, Mr. North, 22,560 time-based and 37,440 performance-based stock options, each of which vested in five equal, annual installments based on Mr. North's continued employment with the Company. In February 2006, our Compensation Committee granted Mr. North 2,800 time-based stock options and 1,200 shares of restricted stock, each of which vest in four equal, annual installments based on his continued employment with the Company. In each of February 2007 and December 2007, our Compensation Committee granted Mr. North 6,000 time-based stock options and 3,000 shares of restricted stock, each of which vest in four equal, annual installments based on his continued employment with the Company. In March 2009, our Compensation Committee granted Mr. North 10,000 time-based stock options and 5,000 shares of restricted stock, each of which vest in four equal, annual

installments based on his continued employment with the
Company.

 In March 2004, our Compensation Committee granted
our President 200,000 time-based stock options that
vested in five equal, annual installments based on Mr.
Pacifico's continued employment with the Company.  In
November 2005, we granted our President 200,000
performance-based stock options.  These options vest in
February 2010 based upon Mr. Pacifico's continued
employment with the Company, *the Company's
achievement of fiscal 2009 adjusted net income of at least
$116 million*, and an individual performance criterion.  In
fiscal 2007, we made assumptions that these performance
criteria will not be met and that these shares will not vest.
In July 2008, our Compensation Committee granted our
President 200,000 time-based stock options that vest in
three equal, annual installments based on Mr. Pacifico's
continued employment with the Company.

In May 2005, our Compensation Committee granted our
Chief Sourcing Officer 60,000 stock options that vest in
four equal, annual installments based on Mr. Whetzel's
continued employment with the Company.  In May 2005,
our Compensation Committee also granted our Chief
Sourcing Officer 40,000 shares of restricted stock that
cliff vest in May 2009 based on Mr. Whetzel's continued
employment with the Company.  In July 2008, our
Compensation Committee granted our Chief Sourcing
Officer 40,000 stock options and 10,000 shares of
restricted stock, each of which vest in four equal, annual
installments based on Mr. Whetzel's continued
employment with the Company.  In March 2009, Mr.
Whetzel was granted 20,000 time-based stock options
and 5,000 shares of restricted stock, each of which vest in
four equal, annual installments based on his continued
employment with the Company.  Pursuant to a Company
policy, while employed by the Company, Mr. Whetzel
shall not sell any of these vested restricted shares, other

than to cover any associated tax obligations, until the fourth anniversary of the date of grant.

In May 2005, our Compensation Committee granted our former Chief Executive Officer 400,000 performance-based stock options. These options were scheduled to vest in varying percentages in February 2009 based upon Mr. Rowan's continued employment with the Company, *the Company's achievement of specified levels of fiscal 2008 adjusted net income ranging from $75 million to $100 million*, and an individual performance criterion. Due to Mr. Rowan's retirement, which was treated as a termination for "good reason," the vesting of these options was accelerated.

## H.    The Individual Defendants Ensure that Adjusted EPS Exceeds Company Guidance

93.    Adjusted EPS, reported by the Company in its quarterly and annual press releases announcing the Company's performance, was a critical measure of the Defendants' perceived success and a key basis for determining their bonuses and stock option grants from 2006 onwards. Because adjusted EPS provides an "apples to apples" comparison for investors to gauge companies' performance within an industry, it was also crucial that Carter's adjusted EPS meet or exceed Company guidance. Reflecting the importance of adjusted EPS, CW 1 confirmed presentations to the Board always included adjusted EPS figures, explaining that: "you want your adjusted numbers. If you're going to come out and say you have an adjusted EPS, *that's the numbers that's going to go into First Call and Market Watch, which is what is picked up by the headlines, which is what the analysts put in their models. You're focused on adjusted, not GAAP.*"

- 47 -

94.    In addition, Casey was strongly motivated to convince the Board that Carter's was performing well.  As CW 1 observed: "[U]ltimately Mike… *he didn't want to be responsible for missing a quarter*.  Because he way vying for the CEO job."

95.    The table below demonstrates that during the Class Period, the reported *adjusted* EPS figures consistently exceeded the Company's guidance (where publicly announced) even when the reported EPS figures did not (the only exception being for fiscal year 2007, which involved significant losses related to the OshKosh business, including the second quarter goodwill writedown).  In at least two instances where the reported EPS figures did not meet guidance, the adjusted EPS figures exceeded guidance by only a penny (4Q and FY 2006).

**Carter's Inc. Diluted EPS Performance**

|  | 2004 | | | | |
| --- | --- | --- | --- | --- | --- |
|  | Q1 2004 | Q2 2004 | Q3 2004 | Q4 2004 | FY 2004 |
| **SEC Filings:** |  |  |  |  |  |
| Reported EPS | 0.35 | 0.20 | 0.62 | 0.50 | 1.66 |
| Adjusted Reported  EPS | 0.36 | 0.20 | 0.62 | 0.50 | 1.67 |
| **Company Guidance (Per Transcripts)** | **0.33** | **0.15** | **0.57** | **0.45** | **1.63** |

|  | 2005 | | | | |
| --- | --- | --- | --- | --- | --- |
|  | Q1 2005 | Q2 2005 | Q3 2005 | Q4 2005 | FY 2005 |
| **SEC Filings:** |  |  |  |  |  |
| Reported EPS | 0.46 | 0.18 | 0.35 | 0.57 | 1.55 |
| Adjusted Reported EPS | N/A | 0.29 | 1.02 | 0.68 | 2.45 |
| **Company Guidance (Per Transcripts)** | **0.42** | **0.24** | **0.81** | **0.63** | **2.40** |

|  | **2006** | | | | |
|---|---|---|---|---|---|
|  | Q1 2006 | Q2 2006 | Q3 2006 | Q4 2006 | FY 2006 |
| **SEC Filings:** |  |  |  |  |  |
| Reported EPS | 0.52 | 0.15 | 0.57 | 0.45 | 1.42 |
| Adjusted Reported EPS | 0.56 | 0.17 | 0.59 | 0.47 | 1.51 |
| **Company Guidance (Per Transcripts)** | **0.53** | **0.16 (stock split)** | **0.56** | **0.46** | **1.50** |

|  | **2007** | | | | |
|---|---|---|---|---|---|
|  | Q1 2007 | Q2 2007* | Q3 2007 | Q4 2007 | FY 2007 |
| **SEC Filings:** |  |  |  |  |  |
| Reported EPS | 0.16 | -2.48 | 0.58 | 0.48 | (1.22) |
| Adjusted Reported EPS | 0.22 | 0.13 | N/A | 0.45 | 1.37 |
| **Company Guidance (Per Transcripts)** | **0.14** | **0.11** | **0.56** | **0.50** | **1.42** |

|  | **2008** | | | | |
|---|---|---|---|---|---|
|  | Q1 2008 | Q2 2008 | Q3 2008 | Q4 2008 | FY 2008 |
| **SEC Filings:** |  |  |  |  |  |
| Reported EPS | 0.19 | 0.05 | 0.58 | 0.47 | 1.29 |
| Adjusted Reported EPS | N/A | 0.10 | 0.60 | N/A | 1.37 |
| **Company Guidance (Per Transcripts)[3]** | **N/A** | **N/A** | **N/A** | **N/A** | **N/A** |

|  | **2009** | | | | |
|---|---|---|---|---|---|
|  | Q1 2009 | Q2 2009 | Q3 2009 | Q4 2009 | FY 2009 |
| **SEC Filings:** |  |  |  |  |  |
| Reported EPS | 0.28 | 0.19 |  |  |  |
| Adjusted Reported EPS | 0.38 | 0.23 |  |  |  |
| **Company Guidance (Per Transcripts)** | **N/A** | **N/A** |  |  |  |

---

[3]    Probably as a result of the problems the Company had in 2007 with the OshKosh division, the Company suspended its previous practice of issuing guidance in 2008 and the first two quarters of 2009. However, as set forth above at ¶ 88, all the Individual Defendants received substantial cash bonuses in 2008, signifying that they had met the applicable bonus target EPS guidelines set by Carter's Compensation Committee.

96.    CW 1 confirms that, in at least one instance in the fourth quarter of 2006, the Defendants were forced to improperly book fall accommodation payments in later quarters.  According to CW 1, several of Carter's key accounts, including JC Penney and Belks "asked for more money due to poor Fall performance but [accommodation] expenses was [sic] booked" in later periods, because the Defendants were concerned with meeting guidance at the end of 2006. As shown below at ¶ 104, the restated adjusted earnings for fiscal year 2006 are below guidance, while the adjusted reported earnings are a penny above guidance, supporting CW 1's account.

## I.    <u>The Truth Begins to Emerge</u>

97.    The Carter's Board appointed a new CFO, Westenberger, in January 2009 to replace interim CFO North.  According to CW 1, the Board "felt that Andy wasn't ready to be a CFO.  He's, from a personality standpoint and from a leadership standpoint, he definitely did not have the skill set, most certainly to be a CFO."

98.    Westenberger was immediately perceived as an outsider.  CW 1 observed that "there was a lot of nervousness with Andy [North]" because of Westenberger's attempts to "to get behind the accounting practices and how certain things were treated."  According to CW 1, once Westenberger "started going on his

independent review of this, he went up and met with Kohl's, a large Carter's customer." CW 1 explained that "Joe Pacifico was trying to work on this apparent number [regarding Kohl's] that was outstanding. And Richard went in behind Joe Pacifico's back and went to [Kohl's] CEO and said, hey there's an amount that's in question, and the Kohl's people said, yeah absolutely, you owe it to us. So Richard flew back and said from an accounting standpoint we've got to disclose this, etc., etc. *And that's what triggered the whole event*." Westenberger was, therefore, the "whistleblower" who triggered the subsequent accounting review of the booking of accommodation payments, uncovering the Accommodations Fraud within just a few months of becoming Carter's CFO.

99.    According to CW 1, Westenberger's trip to Kohl's occurred only a few weeks before Carter's was due to release its third quarter results for 2009. Following Westenberger's return, the Company issued a press release on the morning of October 27, 2009, announcing that it would delay its third quarter earnings release in order to complete a review of its accounting for margin support to its wholesale customers. The stock plummeted by 23% the day of the announcement on extremely heavy trading (14.2 million shares), and Goldman Sachs, a prominent analyst covering Carter's, suspended coverage of the Company following the announcement, citing "the lack of visibility around the magnitude and potential impact of this review."

### J.    The Full Truth about Accommodations is Revealed

100.   On November 9, 2009, after the market had closed, the Defendants issued another press release stating that, following the accounting review, the Company would restate its financials for an astonishingly long period, covering fiscal years 2004-2008, and the first two quarters of 2009.  This shocking announcement triggered a further drop of 14% in Carter's stock price, with 5.5 million shares traded in one day.  In comparison, the average daily trading volume during the Class Period was approximately 753,000 shares.

### K.    Post Class Period Events

#### 1.    Carter's Restatement

101.   Carter's issued its Restatement on January 15, 2010, filing its amended Form 10-K/A the same day.  Carter's restated its annual figures for fiscal years 2004-2006 without restating the quarterly figures for those years.  Carter's restated its quarterly and annual figures for 2007 and 2008, and its figures for the first two quarters of 2009.

102.   In the "Background to the Restatement" section of Carter's amended 10-K/A, the Company states that "[t]he cumulative, after-tax impact of the adjustments required to fairly state the previously issued financial statements for the Affected Periods is a 3% reduction in retained earnings in the amount of $7.5 million as of July 4, 2009.  This amount reflects the sum of adjustments to net income for fiscal 2004 through the six-month period ended July 4, 2009, which

total $4.4 million, *and a 2003 cumulative adjustment to retained earnings in the amount of $3.1 million.*"  In other words, Carter's *started* 2004 with a material overstatement of earnings, admitting that its 2003 financials were *also* materially false and misleading.  Although Carter's conveniently failed to give an explanation for the material overstatement of earnings at the end of 2003 in its amended Form 10-K/A, the Company did, in its December 23, 2009 press release, *explicitly label the 2003 overstatement amount an "Accommodations adjustment," thus admitting that the 2003 overstatement was a direct result of the Accommodations Fraud, and also admitting that the Accommodations Fraud had started before 2004*:

**Impact on Previously Reported Balance Sheets (end of period)**
($ in thousands)

|  | 2003 Cumulative Adjustment | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 |
|---|---|---|---|---|---|---|---|
| Retained earnings, as reported | $ 30,476 | $ 80,134 | $ 127,336 | $ 214,556 | $ 146,526 | $ 221,584 | $ 249,281 |
| Accommodations adjustment | (3,102) | (3,362) | (4,632) | (10,713) | (15, 891) | (13,045) | (7,504) |
| Retained earnings, as restated | $ 27,374 | $ 76,772 | $ 122,704 | $ 203,843 | $ 130,635 | $ 208,539 | $ 241,777 |
| % change | 20.1% | 15.7% | 11.4% | 27.6% | 38.0% | 27.0% | 16.8% |

103.   An analysis of the restated figures is complicated by Carter's failure to provide quarterly restated figures for 2004-2006, and the lack of publicly-issued Company guidance for 2008 and the first two quarters of 2009.  Ignoring 2007, an aberrant year because of the Company's problems with the OshKosh business, *the Restatement reveals that in both 2005 and 2006, the restated EPS* (adjusted for

- 53 -

one-time, non-recurring events per the originally reported adjustment amounts) *was less than Company guidance, while the originally reported adjusted EPS was greater than Company guidance*.

104.  For 2005, adjusted reported EPS was $2.45, above guidance of $2.40, while the restated adjusted EPS was below guidance at $2.39.  Similarly, in 2006, adjusted reported EPS was $1.51, just above guidance of $1.50, while the restated adjusted EPS was significantly below guidance at $1.41 (see chart below).  Thus, in at least those two years, the Defendants' manipulation of the Company's financials through improper booking of accommodations enabled them to meet Company guidance, and falsely portray to the marketplace that Carter's was performing well financially.  This false picture of financial success also gave the marketplace (and Carter's Board) a correspondingly false image of the Individual Defendants' management skills in seeming to consistently beat guidance.  For example, a Credit Suisse analyst report on April 27, 2005 stated: "Carter's exceeded earnings expectations again in the first quarter of 2005. *The company has reported above consensus earnings in each quarter since its October '03 IPO.*  We believe this trend will continue throughout the remainder of 2005, which should further elevate investor expectations."

**Carter's Inc. Diluted EPS Performance**

| 2004 | | | | |
|---|---|---|---|---|
| Q1 2004 | Q2 2004 | Q3 2004 | Q4 2004 | FY |

| | | | | |
|---|---|---|---|---|
| **SEC Filings:** | | | | |
| Reported EPS | 0.35 | 0.20 | 0.62 | 0.50 | 1.66 |
| Adjusted Reported EPS | 0.36 | 0.20 | 0.62 | 0.50 | 1.67 |
| **Company Guidance (Per Transcripts)** | **0.33** | **0.15** | **0.57** | **0.45** | **1.63** |
| Restated EPS | N/A | N/A | N/A | N/A | 1.66 |
| Adjusted Restated EPS (estimated)[4] | N/A | N/A | N/A | N/A | 1.67 |

| | **2005** | | | |
|---|---|---|---|---|
| | Q1 2005 | Q2 2005 | Q3 2005 | Q4 2005 | FY |
| **SEC Filings:** | | | | |
| Reported EPS | 0.46 | 0.18 | 0.35 | 0.57 | 1.55 |
| Adjusted Reported EPS | N/A | 0.29 | 1.02 | 0.68 | 2.45 |
| **Company Guidance (Per Transcripts)** | **0.42** | **0.24** | **0.81** | **0.63** | **2.40** |
| Restated EPS | N/A | N/A | N/A | N/A | 1.49 |
| Adjusted Restated EPS (estimated) | N/A | N/A | N/A | N/A | 2.39 |

| | **2006** | | | |
|---|---|---|---|---|
| | Q1 2006 | Q2 2006 | Q3 2006 | Q4 2006 | FY |
| **SEC Filings:** | | | | |
| Reported EPS | 0.52 | 0.15 | 0.57 | 0.45 | 1.42 |
| Adjusted Reported EPS | 0.56 | 0.17 | 0.59 | 0.47 | 1.51 |
| **Company Guidance (Per Transcripts)** | **0.53** | **0.16 (stock split)** | **0.56** | **0.46** | **1.50** |
| Restated EPS | N/A | N/A | N/A | N/A | 1.32 |
| Adjusted Restated EPS (estimated) | | | | | 1.41 |

| | **2007** | | | |
|---|---|---|---|---|
| | Q1 2007 | Q2 2007 | Q3 2007 | Q4 2007 | FY |
| **SEC Filings:** | | | | |
| Reported EPS | 0.16 | -2.48 | 0.58 | 0.48 | (1.22) |
| Adjusted Reported EPS | 0.22 | 0.13 | N/A | 0.45 | 1.37 |

---

[4] The adjusted restated EPS was calculated by adding the difference between the originally reported and adjusted reported EPS figures provided in Carter's public filings to Carter's restated EPS figures.

- 55 -

| Company Guidance (Per Transcripts) | **0.14** | **0.11** | **0.56** | **0.50** | **1.42** |
| --- | --- | --- | --- | --- | --- |
| Restated EPS | 0.13 | -2.48 | 0.53 | 0.47 | (1.30) |
| Adjusted Restated (estimated) | 0.19 | N/A | N/A | 0.44 | 1.29 |

| | **2008** | | | | |
| --- | --- | --- | --- | --- | --- |
| | Q1 2008 | Q2 2008 | Q3 2008 | Q4 2008 | FY |
| **SEC Filings:** | | | | | |
| Reported EPS | 0.19 | 0.05 | 0.58 | 0.47 | 1.29 |
| Adjusted Reported EPS | N/A | 0.10 | 0.60 | N/A | 1.37 |
| **Company Guidance (Per Transcripts)** | **N/A** | **N/A** | **N/A** | **N/A** | **N/A** |
| Restated EPS | 0.24 | 0.07 | 0.55 | 0.47 | 1.33 |
| Adjusted Restated (Estimate) | N/A | 0.12 | 0.57 | N/A | 1.41 |

| | **2009** | | | | |
| --- | --- | --- | --- | --- | --- |
| | Q1 2009 | Q2 2009 | Q3 2009 | Q4 2009 | FY |
| **SEC Filings:** | | | | | |
| Reported EPS | 0.28 | 0.19 | | | |
| Adjusted Reported EPS | 0.38 | 0.23 | | | |
| **Company Guidance (Per Transcripts)** [E] | **N/A** | **N/A** | | | |
| Restated EPS | 0.28 | 0.28 | | | |
| Adjusted Restated (Estimated) | 0.38 | 0.32 | | | |

105.   The Restatement reveals that the Accommodations Fraud allowed the

Defendants to increase adjusted EPS by $0.06 in 2005 and $0.10 in 2006.  Even in

2007, an otherwise terrible year overall because of problems with the OshKosh

business, the Individual Defendants were able to increase adjusted EPS by $0.08,

putting the Defendants within $0.05 of Company guidance.  Although the

Company suspended guidance in 2008, the Accommodations Fraud also allowed

the Individual Defendants to reap huge cash bonuses by meeting their internal

adjusted EPS targets.  *See* ¶¶ 8, 10, 11, 13, 14, 22-26, 56-115, *supra*.

106.   The Restatement also reveals the significant effects of the Defendants' improper accounting of accommodation payments on the Company's Accounts Receivable figures, which had been consistently and drastically overstated during the Class Period, by as much as *26%*.  The Defendants had to have known of such a significant discrepancy in this key financial metric, or were extremely reckless in not knowing that their Accounts Receivable figures were alarmingly overstated.

| Period Ending | Restatement Adjustment | Previously Reported | Restated | Overstatement [Adjustment/ Restated] |
|---|---|---|---|---|
| 7/9/2009 | (11,813) | 96,864 | 85,051 | 13.9% |
| 4/3/2009 | (20,233) | 112,931 | 92,698 | 21.8% |
| 1/3/2009 | (20,608) | 106,060 | 85,452 | 24.1% |
| 12/29/2007 | (25,112) | 119,707 | 94,595 | 26.5% |
| 12/30/2006 | (16,892) | 110,615 | 93,723 | 18.0% |
| 12/31/2005 | (7,353) | 96,144 | 88,791 | 8.3% |

### (a)    **The Length and Materiality of the Restatement**

107.   Carter's restated *five and a half years'* worth of its financials, a fact even more striking considering that Carter's only went public in October, 2003.  In its amended Form 10-K/A, Carter's *admitted* that "the Company reported various customer accommodations in incorrect fiscal periods" and that "[t]he deferrals [of the accommodation payments] resulted in the overstatement of net sales and net income in certain of the Affected Periods and the understatement of net sales and net income in certain of the Affected Periods."  Moreover, Carter's also admitted that it had to make a "2003 cumulative adjustment to retained earnings in the amount of $3.1 million," meaning that it started 2004 with a material

overstatement, and that its 2003 financials were also materially false and misleading. Although Carter's conveniently failed to give an explanation for the material overstatement of earnings at the end of 2003, the Company did, in its December 23, 2009 press release, explicitly label the 2003 overstatement amount an "Accommodations adjustment," thus admitting that the 2003 overstatement was a direct result of the Accommodations Fraud, and also admitting that the Accommodations Fraud had started before 2004.

108.   In the amended 10-K/A, Carter's also admitted to: (i) control deficiencies in its internal controls associated with customer accommodations processes *that constitute material weaknesses*; and (ii) the need to restate prior period consolidated financial statements. Carter's further explained that "[a] material weakness is a control deficiency, or combination of control deficiencies, that results in more than a remote likelihood *that a material misstatement of the annual or interim consolidated financial statements* will not be prevented or detected."

109.   The nature of the Restatement and the circumstances leading up to it demonstrate that it was the result of conduct that was both reckless and deliberate. The improper booking of accommodation payments, to manage financial results by altering the timing of when reductions in net sales are recognized, demonstrates a deliberate attempt to mislead investors. As CW 1 put it, the Individual Defendants

used the Accommodations Fraud to "manage the street." So, too, the repeated certifications that the Company maintained strong internal controls in compliance with the highest industry standards are at best reckless, where management permitted an admittedly material accounting fraud to be perpetrated for nearly six years.

110.    In admitting its internal controls suffered from "material deficiencies," and, therefore, that the controls in place during the Class Period were not properly designed or operating correctly, Carter's tacitly acknowledged that the Sarbanes-Oxley certifications Rowan and Casey signed each quarter attesting to the adequacy of those controls were false.

111.    This admission, together with the duration of the fraud, whereby it continued, purportedly undetected, for almost six years, highlights that Carter's, Rowan and Casey were reckless in certifying that Carter's had effectively designed and operated internal controls during the Class Period. Either Rowan or Casey knew of the internal control problems during the Class Period, or they were deliberately reckless in signing those certifications by failing to conduct a reasonable inspection confirming that Carter's internal controls were both adequately designed and properly operating, as claimed in the certifications.

112.    Carter's and the Individual Defendants also refuse to reveal the full content of the quarterly manipulations used in furtherance of their fraud scheme,

instead only restating Carter's financials on a *quarterly* basis for 2007 and 2008, and restating on an *annual* basis for 2004 and 2005.  Carter's and the Individual Defendants then attempt to downplay the extent of the Accommodations Fraud, and the seriousness of their misconduct, by referring to the "cumulative" impact of their illegal practices over the entire five and a half year restatement period: "The cumulative, after-tax impact of the adjustments required to fairly state the previously issued financial statements for the Affected Periods is a 3% reduction in retained earnings in the amount of $7.5 million as of July 4, 2009."  Form 10-K/A.

113.    In particular, Carter's and the Individual Defendants attempt to hide the full extent to which Carter's prior results had been manipulated through the improper booking of accommodations *in order to meet expectations for Carter's performance*, by omitting to restate Carter's financials on a quarterly basis over the entire restatement period, and emphasizing that the cumulative cost of the Accommodations Fraud was  $7.5 million, or 3% of retained earnings.

114.    However, in a scheme to manage financial results as alleged herein, the cumulative impact does not represent the true extent of the Defendants' misconduct. The nature of such a scheme is to book deferred accommodation payments in quarters when results are better than forecast, while refraining from booking accommodation payments in quarters where results are worse than forecast.  In other words, the scheme involves under-reporting expenses in "bad"

quarters when they are incurred, and waiting instead for a "good" quarter in which they can be reported without missing financial targets.  Thus, even though the "cumulative" effect of the Accommodations Fraud on earnings might not seem that great, it was undeniably material in that it misled investors about Carter's true financials for a period of over five years, leading the market to believe in a false consistency and management's purported competence.  Indeed, that Carter's and the Individual Defendants chose to restate almost six years' worth of financials demonstrates that the Accommodations Fraud had a material effect on Carter's earnings.

### 2. The Accommodations Fraud Prompts Government Investigations

115.    On December 23, 2009 the Company issued a press release regarding its investigation into the improper booking of accommodation payments, and stating that "[t]he Company has self-reported information concerning this investigation to the Securities and Exchange Commission. The Company has also been informed that the United States Attorney's Office is conducting an inquiry into this matter. The Company will continue to cooperate with these inquiries."

### VIII. CARTER'S MATERIALLY FALSE ACCOUNTING AND FINANCIAL REPORTING

### A. Overview of GAAP Requirements

116.    GAAP are those principles recognized by the accounting profession as the conventions, rules, and procedures that define accepted accounting practice at a

particular time.  As set forth in Financial Accounting Standards Board ("FASB")

Statement of Financial Accounting Concepts ("Concepts Statement") No. 1, one of

the fundamental objectives of financial reporting is that it provides accurate and

reliable information concerning an entity's financial performance during the period

being presented. American Institute of Certified Public Accountants ("AICPA")

Concepts Statement No. 1, ¶42 states:

> 42. Financial reporting should provide information about
> an enterprise's financial performance during a period.
> Investors and creditors often use information about the
> past to help in assessing the prospects of an enterprise.
> Thus, although investment and credit decisions reflect
> investors' and creditors' expectations about future
> enterprise performance, those expectations are commonly
> based at least partly on evaluations of past enterprise
> performance.

117.  Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial

statements filed with the SEC that are not prepared in conformity with GAAP are

presumed to be misleading and inaccurate.  Management is responsible for

preparing financial statements that conform with GAAP.  As noted by the AICPA

professional standards:

> [F]inancial statements are management's
> responsibility….[M]anagement is responsible for
> adopting sound accounting policies and for establishing
> and maintaining internal control that will, among other
> things, record, process, summarize, and report
> transactions (as well as events and conditions) consistent
> with management's assertions embodied in the financial
> statements. The entity's transactions and the related

assets, liabilities and equity are within the direct
knowledge and control of management….Thus, the fair
presentation of financial statements in conformity with
Generally Accepted Accounting Principles is an implicit
and integral part of management's responsibility.

118.   Defendants' representations that Carter's financial statements were

prepared in accordance with GAAP were materially false and misleading because

the financial statements were materially inflated, and distorted the Company's true

financial performance during the Class Period, as the Company has now admitted

by restating Carter's financials.

119.   As a result of their improper booking of accommodation payments,

Carter's and the Individual Defendants caused Carter's reported financial results to

violate, among other things, the following provisions of GAAP for which Carter's

and each Individual Defendant is necessarily responsible:

--  The principle that financial reporting should provide information that is
useful to present and potential investors in making rational investment decisions
and that information should be comprehensible to those who have a reasonable
understanding of business and economic activities (FASB Statement of Concepts
No. 1, ¶34);

-- The principle of materiality, which provides that the omission or
misstatement of an item in a financial report is material if, in light of the
surrounding circumstances, the magnitude of the item is such that it is probable
that the judgment of a reasonable person relying upon the report would have been
changed or influenced by the inclusion or correction of the item (FASB Statement
of Concepts No. 2, ¶132);

-- The principle that financial reporting should provide information about
how management of an enterprise has discharged its stewardship responsibility to
owners (stockholders) for the use of enterprise resources entrusted to it. To the

extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general. (FASB Statement of Concepts No. 1, ¶50);

-- The principle that financial reporting should be reliable in that it represents what it purports to represent. The notion that information should be reliable as well as relevant is central to accounting. (FASB Statement of Concepts No. 2, ¶¶58-59);

-- The principle of completeness, which means that nothing is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions. (FASB Statement of Concepts No. 2, ¶80); and

-- The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered. The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent. (FASB Statement of Concepts No. 2, ¶¶95, 97).

## 1.    **Materiality**

120.    SEC Staff Accounting Bulletin ("SEC SAB") No. 99 requires both

quantitative and qualitative factors to be assessed in determining the materiality of

a misstatement, and unequivocally rejects the use of formulaic, numerical

thresholds to determine whether or not a misstatement is material.  SEC SAB No.

99 provides that "[a] matter is 'material' if there is a substantial likelihood that a

reasonable person would consider it important" which necessarily "requires that

one views the facts in the context of the 'surrounding circumstances,' as the

accounting literature puts it, or the 'total mix' of information, in the words of the

Supreme Court."

121.   Accordingly, SEC SAB No. 99 recognizes that "there are numerous circumstances in which misstatements below 5% could well be material," including where the misstatement "*masks a change in earnings or other trends*," "*hides a failure to meet analysts' consensus expectations for the enterprise*," "*changes a loss into income or vice versa*," "affects the registrant's compliance with regulatory requirements," or "*increas[es] management's compensation*."  As detailed above, all of these circumstances are present here.

122.   Most importantly, the Defendants have themselves confirmed materiality here by choosing to restate the Company's financials.

## B.   Carter's Class Period Financial Statements Violated GAAP

123.   Carter's financial statements during the Class Period were materially false and misleading regarding its net sales, which failed to take into account the proper accommodation payments in the appropriate quarters.  As such, all of Carter's financials, including A/R, EPS, and EBITDA, which derive from net sales, were rendered materially false and misleading during the Class Period. Moreover, Carter's also admitted to a material overstatement in earnings at the end of 2003, rendering their 2003 financial statements false and misleading, including those on which the IPO was based – the Company, in its December 23, 2009 press release, explicitly labeled the 2003 overstatement amount an "Accommodations adjustment," thus admitting that the 2003 overstatement was a direct result of the

Accommodations Fraud, and also admitting that the Accommodations Fraud had started before 2004.

124.   In its amended Form 10-K/A filed on January 15, 2010, Carter's admitted that, because of the Accommodations Fraud, "the previously issued consolidated financial statements for the fiscal years 2004 through 2008 included in the Company's Forms 10-K, and for the fiscal quarters from September 29, 2007 through July 4, 2009 included in the Company's Forms 10-Q, should no longer be relied upon."   The Company was forced to restate its financial results for *18 successive* quarters.

125.   As a result of the Accommodations Fraud, and its failure to comply with GAAP, Carter's was able to falsely inflate its reported results during the Class Period.   Had Carter's complied with GAAP, its reported financial results would have been materially different.   By restating, Carter's admitted that its previously reported financial statements were false and misleading at the time they were originally issued, that the errors contained therein were material, and that there was contemporaneous information available to the Company that demonstrated the falsity of those statements at the time they were issued.

126.   GAAP provides that previously issued financial statements, which are materially misstated as a result of an oversight *or a misuse of facts that existed at the time*, are to be retroactively restated. *See, e.g.*, APB Opinion Nos. 9, SFAS 154

¶¶2(h), 25, and the AICPA's Statement on Auditing Standards No. 53.  Therefore,
GAAP requires a restatement to occur when the originally issued financial
statements were based on fraudulent accounting practices (*i.e.*, "a misuse of facts
that existed at the time.")

127.   Defendants' acknowledgment that Carter's is required by GAAP to
restate its financial statements is an admission that the financial statements
originally issued were false based on information available to them at the time the
results were originally reported, and that the misstatements contained therein were
material.

### 1.   <u>Cookie Jar Accounting via Improper Booking of Accommodation Payments</u>

128.   GAAP prohibits the use of reserve accounts for general or unspecified
purposes.  SFAS No. 5, Accounting for Contingencies, ¶14.  In addition, SFAS 154
¶19 does not permit the deferral of an accounting adjustment arising from a change
in accounting estimate or the correction of an error – if such an error needs to be
corrected, the prior financial statements need to be restated to reflect the
correction.  These provisions both apply to the false booking of accommodation
payments, because the quantification of an accrued reduction to revenue by
Carter's is subject to management's estimate based on the historical results
experienced for customer accommodations.  As Carter's explained in its annual
Form 10-K filings: "In the normal course of business, we grant certain

accommodations and allowances to our wholesale and mass channel customers in order to assist these customers with inventory clearance or promotions. *Such amounts are reflected as a reduction of net sales and are recorded based upon historical trends and annual forecasts*." According to CW 1, who had access to presentations made to the Board that listed Carter's accommodation payments by customer, Carter's biggest customer account was Kohl's, and it had a longstanding history of accommodation payments made to Kohl's on which to base its estimate. Thus, management would set aside certain reserve accounts for accommodation payments based on historical trends with Carter's customers.

129.   CW 1 had access to the Company's "flux balance sheet," where Carter's would break down its reserve accounts pertaining to accommodations. According to CW 1, these flux balance sheets, which were prepared every quarter, and provided to the Individual Defendants, "were very detailed and broke down all the reserves. So accommodations, inventory, A/P, goodwill…was all detailed out in terms of the logic behind every component in the P&L [profit and loss], cash flow, balance sheet." CW 1 stated that "I would see the flux balance sheet, you know, where they would break down all the reserves that were hung up, to see in there what was done by account and I would kind of, that's where I would kind of call out, now why is a certain account up, you know, 40% accommodations and

another account is down. *And that's because they were moving the dollars around between accounts*."

130.   Improper "earnings management," or as CW 1 puts it, "managing the street," refers to financial reporting decisions made by management based on a desired outcome rather than what the accounting requirements dictate.  When a company manages earnings in a manner that violates GAAP over an extended period of time, a multi-year restatement is a common result.  The SEC prohibits the management of earnings and has disciplined registrants for employing this practice.  SEC Accounting and Auditing Enforcement Release No. 1563.  By improperly booking accommodation payments to manage its earnings in violation of GAAP, Carter's falsely conveyed the impression that it was performing consistently well throughout the Class Period, and the concomitant message that senior management knew their business.

131.   SEC SAB No. 99, ¶1. *Assessing Materiality* specifies that such "earnings management" is presumably material:  "While the intent of management does not render a misstatement material, it may provide significant evidence of materiality.  The evidence may be particularly compelling where management has intentionally misstated items in the financial statements to 'manage' reported earnings.  *In that instance, it presumably has done so believing that the resulting amounts and trends would be significant to users of the registrant's financial*

*statements.*  **The staff believes that investors generally would regard as significant a management practice to over- or under-state earnings up to an amount just short of a percentage threshold in order to 'manage' earnings**."

### 2.    <u>Lack of Internal Controls</u>

132.    As a publicly traded company, Carter's is required to maintain books and records in sufficient detail to reflect the transactions of the company and therefore prepare financial statements in accordance with GAAP.  Specifically, Section 13(b)(2) of the Exchange Act requires public companies to: "(A) make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; (B) devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that…transactions are recorded as necessary…to permit the preparation of financial statements in conformity with [GAAP]."  15 U.S.C. §78m(b)(2).

133.    Carter's failed to disclose the material internal control weaknesses inherent in its financial reporting related to its booking of accommodation payments.  According to Auditing Standard No. 2, "[a] material internal control weakness is a significant deficiency, or a combination of significant deficiencies, that results in more than a remote likelihood that a material misstatement of the

annual or interim financial statements will not be prevented or detected." Auditing Standard No. 2, ¶10.

134.   Carter's ultimately admitted in its amended 10-K/A that "[t]hrough the [restatement] investigation, management identified: (i) control deficiencies in its internal controls *associated with customer accommodations processes that constitute material weaknesses*…and (ii) the need to restate prior period consolidated financial statements."

135.   Carter's confirmed its reckless GAAP violations and internal control material weaknesses during the Class Period by admitting that the Company plans to implement the following necessary improvements subsequent to the period ended January 3, 2009:

> Making personnel changes, including the separation of certain employees from the Company, and a restructuring of the Company's sales organization;
>
> Implementing a periodic training program for all sales personnel regarding the appropriate accounting for accommodations and the impact on the Company's financial statements of recording such customer accommodations;
>
> Implementing procedures to improve the capture, review, approval, and recording of all accommodation arrangements in the appropriate accounting period;
>
> Establishing more comprehensive procedures for authorizing accommodations, including tiered accommodations approval levels that include the Chief Financial Officer and Chief Executive Officer;

Establishing a new position in the finance organization with responsibilities to include tracking, monitoring, and reviewing all customer accommodations, including certain budgetary responsibilities for accommodations;

Improving the method of educating employees on the Company's Code of Business Ethics and Professional Conduct; and

Reemphasizing to all employees the availability of the Company's Financial Accounting and Reporting Hotline and communicating information to the Company's vendors and customers about this Hotline, which is available to both Company employees and its business partners.

136.    Thus, contrary to the requirements of GAAP, the PCAOB, and SEC rules, Carter's failed to implement and maintain an adequate internal accounting control system, or knowingly or recklessly tolerated the failure to use existing internal controls in a manner that would ensure its compliance with GAAP.

## IX. **PwC'S ROLE IN THE ACCOMMODATIONS FRAUD**

## A.    **PwC Was Not an Independent Auditor under the AICPA**

137.    The conceptual framework for the AICPA independence standards is provided within the AICPA's Code of Professional Conduct, and defines the two required components of independence as:

a. Independence of mind—The state of mind that permits the performance of an attest service *without being affected by influences that compromise professional judgment*, thereby allowing an individual to act with

- 72 -

integrity and exercise objectivity and professional skepticism.

b. Independence in appearance—The avoidance of circumstances that would cause a reasonable and informed third party, having knowledge of all relevant information, including safeguards applied, to reasonably conclude that the integrity, objectivity, or professional skepticism of a firm or a member of the attest engagement team had been compromised.

138.    In addition to certain specific situations that would render an auditor's independence impaired, AICPA ET (Ethics) Section 101 recognizes that it is not practical to list every circumstance that might result in the appearance of a lack of independence and accordingly, advises that "…a member should evaluate whether that circumstance would lead a reasonable person aware of all the relevant facts to conclude that there is an unacceptable threat to the member's and the firm's independence." The evaluation of threats to independence, and safeguards applied to eliminate, or reduce to an acceptable level such threats, are required to be documented.  AICPA ET Section 101, Independence, ¶ 02 101-1.

139.    Thus, the auditing standards required PwC to "maintain independence in mental attitude in all matters relating to the audit."  (AU 220.01).  "This standard requires that the auditor be independent… *he must be without bias with respect to the client since otherwise he would lack that impartiality necessary for the dependability of his findings*, however excellent his technical proficiency may be."  (AU 220.02).  Here, as detailed below, PwC was biased by its cozy

relationship with its former employees, Casey and North, and was consequently

unable to "maintain independence in mental attitude in all matters relating to" the

Carter's audit.

### 1.    PwC Failed to Exercise Due Professional Care and Professional Skepticism

140.    PwC also had an obligation under AU 230 to exercise "due

professional care" in the performance of its Carter's audits – specifically, AU

230.07 required PwC to "to exercise professional skepticism."  AU 230.07 states

that "[p]rofessional skepticism is an attitude that includes a questioning mind and a

critical assessment of audit evidence."  In addition, AU 230.09 requires that, "[i]n

exercising professional skepticism, *the auditor should not be satisfied with less*

*than persuasive evidence because of a belief that management is honest.*"

141.    PwC allowed its former employees, Casey and North, to take

advantage of their prior relationship with PwC's Connecticut Office, and with the

partner in charge of the Carter's audit, Don Brenner, such that PwC's

independence as an outside auditor was severely compromised.  Instead of

rigorously conducting the required audit, PwC accepted Casey and North's

justifications and either recklessly or deliberately ignored several glaring red flags

that should have alerted a truly independent auditor to the existence of the

Accommodations Fraud.  PwC's lack of independence, in both mind and

appearance, resulted in PwC repeatedly certifying *five years'* worth of fraudulent

financials.

142.    During the Class Period, CW 1 participated in meetings that the

Carter's finance executives (including the Individual Defendants) had with their

supposedly independent outside auditor, PwC.  CW 1 stated that CW 1 "always

questioned how they could do [the smoothing].  And [Casey and North] would

come up with all these fancy documentations, and spend hours and hours, you

know, with PwC. That would always be something that they would always work

very hard, because I never helped them craft this message, I would just

occasionally go sit in on these clearance calls with the auditors.  And a lot of it was

just, you know, Andy [North] had already worked with his contacts at PwC

*because they had the relationship up at the Connecticut office because that's*

*where Andy came from*.  You kind of see how they got away with it, because *that's*

*where Mike [Casey] came from*, that's where Andy came from, so they had the

relationships there.  I think [Casey and North] worked very hard on controlling that

message to [PwC]…so it kind of raised a red flag to me…that they were trying to

book that [accommodation payment] expense to how they wanted it to come out

for whatever reason."

143.   In other words, Casey and North took advantage of their close relationship with PwC so that PwC, instead of conducting a thorough, independent audit as required, would just accept whatever North and Casey told them.

144.   In fact, prior to joining Carter's, Casey was the lead accountant responsible for the Carter's account at PwC's predecessor company, Price Waterhouse LLP.  During his time at the Company, CW 1 witnessed the cozy relationship between Casey and the PwC engagement partner, Don Brenner.  CW 1 recalled that Brenner would "*allow certain things to slide*."

145.   CW 2 also noticed the unusually close relationship PwC had with the Individual Defendants: "I would say that the Price Waterhouse auditors definitely, they know, they are very close to the executives, to those folks there and they know a lot of what goes on there."  CW 2 described the dynamic as "a very easy relationship with those guys….And that's very accurate.  I would say that they're probably not as hard on [the Individual Defendants] as they would be on other clients of theirs, and probably because of the relationship that [the Individual Defendants] have with them.  That they're former employees."  CW 2 confirmed that Don Brenner was the PwC partner in charge of the Carter's audits, and that he had a prior relationship with both Casey and North.

146.   When at Carter's during the Class Period, CW 2 sat very close to Christina DeMarvel, who was the head of Internal Audit and interfaced with PwC

on a regular basis. Due to the proximity of their workspaces, CW 2 observed PwC

being extremely lenient in their audits. CW 2 observed that if North said "we've

got it under control" then PwC would take his word for it and not actually perform

the additional testing. CW 2 observed this and had a close relationship with

DeMarvel. From the conversations that she overheard in the open working area,

CW 2 concluded that PwC was not as extensive in their testing as they would be

with other clients. CW 2 stated that PwC was not testing Carter's internal controls

as rigorously as CW 2 had observed other auditors typically did in CW 2's prior

experience at other companies.

## B.    <u>PwC's Deficient Audits of Carter's Financial Statements</u>

147.   As more fully set forth below, during the Class Period, PwC's audits

of the Company's financial statements were so deficient that the audit amounted to

no audit at all, were an egregious refusal to see the obvious or investigate the

doubtful, and/or disregarded specific "red flags" that would have placed a

reasonable auditor on notice that the Company was engaged in wrongdoing to the

detriment of its investors.

148.   Additionally, in spite of multiple risk alerts that related to the

Company's internal controls, internal audits, and disclosures, PwC deliberately or

recklessly disregarded significant red flags in these areas as well.

1.    **PwC's Certifications**

149.    PwC issued a "clean opinion" pursuant to each of its audits of Carter's

financial statements for the fiscal years 2004-2008.  In connection with the

Company's Form 10-K for fiscal year 2004, filed on March 16, 2005, PwC stated:

> Consolidated financial statements
>
> *In our opinion, the accompanying consolidated balance sheets and the related consolidated statements of operations, cash flows and changes in stockholders' equity present fairly, in all material respects, the financial position of each of Carter's, Inc. and The William Carter Company and its subsidiaries at January 1, 2005 and January 3, 2004, and the results of their operations and their cash flows for each of the three years in the period ended January 1, 2005 in conformity with accounting principles generally accepted in the United States of America.* These financial statements are the responsibility of Carter's, Inc. and The William Carter Company and its subsidiaries' management. Our responsibility is to express an opinion on these financial statements based on our audits. We conducted our audits of these statements in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit of financial statements includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinions.
>
> Internal control over financial reporting

*Also, in our opinion, management's assessments, included in the accompanying Management's Report on Internal Control Over Financial Reporting appearing under Item 9A, that each of Carter's, Inc. and The William Carter Company and its subsidiaries maintained effective internal control over financial reporting as of January 1, 2005 based on criteria established in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO"), is fairly stated, in all material respects, based on those criteria. Furthermore, in our opinion, each of Carter's, Inc. and The William Carter Company and its subsidiaries maintained, in all material respects, effective internal control over financial reporting as of January 1, 2005, based on criteria established in Internal Control—Integrated Framework issued by the COSO.* Carter's, Inc. and The William Carter Company and its subsidiaries' management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting. Our responsibility is to express opinions on management's assessments and on the effectiveness of Carter's, Inc. and The William Carter Company and its subsidiaries' internal control over financial reporting based on our audit. We conducted our audit of internal control over financial reporting in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. *An audit of internal control over financial reporting includes obtaining an understanding of internal control over financial reporting, evaluating management's assessments, testing and evaluating the design and operating effectiveness of internal control, and performing such other procedures as we consider necessary in the circumstances.* We believe that our audit provides a reasonable basis for our opinions.

- 79 -

150.    In connection with the Company's Form 10-K for fiscal year 2005,

filed on March 15, 2006, PwC stated:

Consolidated financial statements

*In our opinion, the consolidated financial statements listed in the accompanying index present fairly, in all material respects, the financial position of Carter's, Inc. and its subsidiaries (the "Company") at December 31, 2005 and January 1, 2005, and the results of their operations and their cash flows for each of the three fiscal years in the period ended December 31, 2005 in conformity with accounting principles generally accepted in the United States of America.* These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits. We conducted our audits of these statements in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit of financial statements includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

Internal control over financial reporting

*Also, in our opinion, management's assessment, included in Management's Report on Internal Control Over Financial Reporting appearing under Item 9A, that the Company maintained effective internal control over financial reporting as of December 31, 2005 based on criteria established in Internal Control—Integrated Framework issued by the Committee of Sponsoring*

*Organizations of the Treadway Commission (COSO), is fairly stated, in all material respects, based on those criteria. Furthermore, in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2005, based on criteria established in Internal Control—Integrated Framework issued by the COSO.* The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting. Our responsibility is to express opinions on management's assessment and on the effectiveness of the Company's internal control over financial reporting based on our audit. We conducted our audit of internal control over financial reporting in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. *An audit of internal control over financial reporting includes obtaining an understanding of internal control over financial reporting, evaluating management's assessment, testing and evaluating the design and operating effectiveness of internal control, and performing such other procedures as we consider necessary in the circumstances.* We believe that our audit provides a reasonable basis for our opinions.

151.    In connection with the Company's Form 10-K for fiscal year 2006,

filed on February 28, 2007, PwC stated:

Consolidated financial statements

*In our opinion, the consolidated financial statements listed in the accompanying index present fairly, in all material respects, the financial position of Carter's, Inc. and its subsidiaries at December 30, 2006 and December 31, 2005, and the results of their operations and their*

- 81 -

*cash flows for each of the three fiscal years in the period ended December 30, 2006 in conformity with accounting principles generally accepted in the United States of America.* These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits. We conducted our audits of these statements in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit of financial statements includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

Internal control over financial reporting

*Also, in our opinion, management's assessment, included in Management's Report on Internal Control over Financial Reporting appearing under ITEM 9A, that the Company maintained effective internal control over financial reporting as of December 30, 2006 based on criteria established in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO), is fairly stated, in all material respects, based on those criteria.*

*Furthermore, in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 30, 2006, based on criteria established in Internal Control—Integrated Framework issued by the COSO.* The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over

financial reporting. Our responsibility is to express opinions on management's assessment and on the effectiveness of the Company's internal control over financial reporting based on our audit. We conducted our audit of internal control over financial reporting in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. *An audit of internal control over financial reporting includes obtaining an understanding of internal control over financial reporting, evaluating management's assessment, testing and evaluating the design and operating effectiveness of internal control, and performing such other procedures as we consider necessary in the circumstances.* We believe that our audit provides a reasonable basis for our opinions.

152.    In connection with the Company's Form 10-K for fiscal year 2007,

filed on February 27, 2008, PwC stated:

> *In our opinion, the consolidated financial statements listed in the accompanying index present fairly, in all material respects, the financial position of Carter's, Inc. and its subsidiaries at December 29, 2007 and December 30, 2006, and the results of their operations and their cash flows for each of the three years in the period ended December 29, 2007 in conformity with accounting principles generally accepted in the United States of America.  Also in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 29, 2007, based on criteria established in Internal Control - Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).* The Company's management is responsible for these financial statements, for maintaining effective internal control over financial reporting and for its assessment of

the effectiveness of internal control over financial reporting, included in Management's Report on Internal Control over Financial Reporting appearing under Item 9A. Our responsibility is to express opinions on these financial statements and on the Company's internal control over financial reporting based on our integrated audits. We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the financial statements are free of material misstatement and whether effective internal control over financial reporting was maintained in all material respects. Our audits of the financial statements included examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. *Our audit of internal control over financial reporting included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk.* Our audits also included performing such other procedures as we considered necessary in the circumstances. We believe that our audits provide a reasonable basis for our opinions.

153.    In connection with the Company's Form 10-K for fiscal year 2008,

filed on February 27, 2009, PwC stated:

> *In our opinion, the consolidated financial statements listed in the accompanying index present fairly, in all material respects, the financial position of Carter's, Inc. and its subsidiaries at January 3, 2009 and December 29, 2007, and the results of their operations and their cash flows for each of the three years in the period ended January 3, 2009 in conformity with accounting principles*

- 84 -

*generally accepted in the United States of America. Also in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of January 3, 2009, based on criteria established in Internal Control - Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).* The Company's management is responsible for these financial statements, for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in Management's Report on Internal Control over Financial Reporting appearing under Item 9A. Our responsibility is to express opinions on these financial statements and on the Company's internal control over financial reporting based on our integrated audits. We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the financial statements are free of material misstatement and whether effective internal control over financial reporting was maintained in all material respects. Our audits of the financial statements included examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. *Our audit of internal control over financial reporting included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk.* Our audits also included performing such other procedures as we considered necessary in the circumstances. We believe that our audits provide a reasonable basis for our opinions.

C.    **Overview of GAAS**

154.    The Public Company Accounting Oversight Board ("PCAOB"),
established by the Sarbanes-Oxley Act of 2002, is responsible for the development
of auditing and related professional practice standards that are required to be
followed by registered public accounting firms. On April 16, 2003, the PCAOB
adopted as its interim standards GAAS as described by the AICPA Auditing
Standards Board's Statement on Auditing Standard ("SAS") No. 95, Generally
Accepted Auditing Standards, and related interpretations in existence on that date.
Accordingly, an auditor's reference to "the standards of the Public Accounting
Oversight Board (United States)" includes a reference to GAAS in existence as of
April 16, 2003. For simplicity, all references to GAAS hereinafter include the
standards of the PCAOB.

155.    GAAS is comprised of ten basic standards that establish the quality of
an auditor's performance and the overall objectives to be achieved in a financial
statement audit.  Auditors are required to follow those standards in each and every
audit they conduct.

156.    The GAAS standards fall into three basic categories: General
Standards; Fieldwork Standards; and Reporting Standards. The General Standards
require, among other things, that the auditor is independent, and conducts the audit
with due professional care, and require that the auditor exercise professional

skepticism.  The Field Work Standards require, among other things, that an auditor obtain a sufficient understanding of the entity's business and operating environment, including its internal controls, to assess the risks of material misstatement of the financial statements due to error or fraud and to properly plan an audit in accordance with GAAS.  Finally, the Reporting Standards require that an auditor express an opinion on the financial statements of a company taken as a whole, or an assertion to the extent that an opinion cannot be expressed.

157.   The auditor's report must express an opinion on the financial statements taken as a whole and must contain a clear indication of the character of the auditor's work. *The auditor can determine that he is able to express an unqualified opinion only if he has conducted his audit in accordance with GAAS.* AU § 508.07.

158.   By issuing its "clean opinions" for 2004, 2005, 2006, 2007, and 2008, PwC knowingly or recklessly disregarded significant weaknesses in Carter's internal controls, specifically internal controls relating to the way Carter's booked accommodation payments, as described herein.

159.   Carter's restatement, as well as the information provided by CW 1 as detailed below, confirm that PwC either recklessly failed to perform the required audit steps necessary during the Class Period, or ignored the findings of those tests and knowingly issued false and misleading unqualified audit opinions.

**D.**    **PwC's GAAS Violations**

160.   Among other things, PwC violated GAAS Standard of Reporting No. 1 which requires the audit report to state whether the financial statements are presented in accordance with GAAP.  (AU 508.04, AU 410).  PwC's opinions falsely represented that Carter's 2004, 2005, 2006, 2007, and 2008 financial statements were presented in conformity with GAAP when they were not, by virtue of the Accommodations Fraud described herein.

161.   PwC also violated GAAS's reporting standards by failing to issue an adverse opinion on the financial that were later restated because they had failed to comply with GAAP.   (AU 508.58).

162.   PwC knowingly or recklessly failed to comply with the audit documentation requirements of Auditing Standard No. 3 (AS 3) and Auditing Standard No. 5 (AS 5) and the evidential matter requirements of AU 326.  Had PwC adequately reviewed such evidence as: (1) Carter's quarterly flux balance sheet/income statement, to which it had access (and which, as described below, contained evidence that accommodation amounts were being fraudulently transferred amongst customer accounts), and (2) obtained customer confirmations of Carter's A/R, which would have shown the drastic overstatement of A/R during the Class Period, PwC would have discovered the Accommodations Fraud. (AU 326.01, 326.37).

163.    Auditing Standard No. 5: "An Audit of Internal Control Over Financial Reporting That is Integrated With an Audit of Financial Statements" suggests that performing walkthroughs will frequently be the most effective way of understanding likely sources of misstatement":

> In performing a walkthrough, the auditor follows a transaction from origination through the company's processes, including information systems, until it is reflected in the company's financial records, using the same documents and information technology that company personnel use. Walkthrough procedures usually include a combination of inquiry, observation, inspection of relevant documentation, and re-performance of controls.

164.    PwC either knowingly or recklessly failed to perform, or recklessly performed, walkthroughs of Carter's revenue and *accounts receivable*, which further contributed to PwC's fraudulent audit reports and Carter's fraudulent financial statements during the Class Period.  In particular, PwC should have also sent accounts receivable confirmations to Carter's customers in connection with PwC's audit of Carter's A/R in order to confirm the accuracy and completeness of Carter's A/R balances.  Had PwC done the appropriate walkthrough of Carter's A/R, it would not have failed to catch the unusually large overstatements of A/R (at times almost 30%) during the Class Period.

165.    Pursuant to AU 316: "Consideration of Fraud in a Financial Statement Audit," PwC was responsible for planning and performing its audit of Carter's

financial statements "to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether caused by error or fraud." AU § 316.01.  PwC knowingly or recklessly abdicated these audit responsibilities. Had PwC conducted its audit in compliance with GAAS and PCAOB standards, it would have discovered the Accommodations Fraud.

**E.    GAAS Required PwC to Consider Risk Factors as Part of Audit Planning**

166.    For purposes of planning and conducting its audits of Carter's, PwC was required to give special consideration to risk factors identified in "Fraud Risk Factors" that may have resulted in material misstatements of the Company's financial statements (AU 316.31-33, AU 316.85 Appendix A.2).  Fraud risk factors may be relevant to economic circumstances in general, an industry, or to a particular entity.  (AU 316.85 Appendix A.2).  The illustrative risk factors given in AU 316.85 are classified based on the three conditions generally present when fraud exists: incentive/pressure to perpetrate fraud, an opportunity to carry out the fraud, *and attitude/rationalization to justify the fraudulent action.*

167.    In particular, AU 316.85 A.2 Incentives/Pressures (b) recognizes that a fraud risk factor exists when:

> b. Excessive pressure exists for management to meet the requirements or expectations of third parties due to the following:

> — Profitability or trend level expectations of investment
> analysts, institutional investors, significant creditors, or
> other external parties (particularly expectations that are
> unduly aggressive or unrealistic), *including expectations*
> *created by management in, for example, overly optimistic*
> *press releases or annual report messages*.

This was precisely the kind of situation fostered by the Defendants' improper
booking of accommodation payments, which created the false impression that
Carter's was consistently performing at or above guidance.

168.   AU 316.85 A.2 Attitudes/Rationalizations also recognizes that a fraud
risk factor exists when there is "*excessive interest by management in maintaining*
*or increasing the entity's stock price or earnings trend*," "*a practice by*
*management of committing to analysts, creditors, and other third parties to*
*achieve aggressive or unrealistic forecasts*," and when "management fail[s] to
correct known significant deficiencies or material weaknesses in internal control
on a timely basis."  All these fraud risk factors were present at Carter's.  The
Defendants were committed to maintaining Carter's purported earnings, both
because a significant portion of their income was tied to Carter's earnings, and
because they wanted to maintain Carter's seemingly consistent financial
performance.  The Defendants also failed to correct internal control deficiencies
such as internal and external audit reporting to North and the finance department –
even after internal audit was supposed to report to Carter's General Counsel, CW 2
witnessed North giving directions to internal audit.

169.   SAS 99 – Consideration of Fraud in a Financial Statement Audit – provides an overview of fraud and the requirements of the auditor.  SAS 99 describes fraud risk factors as "events or conditions that indicate *incentives/pressures to perpetrate fraud*, opportunities to carry out the fraud, or attitudes/rationalizations to justify a fraudulent action."

170.   As an example of such an incentive/pressure to perpetrate fraud, SAS 99 states: "For example, an incentive/pressure to achieve an earnings level…to 'trigger' incentive compensation plan awards, may alone result in a risk of material misstatement due to fraud."  SAS 99, ¶ 36.

171.   SAS 99 specifically cites the tying of "significant portions" of management compensation to stock price targets *as a known risk factor* for fraud.  SAS 99, Appendix A.2.(c).

172.   Under SAS 99, therefore, a recognized fraud risk factor exists if key management personnel's compensation is significantly dependent on operating results, because this is a "[condition] that indicate[s] incentives/pressures to perpetrate fraud."  At Carter's, the majority of the executives' annual cash compensation was tied to the Company's EPS performance.  PwC was required to use an audit approach that appropriately reflected this risk factor.  Its failure to discover the Accommodations Fraud indicates that it either recklessly or deliberately failed to use the appropriate audit approach, or it used the appropriate

approach and recklessly or deliberately ignored evidence of the Accommodations Fraud. As CW 1 directly observed, the extremely close relationship between Casey (the former senior manager at Price Waterhouse LLP) and Don Brenner (the PwC engagement partner in charge of the Carter's account) led to Brenner's "allow[ing] certain things to slide."

## F.    <u>Red Flags Recklessly or Deliberately Disregarded by PwC</u>

173.    PwC was required to perform an integrated audit of Carter's in accordance with PCAOB Auditing Standards, meaning that the independent auditor opines on *both* the effectiveness of internal control over financial reporting and the consistency of the financial statements with GAAP. Specifically, PwC was charged with evaluating the Company's internal controls, internal audits, and financial disclosures. In each area PwC's accounting audit practices were so deficient that it deliberately or recklessly ignored significant red flags that would have alerted it to the Accommodations Fraud.

### 1.    <u>Overstated Accounts Receivable</u>

174.    The Company Restatement revealed that Carter's Accounts Receivable had been drastically overstated during the Class Period, at times by about 26%. The duration of the overstatements (over more than five years), and their magnitude, are both red flags that PwC either knowingly or recklessly

ignored, and would certainly have been discovered if PwC had conducted an audit test of Carter's financials.

| Period Ending | Restatement Adjustment | Previously Reported | Restated | Overstatement [Adjustment/ Restated] |
|---|---|---|---|---|
| 7/9/2009 | (11,813) | 96,864 | 85,051 | 13.9% |
| 4/3/2009 | (20,233) | 112,931 | 92,698 | 21.8% |
| 1/3/2009 | (20,608) | 106,060 | 85,452 | 24.1% |
| 12/29/2007 | (25,112) | 119,707 | 94,595 | 26.5% |
| 12/30/2006 | (16,892) | 110,615 | 93,723 | 18.0% |
| 12/31/2005 | (7,353) | 96,144 | 88,791 | 8.3% |

175.  SAS1 (AU 330) – Fieldwork Standards – Evidential Matter, deals with the auditor's requirement to obtain sufficient competent evidential matter to permit the formulation of an opinion on the financial statements under examination, *including the confirmation of receivables*.

176.  If PwC had not deliberately or recklessly ignored the drastic overstatement of Carter's accounts receivable, it would have been compelled to further examine revenue recognition and, in turn, the improper booking of accommodation payments.

## 2.  **PwC's Inappropriate Relationship with Casey and North**

177.  PwC failed to recognize or acknowledge that it had an inappropriately close relationship with its former employees, particularly Casey and North, that compromised its independence both in mind and in appearance.  AICPA ET Section 101, Independence, ¶ 02 101-1, requires that PwC evaluate and document

threats to its independence, and apply safeguards to eliminate such threats.

Instead, PwC permitted Casey and North to take advantage of their relationship

and failed to conduct an appropriately rigorous audit of Carter's financials and

internal controls – thus permitting Carter's and the Individual Defendants to

perpetrate the Accommodations Fraud for more than five years.

### 3. **Material Overstatement of Earnings at the End of FY 2003**

178.    PwC further failed to uncover Carter's admitted material

overstatement of earnings at the end of FY 2003.  As stated in Carter's 10-K/A:

"[t]he cumulative, after-tax impact of the adjustments required to fairly state the

previously issued financial statements for the Affected Periods is a 3% reduction in

retained earnings in the amount of $7.5 million as of July 4, 2009.  *This amount*

*reflects the sum of adjustments* to net income for fiscal 2004 through the six-month

period ended July 4, 2009, which total $4.4 million, *and a 2003 cumulative*

*adjustment to retained earnings in the amount of $3.1 million*."  In other words,

Carter's started 2004 with a material overstatement of earnings, admitting that its

2003 financials were also materially false and misleading.  Although Carter's

conveniently failed to give an explanation for the material overstatement of

earnings at the end of 2003, the Company did, in its December 23, 2009 press

release, explicitly label the 2003 overstatement amount an "Accommodations

adjustment," thus admitting that the 2003 overstatement was a direct result of the

Accommodations Fraud, and also admitting that the Accommodations Fraud had started before 2004.

### 4.    Duration of the Fraud

179.    Even though Carter's and the Individual Defendants kept the Accommodations Fraud going for over five years, PwC issued a clean audit opinion *five* separate times, for fiscal years 2004-2008, failing at *every* opportunity to discover the long-term fraud because, according to CW 1, PwC partner Don Brenner would "allow certain things to slide." It only took Westenberger a few *months* to discover the Accommodations Fraud, contrasted with PwC's reckless or deliberate ignorance over more than five *years*.

### 5.    Flux Balance Sheets

180.    According to CW 1, the Company's quarterly "flux" balance sheets, which break down all of Carter's reserve accounts, including accommodations, were routinely given to PwC. CW 1 stated that the flux balance sheets, which were prepared every quarter, "were very detailed and broke down all the reserves. So accommodations, inventory, A/P, goodwill…was all detailed out in terms of the logic behind every component in the P&L [profit and loss], cash flow, balance sheet." CW 1 noted that the flux balance sheets showed obvious inconsistencies, explaining: "I would see the flux balance sheet, you know, where they would break down all the reserves that were hung up, to see in there what was done by account

and I would kind of, that's where I would kind of call out, now why is a certain account up, you know, 40% accommodations and another account is down. *And that's because they were moving the dollars around between accounts*."

181.   Had PwC actually reviewed the flux balance sheets with the appropriate rigor, PwC would have been alerted to the suspicious shifting of accommodations between accounts that CW 1 observed, and that in turn would have led to the discovery of the Accommodations Fraud.

### 6.   Material Weaknesses in Internal Controls

182.   Auditing Standard ("AS") No. 2, *An Audit of Internal Control Over Financial Reporting Performed in Conjunction with an Audit of the Financial Statements*, was applicable to PwC. AS 2 ¶ 4 states that "[m]aintaining effective internal control over financial reporting means that no material weaknesses exist; therefore, the objective of the audit of internal control over financial reporting is to obtain reasonable assurance that no material weaknesses exist as of the date specified in management's assessment." A material weakness is a significant deficiency that "results in more than a remote likelihood that a material misstatement of the annual or interim financial statements will not be prevented or detected."15 (AS 2 ¶ 10).

183.    AS No. 5, *An Audit of Internal Control Over Financial Reporting That Is Integrated with An Audit of Financial Statements*, was also applicable to PwC. AS 5 ¶ 2 reflected substantially similar provisions as AS 2 ¶ 4.

184.    AS 2, ¶ 27 (No. 5, ¶7; No. 5, ¶62) describes components of internal controls and explains how an independent auditor should obtain a sufficient understanding of the internal controls for the purpose of assessing the risk of material misstatement and identifying deficiencies in internal control. AS 2 ¶ 27 (No. 5, ¶7; No. 5, ¶62) states as follows:

> In an audit of internal control over financial reporting, the auditor must obtain sufficient competent evidence about the design and operating effectiveness of controls over all relevant financial statement assertions related to all significant accounts and disclosures in the financial statements. The auditor must plan and perform the audit to obtain reasonable assurance that deficiencies that, individually or in the aggregate, would represent material weaknesses are identified.

185.    Despite opining that Carter's had "maintained, in all material respects, effective internal control over financial reporting," the Company's restated 10-K/A concluded that "management identified…control deficiencies in its internal controls associated with customer accommodations processes that constitute *material weaknesses*." The 10-K/A listed these "material weaknesses," all of which had been deliberately or recklessly ignored by PwC, and further stated that "[i]f not remediated, these control deficiencies could result in future material

misstatements to the Company's financial statements.  Accordingly, management

has determined that these control deficiencies constitute material weaknesses."

    186.   The material weaknesses identified by the 10-K/A were:

> (1) Revenue Recognition - The control over the timing of the recording of customer accommodations was *improperly designed* and was not effective in capturing the accuracy, completeness, and timing of accommodations arrangements.  The controls that had been in place focused primarily on the review of internal Company documentation and the representations of members of the sales organization to ensure deductions taken by customers were valid and authorized; however, the controls were not effective in recording completely and accurately the accommodations arrangements in the appropriate accounting periods.

> (2) Control Environment - Sales Organization - Training and oversight of the sales organization were not effective, which resulted in an insufficient understanding by the sales organization regarding the impact of failing to accurately and completely account for customer accommodations in correct periods on the Company's reported financial results.

    187.   In failing to identify these material weaknesses, PwC disregarded,

among other things, the absence of procedures to capture, review, approve, and

record all accommodation arrangements in the appropriate accounting period, and

the lack of comprehensive procedures for authorizing accommodations, including

tiered accommodations approval level.  These deficiencies were later identified in

Carter's amended 10-K/A.

188.   In particular, PwC disregarded the complete lack of a written policy with respect accommodation payments, as observed by CW 2.  CW 2 also observed "so little tracking, process or control" when it came to the Company's "accommodation list" and concluded that "*number one [accommodations] were not tracked when I was there…number two they were not controlled*.  There was no control in place."  PwC, however, recklessly or deliberately ignored this complete lack of internal control around accommodations.

189.   PwC also disregarded the conflicts inherent in Carter's internal and external auditors reporting directly to the finance department, and particularly Casey and North.  CW 2 witnessed North giving directions to the internal audit department, even when internal audit was supposed to report to Carter's General Counsel.

190.   Further, if PwC had conducted the kind of substantive audit tests normally done in connection with sales, listed below, PwC would not have failed to discover the Accommodations Fraud that the Defendants perpetrated for over five years:

> Customer Confirmation – confirmations are utilized in an effort to obtain third-party corroboration regarding outstanding customer indebtedness. In addition to providing independent evidence regarding the validity and accuracy of customer balances, confirmations are used to confirm sales terms and conditions, which may disclose the propriety of recognized revenue. To the extent customer responses are complete and forthcoming,

this procedure is highly effective for disclosing sales terms such as the *true* margin support arrangements at issue.

<u>Cash Application</u>– an analysis of historical cash applications for the period being audited is performed to ensure that invoices are being liquidated timely, and completely based upon the accurate application of cash receipts against the original invoice amount. This audit procedure can be performed right through the report date to further ensure agreement between cash receipts and invoice amount. This procedure is highly effective at uncovering misapplied cash in an effort to hide undisclosed margin support arrangements.

<u>Chargeback Analysis</u> - A review of customer account activity demonstrating an excessive amount of sales credits will bring into question the collectability of the customer receivable, as well as the propriety of recognized revenue. This audit procedure is highly effective at disclosing overstated sales recording subject to *subsequent period adjustment*, which is exactly what the Defendants did with accommodations here.

<u>Cut-Off Testing</u> – analytical procedures are often employed to identify inordinately high levels of sales activity toward the end of a reporting period, and are a useful technique for identifying potentially questionable revenue recognition. This testing is usually combined with an analysis of underlying invoices and shipping documents to determine whether customer sales were, in fact, sold according to terms that would justify revenue recognition *in the period under review*. To the extent unrecorded margin support arrangements were the subject of product shipments made at the end of the reporting period, this procedure would be a first step at identifying such improperly recorded sales.

<u>Contract Review</u> – selecting a sample of any written customer agreements and performing a detailed review of the indicated sales terms will disclose the extent to which

the Company utilizes standard, preapproved agreements, or whether salesmen are given latitude in structuring contract provisions, *which may require further analysis and testing of recognized revenue.* This procedure would indicate a need for additional audit testing if results show a prevalence of non-standard contract provisions.

<u>Commission Agreements</u> – a review of revenue is often accompanied by an analysis of salesman commission payments and underlying agreements in order to uncover potential incentive agreements and payments that may give rise to aggressive sales practices and questionable revenue recognition. This procedure would also lead to increased audit testing in cases where sales compensation is inordinately incentive-based.

<u>Cash Disbursement Analysis</u> – a review of the cash disbursement records is conducted to identify any potential outflows to Company customers in order to identify sales reductions in connection with co-operative advertising, or other arrangements that provide accommodations to customers, and require liability recognition, or reductions to revenue. If customer obligations (*i.e.*, accounts receivable) are not offset for credits and allowances, but rather settled by direct payments from the Company, this procedure would be *highly effective* at disclosing unrecorded, or delayed, margin support arrangements.

191.   Based on the foregoing, since PwC issued unqualified audit opinions during the Class Period, PwC either knowingly or recklessly, in violation of GAAS and PCAOB standards, disregarded Carter's violations of GAAP.

## X. FACTUAL ALLEGATIONS RELATING TO THE OSHKOSH FRAUD

### A.     Carter's Acquires OshKosh

192.   On July 14, 2005, Carter's, through its wholly-owned subsidiary, The William Carter Company, acquired all of the outstanding common stock of OshKosh B'Gosh, Inc. ("OshKosh") for a purchase price of $312.1 million, which included payment for vested stock options.

193.   The purchase price reflected goodwill of $151 million, representing the difference between the total price paid and fair value of OshKosh's assets.  In other words, the premium paid over fair value made up almost half of the entire purchase price, and reflects Carter's estimate of OshKosh's future growth potential and contribution to the Carter's business.

194.   Goodwill is an asset on the Company's balance sheet.  It also is referred to as "cost in excess of fair value net assets acquired," and represents the premium paid for an acquisition.  Goodwill often arises when one company purchases another company.  Goodwill typically reflects the value of intangible assets such as a strong brand name, good customer relations, good employee relations and any patents or proprietary technology.  Goodwill can be a strong signal of a business' growth potential.

195.   The purchase price reflected a preliminary goodwill estimate of $151 million, representing the difference between the total price paid and Carter's

valuation of OshKosh's assets and other liabilities.  In other words, Carter's

estimate of OshKosh's future growth potential and contribution to the Carter's

business made up *half* of the entire purchase price.

196.   Fred Rowan, Carter's Chairman and CEO, was effusive about the

acquisition, touting OshKosh as a source of growth for Carter's, stating in a May

10, 2005 press release: "We are excited to combine two of America's most trusted

children's apparel brands…. *This investment is a vehicle for long-term growth* and

provides an opportunity to increase our share of the baby and young children's

apparel market.  By leveraging our proven brand management and supply chain

skills, we believe we can create significant, long-term value for Carter's

shareholders, customers, and consumers."  (Emphasis added).

197.   On Carter's July 27, 2005 earnings call, Rowan emphasized how well

Carter's knew OshKosh as a result of Carter's careful due diligence and study:

> I think it is important to understand we are restoring this brand
> and company in phases. Each phase is meaningful with respect to our
> shareholders, and *we are confident we know what to fix first*. We
> closed the acquisition on July 14 and have been heavily involved
> since. *Our excellent due diligence proved to be very beneficial. There
> have been no big surprises*.
>
> OshKosh is definitely a unique fit *with significant growth
> opportunities*. There are meaningful synergies, and we can get it
> turned around without major distractions at Carter's. The first phase
> of this turnaround goes as follows. In marketing we will have reduced
> the number of brands and SKUs for fall '06. We are already
> identifying the meaningful core products for fall '06 and will
> materially lower product costs, elevate the product benefits, and in a

number of cases lower the prices. *We know exactly* the cost opportunities as we have costed the important products.

> …

> As I think we communicated in the previous call, *we really did our homework and due diligence, studying the consumer*, to understand what the consumer felt about the brands. They clearly see the brands very different. *We also talked to the wholesale customers at length* with independent surveys so we would not get a clouded view of it.

> > …

> I don't want to say a lot more about that, because *we are getting ready to go in the coming months to their customer base and present a much stronger formula of core, essential products, higher value proposition in those products, much more competitive formula than they have ever had*. So we have great confidence in that.

(Emphasis added).

198.   On the same earnings call, Casey also emphasized that Carter's could "fix" OshKosh, portrayed OshKosh as a tremendous growth opportunity, and declared that Carter's would be able to double their operating margin in two years:

> We've begun to integrate OshKosh.  I would characterize the savings opportunities as significant, and we will realize those savings over time.  I think it is important to know that in 2004 OshKosh's operating margin was less than 5.5%.  In 2002 their operating margin was over 11%, *and we believe we can restore their operating margin to over 10% by 2007*.

> > …

> We certainly have high confidence in the Carter's model assumptions. I'd say we are in a process of validating our model assumptions for OshKosh right now.  *But what we've seen so far is that there is tremendous opportunity both in sales and earnings contribution from OshKosh over time*.  There is no question that we

- 105 -

are validating the assumptions that we have. It's just a question of how quickly we can get at those opportunities, *and it's going to be a source of growth for a long period of time.*

...

So I think at this point we are being very thoughtful about how we model, based on what we know today. *We are trying to give you some direction, and certainly a direction of growth. There is plenty of opportunity.*

(Emphasis added).

199.  Casey further stated on the same call that OshKosh wholesale, in particular, would prove to be a big growth area once Carter's "corrected the product": "I think the big opportunities there, starting with the wholesale business, *correcting the product, turning that wholesale business around,* and that will start before fall 2006." (emphasis added).

## B.   **Carter's Touts OshKosh As a Growth Story**

200.  Investors responded to Carter's message that it would quickly turn OshKosh around, restore its operating margins, and use OshKosh to fuel the Company's growth for years to come.  By August 2005, Carter's stock price increased 50% from the date the OshKosh deal was announced, as the market reacted favorably to the OshKosh Defendants' continuing assertions that they could turn OshKosh around and effectively double its operating margin in a mere two years.  As evidenced by a Credit Suisse First Boston analyst report on August 1, 2005, analysts had accepted the OshKosh growth story: "The acquisition of

OshKosh strengthens the company's position as the leading supplier of children's apparel, provides significant synergies, *and raises Carter's already robust growth outlook*….The company believes it can raise OshKosh's operating margin to over 10% by 2007 from less than 5.5% last year." (Emphasis added).

201.   At an August 1, 2005 meeting with investors, Carter's stayed relentlessly on message about growing OshKosh.  A Ryan Beck analyst reported on the meeting on August 3, 2005:

> The OshKosh acquisition was the principal topic at the various meetings. *Additional details were provided on the growth opportunities, which support meaningful accretion likely in excess* of the $0.25 and $0.35 we are assuming in our model for 2006 and 2007, respectively.  There appears to be sizeable opportunity to grow the top line to $2 billion or more from the proforma $1.3 billion as OshKosh has both a retail and a wholesale opportunity.

(Emphasis added).

202.   As Carter's stock continued to reflect the benefits of the OshKosh Defendants' statements touting the incredible growth opportunities with OshKosh, the Company announced in its Form 8-K, dated September 9, 2005, that it had entered into an amended and restated employment agreement with its CEO, Defendant Rowan.  Under the amended agreement, Rowan stood to earn bonuses "of $500K in 2005, $1M in 2006, and $1M in 2007, subject to the Company's achievement of pre-determined net income and other qualitative performance targets relating to the integration of OshKosh, the Company's recently acquired

division", in addition to his regular income and income derived from any Carter's stock sales. Rowan, therefore, had a powerful incentive to make the OshKosh acquisition a seeming success for Carter's.

203.    On Carter's Third Quarter 2005 earnings call on October 26, 2005, Rowan delivered a glowing progress report on the integration and OshKosh product design, stating that "[t]he OshKosh integration is going very well and is on schedule. We are keeping the brand distinct from Carter's by separating marketing, merchandising, and product design. We are integrating all the support functions. We had an active operating committee at OshKosh led by Dave Brown, our senior executive of operations at Carter's. We are executing well…..We have had very successful sessions with OshKosh merchandising and design."

204.    On the same call, Casey reiterated the growth potential in OshKosh, that Carter's was well on its way to realizing that potential, and that OshKosh was going to be a growth engine for Carter's for a "long time":

> Our focus is on improving the quality of OshKosh's business, which among other ways, we'll measure the improvement in OshKosh margin (indiscernible) improvement at OshKosh by their operating margin.  There are a number of opportunities to improve OshKosh's profitability, *some of which we've already realized.*
> …
> We're integrating our benefit plans with savings of over $2 million a year. Suffice to say, we'll realize significant savings from integrating our two companies. Keep in mind, *we'll reinvest some of these savings to rebuild OshKosh to realize this great brand's top-line growth and earnings potential.* For 2006, relative to our long-term

annual growth objective of 15% to 20% in earnings, we currently expect to be at the top end of that range.

     …

*You will see acceleration in OshKosh's operating margin.* They are a fraction of where their operating margins were just three years ago. *You'll see acceleration in OshKosh's operating margin.* Of course, the operating margin is a fraction of what Carter's is. *It will be a nice contributor for a long time.*

(Emphasis added).

205.   In keeping with its statements about growing OshKosh, the Company also announced on the same earnings call that it would be closing a large number of "unprofitable" OshKosh stores, but would also open stores in other locations as it continued analyzing the OshKosh brand. Rowan stated "We're going to open stores. Eventually we think we could open brand stores as we move more through this brand study we've just started."

206.   Rowan also emphasized that the Company had spoken with wholesale retailers about OshKosh, with all indications for growth being good:

They all had great respect for OshKosh. *They view OshKosh as a firehouse in toddler and the older segments.* They look forward to – I don't want to say carterizing. It sounds like it's a me too. They look forward to being a part of our Company and our accomplishments. *They have great confidence that we are going to do a really good job together with OshKosh.*

(Emphasis added).

207.   In his closing remarks on the same call, Rowan again was effusive on the growth potential in OshKosh, saying "We've got a great brand in OshKosh

already showing some signs of improvement. *We couldn't feel better about the potential of it.* We have the ability to invest where it's needed.  We're quite capable of investing in key areas." (Emphasis added).

208.   The market reacted positively to the OshKosh Defendants' consistently glowing assessments of OshKosh as a long term growth engine for Carter's.  A Next Generation Equity Research analyst report on October 27, 2005 expressed the general market expectations regarding OshKosh growth:  "OshKosh integration efforts appear ahead of plan. We expect cost savings *could yield an operating margin approaching 10% in 2006, up from 5.1% reported in 2004.*" (Emphasis added).

209.   In its November 10, 2005 Form 10-Q, the Company reported that Rowan had been paid $500,000 out of the potential $2.5M bonus package the Directors had approved relating to the OshKosh acquisition.

210.   The OshKosh Defendants continued their assertions that OshKosh would be a tremendous growth vehicle, especially in wholesale.  An analyst from Ryan Beck who attended a meeting held by the Company at a NYC showroom, to preview the Fall 2006 OshKosh line, reported on January 27, 2006 that "[s]trategies were discussed to improve the profitability and restore the wholesale business, which was half of the prior peak at the time of the acquisition."  Another analyst from Morgan Keegan stated in glowing terms in a January 30, 2006 report:

"We believe it's abundantly clear management has a firm grasp not only on how to fix OshKosh, but also on how to turn OshKosh into a growth vehicle."

## C.    The OshKosh Defendants Know That Their Plan to "Fix" OshKosh is Not Working

211.   A January 27, 2006 Ryan Beck report highlighted Carter's stated design changes to the OshKosh line, as part of its overall strategy to "fix" OshKosh.  Notably, Carter's had made the decision to "position the OshKosh line for ages 0 through 7 to a more upscale market against specialty retailers…."  This meant that Carter's had decided to design and price OshKosh clothing for a higher "price point".  The analyst also reported that "[t]he company is expected to complete its brand study for OshKosh by summer with implementation in 2007. The outgrowth of the study could lead to a rollout of brand stores following the initial focus upon restoring the wholesale business".

212.   According to CW 3, a former Inventory Control and Cost Account Manager who worked at OshKosh for 19 years (from 1988 through September 2007) and who reported to the former OshKosh CFO, Carter's "played around" with the styling of the OshKosh brand by placing more "needles, bells and whistles" into the product in order to position OshKosh at a higher price point. CW 3 confirmed that this strategy backfired on Carter's, as it became evident during 2006 that OshKosh sales were slumping.  Because wholesalers placed orders several months in advance of actual sales, Carter's received accurate

indications of what OshKosh sales would be months before actual sales were reported. CW 3 stated that Carter's was aware by the summer of 2006 at the latest, that the fall OshKosh line would be a failure in sales terms. CW 3 explained that Carter's had a nine month time lag between designing a product and bringing it to the market, and that by the summer of 2006, management was floundering in an attempt to "change the brand direction" *yet again* for the Spring 2007 line. CW 3's description stands in stark contrast to the confident expertise projected by the OshKosh Defendants that they knew just what to "fix" at OshKosh in order to turn it around.

213. Other Carter's employees observed that, rather than "fixing" OshKosh, Carter's was making the OshKosh product worse. CW 4, a former Director of Cost Accounting and Budgeting, worked for OshKosh from June 1985, through the acquisition by Carter's, to March 2006. CW 4 stated that the first OshKosh line of clothing under Carter's design team was the Fall 2006 line. CW 5, an Assistant Store Manager who worked at Carter's from November 2005 to March 2008, said that after the acquisition, there was a noticeable deterioration of quality in OshKosh clothing, including fading and shredding, and a corresponding increase in returns. The prior OshKosh products before the Fall 2006 line, by contrast, had been "double seamed" and more durable. In addition to design and quality problems, CW 4 also said that Carter's wholesale customers, like Kohl's

and JC Penny, could not get desirable price points with the new OshKosh line from Carter's.  As a result, wholesale orders fell.

214.   CW 6, a former District Manager for OshKosh from 1998, through the acquisition, to March 2006, echoed the observation that Carter's design changes lessened the quality and durability of OshKosh clothing, and that changes by Carter's to the colors and embroidering of the clothing had a marked negative effect on actual sales.

215.   CW 1, the former Vice President for Investor Relations, confirmed that Rowan and Casey "made a bunch of misrepresentations to the investors and the Board…Yeah, Fred and Mike and, you know, they made a bunch of ridiculous statements…the issue was, okay, we're going to cut down skus [stock keeping units] and take out less complexity, which is thus one of the reasons why we acquired it that could justify the valuation of the brand, right?...Well that wasn't the case.  And there was…a big conflict between OshKosh and the people that were running the brand and what the management team had represented to investors and the board that was actually occurring.  *And they knew for a fact that it was actually getting more complex*, and that that strategy was not getting executed even though it was being represented to investors and the board."

216.   CW 1 also confirmed that the Fall 2006 line was the first Carter's designed OshKosh line, and that the OshKosh Defendants were aware that it would

be a failure months in advance, because of information they had obtained from the "Fall sell-through." CW 1 explained that "[e]verything that happened prior to [the second half of 2006] from a top line, from a revenue perspective, really has nothing to do with the Carter's management team, because it was already designed, developed, produced and sold by a prior management team, prior owners. The lead times are so long. *And once the Fall sell-through started to come through, that's when everyone realized that there was issues*, and that's when things really started to get heated up." CW 1 observed that "obviously Mike [Casey] and Fred [Rowan] realized that all of the representations were probably off, and there was lots of heated debate and finger pointing."

217.    CW 1 also confirmed that Rowan and Casey instructed him to convey to unsuspecting investors that Carter's was going to turn the OshKosh line around, when the OshKosh Defendants already knew that the redesigned line was a failure: "Yeah, the message was we're making a lot of progress. You know, the key accounts love the brand and we're seeing positive traction and we just need another season to learn from the prior season, and so there's always this what-if scenario. I mean there's always the next year's scenario….*we fed [the investors] a bunch of false hope*."

218.    CW 1 expressed his discomfort with conveying this misleading information: "And that's when I became very skeptical and was kind of caught in a

tough spot because I'm an employee of the company…And I reported to [Rowan and Casey], but you know there's an ethics part behind it as well…*you got a whole bunch of other legal issues where I can't just come out and say, look the business sucks* and you know here's a trend line but it, you know.…"

219.   The OshKosh Defendants were fully aware of the false message they were selling to unsuspecting investors.  In an email exchange between CW 1 and Casey in June 2007 in which CW 1 relayed questions from analysts expressing bewilderment at "how we could be so off with OshKosh," Casey admitted that "they have a right to be frustrated. *We've made mistakes in an aggressive attempt to make OK [OshKosh] and retail  something it is not.*"

220.   Even as their own employees were witnessing the slumping sales caused by their poorly chosen design changes, however, the OshKosh Defendants continued to sell the market on the OshKosh turnaround and growth story.

221.   By early 2006, Carter's stock was up 61% from the time the OshKosh acquisition was announced, as a result of the OshKosh Defendants' conditioning the market about the prospects for OshKosh.  A February 9, 2006 Credit Suisse First Boston report reflected the OshKosh Defendants' optimism noting how important OshKosh performance was to Carter's: "We regard OshKosh *as a significant component of the company's top- and bottom-line growth story*, we believe difficulties related to the integration of the two companies' systems and

infrastructure, as well as challenges related to turning around OshKosh *could*

*significantly impact Carter's earnings growth*." (Emphasis added). Thus, the

OshKosh Defendants had effectively conditioned the market that Carter's growth

depended heavily on OshKosh.

## D.    The OshKosh Defendants' Materially False and Misleading Statements and Omissions Relating to the OshKosh Fraud

### 1.    February 22, 2006 Earnings Call

222.    On Carter's Fourth Quarter 2005 earnings call on February 22, 2006,

the OshKosh Defendants continued to plug the OshKosh growth story. Rowan

said:

> [L]et me say we feel we did the right thing acquiring
> [OshKosh]. *There were no material surprises* after the deal due to our
> good due diligence. *We feel the brand has a billion dollar potential.*
> We feel we are on our plan. It's important to realize this will take
> some time to reach the potential. *Fall '06 product is materially better
> but holiday '06 and Spring and Fall of next year will move well ahead
> of Fall '06.*

(Emphasis added).

223.    This statement was false and misleading because Rowan knew, or was

reckless in not knowing, that the Fall 2006 OshKosh line suffered from quality and

design problems, but omitted to disclose this material information to the investing

public. Thus, in contrast to what CW 3 stated regarding Carter's lack of direction

for OshKosh, which CW 1 corroborated, Rowan continued giving the impression

that Carter's was making huge strides in improving the OshKosh product and

growing the OshKosh brand.

224.    On the same call, Pacifico, in addition to continued assertions about

growth opportunities with OshKosh, announced a new head of design at OshKosh

and confirmed that Carter's received wholesale orders several months before actual

sales:

> Talk about Oshkosh now, we built a strong integration plan
> after acquiring Oshkosh in July of last year. The integration is on plan.
> I feel good about the progress we've made and *even better about the*
> *opportunity I see to increase the power in the Oshkosh brand….Most*
> *importantly we significantly upgraded the product for Fall '06.* We
> have integrated all of our support functions of Oshkosh under Carter's
> management and we also moved Oshkosh design under Patty DeRosa
> as of January 1.
> …
>
> [W]e continue to clean up the Oshkosh wholesale distribution
> channel but we are planning a double-digit increase for Fall. *We are*
> *projecting a double-digit increase for Fall '06. All the orders are due*
> *by the end of the month* [February]. I'm confident we'll achieve that
> plan even though we excluded a lot of accounts from year before.

(Emphasis added).

225.    This statement was false and misleading because the OshKosh

Defendants knew, or were reckless in not knowing, that the Fall 2006 line would

not result in a double digit increase in sales by the booking information they

currently possessed at the end of February, and that, in fact, the Fall 2006 line

suffered from design and quality flaws, but omitted to disclose this material information to the investing public.

226. Pacifico further stated that feedback on the new OshKosh line had been "very good", further feeding the OshKosh growth story:

> Yes, Fall '06, like I said, we have a double-digit increase planned for the wholesale line. We would anticipate the same for holiday. Oshkosh has four lines a year, which is a little different than Carter's but-- and then we would expect that to pick up more as we get into 2007. We learn a lot each time we come out with a line. *We had good, very good customer feedback.* We placed the product in the accounts we wanted to place it in so we feel very good about that, but we also see there's a lot of room for improvement as we go forward.

(Emphasis added)

227. This statement was false and misleading because the OshKosh Defendants knew, or were reckless in not knowing, that their wholesale customers were not reacting positively to the Fall 2006 OshKosh line, as corroborated by CW 4 in ¶ 213 above, because of Carter's decision to place the product at a higher price point, yet omitted to disclose this material information to the investing public.

228. Casey, on the same call, falsely claimed to have "stopped the decline" in OshKosh earnings, reiterated that Carter's was on track to double OshKosh's operating margin by 2007, echoed Pacifico's assertion that Carter's was receiving good customer feedback for the new OshKosh designs, stated that Carter's had "corrected" the OshKosh business, and touted OshKosh as a growth engine for the "foreseeable future":

- 118 -

We've made significant changes to Oshkosh's business. *We've stopped the decline in earnings and we have begun rebuilding Oshkosh to the profitable growth business* that it was not that long ago.

…

*We continue to believe we can make significant progress improving Oshkosh's operating margin from less than 5% in 2005 to over 9% in 2006 and over 10% in 2007.* Over the next few years we believe Oshkosh's operating margin could approach Carter's operating margin.

…

So in summary, we've continued to deliver strong organic growth at Carter's. *We've moved quickly to correct the Oshkosh business* and have made very good progress with the integration.

…

The more powerful story is the second half of the year, again, exclusive of these off price customers, we're planning double digit growth in the wholesale business, so that's-- we're very encouraged by that. *We're getting good support for the product* and planning double digit growth….

…

*What we love about Oshkosh it's going to enable us to continue putting up good revenue and earnings growth numbers for the foreseeable future*….one of the reasons we loved the Oshkosh opportunity is we felt as though it was significantly under performing its potential for profitability, *so we're focused on improving their operating margins and we're making good progress doing that*.

(Emphasis added).

229.    These statements were false and misleading for the reasons explained above in ¶¶ 223, 225 and 227, that the OshKosh Defendants knew sales were not going to be up for the Fall 2006 line by the end of February, and that their customers were not receptive to their redesign of OshKosh clothing, which was both of lower quality, and priced higher than the product prior to the Carter's

redesign. Yet, the OshKosh Defendants omitted to disclose this material information to the investing public.

230. Analysts reacted positively to the OshKosh Defendants' statements. A February 22, 2006 Credit Suisse First Boston report stated: "Impressively, OshKosh's operating margin is on track to approach 10% in 2006 from <5% in 2005." This expectation was repeated in at least two other analyst reports – a Next Generation Equity Research report and a Ryan Beck analyst report, both dated February 22, 2006.

## 2.    **April 26, 2006 Earnings Call**

231. In an April 25, 2006 press release, Carter's announced that OshKosh sales for the second half of 2006 would be "flat" compared to the same period in 2005. However, the OshKosh Defendants remained relentlessly on message about the OshKosh growth opportunity and continued to tout Carter's prospects from OshKosh going forward. On the April 26, 2006 First Quarter 2006 earnings call, Pacifico stated that despite the flagging sales, OshKosh profitability had still increased, and that Carter's had received "excellent feedback" from customers regarding the OshKosh line:

> Talk about OshKosh wholesale -- we continue to make progress with the OshKosh integration and are encouraged by our results. As you know, we recently finished booking fall, 2006 and are in the middle of booking holiday, 2006. As we are -- we believe, *for the second half, we will be flat to last year. However, we are expecting increased profitability* based on that we have eliminated planned

upfront discounts and edited unprofitable accounts.....As we said before, this integration is a process and we are learning and improving every step of the way. *We have received excellent feedback* from our accounts, and we're building that into our future lines.....*Every season is getting stronger as OshKosh* -- as we refine the product mix and pricing strategy, narrow the complexity and begin to experience the benefits of our joint leverage. The teams are working well together, and the integration of people and processes is proceeding according to our expectations.

(Emphasis added).

232.   This statement was false and misleading for the same reasons that the statements from the February 22, 2006 earnings call were misleading – that the OshKosh Defendants knew, or were reckless in not knowing, by the end of February that sales were not going to be up for the Fall 2006 line, and that their customers were not receptive to their redesign of OshKosh clothing, which was both of lower quality and more expensive than the product prior to the Carter's redesign.  The OshKosh Defendants, however, omitted to disclose this material information to the investing public.

233.   On the same call, Casey again touted the OshKosh growth story by emphasizing increases in OshKosh's operating margins:

Consistent with our integration plan, *we are improving OshKosh's operating margin*, and we've made significant progress since the acquisition. For the quarter, we've achieved positive operating margin for OshKosh. We expect this trend to continue in the second quarter. This is the first time in several years that OshKosh has achieved an operating profit in the first half of the year. We are on track to realize our acquisition cost savings initiatives, which are estimated to be over $20 million this year.  *We continue to believe that,*

- 121 -

> *over the next few years, OshKosh's operating margin could*
> *approximate Carter's operating margin of over 13%.*

(Emphasis added).

234.   This statement was false and misleading because the OshKosh

Defendants knew, or were reckless in not knowing, that current booking

information showed *declining* sales figures and OshKosh would be *losing* money.

CW 3 confirmed that wholesale accounts continued to provide negative feedback

on the Fall 2006 line throughout the summer of 2006.  Again, the OshKosh

Defendants omitted to disclose this material information to the investing public.

235.   Analysts continued to reflect the OshKosh Defendants' continued

positive assertions about OshKosh's growth and profitability.  On June 14, 2006 a

Credit Suisse First Boston analyst reported that:

> Carter's efforts to turnaround OshKosh's profitability are taking
> hold, and EBIT margins are *expected to improve from 4% prior to the*
> *acquisition to 10% in 2006.*  The two brands continue to fit extremely
> well together, with Carter's dominating the baby category, and
> OshKosh with the potential to replicate that formula in the 2 – 7 year
> old category. Carter's will put its stamp on OshKosh product for the
> first time this fall, and *retailer reception has been strong*, with the
> brand's spring 2007 business in the wholesale channel expected to
> increase 15%.

(Emphasis added).

236.   This was followed by a July 16, 2006 Credit Suisse First Boston

report:  "We believe Carter's can generate double-digit annual top-line growth over

the next 5-7 years driven by [its] own retail and OshKosh wholesale….*Given the*

- 122 -

*strength of the OshKosh brand and Carter's ability to improve the product,*

*OshKosh wholesale is also a large opportunity.*"  (Emphasis added).

**(a)    The Truth Begins to Emerge -- the July 2006 Disclosure**

237.    On July 25, 2006, Carter's issued a press release and the next day

conducted a conference call announcing financial results for the Second Quarter

2006, in which Carter's issued full year earnings guidance for the remainder of

2006 that was well-below analysts' expectations, due to lower than expected fall

sales from OshKosh.  After Carter's released its revised guidance following the

market close on July 25, 2006, its stock price plummeted 12% the next day, to a 52

week low in heavy volume trading (over 4 million shares traded compared to an

average of 753,000 shares/day during the Class Period).

**3.    July 26, 2006 Earnings Call**

238.    Belatedly confirming CW 3's conclusion that the Fall 2006 OshKosh

redesign was a failure, Rowan admitted that Carter's had "positioned fall too

high", but again reiterated the familiar growth story, this time with respect to the

Spring 2007 line:  "[Orders for Spring] will be due mid-August *and we are*

*receiving a very positive reaction from our key accounts* and we will project

double-digit growth in the spring '07 bookings." (emphasis added).

239.    Similarly, Casey continued to emphasize OshKosh growth and

profitability:

- 123 -

With respect to OshKosh profitability in the second quarter, OshKosh's gross margin was about 39% and in line with our expectations. *We have made significant progress improving the profitability of OshKosh.* We improved OshKosh's gross margin 160 basis points in the second quarter and 150 basis points in the first half. We expect to improve OshKosh's gross margin over 400 basis points in the second half and over 300 basis points for the year.

…

In terms of OshKosh, *that is a 10% to 15% growth business.* That is the growth objective for purposes of guidance. Wholesale will be at 10% to 15% growth business…..So there is no question in our mind that OshKosh can be significantly larger business in the wholesale sector.

(Emphasis added).

240.   This statement was false and misleading because the OshKosh

Defendants knew, or were reckless in not knowing, that current booking

information showed declining sales figures and OshKosh would not be profitable.

CW 3 confirmed that wholesale accounts continued to provide negative feedback

on the Fall 2006 line throughout the summer of 2006.  The OshKosh Defendants

omitted to disclose this material information to the investing public.

241.   Although the Fall 2006 design, which, as CW 3 stated, had more

"bells and whistles," was a failure, Carter's continued to embellish the clothing for

Spring 2007.  As a July 26, 2006 Ryan Beck analyst reported after previewing the

Spring 2007 line: "We previewed the OshKosh spring 2007 line, which *was more*

*embellished, had more washes* and better fits."  (emphasis added).

242.    Following the July 26, 2006 earnings call, the first questions started to arise about whether Carter's growth plan for OshKosh was truly on-track.  On September 14, 2006, a Morgan Keegan analyst reported that she was surprised to discover, contrary to the OshKosh Defendants' prior statements that wholesalers were reacting positively to their OshKosh designs, that Macy's West, a leading account for Carter's, *was not carrying any OshKosh clothing at all*:

> The second most pressing question is the 2H:06 plan calling for a slight decline in OshKosh revenues. After a year of store closures and the exit of unprofitable distribution/product categories/etc., *we would have expected to have seen at least some growth out of the business in the second half of this year. Management led us to believe* the lower revenue guidance was from the exit of further unprofitable businesses and *that the repositioning was being received warmly by all major accounts – including Macy's West.*  Thus, after visiting a handful of Macy's West locations over the past few days, *we were quiet [sic] surprised to find out that OshKosh is nowhere to be found in Macy's West*.  We believe Macy's corporate made the call to not carry OshKosh at the last minute. Our contacts have informed us of similar situations when Macy's corporate has "encouraged" divisions not to carry vendors that are not scheduled to be carried by Macy's nationwide.  We estimate the lost OshKosh sales volume to be in the range of $2-$4 million for the back-half of the year.

(Emphasis added).

243.    According to CW 1, the OshKosh Defendants knew that Macy's, a potentially huge account, had refused to carry the redesigned OshKosh line *at the same time* they were telling investors the exact opposite.  CW 1 explained: "the…issue is the fact that there was [sic] representations that the brand was going to go into Macy's.  And I think that it was even in a report.  But most certainly it

- 125 -

was widely communicated to investors that OshKosh was going back into Macy's. *And when those statements were made, that was factually incorrect.*" CW 1 only found out later that the representations that the executives made about OshKosh going to Macy's were completely false. CW 1 stated that this was when his relationship with Rowan and Casey began "to get bad."

244.    As the OshKosh Defendants' growth story was beginning to unravel, Whetzel sold approximately 50,000 of his shares between October 9, 2006 and October 25, 2006.

### 4.    September 19, 2006 Investor Conference

245.    At the September 19, 2006 Bank of America Investment Conference, Rowan stated: "[W]e have materially changed the spring '07 [OshKosh] agenda, and we're excited about the possibilities there. *Our bookings are up there. It's the first time in OshKosh's five or six-year recent history that there's not been a decline in that business.*"

246.    This statement was false and misleading because the OshKosh Defendants knew, or were reckless in not knowing, that current booking information showed *declining* sales figures and OshKosh would be losing money. At management meetings attended by CW 1 *prior* to this investor conference, CW 1 reported that "*management discussed this topic in-depth and made the decision*

to make statements *that were not supported by the current budget or orders by the wholesale channel*."

5. **October 25, 2006 Earnings Call**

247.    On the Third Quarter 2006 earnings call on October 25, 2006, Rowan announced that Patty DeRosa would be moving to marketing for Carter's and would no longer be involved with OshKosh.  Rowan announced that Pacifico would take over as interim President of Retail while Carter's looked for a permanent replacement.

248.    On the same call, Pacifico continued to assert that bookings for Spring and Summer 2007 were up, and that Carter's had made great progress in increasing OshKosh's profitability.  Again, Carter's stressed the positive feedback from customers and its impact on future growth:

> Overall, we are making good progress at OshKosh. *I believe we have improved the quality and the profitability of the business.* We are consistently improving the product and the price value equation in addition to reducing the complexity associated with the old business model….We made a lot of changes based on fall and *it has significantly improved the product by also changing the positioning and pricing for spring '07. Our spring bookings are up 10% in dozens and 3% in dollars. Our summer bookings show further improvement and we are projecting they will be up double-digits. Our customers have provided a lot of positive feedback for our creative expansion of the core items and key priceline.* So, we are executing the right strategies in OshKosh. In addition to these improvements in product, we have also established a dedicated sales team which will focus entirely on the OshKosh brand.

- 127 -

(Emphasis added).

249.   This statement was false and misleading because the OshKosh Defendants knew, or were reckless in not knowing, that current booking information showed declining sales figures and OshKosh would be losing money, not that their spring bookings were up 10% or that their summer bookings were also up by double digits.  Contrary to their assertions, customer feedback was negative, as evidenced by the determination of Macy's West not to carry the redesigned OshKosh line at all.  In keeping with their scheme, the OshKosh Defendants omitted to disclose this material information to the investing public.

250.   Casey, also on the same call, emphasized the growth story again: "now that we have an opportunity to turn the OshKosh business around, that would be the growth vehicle for [Carter's]."  This statement was false and misleading because Casey knew, or was reckless in not knowing, that current booking information showed OshKosh would be unprofitable, and far from being the growth vehicle for Carter's.  CW 1 observed that prior to this call, "*management discussed this topic in-depth and made the decision to make statements **that were not supported by the current budget or orders by the wholesale channel***."

### (a)  The Individual OshKosh Defendants Begin Dumping their Stock

251.  Two days after the earnings call in which the OshKosh Defendants stressed that OshKosh remained on the verge of a turnaround, with spring bookings up 10% and summer bookings up double digits, on October 27, 2006, Rowan began to unload his Carter's shares, selling 105,000 shares on October 27; 195,000 shares on October 30; 120,000 shares on October 31; 104,400 shares on November 1; 100,000 shares on November 2; and 12,000 shares on November 3, realizing proceeds of $18 million.  Similarly, Defendant Whetzel unloaded 53,500 shares from October 9, 2006 through November 16, 2006, realizing $1.5 millions dollars in proceeds.

252.  Pacifico followed suit, selling 8,696 shares on November 3; 18,004 shares on November 7; and 123,300 shares on November 13; a total of 150,000 shares in 10 days, worth $3.85 million.  The Individual OshKosh Defendants all continued to dump their Carter's stock at artificially inflated prices throughout the Class Period.  Indeed by the end of the Class Period, Rowan had dumped all of his shares, reaping a staggering $28.8 million in proceeds.

253.  CW 7 worked as a Senior Vice President in charge of field operations at the regional and district levels, was responsible for real estate acquisition and the representative connection between the stores and the corporation for communications, policy and pay.  CW 7 was employed at Carter's from January

2006 through September, 2007.  CW 7 reported that certain senior Carter's executives, or "top guys," told CW 7 that they were told not to exercise their stock options during a window of opportunity until Rowan had exercised his own options, under an internal "buddy pact".

254.   On November 20, 2006 Ryan Beck issued an analyst report noting certain difficulties with OshKosh: " The top-line shortfall is thought to be about $15 million on the fall line, which had too many bells and whistles. The spring line has been reworked with lower price points….Currently, wholesale sales for OshKosh are projected at only $96 million this year versus $452 million at Carter's despite the fact that OshKosh has better brand awareness and is a bigger factor in playwear, which is two-thirds of the market."

255.   Several analysts, however, including a WR Hambrecht report on December 11, 2006, also repeated the OshKosh Defendants' statement that early 2007 bookings were up double digits, and that OshKosh performance was expected to improve based on those bookings.

256.   A few days before Carter's released its Fourth Quarter 2006 results, a Morgan Keegan analyst noted on January 30, 2007 that "[w]e sense management will give you reason to believe that OshKosh is improving when they provide forward booking numbers on the call *as on the last call management*

*communicated double-digit improvement in 1H:07 unit bookings*." (emphasis added).

**(b)** **The February 2007 "No Growth" Disclosure –
a Further Partial Revelation of the Truth**

257.   After the market closed on February 13, 2007, Carter's issued a

sharply-downward revised outlook for 2007 and, for the first time, disclosed that

they expected *no growth* in comparable store sales:

> We've developed plans to improve the performance of our
> retail stores and OshKosh product performance, which we will discuss
> on our upcoming earnings call, *but we don't expect to realize the
> benefits of these improvements until the second half of 2007.*
> Accordingly, we've lowered our outlook for growth for 2007….*Our
> fiscal 2007 estimates assume **no growth** in comparable store sales*,
> fewer store openings and less contribution from our OshKosh
> wholesale segment than previously planned."

(Emphasis added).

258.   The day after the announcement, Carter's stock plummeted 16.7% to

$21.05 in heavy volume, with 6.2 million shares being traded (compared to an

average of 753,000 shares/day during the Class Period).  As a February 14, 2007

Credit Suisse report noted: "with the stock down 16% today, *the market was

clearly surprised* by the magnitude of the impact these issues will have on 2007."

(emphasis added).

259.   A Next Generation Equity Research report on February 14, 2007

highlighted the impact of the "no growth" disclosure: "2007 guidance was a

disappointment. Management's sales outlook of $1.400-$1.415B represents y/y growth of just 4%-5%, while the GAAP EPS forecast of $1.42-$1.49 *suggests bottom-line growth of 0%-5%.*" (emphasis added).

260.   However, a February 14, 2007 WR Hambrecht analyst took solace in the OshKosh Defendants' previous statement that OshKosh bookings for the first half of 2007 were up by double digits: "we think the Company has done a good job of strengthening both the gross and operating margins of the business from weak levels. We believe the operating performance of OshKosh in Q4 outperformed the company's guidance. We think that OshKosh offers significant opportunity for margin expansion….We think OshKosh is beginning to see traction with these retailers, *as early 2007 orders are up double-digits*."  (emphasis added).

261.   On the Fourth Quarter earnings call on February 21, 2007, the OshKosh Defendants defended their downward revision of guidance, and stated:

> We know where we screwed up and we intend to fix them. *This management team has been together for a long time*, even before Carter's. This is the only time we have had to take our guidance down in about 20 years. We've had bigger battles. *We are each heavily invested in Carter's stock and we don't like the stock being depressed either.*

(Emphasis added).

6.    **February 21, 2007 Earnings Call**

262.    On the February 21, 2007 earnings conference call, OshKosh

Defendants still maintained that OshKosh was the growth engine for the Company.

According to Rowan:

> I don't want to convey too much detail on this call for competitive reasons but *rest assured we will continue to grow our Carter's business and we will position Oshkosh for bigger things*.... Joe Pacifico is president of retail and made significant strides to get that business turned around *and also to reposition the Oshkosh brand for continued growth.*  We will recruit a retail president and *we are repositioning Oshkosh certainly to be a leader.*  Our inventories are in good shape, meaning in addition to rebuilding our retail store deficiencies, which we are catching up, *we have no problems with any of our customers*. Our supply chain is of high quality.

(Emphasis added).

263.    This statement was false and misleading because the OshKosh

Defendants knew, or were reckless in not knowing, that current OshKosh

bookings, representative of future sales, were slumping, and customers like Macy's

were abandoning the OshKosh line, but omitted to disclose this material

information to the investing public.

264.    On the same call, Pacifico was doing his part to keep the OshKosh

growth opportunity deception going:

> Oshkosh wholesale, sales were down 12% due to our decision to close unprofitable accounts last year and our positioning of the price model too high for our holiday '06 as we mentioned on the last call. *Our spring bookings were up 2% and our summer bookings, which represent close to 15% of our annual business, increased 20*

*percent over last year*….We still believe the Oshkosh brand has great potential. It is only a $90 million wholesale business versus over 450 million at Carter's.  It only has a 5% share of zero to seven market, *so a lot of potential*. It is a highly recognized and well loved brand for the consumer.

(Emphasis added).

265.   This statement was false and misleading because the OshKosh Defendants knew, or were reckless in not knowing, that OshKosh bookings were slumping, not growing, and that as a result, OshKosh would not be a growth engine for Carter's.  Yet, the OshKosh Defendants omitted to disclose this material information to the investing public.

### (a)    The Share Repurchase Program

266.   As part of their scheme to inflate Carter's stock price until they could unload more stock, the Individual OshKosh Defendants instituted a share repurchase program timed to reinforce investor confidence in their OshKosh growth story.  Concurrently with the admission that, in effect, Carter's management had close ties going back more than 20 years, and that each Individual Defendant was heavily invested in Carter's stock and did not want to see it at depressed prices, Carter's announced the $100M share repurchase program on February 21, 2007:

> On February 16, 2007, the Company's Board of Directors approved a stock repurchase program pursuant to which the Company is authorized to purchase up to $100 million of its outstanding common shares.  Such repurchases may occur from time to time in the

open market, in negotiated transactions, or otherwise. *The timing and amount of any repurchases will be determined by the Company's management*, based on its evaluation of market conditions, share price, and other factors. At the current price of the Company's common stock, this program would represent more than 7% of the Company's outstanding shares.

(Emphasis added).

267.    Commenting on the timing of the share repurchase program, a February 22, 2007 Next Generation Equity Research analyst report said: "We find the timing of the $100M share repurchase program somewhat curious, as we would have expected the majority of free cash flow generated this year to go toward internal programs such as product innovation, CRM system upgrades, more efficient pricing mechanisms, and/or improved in-store execution (including additional sales associate hires and/or training)."

268.    A Stern Agee analyst report on February 23, 2007 also noted the discrepancy between OshKosh's poor performance and management's upbeat assessments: "Although in its Q406 press release Carter's reiterated its recent guidance for 1Q07 and 2007, *which was well below earlier views, management's comments during the conference call suggested upside*." (Emphasis added).

269.    On February 28, 2007, Carter's filed its Annual report on Form 10-K with the SEC reaffirming the value of the goodwill of $144,890,000 and $102 million in tradename assets Carter's booked in connection with the OshKosh acquisition: "[b]ased upon our most recent assessment performed *as of December*

- 135 -

*30, 2006, we found there to be no impairment* of our cost in excess of fair value of net assets acquired [goodwill] or tradename assets." (Emphasis added). Thus, Carter's sent a strong message to investors that the growth potential of OshKosh remained intact.

### 7.    **March 14, 2007 Investor Conference Statements**

270.    The OshKosh Defendants' misleading assertions that OshKosh was improving continued unabated. At a March 14, 2007 investor conference, Rowan stated:

> We remain confident that acquiring OshKosh was a wise decision. It's a great lifestyle brand with significant potential.
>
> …
>
> When we acquired the brand, it was a train wreck. It had been a -- the duty of the brand, it had been a great core essential of brand, core essential products and narrow in scope for a lot of years….The trap we fell in is we still felt, if we got the products better, it had more cache. I don't want to beat a dead horse but that's what happened. And when we got that resistance -- we're noted to change fast, meaning if we see something doesn't work, we don't linger. And when we saw it didn't work, we've moved and we have high confidence level that this new product agenda will be much more dominant. That is, however, spring '08, which launched in the fourth quarter, but I don't want you to think that everything is fixed March 10 or 11. That's not the case *but business is pretty good because we've got strong promotional and our business is moving pretty well -- and I'm speaking -- referring to our stores -- it's currently pretty good*.

(Emphasis added).

271. This statement was false and misleading because the OshKosh

Defendants knew, or were reckless in not knowing from current booking

information in advance of actual sales, that OshKosh business was not good, but

teetering on the edge of a collapse in sales. However, the OshKosh Defendants

omitted to disclose this material information to the investing public.

272. At the same investor conference, Casey also continued asserting the

OshKosh growth story:

> *Our experience has been good*. We had a nice benefit of
> picking up OshKosh. We increased our unit volume by 25%. *So
> there's a lot of opportunity on the OshKosh side*.

(Emphasis added).

273. This statement was false and misleading because the OshKosh

Defendants knew, or were reckless in not knowing from current booking

information, that OshKosh was losing money and did not represent a growth

opportunity, but omitted to disclose this material information to the investing

public.

274. Analysts took note of the OshKosh Defendants' positive comments at

the investor conference. According to a March 14, 2007 Stern Agee analyst report:

> Carter's management made positive comments on several
> occasions at an investor conference held this morning. Management
> commented on current business, saying "current business is good" and
> "currently, retail is doing well."…The search for a new President of
> Retail is ongoing but the Company said there is no rush, as "things are

improving pretty significantly." Later on, they indicated the business is "already better."

275.   On March 14, 2007 Carter's stock rose from $23.02 to $23.80 following the investor conference comments.

276.   In an April 12, 2007 Proxy statement, the Company revealed that "[i]n 2006, as set forth in more detail in the Summary Compensation Table, the total compensation of our Chief Executive Officer was $4,022,775, *which included a $1,000,000 cash performance bonus for his leadership over the integration of OshKosh B'Gosh*, which we acquired in July 2005." (Emphasis added).

277.   On April 24, 2007, the Company announced its First Quarter 2007 financial results, and stated that "[d]uring the first quarter of fiscal 2007, the Company repurchased 1,252,832 shares of its common stock for approximately $30 million at an average price of $23.95 per share."

278.   The repurchase program was having the desired effect of keeping Carter's stock price inflated while the Individual OshKosh Defendants continued to sell off their stock.  An April 26, 2007 Credit Suisse analyst report stated that the stock was "up 32% since the negative 4Q06 preannouncement."

**8.    April 25, 2007 Earnings Call**

279.   On Carter's April 25, 2007 First Quarter 2007 earnings call, the OshKosh Defendants admitted that "our over-the-counter selling of [OshKosh] spring product is below our expectations" but emphasized that "summer

- 138 -

bookings…were up 20% to last year." In short, the OshKosh Defendants were still misleadingly asserting that wholesale growth would be in the double digits for summer, even though they knew, or were reckless in not knowing, that current booking information was predicting a large sales slump, and that demand for OshKosh's spring line was weak. Nevertheless, Pacifico added that "I feel very good about the progress we've made and the line's potential. We will be showing lines to our key accounts in July, and will provide you an update on our next call."

### (a)    **The Individual OshKosh Defendants Profit From Their Deception**

280.    On the heels of this "positive" assessment about OshKosh growth, and with Carter's stock prices inflated as a result of their misleading statements and their share repurchase program, the Individual OshKosh Defendants continued on a selling spree. Rowan sold 272,000 shares on April 27, 2007; 64,100 shares on May 1, 2007; and 73,900 shares on May 2, 2007, for a total of $11 million. Whetzel sold 100,000 shares over a 2 week period from May 3 to May 18, 2007, for a total of $2.6 million; Pacifico sold 40,000 shares over a three day period from May 18, 2007 to May 21, 2007, for a total of $1.03 million; and Casey sold 146,200 shares on April 27, 2007 for $4 million. By the time the truth about the OshKosh Fraud emerged, the Individual OshKosh Defendants had sold a stunning 1,552,000 shares of Carter's stock (for aggregate proceeds of more than $43,047,999.16) at the inflated prices resulting from their deceit, with Rowan

reaping an additional $1.5 million in bonuses on the "success" of the OshKosh integration.

281.    Even as the Individual OshKosh Defendants were rushing to dump their stock at inflated prices, OshKosh's actual sales continued to sink.  In marked contrast to the OshKosh Defendants' earlier statements that spring bookings were up, according to Carter's Form 10-Q, filed on May 10, 2007:

> OshKosh brand wholesale sales decreased $3.7 million, or 12.9%, in the first quarter of fiscal 2007 to $25.0 million.  Excluding off-price sales, OshKosh brand wholesale sales decreased $2.1 million, or 7.9%, to $24.0 million in the first quarter of fiscal 2007.  The decrease in OshKosh brand wholesale sales, excluding off-price sales, *reflects reduced levels of demand for spring product*.

(Emphasis added).

282.    In stark contrast to the dismal OshKosh sales figures, however, the OshKosh Defendants still maintained their story that OshKosh was a growth vehicle, and summer bookings were up by 20% as a result of an *increase* in the number of OshKosh retail stores from 142 stores in the first quarter of 2006, to 162 stores by the second quarter of 2007.  Carter's opened these stores even though OshKosh inventories per foot were down 14% at the retail division and down 13% at the wholesale division at the start of 2007, and even though, according to CW 7 (who ran the real estate division at Carter's), the OshKosh Defendants knew that new stores historically would not prove profitable in the first year of operations.

283.   On June 4, 2007, Carter's announced that it hired a new President of Retail, James Petty ("Petty").   On June 5, 2007 a Morgan Keegan analyst reported that Patty DeRosa, the former OshKosh head of design, and most recently head of marketing for the Carter's brand, had left Carter's.

284.   By July 2007, the OshKosh Defendants were finally beginning to lose credibility with investors.  As a July 17, 2007 Morgan Keegan analyst report noted: "[w]e can't blame investors for getting tired of management's promises to improve performance at OshKosh. Our contacts lead us to believe that some improvement will be evident beginning in late 4Q:07 (spring bookings) as management is showing a renewed focus on its largest customers. Investors are likely to remain skeptical until spring results, and we can't blame them."

### (b)   The OshKosh Defendants are Forced to Reveal the Truth Regarding OshKosh

285.   As set forth below, the new President of Retail, a management outsider, refused to go along with the OshKosh Defendants' plans and public statements, forcing the OshKosh Defendants to reveal the truth about OshKosh. Consequently, after the close of the market on July 24, 2007, Carter's made the shocking announcement that it was writing down all of the OshKosh goodwill on its books, finally disclosing that OshKosh was not the growth engine that the OshKosh Defendants had relentlessly conditioned the market to expect:

*As a result of the continued negative trends in sales and profitability* of the Company's OshKosh B'Gosh wholesale and retail segments and projections for such segments for the balance of fiscal 2007, the Company conducted an interim impairment test on the value of the intangible assets that the Company recorded in connection with the acquisition of OshKosh B'Gosh, Inc. in July 2005.  As a result of this analysis, on July 19, 2007, the Company determined that these intangible assets were impaired and that a material charge would be required. The Company determined that its Cost in Excess of Fair Value of Net Assets Acquired assets [goodwill] related to both the OshKosh wholesale and retail segments *were fully impaired* in the approximate amount of $142.9 million, and that its Tradename asset is impaired in the amount of $12 million.

(Emphasis added).

286.    The second quarter 2007 financial results also revealed that OshKosh wholesale sales had dropped a staggering 45% from the same period the prior year, plummeting from $20.4 million in the second quarter 2006 to $9.9 million in the second quarter 2007.

287.    The announcement was an admission by OshKosh Defendants that rather than being the growth engine of the future for Carter's, the OshKosh acquisition was a failure.  Indeed, according to Feng Gu, assistant professor of accounting at the State University of New York, and the co-author of a study of the economic consequences of goodwill carried on balance sheets, "[g]oodwill impairment writeoff is not a benign event.  It represents the public acknowledgement of the failed nature of an acquisition."

- 142 -

288.   The OshKosh Defendants' revelation caused the Company's stock to fall sharply on July 25, 2007, from $24.87 per share to $22.75 per share on heavy volume (4.4 million shares traded compared to an average of 753,000 shares/day during the Class Period).

E.   **Post-Disclosure Events**

289.   A September 25, 2007 Morgan Keegan analyst report indicated that Petty, the new President of Retail who had joined the Company on June 4, 2007, and was not an inside member of the management team that had worked together for more than 20 years and dumped stock during the Class Period, had "refused to sign off" on management's plans for OshKosh, and was a "major contributor" to the goodwill writedown.[5]  CW 1 confirmed Petty's outsider status, noting that he had no prior relationship with the OshKosh Defendants and was initially recruited by Greenpeak, an external advisory agency: "He's pretty much been an outsider…he's still an outsider to Mike [Casey]."  As with the Accommodations Fraud, it was a management outsider who exposed the fraud.

---

[5] The Securities and Exchange Commission ("SEC") view on cash flow projections that support goodwill can be found in *SEC Staff Accounting Bulletin: No. 100 – Restructuring and Impairment Charges* (issued November 24, 1999): "estimates of expected future cash flows should be the best estimate based on reasonable and supportable assumptions and projections... all available evidence should be considered in developing estimates of expected future cash flows and that the weight given to the evidence should be commensurate with the extent to which the evidence can be verified objectively."

290. CW 7, who had reported to Defendant Pacifico, confirmed that the decision to write down goodwill would have to be made by "top" executives such as Rowan, Casey, Pacifico and Whetzel.

291. On June 11, 2008, Carter's announced Rowan's retirement. A June 12, 2008 RBC analyst report said: "we do believe that the under-performance of the OshKosh division since its acquisition in 2005 may have played a role in his and the Board's decision for him to retire at the current time." CW 1 confirmed that Rowan's departure was due to the OshKosh failure, stating that "[t]hat's what ultimately got Fred out of the company." However, Rowan left the Company considerably richer at the expense of Carter's unsuspecting investors, reaping $37 million dollars from his role in the Accommodations Fraud and the OshKosh Fraud, which comprised the Defendants' two-pronged scheme to fraudulently reap maximum personal profit.

## XI. **ADDITIONAL SCIENTER ALLEGATIONS**

292. During the Class Period, the Individual Defendants sold substantial amounts of Carter's common stock from their personal holdings while in possession of adverse non-public information about growth opportunities at OshKosh. The Individual OshKosh Defendants held positions that would have made them privy to information about booking orders made months in advance of actual sales, and about retailers' reception of the OshKosh redesign. The

Individual OshKosh Defendants also instituted a share repurchase program in the First Quarter of 2007 that enabled the Company to purchase $30M of outstanding shares, pumping the share price up, before selling more shares in the Second Quarter of 2007.

293.  By the end of the Class Period, Rowan had sold 1.2 million shares, making a profit of $37 million, which accounted for 33% of his total holdings; Casey had sold 163,000 shares (profit of $4.5 million) accounting for 22% of his holdings; Pacifico had sold 190,000 shares (profit of $5.1 million) accounting for 29% of his holdings; and Whetzel had sold 307,000 shares (profit of $8 million) accounting for 44% of his holdings.  The chart below details the number of shares the Individual Defendants sold during the Class Period and the profits gained from such sales, due to artificial inflation from both the Accommodations and the OshKosh Frauds.  The chart also demonstrates that the Individual OshKosh Defendants made a significant proportion of their sales during the period in which they were effusively describing the purported OshKosh growth opportunity, and before the whole truth about the OshKosh Fraud was revealed on July 24, 2007.

| Filer Name | Number Of Shares | Transaction Type | Price | Transaction Value | Transaction Date | Trading Plan |
|---|---|---|---|---|---|---|
| Casey, Michael Dennis | -6,000 | Acquisition | 0.00[6] | 0.00 | 02/16/06 | n/a |

[6] The Individual Defendants periodically received stock grants as a form of compensation.

| Filer Name | Number Of Shares | Transaction Type | Price | Transaction Value | Transaction Date | Trading Plan |
|---|---|---|---|---|---|---|
| | 8,200 | Sale | 66.75 | 547,350.00 | 05/01/06 | n/a |
| | 1,000 | Sale | 66.24 | 66,240.00 | 05/01/06 | n/a |
| | 400 | Sale | 66.23 | 26,492.00 | 05/01/06 | n/a |
| | 500 | Sale | 66.18 | 33,090.00 | 05/01/06 | n/a |
| | 1,100 | Sale | 66.17 | 72,787.00 | 05/01/06 | n/a |
| | 3,500 | Sale | 66.20 | 231,700.00 | 05/01/06 | n/a |
| | 100 | Sale | 66.32 | 6,632.00 | 05/01/06 | n/a |
| | 200 | Sale | 66.26 | 13,252.00 | 05/01/06 | n/a |
| | -12,000 | Acquisition | 0.00 | 0.00 | 02/15/07 | n/a |
| | 146,200 | Sale | 26.84 | 3,924,008.00 | 04/27/07 | n/a |
| | -146,200 | Conversion | 3.08 | -450,296.00 | 04/27/07 | n/a |
| | -75,000 | Acquisition | 0.00 | 0.00 | 08/06/08 | n/a |
| | 1,825 | Sale | 16.81 | 30,678.25 | 03/03/09 | n/a |
| | -50,000 | Acquisition | 0.00 | 0.00 | 03/12/09 | n/a |
| **PROFIT** | | | | **4,501,933.25** | | |
| **NUMBER OF SHARES SOLD** | | | | **163,025** | | |
| **PERCENTAGE SOLD (including options granted during Class Period)** | | | | **21.67%** | | |
| **PERCENTAGE SOLD (not including options granted during Class Period)** | | | | **32.01%** | | |
| | | | | | | |
| **Pacifico, Joseph** | 8,696 | Sale | 27.12 | 235,835.52 | 11/03/06 | n/a |
| | 18,004 | Sale | 27.00 | 486,108.00 | 11/07/06 | n/a |
| | 90,834 | Sale | 27.00 | 2,452,518.00 | 11/13/06 | n/a |
| | 4,100 | Sale | 27.01 | 110,741.00 | 11/13/06 | n/a |
| | 7,498 | Sale | 27.02 | 202,595.96 | 11/13/06 | n/a |
| | 2,400 | Sale | 27.03 | 64,872.00 | 11/13/06 | n/a |
| | 1,568 | Sale | 27.05 | 42,414.40 | 11/13/06 | n/a |
| | 200 | Sale | 27.15 | 5,430.00 | 11/13/06 | n/a |
| | 300 | Sale | 27.16 | 8,148.00 | 11/13/06 | n/a |
| | 700 | Sale | 27.12 | 18,984.00 | 11/13/06 | n/a |
| | 1,100 | Sale | 27.11 | 29,821.00 | 11/13/06 | n/a |
| | 600 | Sale | 27.10 | 16,260.00 | 11/13/06 | n/a |
| | 2,200 | Sale | 27.09 | 59,598.00 | 11/13/06 | n/a |
| | 3,800 | Sale | 27.08 | 102,904.00 | 11/13/06 | n/a |
| | 1,100 | Sale | 27.07 | 29,777.00 | 11/13/06 | n/a |
| | 5,500 | Sale | 27.06 | 148,830.00 | 11/13/06 | n/a |
| | 1,400 | Sale | 27.04 | 37,856.00 | 11/13/06 | n/a |
| | 27,500 | Sale | 25.81 | 709,775.00 | 05/18/07 | n/a |
| | 12,500 | Sale | 25.75 | 321,875.00 | 05/21/07 | n/a |

| Filer Name | Number Of Shares | Transaction Type | Price | Transaction Value | Transaction Date | Trading Plan |
|---|---|---|---|---|---|---|
| **PROFIT** | | | | **5,084,342.88** | | |
| **NUMBER OF SHARES SOLD** | | | | **190,000** | | |
| **PERCENTAGE SOLD (including options granted during Class Period)** | | | | **29.01%** | | |
| **PERCENTAGE SOLD (not including options granted during Class Period)** | | | | **53.54%** | | |
| | | | | | | |
| **Rowan, Frederick J. II** | 2,000 | Sale | 59.27 | 118,540.00 | 08/18/05 | n/a |
| | 2,600 | Sale | 59.53 | 154,778.00 | 08/18/05 | n/a |
| | 100 | Sale | 59.19 | 5,919.00 | 08/18/05 | n/a |
| | 300 | Sale | 59.51 | 17,853.00 | 08/18/05 | n/a |
| | 200 | Sale | 59.74 | 11,948.00 | 08/18/05 | n/a |
| | 500 | Sale | 59.61 | 29,805.00 | 08/18/05 | n/a |
| | 500 | Sale | 59.70 | 29,850.00 | 08/18/05 | n/a |
| | 900 | Sale | 59.55 | 53,595.00 | 08/18/05 | n/a |
| | 900 | Sale | 59.52 | 53,568.00 | 08/18/05 | n/a |
| | 900 | Sale | 59.54 | 53,586.00 | 08/18/05 | n/a |
| | 1,800 | Sale | 59.15 | 106,470.00 | 08/18/05 | n/a |
| | 1,000 | Sale | 59.60 | 59,600.00 | 08/18/05 | n/a |
| | 2,300 | Sale | 59.50 | 136,850.00 | 08/18/05 | n/a |
| | 1,700 | Sale | 58.90 | 100,130.00 | 08/19/05 | n/a |
| | 9,800 | Sale | 59.00 | 578,200.00 | 8/19/2005 (8/22/05 on Form 4) | n/a |
| | 400 | Sale | 59.04 | 23,616.00 | 08/19/05 | n/a |
| | 800 | Sale | 59.03 | 47,224.00 | 08/19/05 | n/a |
| | 200 | Sale | 59.12 | 11,824.00 | 08/19/05 | n/a |
| | 200 | Sale | 59.01 | 11,802.00 | 8/19/2005 (8/22/05 on Form 4) | n/a |
| | 100 | Sale | 59.02 | 5,902.00 | 08/19/05 | n/a |
| | 600 | Sale | 59.01 | 35,406.00 | 08/19/05 | n/a |
| | 2,200 | Sale | 59.00 | 129,800.00 | 08/19/05 | n/a |
| | 3,000 | Sale | 57.50 | 172,500.00 | 08/23/05 | n/a |
| | 100 | Sale | 57.67 | 5,767.00 | 08/23/05 | n/a |
| | 100 | Sale | 57.34 | 5,734.00 | 08/23/05 | n/a |
| | 200 | Sale | 57.27 | 11,454.00 | 08/23/05 | n/a |
| | 300 | Sale | 57.14 | 17,142.00 | 08/23/05 | n/a |
| | 500 | Sale | 57.52 | 28,760.00 | 08/23/05 | n/a |

| Filer Name | Number Of Shares | Transaction Type | Price | Transaction Value | Transaction Date | Trading Plan |
|---|---|---|---|---|---|---|
| | 3,700 | Sale | 57.25 | 211,825.00 | 08/23/05 | n/a |
| | 1,900 | Sale | 57.60 | 109,440.00 | 08/23/05 | n/a |
| | 1,700 | Sale | 57.00 | 96,900.00 | 08/23/05 | n/a |
| | 893 | Sale | 57.57 | 51,410.01 | 08/23/05 | n/a |
| | 900 | Sale | 57.35 | 51,615.00 | 08/23/05 | n/a |
| | 3,100 | Sale | 57.30 | 177,630.00 | 08/23/05 | n/a |
| | 2,500 | Sale | 57.55 | 143,875.00 | 08/23/05 | n/a |
| | 900 | Sale | 57.76 | 51,984.00 | 08/24/05 | n/a |
| | 500 | Sale | 57.65 | 28,825.00 | 08/24/05 | n/a |
| | 500 | Sale | 57.64 | 28,820.00 | 08/24/05 | n/a |
| | 100 | Sale | 57.60 | 5,760.00 | 08/24/05 | n/a |
| | 100 | Sale | 57.79 | 5,779.00 | 08/24/05 | n/a |
| | 100 | Sale | 57.55 | 5,755.00 | 08/24/05 | n/a |
| | 300 | Sale | 57.50 | 17,250.00 | 08/24/05 | n/a |
| | 600 | Sale | 57.35 | 34,410.00 | 08/24/05 | n/a |
| | 3,800 | Sale | 57.25 | 217,550.00 | 08/24/05 | n/a |
| | 600 | Sale | 57.31 | 34,386.00 | 08/24/05 | n/a |
| | 100 | Sale | 57.18 | 5,718.00 | 08/24/05 | n/a |
| | 2,400 | Sale | 57.10 | 137,040.00 | 08/24/05 | n/a |
| | -23,900 | Conversion | 1.50 | -35,850.00 | 08/25/05 | n/a |
| | 10,000 | Sale | 56.53 | 565,300.00 | 08/25/05 | n/a |
| | 3,900 | Sale | 56.00 | 218,400.00 | 08/25/05 | n/a |
| | 10,000 | Sale | 56.07 | 560,700.00 | 08/25/05 | n/a |
| | -11,900 | Conversion | 1.50 | -17,850.00 | 08/26/05 | n/a |
| | 11,900 | Sale | 55.19 | 656,761.00 | 08/26/05 | n/a |
| | -57,900 | Conversion | 1.50 | -86,850.00 | 12/09/05 | n/a |
| | 600 | Sale | 63.40 | 38,040.00 | 12/09/05 | n/a |
| | 100 | Sale | 63.22 | 6,322.00 | 12/09/05 | n/a |
| | 200 | Sale | 63.31 | 12,662.00 | 12/09/05 | n/a |
| | 800 | Sale | 63.18 | 50,544.00 | 12/09/05 | n/a |
| | 300 | Sale | 63.00 | 18,900.00 | 12/09/05 | n/a |
| | 600 | Sale | 62.81 | 37,686.00 | 12/09/05 | n/a |
| | 1,000 | Sale | 62.45 | 62,450.00 | 12/09/05 | n/a |
| | 500 | Sale | 62.30 | 31,150.00 | 12/09/05 | n/a |
| | 800 | Sale | 61.26 | 49,008.00 | 12/09/05 | n/a |
| | 100 | Sale | 61.31 | 6,131.00 | 12/09/05 | n/a |
| | 600 | Sale | 61.32 | 36,792.00 | 12/09/05 | n/a |
| | 300 | Sale | 61.33 | 18,399.00 | 12/09/05 | n/a |
| | 10,000 | Sale | 62.00 | 620,000.00 | 12/09/05 | n/a |
| | 200 | Sale | 62.03 | 12,406.00 | 12/09/05 | n/a |
| | 100 | Sale | 62.20 | 6,220.00 | 12/09/05 | n/a |
| | 100 | Sale | 62.22 | 6,222.00 | 12/09/05 | n/a |
| | 100 | Sale | 62.26 | 6,226.00 | 12/09/05 | n/a |
| | 5,200 | Sale | 60.75 | 315,900.00 | 12/09/05 | n/a |
| | 1,700 | Sale | 61.00 | 103,700.00 | 12/09/05 | n/a |

| Filer Name | Number Of Shares | Transaction Type | Price | Transaction Value | Transaction Date | Trading Plan |
|---|---|---|---|---|---|---|
| | 100 | Sale | 61.09 | 6,109.00 | 12/09/05 | n/a |
| | 500 | Sale | 61.10 | 30,550.00 | 12/09/05 | n/a |
| | 1,000 | Sale | 61.11 | 61,110.00 | 12/09/05 | n/a |
| | 1,100 | Sale | 61.12 | 67,232.00 | 12/09/05 | n/a |
| | 100 | Sale | 61.15 | 6,115.00 | 12/09/05 | n/a |
| | 1,300 | Sale | 61.17 | 79,521.00 | 12/09/05 | n/a |
| | 1,400 | Sale | 61.25 | 85,750.00 | 12/09/05 | n/a |
| | 100 | Sale | 60.60 | 6,060.00 | 12/09/05 | n/a |
| | 100 | Sale | 60.65 | 6,065.00 | 12/09/05 | n/a |
| | 100 | Sale | 60.66 | 6,066.00 | 12/09/05 | n/a |
| | 600 | Sale | 60.68 | 36,408.00 | 12/09/05 | n/a |
| | 2,700 | Sale | 60.70 | 163,890.00 | 12/09/05 | n/a |
| | 200 | Sale | 60.71 | 12,142.00 | 12/09/05 | n/a |
| | 700 | Sale | 60.72 | 42,504.00 | 12/09/05 | n/a |
| | 300 | Sale | 60.73 | 18,219.00 | 12/09/05 | n/a |
| | 6,500 | Sale | 60.74 | 394,810.00 | 12/09/05 | n/a |
| | 200 | Sale | 62.31 | 12,462.00 | 12/09/05 | n/a |
| | 4,800 | Sale | 62.80 | 301,440.00 | 12/09/05 | n/a |
| | 800 | Sale | 62.85 | 50,280.00 | 12/09/05 | n/a |
| | 200 | Sale | 63.02 | 12,604.00 | 12/09/05 | n/a |
| | 10,800 | Sale | 63.20 | 682,560.00 | 12/09/05 | n/a |
| | 1,000 | Sale | 63.21 | 63,210.00 | 12/09/05 | n/a |
| | -105,000 | Conversion | 0.75 | -78,750.00 | 10/27/06 | n/a |
| | 105,000 | Sale | 29.31 | 3,077,550.00 | 10/27/06 | n/a |
| | -195,000 | Conversion | 0.75 | -146,250.00 | 10/30/06 | n/a |
| | 195,000 | Sale | 28.61 | 5,578,950.00 | 10/30/06 | n/a |
| | -120,000 | Conversion | 0.75 | -90,000.00 | 10/31/06 | n/a |
| | 120,000 | Sale | 28.16 | 3,379,200.00 | 10/31/06 | n/a |
| | -104,400 | Conversion | 0.75 | -78,300.00 | 11/01/06 | n/a |
| | 104,400 | Sale | 27.82 | 2,904,408.00 | 11/01/06 | n/a |
| | -100,000 | Conversion | 0.75 | -75,000.00 | 11/02/06 | n/a |
| | 100,000 | Sale | 26.69 | 2,669,000.00 | 11/02/06 | n/a |
| | -12,000 | Conversion | 0.75 | -9,000.00 | 11/03/06 | n/a |
| | 12,000 | Sale | 26.83 | 321,960.00 | 11/03/06 | n/a |
| | -272,000 | Conversion | 0.75 | -204,000.00 | 04/27/07 | n/a |
| | 272,000 | Sale | 26.87 | 7,308,640.00 | 04/27/07 | n/a |
| | -64,100 | Conversion | 0.75 | -48,075.00 | 05/01/07 | n/a |
| | 64,100 | Sale | 26.02 | 1,667,882.00 | 05/01/07 | n/a |
| | -73,900 | Conversion | 0.75 | -55,425.00 | 05/02/07 | n/a |
| | 73,900 | Sale | 26.24 | 1,939,136.00 | 05/02/07 | n/a |
| **PROFIT** | | | | **36,939,997.01** | | |
| **NUMBER OF SHARES SOLD** | | | | **1,198,993** | | |
| **PERCENTAGE SOLD (including** | | | | **33.06%** | | |

| Filer Name | Number Of Shares | Transaction Type | Price | Transaction Value | Transaction Date | Trading Plan |
|---|---|---|---|---|---|---|
| options granted during Class Period) | | | | | | |
| **PERCENTAGE SOLD (not including options granted during Class Period)** | | | | **50.37%** | | |
| **Whetzel, Charles E. Jr.** | 300 | Sale | 38.56 | 11,568.00 | 04/11/05 | a |
| | 200 | Sale | 38.57 | 7,714.00 | 04/11/05 | a |
| | 100 | Sale | 38.63 | 3,863.00 | 04/11/05 | a |
| | 300 | Sale | 38.68 | 11,604.00 | 04/11/05 | a |
| | 300 | Sale | 38.73 | 11,619.00 | 04/11/05 | a |
| | 200 | Sale | 39.03 | 7,806.00 | 04/11/05 | a |
| | 600 | Sale | 39.00 | 23,400.00 | 04/11/05 | a |
| | 1,100 | Sale | 38.99 | 42,889.00 | 04/11/05 | a |
| | 600 | Sale | 38.98 | 23,388.00 | 04/11/05 | a |
| | 300 | Sale | 38.97 | 11,691.00 | 04/11/05 | a |
| | 300 | Sale | 38.97 | 11,691.00 | 04/11/05 | a |
| | 500 | Sale | 38.96 | 19,480.00 | 04/11/05 | a |
| | 400 | Sale | 38.85 | 15,540.00 | 04/11/05 | a |
| | 200 | Sale | 38.83 | 7,766.00 | 04/11/05 | a |
| | 300 | Sale | 38.82 | 11,646.00 | 04/11/05 | a |
| | 100 | Sale | 38.81 | 3,881.00 | 04/11/05 | a |
| | 200 | Sale | 38.80 | 7,760.00 | 04/11/05 | a |
| | 100 | Sale | 38.79 | 3,879.00 | 04/11/05 | a |
| | 100 | Sale | 38.78 | 3,878.00 | 04/11/05 | a |
| | 100 | Sale | 38.75 | 3,875.00 | 04/11/05 | a |
| | 200 | Sale | 38.74 | 7,748.00 | 04/11/05 | a |
| | 200 | Sale | 38.95 | 7,790.00 | 04/11/05 | a |
| | 800 | Sale | 38.94 | 31,152.00 | 04/11/05 | a |
| | 200 | Sale | 38.93 | 7,786.00 | 04/11/05 | a |
| | 100 | Sale | 38.92 | 3,892.00 | 04/11/05 | a |
| | 100 | Sale | 38.91 | 3,891.00 | 04/11/05 | a |
| | 700 | Sale | 38.90 | 27,230.00 | 04/11/05 | a |
| | 500 | Sale | 38.88 | 19,440.00 | 04/11/05 | a |
| | 400 | Sale | 38.87 | 15,548.00 | 04/11/05 | a |
| | 100 | Sale | 38.86 | 3,886.00 | 04/11/05 | a |
| | 200 | Sale | 38.89 | 7,778.00 | 04/11/05 | a |
| | 100 | Sale | 38.69 | 3,869.00 | 04/11/05 | a |
| | 300 | Sale | 38.66 | 11,598.00 | 04/11/05 | a |
| | 100 | Sale | 38.62 | 3,862.00 | 04/11/05 | a |
| | 400 | Sale | 41.70 | 16,680.00 | 04/25/05 | a |
| | 100 | Sale | 41.83 | 4,183.00 | 04/25/05 | a |
| | 100 | Sale | 40.98 | 4,098.00 | 04/25/05 | a |

| Filer Name | Number Of Shares | Transaction Type | Price | Transaction Value | Transaction Date | Trading Plan |
|---|---|---|---|---|---|---|
| | 100 | Sale | 40.95 | 4,095.00 | 04/25/05 | a |
| | 100 | Sale | 40.89 | 4,089.00 | 04/25/05 | a |
| | 100 | Sale | 40.85 | 4,085.00 | 04/25/05 | a |
| | 100 | Sale | 40.84 | 4,084.00 | 04/25/05 | a |
| | 300 | Sale | 41.80 | 12,540.00 | 04/25/05 | a |
| | 100 | Sale | 41.78 | 4,178.00 | 04/25/05 | a |
| | 100 | Sale | 41.95 | 4,195.00 | 04/25/05 | a |
| | 100 | Sale | 41.94 | 4,194.00 | 04/25/05 | a |
| | 200 | Sale | 41.93 | 8,386.00 | 04/25/05 | a |
| | 200 | Sale | 41.91 | 8,382.00 | 04/25/05 | a |
| | 300 | Sale | 41.88 | 12,564.00 | 04/25/05 | a |
| | 700 | Sale | 41.85 | 29,295.00 | 04/25/05 | a |
| | 100 | Sale | 41.84 | 4,184.00 | 04/25/05 | a |
| | 100 | Sale | 41.82 | 4,182.00 | 04/25/05 | a |
| | 300 | Sale | 41.71 | 12,513.00 | 04/25/05 | a |
| | 200 | Sale | 41.75 | 8,350.00 | 04/25/05 | a |
| | 300 | Sale | 41.66 | 12,498.00 | 04/25/05 | a |
| | 100 | Sale | 41.54 | 4,154.00 | 04/25/05 | a |
| | 200 | Sale | 40.83 | 8,166.00 | 04/25/05 | a |
| | 400 | Sale | 41.69 | 16,676.00 | 04/25/05 | a |
| | 100 | Sale | 41.68 | 4,168.00 | 04/25/05 | a |
| | 200 | Sale | 41.67 | 8,334.00 | 04/25/05 | a |
| | 200 | Sale | 41.63 | 8,326.00 | 04/25/05 | a |
| | 700 | Sale | 41.61 | 29,127.00 | 04/25/05 | a |
| | 500 | Sale | 41.60 | 20,800.00 | 04/25/05 | a |
| | 100 | Sale | 41.45 | 4,145.00 | 04/25/05 | a |
| | 300 | Sale | 41.42 | 12,426.00 | 04/25/05 | a |
| | 100 | Sale | 41.41 | 4,141.00 | 04/25/05 | a |
| | 100 | Sale | 41.40 | 4,140.00 | 04/25/05 | a |
| | 100 | Sale | 41.39 | 4,139.00 | 04/25/05 | a |
| | 100 | Sale | 41.33 | 4,133.00 | 04/25/05 | a |
| | 100 | Sale | 41.32 | 4,132.00 | 04/25/05 | a |
| | 100 | Sale | 41.31 | 4,131.00 | 04/25/05 | a |
| | 100 | Sale | 41.30 | 4,130.00 | 04/25/05 | a |
| | 100 | Sale | 41.20 | 4,120.00 | 04/25/05 | a |
| | 300 | Sale | 41.18 | 12,354.00 | 04/25/05 | a |
| | 100 | Sale | 41.16 | 4,116.00 | 04/25/05 | a |
| | 100 | Sale | 41.15 | 4,115.00 | 04/25/05 | a |
| | 100 | Sale | 41.14 | 4,114.00 | 04/25/05 | a |
| | 100 | Sale | 41.12 | 4,112.00 | 04/25/05 | a |
| | 100 | Sale | 41.10 | 4,110.00 | 04/25/05 | a |
| | 100 | Sale | 41.09 | 4,109.00 | 04/25/05 | a |
| | 200 | Sale | 41.07 | 8,214.00 | 04/25/05 | a |
| | 100 | Sale | 41.05 | 4,105.00 | 04/25/05 | a |
| | 200 | Sale | 41.04 | 8,208.00 | 04/25/05 | a |

| Filer Name | Number Of Shares | Transaction Type | Price | Transaction Value | Transaction Date | Trading Plan |
|---|---|---|---|---|---|---|
| | 300 | Sale | 41.76 | 12,528.00 | 04/25/05 | a |
| | 600 | Sale | 41.81 | 25,086.00 | 04/25/05 | a |
| | 100 | Sale | 41.72 | 4,172.00 | 04/25/05 | a |
| | -20,000 | Acquisition | 0.00 | 0.00 | 05/13/05 | n/a |
| | 900 | Sale | 59.34 | 53,406.00 | 06/05/06 | b |
| | 100 | Sale | 29.12 | 2,912.00 | 10/09/06 | b |
| | 1,400 | Sale | 29.08 | 40,712.00 | 10/09/06 | b |
| | 1,100 | Sale | 29.07 | 31,977.00 | 10/09/06 | b |
| | 10,600 | Sale | 29.00 | 307,400.00 | 10/09/06 | b |
| | 300 | Sale | 29.01 | 8,703.00 | 10/09/06 | b |
| | 300 | Sale | 29.02 | 8,706.00 | 10/09/06 | b |
| | 100 | Sale | 29.03 | 2,903.00 | 10/09/06 | b |
| | 1,000 | Sale | 29.10 | 29,100.00 | 10/09/06 | b |
| | 1,700 | Sale | 29.09 | 49,453.00 | 10/09/06 | b |
| | 600 | Sale | 29.06 | 17,436.00 | 10/09/06 | b |
| | 7,000 | Sale | 29.04 | 203,280.00 | 10/09/06 | b |
| | 600 | Sale | 29.05 | 17,430.00 | 10/09/06 | b |
| | 200 | Sale | 29.11 | 5,822.00 | 10/09/06 | b |
| | 200 | Sale | 29.04 | 5,808.00 | 10/10/06 | b |
| | 2,500 | Sale | 29.51 | 73,775.00 | 10/12/06 | b |
| | 200 | Sale | 29.07 | 5,814.00 | 10/12/06 | b |
| | 300 | Sale | 29.29 | 8,787.00 | 10/12/06 | b |
| | 100 | Sale | 29.08 | 2,908.00 | 10/12/06 | b |
| | 100 | Sale | 29.09 | 2,909.00 | 10/12/06 | b |
| | 200 | Sale | 29.21 | 5,842.00 | 10/12/06 | b |
| | 372 | Sale | 29.24 | 10,877.28 | 10/12/06 | b |
| | 328 | Sale | 29.25 | 9,594.00 | 10/12/06 | b |
| | 300 | Sale | 29.27 | 8,781.00 | 10/12/06 | b |
| | 700 | Sale | 29.28 | 20,496.00 | 10/12/06 | b |
| | 1,000 | Sale | 29.32 | 29,320.00 | 10/12/06 | b |
| | 1,300 | Sale | 29.33 | 38,129.00 | 10/12/06 | b |
| | 10,000 | Sale | 29.00 | 290,000.00 | 10/12/06 | b |
| | 300 | Sale | 29.03 | 8,709.00 | 10/12/06 | b |
| | 1,200 | Sale | 29.04 | 34,848.00 | 10/12/06 | b |
| | 1,000 | Sale | 29.49 | 29,490.00 | 10/12/06 | b |
| | 500 | Sale | 29.48 | 14,740.00 | 10/12/06 | b |
| | 200 | Sale | 29.37 | 5,874.00 | 10/12/06 | b |
| | 300 | Sale | 29.34 | 8,802.00 | 10/12/06 | b |
| | 1,100 | Sale | 29.36 | 32,296.00 | 10/12/06 | b |
| | 1,000 | Sale | 29.51 | 29,510.00 | 10/12/06 | b |
| | 4,700 | Sale | 29.00 | 136,300.00 | 10/25/06 | b |
| | 300 | Sale | 29.02 | 8,706.00 | 10/25/06 | b |
| | 300 | Sale | 29.08 | 8,724.00 | 11/16/06 | b |
| | 25,000 | Sale | 25.98 | 649,500.00 | 05/03/07 | n/a |
| | 30,000 | Sale | 25.83 | 774,900.00 | 05/04/07 | n/a |

| Filer Name | Number Of Shares | Transaction Type | Price | Transaction Value | Transaction Date | Trading Plan |
|---|---|---|---|---|---|---|
| | 20,000 | Sale | 25.76 | 515,200.00 | 05/07/07 | n/a |
| | 25,000 | Sale | 25.82 | 645,500.00 | 05/18/07 | n/a |
| | -10,000 | Acquisition | 0.00 | 0.00 | 07/01/08 | n/a |
| | -5,000 | Acquisition | 0.00 | 0.00 | 03/12/09 | n/a |
| | 13,020 | Sale | 21.05 | 274,071.00 | 05/14/09 | n/a |
| | 20,000 | Sale | 24.95 | 499,000.00 | 09/01/09 | c |
| | -20,000 | Conversion | 3.08 | -61,600.00 | 09/01/09 | n/a |
| | -20,000 | Conversion | 3.08 | -61,600.00 | 09/08/09 | n/a |
| | 20,000 | Sale | 25.28 | 505,600.00 | 09/08/09 | c |
| | 10,000 | Sale | 25.36 | 253,600.00 | 09/14/09 | c |
| | -10,000 | Conversion | 3.08 | -30,800.00 | 09/14/09 | n/a |
| | -20,000 | Conversion | 3.08 | -61,600.00 | 10/01/09 | n/a |
| | 20,000 | Sale | 26.13 | 522,600.00 | 10/01/09 | c |
| | -20,000 | Conversion | 3.08 | -61,600.00 | 10/05/09 | n/a |
| | 20,000 | Sale | 26.25 | 525,000.00 | 10/05/09 | c |
| | 10,000 | Sale | 27.97 | 279,700.00 | 10/12/09 | c |
| | -10,000 | Conversion | 3.08 | -30,800.00 | 10/12/09 | n/a |
| | -20,000 | Conversion | 3.08 | -61,600.00 | 11/09/09 | n/a |
| | 20,000 | Sale | 24.00 | 480,000.00 | 11/09/09 | c |
| **PROFIT** | | | | **7,981,264.28** | | |
| **NUMBER OF SHARES SOLD** | | | | **307,720** | | |
| **PERCENTAGE SOLD (including options granted during Class Period)** | | | | **43.89%** | | |
| **PERCENTAGE SOLD (not including options granted during Class Period)** | | | | **59.06%** | | |

a - The sales reported in this Form 4 were effected pursuant to a Rule 10b5-1 trading plan adopted by the reporting person on December 8, 2004.

b - The sale reported in this Form 4 was effected pursuant to a Rule 10b5-1 trading plan adopted by the reporting person on June 2, 2006.

c - The transactions reported in this Form 4 were effectuated pursuant to a Rule 10b5-1 trading plan adopted by the reporting person on August 28, 2009.

# XII.  APPLICABILITY OF PRESUMPTION OF RELIANCE UNDER THE AFFILIATED UTE DOCTRINE, AND/OR IN THE ALTERNATIVE, THE FRAUD ON THE MARKET DOCTRINE

294.   Plaintiff is entitled to a presumption of reliance under *Affiliated Ute v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against the Defendants are primarily predicated upon omissions of material fact which there was a duty to disclose.

295.   Plaintiff is entitled to a presumption of reliance because, as more fully alleged above, the Defendants failed to disclose material information regarding: (1) the OshKosh division's business, financial results and business prospects, throughout the duration of the OshKosh Fraud; and (2) the improper booking of Carter's accommodation payments in the wrong periods, and the resulting false financial information reported by Carter's throughout the Class Period.

296.   In the alternative, Plaintiff is entitled to a presumption of reliance under the fraud on the market doctrine of the Defendants' material misrepresentations and omissions, because at all relevant times, the market for Carter's common stock was an efficient market for the following reasons, among others:

(a)    Carter's stock met the requirements for listing, and was listed and actively traded on the New York Stock Exchange, a highly efficient and automated market;

(b)    As a regulated issuer, Carter's filed periodic public reports with the SEC (and was eligible to file SEC Forms S-1) and the New York Stock Exchange;

(c)    Carter's regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    Carter's was followed by numerous investor research services that published publicly available reports, as well as by several securities analysts (including Omar Saad and Edward Kelly from Credit Suisse First Boston, Brad Stephens from Morgan Keegan, Margaret Whitfield when she was an analyst at Ryan Beck, Margaret Whitfield and Kimberly Huang from Sterne Agee, Margaret Mager from Goldman Sachs, Christina A. de Marval and R. J. Hottovy from Next Generation Equity Research, and Melissa Otto from WR Hambrecht & Co.) employed by major brokerage firms who wrote reports which were distributed to

the sales force and certain customers of their respective brokerage firms.  Each of

these reports was publicly available and entered the public marketplace.

297.   As a result of the foregoing, the market for Carter's common stock

promptly digested current information regarding Carter's from all publicly

available sources and reflected such information in Carter's stock price.  Under

these circumstances, all purchasers of Carter's common stock during the Class

Period suffered similar injury through their purchase of Carter's common stock at

artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

298.   The statutory safe harbor provided for forward-looking statements

under certain circumstances does not apply to any of the allegedly false statements

pleaded in this Complaint.  Many of the specific statements pleaded herein were

not identified as "forward-looking statements" when made.  To the extent there

were any forward-looking statements, there were no meaningful cautionary

statements identifying important factors that could cause actual results to differ

materially from those in the purportedly forward-looking statements.

Alternatively, to the extent that the statutory safe harbor does apply to any

forward-looking statements pleaded herein, Defendants are liable for those false

forward-looking statements because at the time each of those forward-looking

statements was made, the particular speaker knew that the particular forward-

looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Carter's who knew that those statements were false when made.

## LOSS CAUSATION/ECONOMIC LOSS

299.   Defendants' wrongful conduct, as alleged herein, directly and proximately caused the damages suffered by Plaintiff and the Class.

300.   During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct which artificially inflated the prices of Carter's common stock by: (i) misrepresenting the success of, or failing to disclose that, the integration of OshKosh was not nearly as successful as Defendants led the market to believe, sales of OshKosh's products were performing well below expectations, and that OshKosh would not be the "growth engine" Defendants stated it would be; and (ii) improperly booking accommodation payments in the wrong periods in order to meet Company-issued financial guidelines.

301.   When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market the price of Carter's common stock fell precipitously, as the prior artificial inflation was released.  As a result of their purchases of Carter's common stock during the Class Period, Plaintiff and the

other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

302.   By failing to disclose the truth about the Accommodations Fraud and the OshKosh Fraud, and making numerous false and misleading statements to hide that truth, Defendants presented a misleading picture of Carter's business and prospects.  Defendants' false and misleading statements had the intended effect and caused Carter's common stock to trade at artificially inflated levels throughout the Class Period, reaching an adjusted high of $ 35.11 per share on March 16, 2006.

303.   As a direct result of the subsequent disclosures about the OshKosh and Accommodations Frauds, the price of Carter's common stock dropped precipitously.  These disclosures removed the inflation from the price of Carter's common stock, causing real economic loss to investors who had purchased Carter's common stock during the Class Period.

## COUNT I

### Violation Of Section 10(b) Of The Exchange Act And Rule 10b-5(b) Promulgated Thereunder Against All Defendants

304.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.  This claim is asserted against Carter's, Rowan, Casey, Pacifico, North, Whetzel and PwC.

305.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public regarding Carter's business, operations, management and the intrinsic value of Carter's common stock; and (ii) cause Plaintiff and other members of the Class to purchase Carter's common stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

306.    Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Carter's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

307.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal the improper booking

of accommodation payments in the wrong time periods, in order to manipulate Carter's reported financials, as specified herein.

308.   The Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information, and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Carter's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Carter's and its business operations in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Carter's common stock during the Class Period.

309.   Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these Defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections

and/or reports; (iii) each of these Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

310.    The Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Carter's operating condition from the investing public and supporting the artificially inflated price of its common stock.  As demonstrated by Defendants' overstatements and misstatements of the Company's business, operations and earnings throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

311.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts regarding the Accommodations Fraud, as set forth above, the market price of Carter's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of Carter's publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the common stock trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Carter's securities during the Class Period at artificially high prices and were damaged when the value of their securities declined upon disclosure of the truth about Defendants false and misleading statements and omissions.

312.    At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding Carter's financial results, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Carter's securities, or, if they had acquired such common

stock during the Class Period, they would not have done so at the artificially

inflated prices which they paid.

313.    By virtue of the foregoing, Defendants have violated Section 10(b) of

the Exchange Act, and Rule 10b-5 promulgated thereunder.

314.    As a direct and proximate result of Defendants' wrongful conduct,

Plaintiff and the other members of the Class suffered damages in connection with

their respective purchases and sales of the Company's securities during the Class

Period.

## COUNT II

### Violation Of Section 10(b) Of
### The Exchange Act And Rule 10b-5(b)
### Promulgated Thereunder Against The OshKosh Defendants

315.    Plaintiff repeats and realleges each and every allegation contained

above as if fully set forth herein.  This claim is asserted against Carter's, Rowan,

Casey, Pacifico, and Whetzel.

316.    For the duration of the OshKosh Fraud, the OshKosh Defendants

carried out a plan, scheme and course of conduct which was intended to, and did:

(i) deceive the investing public regarding Carter's business, operations,

management and the intrinsic value of Carter's common stock; and (ii) cause

Plaintiff and other members of the Class to purchase Carter's common stock at

artificially inflated prices.  In furtherance of this unlawful scheme, plan and course

- 163 -

of conduct, the OshKosh Defendants, and each of them, took the actions set forth herein.

317.   The OshKosh Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Carter's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  All the OshKosh Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

318.   The OshKosh Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about OshKosh as a growth vehicle for Carter's as specified herein.

319.   The OshKosh Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information, and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Carter's value and performance and continued substantial

growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Carter's and its business operations in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Carter's common stock for the duration of the OshKosh Fraud.

320.   Each of the Individual OshKosh Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the OshKosh Defendants were high-level executives and/or directors at the Company during the OshKosh Fraud and members of the Company's management team or had control thereof; (ii) each of these Individual OshKosh Defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these Individual OshKosh Defendants enjoyed significant personal contact and familiarity with the other Individual OshKosh Defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these Individual OshKosh Defendants

was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

321.   The OshKosh Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such OshKosh Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Carter's operating condition from the investing public and supporting the artificially inflated price of its common stock. As demonstrated by the OshKosh Defendants' overstatements and misstatements of the Company's business, operations and earnings throughout the duration of the Oshkosh Fraud, the OshKosh Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

322.   As a result of the dissemination of the materially false and misleading information and failure to disclose material facts regarding the OshKosh Fraud, as set forth above, the market price of Carter's securities was artificially inflated for the duration of the OshKosh Fraud.  In ignorance of the fact that market prices of Carter's publicly-traded securities were artificially inflated, and relying directly or

indirectly on the false and misleading statements made by the OshKosh Defendants, or upon the integrity of the market in which the common stock trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by the OshKosh Defendants but not disclosed in public statements by the OshKosh Defendants during the OshKosh Fraud, Plaintiff and the other members of the Class acquired Carter's securities during the OshKosh Fraud at artificially high prices and were damaged when the value of their securities declined upon disclosure of the truth about the OshKosh Defendants' false and misleading statements and omissions.

323.    At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the OshKosh Fraud and Carter's financial results, which were not disclosed by the OshKosh Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Carter's securities, or, if they had acquired such common stock during the OshKosh Fraud, they would not have done so at the artificially inflated prices which they paid.

324.    By virtue of the foregoing, the OshKosh Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

As a direct and proximate result of the OshKosh Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the OshKosh Fraud.

## COUNT III

### Violation Of Section 10(b) Of The Exchange Act And Rule 10b-5(a) and (c) Promulgated Thereunder Against All Defendants Except PwC

325.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.  This claim is asserted against Carter's, Rowan, Casey, Pacifico, North, and Whetzel.

326.   This Count is brought solely and exclusively under the provisions of Rule 10b-5(a) and (c).  Accordingly, Plaintiff need not allege in this Count nor prove in this case that any of the Defendants made any misrepresentations or omissions of material fact for which they may also be liable under Rule 10b-5(b) and/or any other provisions of law.

327.   During the Class Period, Defendants carried out a common plan, scheme, and unlawful course of conduct that was intended to, and did: (i) deceive the investing public, including Plaintiff and the Class; (ii) artificially inflate the market price of Carter's common stock; and (iii) cause Plaintiff to purchase Carter's common stock at artificially inflated prices.

328.    In furtherance of this unlawful plan, scheme and course of conduct, Defendants employed devices, schemes and artifices to defraud, and knowingly and/or recklessly engaged in acts, transactions, practices, and courses of business that operated as a fraud and deceit upon Plaintiff and the Class in connection with their purchases of Carter's common stock, in violation of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder.

329.    Defendants' fraudulent devices, schemes, artifices and deceptive acts, practices, and course of business included the knowing and/or reckless suppression and concealment of information regarding: (i) the improper booking of Carter's accommodation payments in the wrong time periods during the Class Period, and the consequent materially false financial information reported by Carter's during the Class Period; and (ii) the knowing and/or reckless suppression and concealment of information regarding OshKosh's true growth potential and profitability throughout the duration of the OshKosh Fraud.

330.    Plaintiff and the Class reasonably relied upon the integrity of the market in which Carter's securities traded.

331.    During the Class Period, Plaintiff and the Class were unaware of Defendants' fraudulent scheme and unlawful course of conduct.  Had Plaintiff and the Class known of Defendants' unlawful scheme and unlawful course of conduct,

they would not have purchased Carter's securities, or if they had, would not have done so at the artificially inflated prices paid for such securities.

332.  As a direct and proximate result of Defendants' scheme to defraud and such unlawful course of conduct, Plaintiff and the Class suffered damages in connection with their purchases of Carter's common stock during the Class Period.

333.  By reason of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder, and are liable to Plaintiff and the Class for damages suffered in connection with their purchases of Carter's securities during the Class Period.

## COUNT IV

## Violation Of Section 20(a) Of
## The Exchange Act Against the Individual Defendants

334.  Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.  This claim is asserted against Rowan, Casey, Pacifico, North, and Whetzel.

335.  The Individual Defendants acted as controlling persons of Carter's within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power

to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements regarding Carter's core financials, which were materially misstated as a result of the Accommodations Fraud, prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

336.   In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

337.   As set forth above, Carter's and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## COUNT V

## Violation Of Section 20(a) Of
## The Exchange Act Against the Individual OshKosh Defendants

338.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.  This claim is asserted against Rowan, Casey, Pacifico, and Whetzel.

339.   The Individual OshKosh Defendants acted as controlling persons of Carter's within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual OshKosh Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  The Individual OshKosh Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements regarding OshKosh growth and profitability prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

340.   In particular, each of these Individual OshKosh Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

341.   As set forth above, Carter's and the Individual OshKosh Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual OshKosh Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of the OshKosh Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the OshKosh Fraud.

## COUNT VI

### Violation of Section 20A of the Exchange Act
### Against the Individual Defendants

342.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.  This claim is asserted against Rowan, Casey, Pacifico, and Whetzel (the "20A Defendants").

343.   This Count is asserted against each of the Individual Defendants who sold Carter's common stock during the Class Period for their violations of Section

- 173 -

20A of the Exchange Act, 15 U.S.C. § 78t-1, on behalf of Plaintiff and all other members of the Class who purchased Carter's common stock contemporaneously with the Individual Defendants' improper insider sales during the Class Period.

344.   By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the 20A Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  The 20A Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements regarding: (i) OshKosh growth and profitability, and (ii) Carter's materially false financial statements, which were rendered false and misleading by the Accommodations Fraud, prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected, at the time they reaped millions of dollars in proceeds from sales of Carter's stock.

345.   As set forth above, the 20A Defendants sold a total of 1,860,000 shares of Carter's stock (for aggregate proceeds of $54.6 million) in trades during the Class Period.

346.   These sales were made while the 20A Defendants were in the possession of material, adverse non-public information regarding the OshKosh Fraud and the Accommodations Fraud, and this conduct violated Sections 10(b) and 20A of the Exchange Act.

347.   As set forth in the certifications previously filed with the Court and adopted by reference here, Plaintiff purchased Carter's stock on: (1) May 15 and May 16, 2007 which purchases were made "contemporaneously" with sales of Carter's securities by the 20A Defendants on at least the following dates: May 2, 2007, May 3, 2007, May 4, 2007 and May 5, 2007; (2) May 18 and May 21, 2007 which purchases were made "contemporaneously" with sales of Carter's securities by the 20A Defendants on at least May 18, 2007; (3) May 22, May 23 and May 24, 2007 which purchases were made "contemporaneously" with sales of Carter's securities by the 20A Defendants on at least May 18 and May 21, 2007.

348.   As set forth in the certification previously filed with the Court in the Mylroie Action and adopted by reference here, Plaintiff Scott Mylroie purchased Carter's stock on October 12, 2009, which purchases were made "contemporaneously" with sales of Carter's securities by the 20A Defendants on at least October 5, 2009 and October 12, 2009.

349.   Numerous other Class members also purchased Carter's common stock contemporaneously with the 20A Defendants' sales of stock during the Class Period.

350.   As a result, under 20A of the Exchange Act, the 20A Defendants are liable to Plaintiff and the Class for all profits gained and losses avoided as a result of these transactions.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(a)     Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and Labaton Sucharow LLP as Lead Counsel;

(b)     Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED:  March 15, 2010

**PAGE PERRY LLC**

By:  /s/ David J. Worley
David J. Worley
James M. Evangelista
1040 Crown Pointe Parkway, Suite
1050 Atlanta, Georgia 30338
Tel: (770) 673-0047
Fax**:** (770) 673-0120

*Liaison Counsel for Lead Plaintiff and the Class*

**LABATON SUCHAROW LLP**
Christopher Keller
Jonathan Gardner
Angelina Nguyen
140 Broadway
New York, New York 10005
Tel:  (212) 907-0700
Fax:  (212) 818-0477

*Lead Counsel for Lead Plaintiff*
*Plymouth County Retirement System*
*and the Class*

**GLANCY BINKOW**
**& GOLDBERG LLP**
Lionel Z. Glancy
Michael Goldberg
1801 Avenue of the Stars, Suite 311
Los Angeles, California  90067
Tel:  (310) 201-9150
Fax:  (310) 201-9160
Email: info@glancylaw.com

*Counsel for Plaintiffs*

**FINKELSTEIN THOMPSON & LOUGHRAN**
Donald J. Enright
1050 30th Street, NW
Duvall Foundry
Washington , DC 20007
Tel: (202) 337-8000
Fax: (202) 337-8090
Email:
mmclellan@finkelsteinthompson.com

*Attorneys for Plaintiff Scott Mylroie*