## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA

| | |
|---|---|
| In re | ) |
| CARTER'S, INC. SECURITIES | )    Civil Action No.:  1:08-CV-2940-JOF |
| LITIGATION | ) |
| | ) |

## MEMORANDUM OF LAW IN SUPPORT OF CARTER'S, INC.'S MOTION TO DISMISS WITH PREJUDICE THE FIRST AMENDED AND <u>CONSOLIDATED CLASS ACTION COMPLAINT</u>

Randall W. Bodner

Christopher G. Green

James R. Drabick

Heather B. Sanborn

William J. Dunn

Ropes & Gray LLP

One International Place

Boston, MA 02110-2624

(617) 951-7000


Russell L. Lippman

Ropes & Gray LLP

1211 Avenue of the Americas

New York, NY 10036-8704

(212) 596-9000

J. Marbury Rainer

Patrice Russell Walker

Parker Hudson Rainer & Dobbs

285 Peachtree Center Avenue, N.E.

1500 Marquis II Tower

Atlanta, GA 30303

(404) 420-5564



*Attorneys for Defendant Carter's, Inc.*

# TABLE OF CONTENTS

**Page**

PROCEDURAL HISTORY ..................................................................... 1

PRELIMINARY STATEMENT ............................................................ 2

SUMMARY OF THE OSHKOSH ALLEGATIONS ........................... 10

I.   Factual Background And Alleged Misstatements ........................ 10

    A.   Carter's Acquires OshKosh On July 14, 2005 ................... 10

    B.   Carter's Forecasts Of OshKosh's Financial
       Performance Following The Acquisition ............................ 13

    C.   The Allegedly Misleading Statements Regarding
       OshKosh's Financial Performance ...................................... 15

II.   The Allegations Of Scienter Related To The OshKosh Claims ................... 24

III.   The Allegations Of Loss Causation Related To The OshKosh Claims ....... 25

IV.   The Counts Predicated On The OshKosh Claims ........................ 25

ARGUMENT – OSHKOSH CLAIMS .................................................. 26

I.   The Amended Complaint Fails To State A Claim
    For Securities Fraud Under Section 10(b) And
    Rule 10b-5 Based On The Oshkosh Claims ................................ 26

    A.   The Alleged Misstatements Are Not Actionable Because
       They Fall Squarely Within The PSLRA Safe Harbor For
       Forward-Looking Statements ............................................... 27

       1.   The Alleged Misstatements Are Forward-Looking .................... 28

       2.   The Forward-Looking Statements Were
          Accompanied By Meaningful Cautionary Language ................. 31

    B.   The Forward-Looking Statements Are Also Not Actionable
       Because There Were No Contrary "Then-Current" Facts
       And The Statements Proved To Be Accurate ...................... 35

    C.    The Amended Complaint Fails To Plead Scienter ............................... 46

        1.    There Are No Factual Allegations Showing That The OshKosh Defendants Had Actual Knowledge That Any Forward-Looking Statement Was False When Made .................. 47

        2.    The Amended Complaint's Allegations Regarding Motive And Opportunity Fail To Support Any Inference Of Scienter .... 49

    D.    The Amended Complaint Fails To Plead Loss Causation ................... 58

II.    The Remaining Counts Fail Because There Is No Primary Violation ......... 61

SUMMARY OF ACCOMMODATIONS ALLEGATIONS ............................... 62

I.    Factual Background ...................................................................... 63

    A.    The November 9 Release – Carter's Announces Intention to Restate Certain Financial Statements ............................... 64

    B.    Carter's Announces The 3% Impact Of The Restatement .................. 65

    C.    Plaintiffs' Holdings of Carter's Stock .................................... 68

    D.    Plaintiffs' Scienter Allegations ........................................... 69

II.    The Counts Predicated on the Accommodations Claims ............................ 70

ARGUMENT – ACCOMMODATIONS CLAIMS ............................................ 71

I.    The Accommodations Claims Must Be Dismissed Because Neither Plymouth Nor Mylroie Has Standing ................................ 72

II.    The Accommodations Claims Must Also Be Dismissed Because the Amended Complaint Fails to Allege a Strong Inference of Scienter ........... 77

    A.    The Amended Complaint Fails to Allege Actual Knowledge or Recklessness .................................... 77

    B.    The Amended Complaint's Allegations Regarding Motive And Opportunity Fail To Support Any Inference Of Scienter ............. 86

III.    The Remaining Counts Fail Because There Is No Primary Violation ......... 92

CONCLUSION .................................................................................. 93

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Abrams v. Baker Hughes Inc.*,
    292 F.3d 424 (5th Cir. 2002) ....................................................................84, 87

*Acito v. IMCERA Group, Inc.*,
    47 F.3d 47 (2d Cir. 1995) ..........................................................................50, 56

*Alaska Elec. Pension Fund v. Adecco S.A.*,
    434 F. Supp. 2d 815 (S.D. Cal. 2006)..............................................................42

*Aldridge v. AT Cross Corp.*,
    284 F.3d 72 (1st Cir. 2002)................................................................................87

*Amalgamated Bank v. Coca-Cola Co.*,
    No. Civ. A. 1:05-CV-1226, 2006 WL 2818973
    (N.D. Ga. Sept. 29, 2006) ....................................................................28, 30, 32

*Bovee v. Coopers & Lybrand*,
    272 F.3d 356 (6th Cir. 2001) .............................................................................67

*Bryant v. Avado Brands, Inc.*,
    187 F.3d 1271 (11th Cir. 1999) ...............................................11, 47, 49, 84, 86

*CA Pub. Employees' Ret. Sys. v. Chubb*,
    394 F.3d 126 (3d Cir. 2004) ..............................................................................78

*Caiafa v. Sea Containers Ltd.*,
    525 F. Supp. 2d 398 (S.D.N.Y. 2007) ..............................................................49

*Cent. Laborers' Pension Fund v. Integrated Elec. Servs. Inc.*,
    497 F.3d 546 (5th Cir. 2007) .............................................................................85

*Chill v. Gen. Elec. Co.*,
    101 F.3d 263 (2d Cir. 1996) ..............................................................................90

*City of Austin Police Ret. Sys. v. ITT Educ. Servs., Inc.*,
    388 F. Supp. 2d 932 (S.D. Ind. 2005)....................................................43

*City of Sterling Heights Police & Fire Ret. Sys. v.*
    *Vodafone Group Pub. Ltd. Co.*,
    655 F. Supp. 2d 262 (S.D.N.Y. 2009) ...............................................49

*Cole v. Health Mgmt. Assocs., Inc.*,
    No. 2:07cv00484-FtM-UA-DNF, 2009 WL 2713178
    (M.D. Fla. July 17, 2009)......................................................................60

*Cutsforth v. Renschler*,
    235 F. Supp. 2d 1216 (M.D. Fla. 2002)...............................................49

*Dura Pharm., Inc. v. Broudo*,
    544 U.S. 336 (2005)........................................................................58, 76

*Durham v. Whitney Info. Network, Inc.*,
    No. 06-CV-00687, 2009 WL 3783375 (M.D. Fla. Nov. 10, 2009)...................74

*ECA & Local 134 IBEW Pension Trust of Chicago v.*
    *JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009) ...............................................................89

*Edward J. Goodman Life Income Trust v. Jabil Circuit, Inc.*,
    594 F.3d 783 (11th Cir. 2010) ...................................................passim

*Edward J. Goodman Life Income Trust v. Jabil Circuit, Inc.*,
    560 F. Supp. 2d 1221 (M.D. Fla. 2008)...................................48, 56, 62

*Ehlert v. Singer*,
    245 F.3d 1313 (11th Cir. 2001) .........................................................34

*Frazier v. VitalWorks, Inc.*,
    341 F. Supp. 2d 142 (D. Conn. 2004)...................................................51

*Garfield v. NDC Health Corp.*,
    466 F.3d 1255 (11th Cir. 2006) .............................48, 78, 81, 85, 90

*Griffin v. Dugger*,
    823 F.2d 1476 (11th Cir. 1987) .........................................................72

*Grossman v. Novell, Inc.*,
  120 F.3d 1112 (10th Cir. 1997) ..............................................................29, 37, 38

*Harris v. Ivax Corp.*,
  182 F.3d 799 (11th Cir. 1999) ....................................................................passim

*Higginbotham v. Baxter Int'l, Inc.*,
  495 F.3d 753 (7th Cir. 2007) ..............................................................................80

*Hillson Partners Ltd. P'ship v. Adage, Inc.*,
  42 F.3d 204 (4th Cir. 1994) ................................................................................30

*Hubbard v. BankAtlantic Bancorp, Inc.*,
  625 F. Supp. 2d 1267 (S.D. Fla. 2008) ..............................................................53

*In re AFC Enters., Inc. Sec. Litig.*,
  348 F. Supp. 2d 1363 (N.D. Ga. 2004) ..............................................................91

*In re Airgate PCS, Inc. Sec. Litig.*,
  389 F. Supp. 2d 1360 (N.D. Ga. 2005) .........................................................29, 30

*In re Avista Corp. Sec. Litig.*,
  415 F. Supp. 2d 1214 (E.D. Wash. 2005) ..........................................................75

*In re BellSouth Corp. Secs. Litig.*,
  355 F. Supp. 2d 1350 (N.D. Ga. 2005) ..............................................................89

*In re BISYS Sec. Litig.*,
  397 F. Supp. 2d 430 (S.D.N.Y. 2005) ................................................................51

*In re Boston Tech., Inc. Sec. Litig.*,
  8 F. Supp. 2d 43 (D. Mass. 1998) ......................................................................47

*In re Cabletron Sys., Inc.*,
  311 F.3d 11 (1st Cir. 2002) ................................................................................80

*In re Corning Sec. Litig.*,
  No. 01-CV-6580-CJS, 2004 WL 1056063 (W.D.N.Y. Apr. 9, 2004)................53

*In re Dell Inc. Sec. Litig.*,
  591 F. Supp. 2d 877 (W.D. Tex. 2008) ..............................................................74

*In re eSpeed, Inc. Sec. Litig.*,
    457 F. Supp. 2d 266 (S.D.N.Y. 2006) ...............................................................51

*In re Faro Techs. Sec. Litig.*,
    No. 6:05-cv-1810-Orl-22DAB, 2007 WL 430731
    (M.D. Fla. Feb. 3, 2007) ...................................................................................59

*In re Fed. Nat. Mortg. Ass'n Sec.*,
    503 F. Supp. 2d 1 (D.D.C. 2007).......................................................................91

*In re First Union Corp. Sec. Litig.*,
    128 F. Supp. 2d 871 (W.D.N.C. 2001) ..........................................................4, 30

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
    574 F.3d 29 (2d Cir. 2009) ...............................................................................73

*In re Great Atlantic & Pacific Tea Co., Inc. Sec. Litig.*,
    103 Fed. Appx. 465 (3d Cir. 2004)....................................................................90

*In re Hansen Natural Corp. Sec. Litig.*,
    527 F. Supp. 2d 1142 (C.D. Cal. 2007) .............................................................75

*In re Immucor, Inc. Sec. Litig.*,
    No. 1:05-CV-2276-WSD, 2006 WL 3000133 (N.D. Ga. 2006) ........................55

*In re Impax Labs., Inc. Sec. Litig.*,
    2007 WL 5076983 (N.D. Cal. Jan. 3, 2007).........................................74, 75, 76

*In re Keyspan Corp. Sec. Litig.*,
    383 F. Supp. 2d 358 (E.D.N.Y. 2003) ...............................................................51

*In re Maxim Integrated Prods. Inc. Sec. Litig.*,
    639 F. Supp. 2d 1038 (N.D. Cal. 2009)..............................................................74

*In re Metawave Commc'ns Corp. Sec. Litig.*,
    298 F. Supp. 2d 1056 (W.D. Wash. 2003) ...................................................78, 81

*In re Miva, Inc. Sec. Litig.*,
    544 F. Supp. 2d 1310 (M.D. Fla. 2008)..............................................................55

*In re Petco Animal Supplies Inc. Sec. Litig.*,
   No. 05-CV-0823-H (RBB),
   2005 WL 5957816 (S.D. Cal. Aug. 1, 2005).......................................................42

*In re Prestige Brands Holding, Inc.*,
   No. 05 CV. 06924(CLB), 2006 WL 2147719
   (S.D.N.Y. July 10, 2006) ............................................................................50, 51

*In re S1 Corp. Sec. Litig.*,
   173 F. Supp. 2d 1334 (N.D. Ga. 2001).............................................................29

*In re Serologicals Sec. Litig.*,
   No. Civ.A.1:00-CV1025CAP, 2003 WL 24033694
   (N.D. Ga. Feb. 20, 2003) ....................................................................................49

*In re Smith Gardner Sec. Litig.*,
   214 F. Supp. 2d 1291 (S.D. Fla. 2002)..............................................................50

*In re Spectrum Brands, Inc. Sec. Litig.*,
   461 F. Supp. 2d 1297 (N.D. Ga. 2006).......................................................45, 82

*In re Vantive Corp. Sec. Litig.*,
   283 F.3d 1079 (9th Cir. 2002) ....................................................................50, 52

*Institutional Investors Group v. Avaya, Inc.*,
   564 F.3d 242 (3d Cir. 2009) ..............................................................................43

*Kane v. Madge Networks N.V.*,
   No. C-96-20652-RMW, 2000 WL 33208116
   (N.D. Cal. May 26, 2000) ...................................................................................44

*Lentell v. Merrill Lynch & Co.*,
   396 F.3d 161 (2d Cir. 2005) ..............................................................................74

*Ley v. Visteon Corp.*,
   543 F.3d 801 (6th Cir. 2008) .............................................................................84

*Limantour v. Cray Inc.*,
   432 F. Supp. 2d 1129 (W.D. Wash. 2006) ..................................................81, 83

*Lipton v. Pathogenesis Corp.*,
   284 F.3d 1027 (9th Cir. 2002) ............................................................54

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992)............................................................................72

*Malin v. XL Capital Ltd.*,
   499 F. Supp. 2d 117 (D. Conn. 2007)..................................................52

*Miller v. Champion Enters., Inc.*,
   346 F.3d 660 (6th Cir. 2003) ..............................................................36

*Mizzaro v. Home Depot, Inc.*,
   544 F.3d 1230 (11th Cir. 2008) ......................... 27, 44, 46, 47, 48, 78, 82, 83, 91

*Morse v. McWhorter*,
   200 F. Supp. 2d 853 (M.D. Tenn. 2000) .............................................57

*O'Shea v. Littleton*,
   414 U.S. 488 (1974)............................................................................72

*Oppenheimer v. Novell, Inc.*,
   851 F. Supp. 412 (D. Utah 1994)........................................................57

*Raab v. Gen. Physics Corp.*,
   4 F.3d 286 (4th Cir. 1993) ..................................................................29

*Robbins v. Koger Props., Inc.*,
   116 F.3d 1441 (11th Cir. 1997) ..........................................................58

*Ronconi v. Larkin*,
   253 F.3d 423 (9th Cir. 2001) ..............................................................50

*Rosenberg v. Gould*,
   554 F.3d 962 (11th Cir. 2009) ................................................46, 61, 92

*Rudolph v. UTStarcom*,
   560 F. Supp. 2d 880 (N.D. Cal. 2008)...................................56, 62, 75

*S.E.C. v. Merchant Capital, LLC*,
   483 F.3d 747 (11th Cir. 2007) .....................................................31, 36

*Schleicher v. Wendt*,
    529 F. Supp. 2d 959 (S.D. Ind. 2007)................................................................43

*Skubella v. Checkfree Corp.*,
    No. 1:07-CV-796-TWT, 2008 WL 1902118
    (N.D. Ga. Apr. 25, 2008) ...............................................................31, 32

*Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*,
    365 F.3d 353 (5th Cir. 2004) .........................................................36, 92

*Teamsters Local 175 v. Clorox Co.*,
    353 F.3d 1125 (9th Cir. 2004) .............................................................36

*Tellabs Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308, 127 S. Ct. 2499 (2007)................................ 5, 6, 10, 46, 50, 53, 55

*Weiss v. Amkor Tech., Inc.*,
    527 F. Supp. 2d 938 (D. Ariz. 2007) .....................................................75

*Wietchner v. Monterey Pasta Co.*,
    294 F. Supp. 2d 1102 (N.D. Cal. 2003).................................................53

*Ziemba v. Cascade Int'l, Inc.*,
    256 F.3d 1194 (11th Cir. 2001) ............................................................84

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009) ........................................................80, 83

## STATUTES

15 U.S.C. § 77z-2(i) ..............................................................................28

15 U.S.C. § 78t-1(a) ..............................................................................61

15 U.S.C. § 78u-4(b)(2) .........................................................................46

15 U.S.C. § 78u-5(c)(1) ....................................................................28, 35

15 U.S.C. § 78u-5(c)(1)(A)(i) ................................................................31

15 U.S.C. § 78u-5(c)(1)(B) .......................................................................34

Section 10(b) of the Securities Exchange Act of 1934....................25, 26, 61, 71, 92

## OTHER AUTHORITIES

Federal Rule of Civil Procedure 9(b)........................................................3, 26, 44, 85

Federal Rule of Civil Procedure 12(b)(6) ...........................................................3, 26

H.R. Conf. Rep. 104-369 (1995), reprinted in 1995 U.S.C.C.A.N. 730 .................36

SEC Rule 10b-5 ........................................................................................26

SEC Rule 10b5-1 .......................................................................................61

Carter's, Inc. ("Carter's" or the "Company") respectfully submits this Memorandum of Law in Support of its Motion to Dismiss With Prejudice the First Amended and Consolidated Class Action Complaint [Docket No. 51].

## PROCEDURAL HISTORY

This putative securities fraud class action involves two separate and distinct sets of allegations and claims arising under the federal securities laws. The first set, referred to herein as the "OshKosh Claims," was first advanced in the Class Action Complaint filed by Lead Plaintiff Plymouth County Retirement System ("Plymouth") on September 19, 2008. After no other shareholder applied for Lead Plaintiff status, this Court appointed Plymouth Lead Plaintiff on March 13, 2009. Plymouth thereafter filed an Amended Class Action Complaint on May 12, 2009, which the original named defendants moved to dismiss.

While the motion to dismiss was pending, a new plaintiff, Scott Mylroie ("Mylroie"), filed a separate action over a year later, on November 17, 2009, asserting for the first time certain additional claims referred to herein as the "Accommodations Claims." On November 24, 2009, the Court *sua sponte* consolidated the two actions, thereby mooting the pending motion to dismiss, and the Court granted leave to renew the motion in the consolidated matter. Pursuant to the Parties' stipulated scheduling order, Plaintiffs Plymouth and Mylroie filed

the present First Amended and Consolidated Class Action Complaint (the "Amended Complaint"), including both the OshKosh Claims and the Accommodations Claims, on March 15, 2010.[1]

## PRELIMINARY STATEMENT

Plymouth and Mylroie ("Plaintiffs") bring this action purportedly on behalf of all purchasers of Carter's stock during the four and one-half year (56-month) period between March 16, 2005 and November 10, 2009 (the alleged "Class Period"). Plaintiffs allege that during the Class Period, the Defendants (i) "misled and defrauded" investors concerning the future "growth prospects" of children's apparel manufacturer OshKosh B'Gosh, Inc. ("OshKosh"), a company that Carter's acquired in July 2005 (the "OshKosh Claims"), and (ii) over a five and one-half year period, improperly booked so-called "accommodations" in incorrect

---

[1] In this consolidated action, Plaintiffs bring claims against Carter's, certain current and former officers of Carter's, and Carter's outside auditor PricewaterhouseCoopers LLP ("PwC"). Am. Compl. ¶¶ 33-41. Frederick J. Rowan, II formerly served as Chairman of the Board and Chief Executive Officer. *Id.* ¶ 34. Joseph Pacifico formerly served as President. *Id.* ¶ 35. Michal D. Casey had served as Executive Vice President and Chief Financial Officer and now serves as CEO and Chairman of the Board. *Id.* ¶ 36. Charles E. Whetzel, Jr. serves as Executive Vice President and Chief Sourcing Officer. *Id.* ¶ 37. Andrew North had served as Vice President of Corporate Compliance and Interim Chief Financial Officer and now serves as Vice President of Finance. *Id.* ¶ 38.

quarterly periods, which had the net effect of increasing earnings over that entire period by 3% (the "Accommodations Claims").  Am. Compl. ¶¶ 4, 14.

*The OshKosh Claims*

As to the OshKosh Claims, the Amended Complaint asserts that Carter's, Mr. Rowan, Mr. Pacifico, Mr. Casey, and Mr. Whetzel (the "OshKosh Defendants") "misrepresented OshKosh's future prospects" and "that rather than being the growth engine of the future for Carter's, the OshKosh acquisition was a failure."  Am. Compl. ¶¶ 5, 287.  According to the Amended Complaint, the supposed "falsity" of forward-looking commentary concerning OshKosh's "future prospects" became publicly known on July 24, 2007, when Carter's recorded a non-cash impairment charge and wrote down the estimated value of OshKosh's intangible assets known as goodwill and trade name.  *See id.* ¶¶ 285-87.

The Amended Complaint does not meet the pleading requirements of Rule 9(b), the Private Securities Litigation Reform Act ("PSLRA"), and Rule 12(b)(6) for three independently dispositive reasons:  (i) it fails to identify actionable misstatements of fact, and instead is predicated solely upon forward-looking predictions and statements concerning OshKosh's potential future performance that are not actionable under the safe harbor provisions of the PSLRA; (ii) it fails to allege particularized facts giving rise to a "strong inference" that the OshKosh

Defendants intended to defraud shareholders when providing guidance and commentary concerning OshKosh's possible future performance; and (iii) it fails to plead a viable and factually supported theory of loss causation.

First, the Amended Complaint fails to identify actionable misstatements of fact. In alleging that Carter's somehow "defrauded" investors about OshKosh's "growth prospects," the Amended Complaint does not cite to a single instance in which Carter's supposedly misstated *facts* concerning OshKosh's financial results or performance following the acquisition. Critically, Plaintiffs do not point to a single disclosure contained in Carter's financial results, set forth in Forms 10-K, 10-Q, and 8-K filed with the Securities and Exchange Commission ("SEC"), that is even inaccurate, let alone fraudulent, with respect to OshKosh.

Plaintiffs instead rely entirely upon out-of-context snippets taken from earnings calls during which senior executives provided their views concerning OshKosh's future. But this commentary falls squarely within the PSLRA's safe harbor for forward-looking statements. In compliance with the safe harbor, Carter's provided cautionary language at the outset of each earnings call identifying the predictions and views expressed on the calls as "forward-looking" and explaining that actual future results could differ materially from those

predictions. Under Eleventh Circuit law, this alone requires the Amended Complaint to be dismissed.

What is more, the Amended Complaint fails to allege any particularized facts that somehow render the forward-looking statements to have been false when made or to have been made without a reasonable basis. Indeed, the forward-looking guidance and commentary provided by the OshKosh Defendants proved to be accurate.

Second, the Amended Complaint fails to plead scienter, in that it fails to allege facts giving rise to a "strong inference" that any of the OshKosh Defendants intended to commit fraud, as required under the PSLRA and the Supreme Court's decision in *Tellabs Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 127 S. Ct. 2499 (2007). In an effort to manufacture some evidence of fraudulent motive, the Amended Complaint asserts that the OshKosh Defendants "dumped" stock during the unduly long four and one-half year (56-month) Class Period. But on the sales alleged, there was no "dumping" – the OshKosh Defendants did *not* sell the vast majority of their holdings, and the fraction each did sell was consistent with his historical trading and circumstances. Moreover, Carter's initiated a stock repurchase program during the Class Period, reflecting the view of senior management and the Board of Directors that the Company's stock was

- 5 -

*undervalued* during the Class Period and was thus attractive for repurchase, not artificially inflated and ripe for "suspicious" "dumping" as Plaintiffs allege. The Amended Complaint fails to supply any explanation for how or why Carter's and the OshKosh Defendants had any reason to intentionally mislead its shareholders, much less one that is "at least as compelling as any opposing inference" under *Tellabs*. *See* 551 U.S. at 324.

Third, Plaintiffs fail to meet their burden to plead loss causation. Facts concerning OshKosh were disclosed throughout the Class Period, and there was never a "corrective" disclosure that reversed or corrected Carter's stock price. In fact, when the impairment charge was disclosed on July 24, 2007, there was no "sudden reversal" in stock price as alleged. *See* Am. Compl. ¶ 18. Plaintiffs' argument on loss causation – that OshKosh's purportedly diminishing "growth prospects" were actually revealed to the market three separate times over the course of the purported Class Period – utterly undermines Plaintiffs' core contention that OshKosh's allegedly "true" growth prospects were hidden from investors throughout the Class Period. The two propositions simply cannot be logically reconciled. The Amended Complaint thus does not – and cannot – show that forward-looking commentary concerning OshKosh's "growth prospects"

somehow caused the stock to be artificially inflated, or that the disclosure of the write-down "corrected" any such purported inflation.

These pleading defects expose the fundamental flaw in Plaintiffs' theory. To the extent this securities class action is based on the so-called OshKosh Claims, it is predicated entirely upon – and was prompted solely by – the mere fact that after its acquisition by Carter's, OshKosh's turnaround and performance turned out to be less successful than originally hoped and, thus, did not support the value of OshKosh's intangible assets as booked at the time of its acquisition. As a result, Carter's complied with applicable accounting rules and wrote down the estimated value of OshKosh's goodwill and trade name. But there is no allegation – nor could there be – that the write-down should have been taken earlier or otherwise required the restatement of any previously reported actual results concerning OshKosh. Plaintiffs' core theory simply reduces to a "fraud by hindsight" proposition that because OshKosh's performance over time has proven thus far to be disappointing and resulted in a write-down, there "must have been" some earlier fraud. But such a proposition is not viable as a matter of law.

*The Accommodations Claims*

The Accommodations Claims, filed a year after the OshKosh Claims, allege that Carter's and PwC, as well as Mr. Rowan, Mr. Pacifico, Mr. Casey, Mr. North,

and Mr. Whetzel (the "Individual Defendants"), were engaged in a fraud relating to Carter's accounting for margin support, or so-called "accommodations." Wholesalers like Carter's provide accommodations in the form of monetary support to their retailers when the wholesalers' products are sold at discounts, thus reducing the retailers' expected revenues and profits. By operation of certain accounting principles, such accommodations must be accounted for in the quarter in which the wholesaler sells the product to the retailer. Accordingly, even when a wholesaler and a retailer do not reach final agreement on the terms and amount of any accommodation until the subsequent quarter, the wholesaler normally should account for that accommodation (and the commensurate reduction in its profit margin) in the preceding quarter in which the products were sold. In November 2009, Carter's announced that it had discovered that some members of Carter's sales group had not communicated to Carter's finance team the deferral of certain accommodations into later fiscal periods, and that, as a result, some accommodations had been recorded in the incorrect quarters. Carter's then corrected the calculations of earnings for each quarter over a five and one-half year period, and announced the Company's restated earnings in December 2009.

The restatement had a total net effect of 3% on earnings over the entire five and one-half year period. Carter's stock price rose in response to the release of the

restated earnings.  Financial analysts following Carter's described the restatement as "essentially a non-event."

Plaintiffs' counsel nonetheless attempt to seize upon the restated earnings as grounds for a separate securities claim.  Plaintiffs assert that Carter's current executive team not only knew about, but for some reason orchestrated, the deferral of accommodations into incorrect quarterly periods.  But because a motive to inflate earnings by a mere 3% over half a decade is facially implausible, Plaintiffs contend that Carter's executive team did so not to inflate Carter's earnings, but rather to "smooth" Carter's earnings.  Am. Compl. ¶ 78.

Plaintiffs' accommodations allegations fail to state a claim as a matter of law.  As a threshold matter, neither named Plaintiff held securities in Carter's at the time Carter's announced its intention to restate certain financial statements, and thus neither has standing to bring the Accommodations Claims.  That jurisdictional defect alone requires dismissal.

But even looking past that, Plaintiffs fail to allege facts that establish that any Individual Defendant knew about the accommodations deferrals that led to the restatement or that otherwise support an inference of fraudulent intent.  The two "confidential witnesses" upon whom Plaintiffs' theory is based, one of whom the Amended Complaint acknowledges is a disgruntled terminated employee, have no

personal knowledge of any facts supporting the theory of fraudulent intent they spin. To overcome this defect, Plaintiffs offer generalized allegations that the Individual Defendants were motivated to engage in the purported fraud by their performance-based compensation packages and desire to perform well. But such allegations could apply to any corporate executive and thus fail to support the "cogent and compelling" inference of fraudulent intent that the PSLRA and the Supreme Court in *Tellabs* require. Having failed to allege the requisite strong inference of scienter, Plaintiffs' Accommodations Claims must be dismissed.

## SUMMARY OF THE OSHKOSH ALLEGATIONS

### I.    Factual Background And Alleged Misstatements

#### A.    Carter's Acquires OshKosh On July 14, 2005

Carter's is a leading designer, manufacturer, and marketer of babies' and children's apparel in the United States. Am. Compl. ¶ 56. On May 10, 2005, Carter's announced its plan to acquire the children's apparel company OshKosh. *Id.* ¶ 196. OshKosh had a recent history of operational difficulties. *Id.* ¶ 15. Carter's viewed (and continues to view) the acquisition of an underperforming OshKosh as requiring a turnaround, but also as presenting an opportunity for long-term growth. *Id.* ¶¶ 15, 200. On July 14, 2005, Carter's acquired OshKosh. *Id.* ¶ 192.

Of the total purchase price of $312.1 million that Carter's paid for OshKosh, Carter's identified tangible and intangible assets of $161.1 million. *Id.* ¶¶ 192-93. The difference between the purchase price and the value of OshKosh's identified assets represented the value of OshKosh's "goodwill." *Id.* Accordingly, the goodwill recorded by Carter's in connection with its OshKosh acquisition was $151 million. *Id.*

Under applicable accounting rules, estimates of "goodwill" are evaluated on an annual basis. *See* Statement of Financial Accounting Standard 142 ("SFAS 142"). In its 2005 annual report, publicly filed on March 15, 2006, Carter's specifically warned investors that estimates of goodwill and trade name are ones "that require management's most difficult and subjective judgments, often as a result of the need to make estimates about the effect of matters that are inherently uncertain." Declaration of Christopher G. Green, dated April 30, 2010 ("Green Decl."), Ex. 5 (FY2005 Form 10-K) at 33.[2] Carter's noted that the kinds of "[f]actors affecting such impairment reviews include the continued market acceptance of our products and the development of new products." *Id.* at 34.

---

[2] This Court may consider on a motion to dismiss any document relied upon in, and central to, the Amended Complaint, as well as all relevant documents publicly filed with the SEC. *See Harris v. Ivax Corp.*, 182 F.3d 799, 802 n.2 (11th Cir. 1999); *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1276 (11th Cir. 1999).

Similarly, in its 2006 annual report, publicly filed on February 28, 2007, Carter's warned investors that "[e]stimated future cash flows used in such impairment reviews could be negatively impacted if we do not achieve our sales growth plans, planned cost savings, and other assumptions that support the carrying value of these intangible assets, which could result in potential impairment of such assets." *Id.*, Ex. 18 (FY2006 Form 10-K) at 11.

Following the OshKosh acquisition, Carter's implemented an integration plan to attempt to improve OshKosh's financial performance. *See* Am. Compl. ¶ 17. This plan included closing unprofitable stores, *id.* ¶ 205; completing an OshKosh brand study by the summer of 2006, *id.* ¶ 211; implementing the results of the brand study a year later in 2007, *id.*; upgrading the product lines, *id.* ¶ 224; and integrating support and design functions under Carter's management, *id.*

From the very beginning, the OshKosh integration was disclosed as a long-term effort that involved risk and could take time to complete. *See* Am. Compl. ¶ 222. In an April 2006 earnings call commenting on financial results for the first quarter of 2006, Mr. Rowan, Carter's then-CEO, explained to investors that "[w]e are looking together to 2 or 3 year plans for growth. Essentially, we are repositioning OshKosh to preeminence, that's going to take some time. . . ." Green Decl., Ex. 8 (4/26/06 Earnings Call) at 2.

**B.    Carter's Forecasts Of OshKosh's Financial
Performance Following The Acquisition**

As Carter's had warned, OshKosh's performance encountered difficulties
following the acquisition.  Carter's disclosed the net sales results for OshKosh that
reflected these difficulties on a quarterly basis.  The Company held earnings calls
with investors following each release of the quarterly financials to discuss the
results and to provide numerical guidance of expected future net sales for
OshKosh.  On the earnings calls during the purported Class Period, Carter's
disclosed earnings guidance demonstrating a cautious prognosis for OshKosh's
growth prospects for each of the upcoming quarters.  *See, e.g.*, Am. Compl. ¶ 222;
Green Decl., Ex. 4 (2/22/06 Earnings Call) at 7.  Management provided investors
with these numerical forecasts of anticipated OshKosh net sales up to a year in
advance of actual sales results and revised the guidance as the OshKosh turnaround
unfolded and as more facts became available.

The chart below provides the actual OshKosh net sales results for each fiscal
quarter from the Forms 8-K and 10-K that are incorporated into the pleadings, and
compares those results to the guidance that Carter's provided to investors months
in advance on the very same earnings calls cited in the Amended Complaint.  As
the chart demonstrates, Carter's guidance – both initially and as revised – closely
tracked the eventual, actual quarterly net sales results.  In a number of quarters,

Carter's projections of OshKosh net sales actually turned out to be *less* optimistic than the actual results.

| Fiscal Quarter | OshKosh Net Sales – Guidance (in millions) | OshKosh Net Sales – Actual (in millions) |
|---|---|---|
| **1Q2006 (Jan. 1 – Mar. 31)** | **$70.0** (released 2/22/06) *See* Am. Compl. ¶¶ 222-228; Green Decl., Ex. 4 (2/22/06 Earnings Call) at 7. | **$71.0** (released 4/25/06) *See* Am. Compl. ¶ 231; Green Decl., Ex. 7 (1Q2006 Form 8-K) at 4. |
| **2Q2006 (Apr. 1 – June 30)** | **$71.0** (released 4/26/06) *See* Am. Compl. ¶¶ 231-234; Green Decl., Ex. 8 (4/26/06 Earnings Call) at 5. | **$71.1** (released 7/26/06) *See* Am. Compl. ¶ 237; Green Decl., Ex. 9 (2Q2006 Form 8-K) at 4. |
| **3Q2006 (July 1 – Sept. 30)** | **$94.0** (released 7/26/06) *See* Am. Compl. ¶¶ 238-239; Green Decl., Ex. 10 (7/26/06 Earnings Call) at 6. | **$88.5** (released 10/25/06) *See* Am. Compl. ¶ 247; Green Decl., Ex. 12 (3Q2006 Form 8-K) at 4. |
| **4Q2006 (Oct. 1 – Dec. 31)** | **$102.0** (originally released 7/26/06) *See* Am. Compl. ¶¶ 238-239; Green Decl., Ex. 10 (7/26/06 Earnings Call) at 7. <br><br> **$93.0** (revised 10/25/06) *See* Am. Compl. ¶¶ 247-250; Green Decl., Ex. 13 (10/25/06 Earnings Call) at 6. | **$94.8** (released 2/21/07) *See* Am. Compl. ¶ 262; Green Decl., Ex. 16 (4Q2006 Form 8-K) at 5. |
| **Total Fiscal 2006** | **$350.0** (originally released 2/22/06) *See* Am. Compl. ¶¶ 222-228; Green Decl., Ex. 4 (2/22/06 Earnings Call) at 7. <br><br> **$340.0** (revised 4/26/06) *See* Am. Compl. ¶¶ 231-234; Green Decl., Ex. 8 (4/26/06 Earnings Call) at 6. <br><br> **$330 to $338** (revised 7/26/06) *See* Am. Compl. ¶¶ 238-239; Green Decl., Ex. 10 (7/26/06 Earnings Call) at 7. <br><br> **$323.0** (revised 10/25/06) *See* Am. Compl. ¶¶ 247-250; Green Decl., Ex. 13 (10/25/06 Earnings Call) at 6. | **$325.5** (released 2/28/07) *See* Am. Compl. ¶ 269; Green Decl., Ex. 18 (FY2006 Form 10-K) at 20. <br><br> **$322.97** (amended 1/15/10) <br><br> *See* Am. Compl. ¶ 124; Green Decl., Ex. 25 (FY2008 Form 10-K/A) at 54. |
| **1Q2007 (Jan. 1 – Mar. 31)** | **$67.0** (released 2/21/07) *See* Am. Compl. ¶¶ 262-264; Green Decl., Ex. 17 (2/21/07 Earnings Call) at 6. | **$70.8** (released 4/24/07) *See* Am. Compl. ¶ 279; Green Decl., Ex. 19 (1Q2007 Form 8-K) at 4. |
| **2Q2007 (Apr. 1 – June 30)** | **$67.5** (released 4/25/07) *See* Am. Compl. ¶ 279; Green Decl., Ex. 20 (4/25/07 Earnings Call) at 4. | **$59.1** (released 7/24/07) *See* Am. Compl. ¶ 286; Green Decl., Ex. 21 (2Q2007 Form 8-K) at 4. |

### C.    The Allegedly Misleading Statements
### Regarding OshKosh's Financial Performance

The Amended Complaint does not challenge a single numerical forecast of OshKosh's "growth prospects" or any release of actual net sales as false or misleading.[3]  Instead, it quotes and cherry-picks snippets of forward-looking commentary and opinion from six earnings calls and from two presentations given at investor conferences during the Class Period.[4]  The Amended Complaint then asserts that each forward-looking statement or block quotation "was false and misleading" when made because the OshKosh Defendants allegedly "knew or were extremely reckless in not knowing" that OshKosh's "growth prospects" were non-existent.  *See, e.g.*, Am. Compl. ¶¶ 223, 225, 227.

---

[3] The Amended Complaint does not allege that the restatement of past financials referenced in the Accommodations Claims materially affected the reporting of *OshKosh* net sales.  In fact, the amended financial results for the 2006 fiscal year brought the actual sales results even closer to the guidance provided on October 25, 2006.  *See* Green Decl., Ex. 25 (FY2008 Form 10-K/A) at 54; *id.*, Ex. 10 (7/26/06 Earnings Call) at 7.

[4]  The allegedly misleading forward-looking statements are included in the Amended Complaint at paragraphs 222-279 (pages 116-139).  For ease of reference, the alleged misleading statements related to the OshKosh Claims as forth in the Amended Complaint are itemized in Exhibit 1 to the Green Declaration.

### 1.    Fourth Quarter Of 2005 Financial
### Results – Early Assessment

Carter's released its financial results for the fourth quarter of 2005 on February 22, 2006.  *See* Green Decl., Ex. 3 (4Q2005 Form 8-K) at 4.  The Form 8-K disclosed a 23% decrease in OshKosh wholesale sales and a 10.2% decrease in retail sales from the prior OshKosh-operated fourth quarter of 2004.  *See id.*; *id.*, Ex. 11 (4Q2004 OshKosh Form 8-K) at 3-4.  On the earnings call, Mr. Rowan discussed these negative results by cautioning investors that "[i]t's important to realize that [the OshKosh acquisition] will take some time to reach the potential." *Id.*, Ex. 4 (2/22/06 Earnings Call) at 2.  Mr. Casey, then CFO of Carter's and now its CEO, added: "I think the important thing for 2006 is think of it as first half / second half.  And the reason we say that is our first ability to impact product doesn't come until fall [2006]. . . . So in the first half . . . the level of sales will be flat year-over-year."  *Id*. at 11-12.  Similarly, Mr. Pacifico, then President of Carter's, told investors that: "We planned the first half flat . . . ."  *Id*. at 4.

Despite the negative OshKosh sales numbers and these comments, the Amended Complaint characterizes this earnings call as "giving the impression that Carter's was making huge strides in improving the OshKosh product and growing the OshKosh brand."  Am. Compl. ¶ 223.  Plaintiffs purport to have been misled by optimistic and hopeful comments regarding OshKosh's long-term prospects, such

- 16 -

as "I feel good about the progress we've made and even better about the opportunity I see to increase the power in the OshKosh brand," and forward-looking projections about the sales of product lines that were months away from touching the shelves and a year – if not more – away from final net sales figures. *See id.* ¶ 222 ("Fall [2006] product is materially better but holiday [2006] and Spring and Fall of [2007] will move well ahead of fall [2006].") ¶ 224 ("We are projecting a double-digit increase for Fall [2006].")

### 2. First Quarter of 2006 Financial Results – Downgrading Guidance and Forecasting "Flat" Sales For 2006

On April 25, 2006, Carter's disclosed that net sales for OshKosh in the first quarter of 2006 were $71 million. Green Decl., Ex. 7 (1Q2006 Form 8-K) at 4-5. Net sales exceeded the investor guidance by $1 million, but constituted a 10.3% wholesale and 17.9% retail decrease from the first quarter of 2005. *See id.*; *id.*, Ex. 14 (1Q2005 OshKosh Form 8-K) at 6. As a result, Mr. Pacifico downgraded guidance for the fall of 2006 by stating: "As you know, we recently finished booking fall 2006 and are in the middle of booking holiday 2006. As we are – we believe for the second half [of 2006], it would be flat to last year . . . ." Green Decl., Ex. 8 (4/26/2006 Earnings Call) at 3. Mr. Casey reminded investors that "[t]hese turnarounds go in phases. They aren't all everything gets corrected in the

first phase and that was never in our plan . . . . [I]t will take a couple of years." *Id.*
at 10.

Despite the downgrade in guidance for 2006 sales, the Amended Complaint
alleges that statements made on this earnings call were somehow "false and
misleading" because the OshKosh Defendants "remained relentlessly on message
about the OshKosh growth opportunity." Am. Compl. ¶¶ 231-32. Plaintiffs
purport to have been misled by statements such as "we are improving OshKosh's
operating margin." *Id.*[5]

### 3.    Second Quarter of 2006 Financial Results – Disappointing Projections Continue Into 2007

Summarizing OshKosh's performance for the first half of 2006, Mr. Casey
explained: "As we said on previous calls, as expected OshKosh was dilutive to net
income in the first half." Green Decl., Ex. 10 (7/26/06 Earnings Call) at 4. This
tracked the guidance Carter's provided to investors three months earlier, which
underestimated the actual net sales results by $0.1 million. *See id.*, Ex. 8
(4/26/2006 Earnings Call) at 5. Carter's also highlighted the disappointing data
affecting the projections for the rest of 2006 and into 2007. Mr. Pacifico told
investors regarding the upcoming 2006-2007 holiday sales: "[Y]ou have the

---

[5] The Amended Complaint fails to include a single allegation to challenge the
accuracy of this statement, or any statement regarding improved operating margins
and profitability for OshKosh.

numbers, the holiday bookings I would say were a little disappointing compared to what we originally planned." *Id.*, Ex. 10 at 8. Though it was still "too early to get any over-the-counter sales," he readily acknowledged mispositioning the Fall 2006 product line and accordingly projected that "[o]ur second half revenue, the fall holiday lines, we planned down 10% than last year." *Id.* at 4.

The Amended Complaint alleges that these negative disclosures represented the "truth" beginning to "emerge" "that the Fall 2006 OshKosh redesign was a failure." Am. Compl. ¶¶ 237-38. But the Amended Complaint nonetheless cites the same disclosures as allegedly further evidence that "the OshKosh Defendants omitted to disclose" information regarding negative sales for the Fall product line. *See, e.g.*, *id.* ¶ 240.

### 4.    Third Quarter of 2006 Financial Results – Negative Sales Results Continue

Carter's released financial results for the third quarter of 2006 on October 25, 2006, disclosing a 20.9% decrease in OshKosh's comparable wholesale sales and a 1.2% decrease in retail sales. Green Decl., Ex. 12 (3Q2006 Form 8-K) at 4; *id.*, Ex. 6 (3Q2005 Form 8-K) at 5. On the earnings call, Mr. Pacifico discussed the negative OshKosh sales performance and reiterated the negative forward-looking guidance for OshKosh's wholesale sales, stating: "Specifically talking about OshKosh wholesale, as we discussed on previous calls, wholesale sales will

be down for the year." *Id.*, Ex. 13 (10/25/06 Earnings Call) at 3.  Mr. Casey then quantified this negative guidance for the fourth quarter of 2006 by projecting a 11% comparable decrease in OshKosh wholesale sales and a 5% decrease in comparable retail sales.  *Id.* at 6.

The Amended Complaint nevertheless alleges that statements made on this earnings call "continued to assert that . . . Carter's had made great progress in increasing OshKosh's profitability" and "emphasized the growth story again." Am. Compl. ¶¶ 248-50.  Plaintiffs rely primarily on statements looking months ahead not even to sales, but to bookings for potential future sales of the Spring and Summer 2007 product lines: "Our spring [of 2007] bookings are up 10% in dozens and 3% in dollars.  Our summer [of 2007] bookings show further improvement and we are projecting they will be up double-digits." [6]  *Id*. ¶ 248.

### 5.    Fourth Quarter of 2006 Financial Results – "No Growth" Guidance

The preliminary results for the fourth quarter of 2006 became available to Carter's in early 2007 and were lower than anticipated.  On February 13, 2007, Carter's accordingly released the preliminary results and lowered its guidance for

---

[6] Plaintiffs repeatedly cite statements that refer to "bookings" as opposed to "sales," but Plaintiffs allege no facts whatsoever contradicting statements regarding the number of bookings received and what those numbers allegedly foretold for actual net sales.

2007.  Am. Compl. ¶ 257; Green Decl., Ex. 15 (2/13/07 Form 8-K) at 4 ("The negative trends in our retail stores continued through the fourth quarter of 2006 and are impacting our 2007 results.").  The revised guidance for the 2007 fiscal year assumed for its projections "*no growth* in comparable store sales, fewer store openings and less contribution from our OshKosh wholesale segment."  Am. Compl. ¶ 257 (emphasis added).

On the February 21, 2007 earnings call, Mr. Pacifico noted that Carter's expected the poor financial results to continue through 2007 by telling investors: "[S]pring selling is off to a slow start and as a result, we have been cautious about our fall '07 commitment.  As of now we expect fall orders to be flat to down 10%."  Green Decl., Ex. 17 (2/21/07 Earnings Call) at 3.  Likewise, Mr. Casey cautioned: "We also have more work to do improving OshKosh product performance, which has taken longer than expected and will impact our growth in OshKosh wholesale sales this year."  *Id*. at 5.  He went on to project that OshKosh sales in the first quarter of 2007 would reflect a 5% decrease from 2006, with wholesale sales down 8% and retail sales down 3%.  *Id.* at 6.

Despite the Company's projection of "no growth" for the entire 2007 fiscal year, the Amended Complaint alleges that investors were misled because the "Defendants still maintained that OshKosh was the growth engine for the

Company." Am. Compl. ¶ 262. For this, Plaintiffs attempt to rely on Mr. Rowan's statement that "rest assured we will continue to grow our Carter's business and we will position Oshkosh for bigger things," and on Mr. Pacifico's statement that "[w]e still believe the Oshkosh brand has great potential." *Id.* ¶¶ 262, 264.

### 6. First Quarter of 2007 Financial Results – Poor Fiscal 2007 Sales Continue

On April 24, 2007, Carter's disclosed that OshKosh net sales exceeded the investor guidance by $3.8 million in the first quarter of 2007, but still reflected a 0.2% decrease in net sales as compared to the first quarter of 2006, with wholesale sales decreasing 7.9%. Green Decl., Ex. 19 (4/24/2007 Form 8-K) at 4. On the earnings call, Mr. Rowan did not parse words when he told investors: "The share of market that we have is low as hell in those wholesalers; I mean the road is up." Green Decl., Ex. 20 (4/25/07 Earnings Call) at 10. The guidance provided by Mr. Casey for the second quarter of 2007 reflected the continued expectation of negative sales growth results, projecting OshKosh net sales to be down 5%, with wholesale sales down 31%. *Id.* at 4.

Plaintiffs nonetheless allege to have been misled because the "OshKosh Defendants were still misleadingly asserting that wholesale growth would be in the double digits for summer [of 2007]." Am. Compl. ¶ 279. The basis for this allegation is Mr. Pacifico's statement that "[o]ur summer bookings, which were up

20% to last year began shipping in the first week of April and it's a little early to get a good read on the sell-throughs in wholesale." *Id.*; Green Decl., Ex. 20 (4/25/07 Earnings Call) at 2. It bears noting that summer product sales would be realized in the financials for the third quarter of the fiscal year. Carter's released the results for the third quarter of 2007 on October 29, 2007, which showed a 9.9% increase in OshKosh wholesale sales consistent with statements regarding an increase in summer wholesale bookings. Green Decl., Ex. 24 (10/23/07 Form 8-K) at 4.

### 7. Second Quarter of 2007 Financial Results – Write-Down Required

Despite the "no growth" guidance provided in February for the 2007 fiscal year, the Amended Complaint alleges that Carter's was "forced to reveal the truth regarding OshKosh" with the release of results for the second quarter of 2007 on July 24. Am. Compl. ¶ 285. The financial results for OshKosh showed a deepening of the negative trend in sales and earnings, which included a 45.3% decrease in wholesale sales and a 3.6% decrease in retail sales. *Id.* ¶ 286; Green Decl., Ex. 21 (7/24/07 Form 8-K) at 4-5.

The Company conducted an interim impairment test on the value of intangible assets that Carter's recorded with respect to the OshKosh acquisition. Am. Compl. ¶ 285. The test resulted in a partial impairment of OshKosh's trade

name and a full impairment of OshKosh's $142.9 million in goodwill. *Id.* Carter's accordingly wrote down the full value of the goodwill and $12 million of the value attributed to the OshKosh trade name. *Id.* The Amended Complaint alleges that this write-down "finally disclos[ed] that OshKosh was not the growth engine that the OshKosh Defendants had relentlessly conditioned the market to expect." *Id.* There is no allegation, however, that the impairment charge should have been taken at any earlier point in time, that any accounting professional (or anyone else for that matter) suggested as much, or that the accounting of OshKosh's trade name or goodwill somehow failed to comply with GAAP.

## II. The Allegations Of Scienter Related To The OshKosh Claims

The Amended Complaint does not contain any factual allegations demonstrating that any OshKosh Defendant had "actual knowledge" of facts contrary to those contained in the alleged forward-looking statements. Instead, the Amended Complaint attempts to impute scienter solely on the basis of their "motive" allegations, including (i) the percentage of beneficial stock ownership that Mr. Rowan, Mr. Casey, Mr. Pacifico, and Mr. Whetzel sold during the protracted 56-month Class Period, (ii) the share repurchase program instituted by Carter's in 2007, (iii) ordinary performance-based incentives contained in Mr. Rowan's employment agreement, and (iv) a so-called "informal 'buddy pact'"

whereby the OshKosh Defendants allegedly discouraged lower-ranking executives from exercising their options.  *Id.* ¶¶ 5, 21, 202, 253, 266, 293.

## III.  The Allegations Of Loss Causation Related To The OshKosh Claims

The Amended Complaint alleges that three "partial" disclosures made throughout the Class Period corrected prior misstatements.  Am. Compl. ¶¶ 237, 257, 285.  Those so-called corrections allegedly removed "artificial inflation" from the stock, thereby causing actionable loss.  *Id.* ¶ 301.  These "partial" corrective disclosures span a year:  the first was on July 26, 2006, the second was nine months later on February 13, 2007, and the final disclosure was on July 24, 2007.  *Id.* ¶¶ 237, 257, 285.  As explained below, none of those disclosures "corrected" any misstatement from a prior reporting period.  Each simply conveyed current information as it became known.

## IV.  The Counts Predicated On The OshKosh Claims

On the basis of the allegations above, the Amended Complaint asserts four counts of securities fraud based on the OshKosh Claims, only two of which are asserted against Carter's.  Counts II and III allege that the OshKosh Defendants (Carter's, Mr. Rowan, Mr. Casey, Mr. Pacifico, and Mr. Whetzel) violated Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") by allegedly

disseminating materially false and misleading information concerning OshKosh.[7]

Am. Compl. ¶¶ 315-33.  Count V alleges that Mr. Rowan, Mr. Casey, Mr. Pacifico, and Mr. Whetzel violated Section 20(a) of the Exchange Act as alleged controlling persons of Carter's.  *Id.* ¶¶ 338-41.  Count VI alleges that the stock sales made by Mr. Rowan, Mr. Casey, Mr. Pacifico, and Mr. Whetzel during the 56-month Class Period violated Section 20A because they allegedly traded on the basis of material, non-public information.  *Id.* ¶¶ 342-50.

## ARGUMENT – OSHKOSH CLAIMS

The Amended Complaint fails to meet the pleading requirements of Federal Rules of Civil Procedure 9(b) and 12(b)(6) and the PSLRA, and it fails to plead with particularity the basic elements of a securities fraud claim under Section 10(b) and Rule 10b-5.

**I.    The Amended Complaint Fails To State a Claim For Securities Fraud Under Section 10(b) And Rule 10b-5 Based On The Oshkosh Claims**

To state a claim pursuant to Section 10(b) and Rule 10b-5, Plaintiffs must allege particularized facts showing six elements: (1) a material misrepresentation or omission of fact; (2) made with scienter; (3) in connection with the sale or

---

[7]  Mr. North is also named in Count III, but only with respect to the Accommodations Claims discussed below.  *See infra*, pp. 62-93; Am. Compl. ¶¶ 325-333.

purchase of a security; (4) upon which the plaintiff relied; (5) and suffered economic loss; (6) which was proximately caused by the material misrepresentation or omission. *Edward J. Goodman Life Income Trust v. Jabil Circuit, Inc.*, 594 F.3d 783, 789 (11th Cir. 2010); *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1236-37 (11th Cir. 2008). The Amended Complaint must be dismissed because it does not allege with particularity (i) any actionable misrepresentation (ii) made with scienter (iii) that proximately caused a loss.

### A.    The Alleged Misstatements Are Not Actionable Because They Fall Squarely Within The PSLRA Safe Harbor For Forward-Looking Statements

The OshKosh Claims are predicated entirely upon forward-looking statements made by Mr. Rowan, Mr. Pacifico, and Mr. Casey about OshKosh's possible future "growth prospects" that are not actionable because they fall squarely within the safe harbor provisions of the PSLRA. *See* Green Decl., Ex. 1 (setting forth the pleading defects of each alleged misstatement related to the OshKosh Claims).[8] The PSLRA safe harbor protects corporate executives from becoming liable for predictions and forecasts about possible future performance where, as here, the forward-looking statements were accompanied by meaningful

---

[8] The Amended Complaint does not even allege that Mr. Whetzel made any of the alleged misstatements, thereby requiring dismissal in his favor on that ground alone.

cautionary language.  15 U.S.C. § 78u-5(c)(1); *Harris v. Ivax Corp.*, 182 F.3d 799,

803 (11th Cir. 1999); *Edward J. Goodman Life Income Trust*, 594 F.3d at 795.

The Amended Complaint does not allege that a single *fact* related to

OshKosh contained in any of Carter's Forms 10-K, 10-Q, or 8-K filed during the

alleged Class Period was inaccurate.  Plaintiffs thus resort, repeatedly, to the

contention that "the OshKosh Defendants systematically and consistently

misrepresented the *growth and profit opportunity* of the OshKosh acquisition

during the Class Period."  Am. Compl. ¶ 19 (emphasis added).  But such

statements are just the kind of forward-looking projections accompanied by

abundant meaningful cautionary language that the PSLRA safe harbor renders not

actionable as a matter of law.

### 1.    The Alleged Misstatements Are Forward-Looking

The PSLRA defines a forward-looking statement to include a "statement

containing a projection of revenues," "a statement of the plans and objectives of

management for future operations," and "a statement of future economic

performance."  15 U.S.C. § 77z-2(i).  Courts in this Circuit have specifically held

that statements regarding a company's growth potential are classic forward-looking

statements under the PSLRA.  *See, e.g.*, *Amalgamated Bank v. Coca-Cola Co.*, No.

Civ. A. 1:05-CV-1226, 2006 WL 2818973, at *5-8 (N.D. Ga. Sept. 29, 2006).

The forward-looking statements that Plaintiffs allege were somehow "false" all concern future economic performance, including, by way of example:

- "We are projecting a double-digit increase for Fall '06." Am. Compl. ¶ 224;

- "[W]e believe, for the second half, we will be flat to last year. However, we are expecting increased profitability based on that we have eliminated planned upfront discounts and [have deleted] unprofitable accounts . . . ." *Id.* ¶ 231;

- "We still believe the OshKosh brand has great potential. It is only a $90 million wholesale business versus over 450 million at Carter's. It only has a 5% share of zero to seven market, so a lot of potential." *Id.* ¶ 264.

These statements are plainly forward-looking because they implicate possible events and performance in the future, and the accuracy of the projections is discernable only at a time after its disclosure. *See Harris,* 182 F.3d at 805; *In re Airgate PCS, Inc. Sec. Litig.*, 389 F. Supp. 2d 1360, 1372, 1379-80 (N.D. Ga. 2005) (statements are forward-looking even if they contain a mix of "both current fact and future prediction," so long as they "implicat[e] events in the future"). [9]

---

[9] Many of the forward-looking statements cited in the Amended Complaint are also not actionable because they constitute mere expressions of corporate optimism and opinion that are "[v]ague, optimistic statements" "not capable of objective verification" to a "substantial certainty." *See In re S1 Corp. Sec. Litig.*, 173 F. Supp. 2d 1334, 1350-51 (N.D. Ga. 2001); *Airgate*, 389 F. Supp. 2d at 1379 (statements regarding "the opportunity to leverage" and the "growth potential" of the merger not actionable); *Raab v. Gen. Physics Corp.*, 4 F.3d 286, 289-90 (4th Cir. 1993) (statements that a company expected a "10% to 30% growth rate" and was "poised to carry the growth . . . into the future" not actionable); *Grossman v. Novell, Inc.,* 120 F.3d 1112, 1121-22 (10th Cir. 1997) (statements that a company

The forward-looking statements in the Amended Complaint are nearly identical to ones specifically held by the Eleventh Circuit to be non-actionable. For example, in *Harris*, investors alleged that the defendants made false or misleading statements or omissions through optimistic press releases that "[r]eorders are expected to improve." 182 F.3d at 804. But they failed to predict a $104 million write-down in goodwill. *Id.* at 802. The Court held that the alleged statements and omissions were forward-looking and that the safe harbor provision of the PSLRA therefore foreclosed liability. *Id.* at 804-05; *see also Amalgamated Bank*, 2006 WL 2818973, at *5-9 (ruling as forward-looking statements that company was "confident [it] would meet its 11%-12% annual EPS growth target," and that its earnings reflected "flawless execution" of its merger strategy prior to a $392 million impairment charge); *Airgate*, 389 F. Supp. 2d at 1372 (ruling as forward-looking statement "we expect to generate positive earnings"). There is simply no credible argument that statements concerning OshKosh's future "growth prospects" are not "forward-looking" within the meaning of the PSLRA.

---

was experiencing "substantial success" with integration plans related to a merger that presented "a compelling set of opportunities" not actionable); *Hillson Partners Ltd. P'ship v. Adage, Inc.*, 42 F.3d 204, 212 (4th Cir. 1994) (statement that "significant sales gains should be seen as the year progresses" not actionable); *see also In re First Union Corp. Sec. Litig.*, 128 F. Supp. 2d 871, 891 (W.D.N.C. 2001) (ruling as immaterial the statement: "We are very pleased with our progress in integrating recent acquisitions and with the growth prospects stemming from these transactions").

### 2.    The Forward-Looking Statements Were Accompanied By Meaningful Cautionary Language

Under the plain text of the PSLRA, a forward-looking statement that is accompanied by "meaningful cautionary statements" is not actionable because the statements are "immaterial as a matter of law." 15 U.S.C. § 78u-5(c)(1)(A)(i); *cf. S.E.C. v. Merchant Capital, LLC*, 483 F.3d 747, 768 (11th Cir. 2007) (cautionary language rendered forward-looking projections "immaterial as a matter of law").

As in *Harris*, the forward-looking statements in this case are not actionable because they were accompanied by meaningful cautionary language that warned of "risks of a significance similar to that actually realized." *Harris*, 182 F.3d at 807; *see* 15 U.S.C. § 78u-5(c)(1)(A)(i); *Skubella v. Checkfree Corp.*, No. 1:07-CV-796-TWT, 2008 WL 1902118, at *8 (N.D. Ga. Apr. 25, 2008). At the outset of each earnings call that Plaintiffs allege contained misstatements, the OshKosh Defendants specifically warned investors:

> Before we begin, let me remind you that statements made on this conference call and in the Company's press release, other than those concerning historical information, should be considered forward-looking statements, and actual results may differ materially. For a detailed discussion of factors that could cause actual results to vary from those contained in the forward-looking statements, please refer to the Company's most recent annual report filed with the Securities and Exchange Commission.

*E.g.*, Green Decl., Ex. 4 (2/22/06 Earnings Call) at 1.[10]  These statements embody the very warnings that numerous courts in this Circuit have held constitute meaningful cautionary language with respect to a company's future growth prospects.  *See, e.g., Skubella*, 2008 WL 1902118, at *8 (warning in press release "that the risks and uncertainties [presented] in the company's periodic reports 'could cause actual results to differ materially from plans and projections'" was meaningful cautionary language); *Amalgamated Bank,* 2006 WL 2818973, at *6 (warning on conference call that forward-looking statements "should be considered in conjunction with the cautionary statements that are contained in our earnings release and . . . the company's most recent form 10-K" was meaningful cautionary language).

Furthermore, the risk factors contained in Carter's annual reports – which were also incorporated by reference into each earnings call – warned of the precise difficulties in the OshKosh integration process that ultimately came to pass.  In Carter's 2005 annual report on Form 10-K, released on March 15, 2006, Carter's specifically warned:

---

[10] *See also* Green Decl., Ex. 8 (4/26/06 Earnings Call) at 1;  Ex. 10  (7/26/06 Earnings Call) at 1; Ex. 13 (10/25/06 Earnings Call) at 1; Ex. 17 (2/21/07 Earnings Call) at 1; Ex. 20 (4/25/07 Earnings Call) at 1.

> We may fail to realize the cost savings and other benefits that we
> expect from synergies and other cost reduction initiatives . . . . We
> may encounter difficulties during the integration process [related to
> the OshKosh acquisition]. If we do not achieve our integration plans
> and the benefits and synergies we had anticipated, this could have an
> adverse effect on our operating results.

Green Decl., Ex. 5 (FY2005 Form 10-K) at 11. Additionally, Carter's Form 10-K

for the 2006 fiscal year, filed on February 28, 2007, specifically disclosed the very

risk that came to be realized in this case – the risk of a goodwill impairment

resulting from the difficulty in projecting future cash flows and other financial

performance metrics:

> We may not achieve sales growth plans, cost savings, and other
> assumptions that support the carrying value of our intangible
> assets. . . . [I]n connection with the Acquisition of OshKosh, we
> recorded cost in excess of fair value of net assets acquired of $143.2
> million and an OshKosh brand tradename asset of $102.0 million.
> The carrying value of these assets is subject to annual impairment
> reviews as of the last day of each fiscal year or more frequently if
> deemed necessary to any significant events or changes in
> circumstances. Estimated future cash flows used in such impairment
> reviews could be negatively impacted if we do not achieve our sales
> growth plans, planned cost savings, and other assumptions that
> support the carrying value of these intangible assets, which could
> result in potential impairment of such assets.

*Id.*, Ex. 18 (FY2006 Form 10-K) at 11; *see id.*, Ex. 16 (2/21/07 Form 8-K) at 9.

The targeted and detailed warnings that Carter's provided to investors were

even more specific and "closely related" to the actualized risk than those

previously held sufficient to constitute meaningful cautionary language in this

Circuit's decisions in *Harris* and *Ehlert v. Singer*. *See Harris*, 182 F.3d at 807; *Ehlert v. Singer*, 245 F.3d 1313, 1320 (11th Cir. 2001). In this case, the risk that OshKosh's failure to meet anticipated financial performance "could impact the carrying value of [OshKosh's] intangible assets" is precisely what came to be. *See* Green Decl., Ex. 18 (FY2006 Form 10-K) at 11. This renders the nexus between the warnings and actualized risk far more focused than the general warning held sufficient in *Harris*, which failed to identify the specific factor that caused actual results to differ from the forward-looking statement and led to a $104 million write-down in goodwill. *See* 182 F.3d at 807. The warnings in this case were also more fulsome than the cautionary language in *Ehlert* that did not warn investors that a specific version of its software was non-compliant with Year 2000 upgrades. *See* 245 F.3d at 1319-20. There simply can be no legitimate dispute that the PSLRA's safe harbor applies to each forward-looking statement in this case.[11]

---

[11] The PSLRA safe harbor provision would also apply even in the absence of meaningful cautionary language because Plaintiffs have failed to show that the OshKosh Defendants made the forward-looking statements with "actual knowledge" of their falsity, as addressed *infra*, § I.C.1. *See* 15 U.S.C. § 78u-5(c)(1)(B); *Edward J. Goodman Life Income Trust*, 594 F.3d at 795 ("As a third alternative, the defendant can avail himself of the safe harbor if the plaintiff fails to prove that the statement was made with actual knowledge that it was false.")

**B.    The Forward-Looking Statements Are Also Not Actionable Because There Were No Contrary "Then-Current" Facts And The Statements Proved To Be Accurate**

Given the forward-looking nature of the alleged misstatements and the meaningful cautionary language that accompanied them, as the Eleventh Circuit just recently affirmed in *Goodman*, that is the end of the analysis permitted under the PSLRA and *Harris*. *See* 15 U.S.C. § 78u-5(c)(1) (PSLRA language); *Harris*, 182 F.3d at 803; *Edward J. Goodman Life Income Trust*, 594 F.3d at 795. Despite this straightforward and controlling law, Plaintiffs nonetheless attempt to create an unrecognized exception.

According to Plaintiffs, the PSLRA's safe harbor provision somehow does not apply because, when "each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false." Am. Compl. ¶ 298. But the Eleventh Circuit in *Goodman* recently rejected this very argument and held that "an allegation of actual knowledge of falsity will not deprive a defendant of protection by the statutory safe harbor if his forward-looking statements are accompanied by meaningful cautionary language." *Edward J. Goodman Life Income Trust*, 594 F.3d at 795; *see also Harris*, 182 F.3d at 803. In addition to the irrelevance of these allegations as a matter of law under *Harris* and *Goodman*, these claims lack any particularized facts evidencing the OshKosh

Defendants' supposed knowledge of contrary facts. Purely for completeness, this deficiency is addressed below. *See Edward J. Goodman Life Income Trust*, 594 F.3d at 795; *Harris*, 182 F.3d at 803.

As this Circuit held in *Harris* and in *Goodman* (like the majority of Circuits that have considered the issue), under the plain text of the PSLRA, "if a [forward-looking statement] is accompanied by 'meaningful cautionary language,' the defendants' state of mind is irrelevant." *Harris*, 182 F.3d at 803; *Edward J. Goodman Life Income Trust*, 594 F.3d at 795.[12] Thus, well-settled Eleventh Circuit law holds that such predictive statements are not material, and thus not actionable as a matter of law, regardless of the OshKosh Defendants' knowledge of any contrary facts. *See Merchant Capital*, 483 F.3d at 768 (holding that cautionary language in offering documents "rendered the projections immaterial as a matter of

---

[12] *See Miller v. Champion Enters., Inc.*, 346 F.3d 660, 672 (6th Cir. 2003) ("[I]f the statement qualifies as "forward-looking" and is accompanied by sufficient cautionary language, a defendant's statement is protected regardless of the actual state of mind."); *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 371 (5th Cir. 2004) (under the PSLRA safe harbor, the prong focusing on cautionary statements is independent from the prong focusing on state of mind); *Teamsters Local 175 v. Clorox Co.*, 353 F.3d 1125, 1131-32 (9th Cir. 2004) (holding that the safe harbor applied upon the conclusion that sufficient warnings accompanied the forward-looking statements); *see also* H.R. Conf. Rep. 104-369, at 44 (1995), reprinted in 1995 U.S.C.C.A.N. 730, 743 ("The first prong of the safe harbor requires courts to examine only the cautionary statement accompanying the forward-looking statement. Courts should not examine the state of mind of the person making the statement.").

law, even if they were misrepresentations"). As the Eleventh Circuit put it, "[s]o long as the language accompanying the projections is meaningfully cautionary, the law requires us to be unconcerned with the speaker's state of mind at the time he makes the projections." *Edward J. Goodman Life Income Trust*, 594 F.3d at 795.

But the forward-looking statements are not actionable for an additional, independently dispositive reason: a full reading of the OshKosh Defendants' forward-looking statements and projections – not just the cherry-picked snippets stripped of their factual and substantive context – shows that they were consistent with the known facts and even proved to be accurate. *See Harris*, 182 F.3d at 802 n.2, 805; *see also Grossman,* 120 F.3d at 1120 ("[S]tatements must be analyzed in context when determining whether or not they are materially misleading.").

### 1.    The OshKosh Defendants' Forward-Looking Statements And Projections About OshKosh's Future Performance Were Accurate When Made

As the chart in the Summary of Allegations demonstrates, the Amended Complaint completely ignores the actual numerical forecasts of OshKosh's "growth prospects." *See supra*, p. 14. A review of Carter's sales guidance, which was made months in advance of actual quarterly net sales results and then revised as more information developed, shows that the Company's estimates of OshKosh's

future performance proved to be materially accurate and, for at least four quarters, overly conservative. *See id.*

As to the management's commentary about OshKosh's prosperity, starting with the very first earnings call referenced in the Amended Complaint on February 22, 2006, Carter's made clear that the OshKosh turnaround effort faced challenges. *See* Am. Compl. ¶ 222. Notwithstanding these cautious (if not negative) forecasts and warnings, Plaintiffs claim that investors listening to these earnings calls were somehow misled about OshKosh's "growth prospects." But the Amended Complaint pleads no facts – literally none – to support allegations that the OshKosh Defendants "knew" at the time they made the few optimistic statements they did, such as their hope that the OshKosh "brand has a billion dollar potential" and that "Spring and Fall of next year will move well ahead of Fall '06," that such projections and results were not attainable on the hoped-for timeline. *Id.*

On the next earnings call held on April 26, 2006 (reporting Q1 2006 results), Carter's announced that it was revising its forecasts given OshKosh's continuing troubles. Carter's projected that there would not likely be double-digit growth, but rather sales would likely be "flat" for the second half of 2006. *See* Am. Compl. ¶ 231; Green Decl., Ex. 8 (4/26/06 Earnings Call) at 3. Mr. Casey emphasized that the turnaround process would take "a couple of years." *Id.* at 10.

Ignoring the downward revision of forecasts for the second half of 2006 and the accompanying cautionary statements, the Amended Complaint relies upon snippets of encouraging words referring to OshKosh's "progress" and "excellent feedback from . . . accounts" and argues that these somehow misled investors about OshKosh's "growth prospects." *See* Am. Compl. ¶ 231. But those optimistic snippets could not conceivably have "misled" investors when put in the full context of what was actually said, *i.e.*, that sales for the remainder of the year would be "flat." *See id.*

Only three months later, on July 25, 2006, Carter's reported its earnings for the second quarter of 2006. Am. Compl. ¶ 237. Now armed with additional information, Carter's once again downwardly revised its guidance for the second half of the year. *Id.* Carter's announced that, rather than OshKosh's sales being "flat" for the remainder of 2006, Carter's now expected OshKosh wholesale sales to be *down*. *Id.*; Green Decl., Ex. 10 (citing 7/26/06 Earnings Call) at 4-5. Carter's stock price fell 12% on this news. Am. Compl. ¶ 237. Despite that development, Plaintiffs nonetheless maintain that investors were misled on the call about OshKosh's "growth prospects" – not, however, about the "second half of 2006," but rather about "spring '07 bookings." *See id*. ¶ 238. In the face of an expected (and announced) sales decline for the rest of 2006, the Amended

Complaint provides no explanation for how any reasonable investor could be misled into thinking that OshKosh's "growth prospects" were anything but uncertain (at best). And the Amended Complaint alleges no facts – not a single one – showing how the OshKosh Defendants somehow knew in July 2006 that their expectations for OshKosh in spring 2007 were supposedly "false." *See id.* ¶¶ 237-240.

Each of the earnings calls that followed on October 25, 2006 (reporting Q3 2006 results), February 21, 2007 (reporting Q4 2006 results), and April 25, 2007 (reporting Q1 2007 results), provided investors with further negative earnings guidance and a cautious prognosis for OshKosh's growth prospects. Yet, as with the statements above, Plaintiffs improperly cherry-pick cautiously optimistic words from those calls, ignore their factual and substantive context, and allege that they were somehow misleading.[13]

---

[13] On the October 25, 2006 earnings call, the OshKosh Defendants noted that "[Q4 2006] sales will be $93 million, down 11%," Green Decl., Ex. 13 (10/25/06 Earnings Call) at 6, but Plaintiffs purport to have been led astray by statements regarding "executing the right strategies" and the "opportunity to turn the OshKosh business around," Am. Compl. ¶¶ 248, 250. On the February 21, 2007 earnings call, the OshKosh Defendants noted that Q1 2007 sales were "projected to be $67 million, down 5% from 2006" and that "spring selling is off to a slow start," Green Decl., Ex. 17 (2/21/07 Earnings Call) at 3, 6, but Plaintiffs purport to have been misled by statements regarding "position[ing] OshKosh for bigger things" and "continued growth," Am. Compl. ¶ 262. On the April 25, 2007 earnings call, the OshKosh Defendants projected Q2 2007 sales "to be down 5%" because "selling

In sum, nowhere in the Amended Complaint do Plaintiffs establish that the OshKosh Defendants' forward-looking statements and projections about OshKosh's "growth prospects" were false. The documents incorporated in the pleadings establish precisely the opposite. The OshKosh Defendants were clear about the risks attendant to the turnaround of OshKosh; they were clear all along that Carter's faced challenges; they revised forecasts as the turnaround effort unfolded; and their forecasts and projections – far from misleading – were responsible and proved to be materially accurate. There simply was no fraud, and cherry-picked snippets taken out of context, which at most can be described as cautious optimism,[14] cannot give rise to a securities fraud action.

### 2.    The Confidential Witnesses Do Not Supply Any "Then-Current Facts" That Rendered Defendants' Forward-Looking Statements False When Made

The Amended Complaint relies upon the opinions and anecdotal observations of six confidential witnesses ("CWs") that supposedly demonstrate that the OshKosh Defendants somehow knew their forward-looking statements about OshKosh's future performance were "false" due to (i) declining advance

---

of Spring product is below our expectations," Green Decl., Ex. 20 (4/25/07 Earnings Call) at 2, 4, but Plaintiffs purport to have been misled by the (true and unchallenged) statement that "summer bookings . . . were up 20% to last year" over a three-week period, Am. Compl. ¶ 279.

[14] *See, supra* note 9 (non-actionable corporate optimism and puffery).

sales orders and (ii) negative customer feedback.[15]  *See* Am. Compl. ¶¶ 212-19. But not one confidential witness advances any particularized *fact* that was communicated to or known by any OshKosh Defendant that rendered a forward-looking statement false.

Indeed, on the face of the allegations, only two of the confidential witnesses (CW1 and CW7) had any interaction whatsoever with any of the OshKosh Defendants.  *See* Am. Compl. ¶¶ 212-19, 253, 290.  The other four confidential witnesses (CWs 3, 4, 5, 6) are former low-level employees whose duties were limited in scope, including those of an Assistant Store Clerk, District Manager, Director of Cost Accounting and Budgeting, and Inventory Control and Cost Accounting Manager.  *See id.*; *Alaska Elec. Pension Fund v. Adecco S.A.*, 434 F. Supp. 2d 815, 825 (S.D. Cal. 2006) (declining to credit allegations attributed to confidential witnesses who "appear to be low-level employees" and as to whom the complaint failed to supply any basis for knowledge regarding "the Company's worldwide financial statements")*; In re Petco Animal Supplies Inc. Sec. Litig.*, No. 05-CV-0823-H (RBB), 2005 WL 5957816, at *21 (S.D. Cal. Aug. 1, 2005) (agreeing with defendant that "the anecdote of a single store . . . is insufficient to

---

[15] A seventh confidential witness (CW 2) relates only to the Accommodations Claims.  *See, e.g.*, Am. Compl. ¶ 60.

support Plaintiffs' broad claim of an effect on the stock price in any particular quarter"). Two confidential witnesses (CW4 and CW6) either left from or were terminated by Carter's within a month of the beginning of the first challenged statement and thus could not possibly have direct, personal knowledge of events in the alleged Class Period. *See* Am. Compl. ¶¶ 213-14; *City of Austin Police Ret. Sys. v. ITT Educ. Servs., Inc.*, 388 F. Supp. 2d 932, 942 (S.D. Ind. 2005) (allegations by CWs deficient where their employment was terminated prior to the purported fraud). None of them has or ever had direct personal knowledge of OshKosh's business as a whole, much less Carter's company-wide financial forecasts for OshKosh. *See Institutional Investors Group v. Avaya, Inc.*, 564 F.3d 242, 265-66 (3d Cir. 2009) (adopting defendants' argument that "reliance on the CWs in the Amended Complaint is insufficient to meet the particularity requirements of the PSLRA because none of the CWs worked in positions which would provide them with insights or visibility into [the company's] forecasts."); *Schleicher v. Wendt*, 529 F. Supp. 2d 959, 972 (S.D. Ind. 2007) (ruling that confidential witnesses must be described with "sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged") (citation omitted).

Furthermore, none of the confidential witnesses alleges any facts establishing that "current booking information showed *declining* sales figures and that OshKosh would be *losing* money." *See* Am. Compl. ¶ 234 (emphasis in original). There is not a single particularized fact quantifying the number of purportedly reduced orders, comparing that reduction to the negative sales guidance disclosed, what (if any) percentage decrease occurred, when (if ever) that decrease became known, and whether (if at all) it had any impact (let alone a material impact) on the OshKosh division's wholesale business, much less on Carter's business as a whole.[16] All of those facts need to be pleaded; none are provided. Left with bare assertions, the confidential witness allegations come nowhere close to meeting the particularity requirements of the PSLRA and Rule 9(b). *See, e.g.*, *Mizzaro*, 544 F.3d at 1240 (holding that less weight may be applied to confidential witnesses where their allegations lack particularity); *Kane v. Madge Networks N.V.*, No. C-96-20652-RMW, 2000 WL 33208116, at *8 (N.D. Cal. May 26, 2000) (dismissing complaint where "nowhere do plaintiffs allege what good-

---

[16] Plaintiffs also fail to allege the materiality of the purportedly concealed information. Notably, the Amended Complaint addresses advance sales figures and negative customer reaction solely in the OshKosh *wholesale segment*, which constituted a mere 6.4% of Carter's overall sales in FY 2007. *See* Green Decl., Ex. 25 (FY2008 Form 10-K/A) at 5, 21, 84. Thus, for instance, even a 45% decrease in the OshKosh wholesale sales for the entire 2007 fiscal year would have had only a 2.9% effect on total Carter's net sales for the year. *See id.* at 22.

faith earnings projections *would* have been, nor do they present the facts that would go into making such projections") (emphasis in original).

As for allegations that "negative customer feedback" rendered the OshKosh Defendants' forward-looking statements false, none of the CWs alleges any facts to show that *customers*, as opposed to two or three isolated OshKosh *employees*, were reacting negatively to changes in OshKosh designs. *See, e.g.*, Am. Compl. ¶ 227 (citing CW4's observation and opinion on the OshKosh product line). The Amended Complaint cites to confidential witnesses and unnamed "employees" who were allegedly of the opinion that "rather than 'fixing' OshKosh, Carter's was making the OshKosh product worse." *Id*. ¶ 213. But missing is any factual allegation concerning *customers'* views. *See id.* There are no allegations as to *what* the customer feedback was, *when* it was purportedly received, to which products it related, and what (if any) impact it had on OshKosh's business or "growth prospects," let alone Carter's business as a whole. *See In re Spectrum Brands, Inc. Sec. Litig.*, 461 F. Supp. 2d 1297, 1310 (N.D. Ga. 2006) (confidential witnesses' allegations did not allege sufficient facts to determine whether they were anything other than merely "anecdotal").

In sum, even looking past the Eleventh Circuit's holdings in *Harris* and *Goodman,* the OshKosh Defendants' forward-looking statements, which followed

meaningful cautionary language, remain within the statutory safe harbor of the PSLRA and are not actionable.

### C.    The Amended Complaint Fails To Plead Scienter

The Amended Complaint also fails to plead scienter, falling far short of establishing the "strong inference" required by the PSLRA.   15 U.S.C. § 78u-4(b)(2).  The Supreme Court held in *Tellabs* that a "strong inference" is "more than merely 'reasonable' or 'permissible' – it must be cogent and compelling," and must be "at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 127 S. Ct. at 2505, 2510; *Edward J. Goodman Life Income Trust*, 594 F.3d at 790-91 (citing the *Tellabs* standard); *Rosenberg v. Gould*, 554 F.3d 962, 965 (11th Cir. 2009) (same).  *Tellabs* requires "a comparative evaluation [where courts] consider, not only inferences urged by the plaintiff . . . but also competing inferences rationally drawn from the facts alleged."   127 S. Ct. at 2504.   A securities fraud complaint must thus be dismissed if it does not plead facts giving rise to an inference of fraud that is "at least as compelling" as inferences of non-culpable intent.  *Id.* at 2510.  As the Eleventh Circuit has recognized, this standard is even more strict than that applied on summary judgment because *Tellabs* requires a court to determine "what a reasonable person *would* think, not what a reasonable person *could* think."  *Mizzaro*, 544 F.3d at 1239 (emphasis in original).

- 46 -

### 1. There Are No Factual Allegations Showing That The OshKosh Defendants Had Actual Knowledge That Any Forward-Looking Statement Was False When Made

In the Eleventh Circuit, in order to plead facts sufficient to support a strong inference of scienter, a plaintiff must allege either actual knowledge or "at least a showing of severe recklessness." *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1285-86 (11th Cir. 1999). Not one allegation in the Amended Complaint refers to a specific document, meeting, conversation, or any other piece of information directly involving any OshKosh Defendant that supports an inference that he somehow knew that projections and opinions of OshKosh's future financial performance were factually false. *See Edward J. Goodman Life Income Trust*, 594 F.3d at 794 (despite a "litany of confidential witnesses," the complaint's allegations failed to provide "facts indicating any individual [defendant's] knowledge"); *Mizzaro*, 544 F.3d at 1250 (noting that the absence of any documents or communications from the defendants "weighs strongly against the inference that the named defendants . . . orchestrated the fraud"); *cf. In re Boston Tech., Inc. Sec. Litig.*, 8 F. Supp. 2d 43, 57 (D. Mass. 1998) ("To satisfy this [knowledge] requirement, complaints typically identify internal reports, memoranda, or the like, and allege both the contents of those documents and defendants' possession of them at the relevant time.").

Rather than allege facts showing such actual knowledge, the Amended Complaint only repeats the conclusory refrain that the OshKosh Defendants "knew or were reckless in not knowing" some otherwise unidentified fact. *See, e.g.*, Am. Compl. ¶¶ 225, 227, 232; *see also id.* ¶ 290 (citing CW7 for the proposition that "the decision to writedown goodwill *would have to be made* by 'top' executives such as Rowan, Casey, Pacifico, and Whetzel") (emphasis added); ¶ 292 ("The Individual OshKosh Defendants held positions that *would have made* them privy to information about booking orders made months in advance . . . .") (emphasis added); *Edward J. Goodman Life Income Trust v. Jabil Circuit, Inc.*, 560 F. Supp. 2d 1221, 1238 (M.D. Fla. 2008) ("A conclusory allegation that a defendant 'knew,' 'knew or should have known' or acted 'knowingly or with severe recklessness' fails to support an inference of scienter."), *aff'd*, 594 F.3d 783 (11th Cir. 2010). The Amended Complaint is thus based on the mere assertion that the disappointing financial performance of OshKosh following its acquisition by Carter's shows that there "must have been fraud."    But such conclusory "must-have-known" allegations are routinely rejected by courts as not evidencing scienter. *See Mizzaro*, 544 F.3d at 1250 ("[W]e indulge at least some skepticism about allegations that hinge entirely on a theory that senior management 'must have known' everything that was happening . . . ."); *Garfield v. NDC Health Corp.*, 466

F.3d 1255, 1270 (11th Cir. 2006) ("[M]erely alleging scienter in general, conclusory terms does not meet the particularity requirement.").[17]

>    **2.    The Amended Complaint's Allegations Regarding Motive And Opportunity Fail To Support Any Inference Of Scienter**

Without particularized allegations of actual knowledge, the Amended Complaint asserts that the OshKosh Defendants had a motive and opportunity to commit fraud. *See* Am. Compl. ¶¶ 292-93. The Eleventh Circuit has made clear that it "reject[s] the notion that allegations of motive and opportunity to commit fraud, standing alone, are sufficient to establish scienter in this Circuit" without some further allegation of knowledge or recklessness. *Bryant*, 187 F.3d at 1285-86. Allegations of stock trades, in particular, "raise only issues of motive and

---

[17] *See also In re Serologicals Sec. Litig.*, No. Civ.A.1:00-CV1025CAP, 2003 WL 24033694, at *10 (N.D. Ga. Feb. 20, 2003) ("[T]he court finds that the plaintiffs fail to allege with any particularity facts to suggest that the non-specialty assets were impaired at the times that the defendants said they were not or, more importantly, that they should have known that they were so impaired."); *City of Sterling Heights Police & Fire Ret. Sys. v. Vodafone Group Pub. Ltd. Co.*, 655 F. Supp. 2d 262, 271-72 (S.D.N.Y. 2009) (dismissing complaint where allegations "fail[ed] to identify any awareness by the defendants that an impairment charge was necessary" and merely contrasted confident public statements with later impairment charge); *Cutsforth v. Renschler*, 235 F. Supp. 2d 1216, 1257 (M.D. Fla. 2002) (insufficient factual allegations to support contention that write-down should have been taken earlier); *Caiafa v. Sea Containers Ltd.*, 525 F. Supp. 2d 398, 409, 409 n.8 (S.D.N.Y. 2007) (write-down claim failed because the plaintiffs did not specify "*what* facts should have triggered an impairment analysis at *what point* or otherwise allege with any specificity how [the defendant's] financial disclosures were inaccurate") (emphasis in original).

opportunity, which courts in this Circuit have held are insufficient, without more, to raise a strong inference of scienter." *In re Smith Gardner Sec. Litig.*, 214 F. Supp. 2d 1291, 1303-04 (S.D. Fla. 2002). Accordingly, the fact that Plaintiffs rely on so-labeled "insider" trades – and nothing else – to establish scienter alone requires dismissal.

Even so, the Plaintiffs' effort to impute to the OshKosh Defendants some improper motive to defraud fails of its own weight for no fewer than five reasons:

### (a)    *Even Over The Course Of Plaintiffs' Improperly Long Class Period, The OshKosh Defendants Only Sold A Fraction Of Their Carter's Holdings*

The percentage of exercisable shares that each OshKosh Defendant disposed of during the Class Period is consistent with the levels that courts have found insufficient to support a strong inference of scienter. *See In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1092, 1097 (9th Cir. 2002) (holding that an aggregate sale of 38% of the Defendants' holdings did not raise a strong inference of fraud), *abrogated on other grounds by Tellabs*, 127 S. Ct. at 2511; *Acito v. IMCERA Group, Inc.,* 47 F.3d 47, 54 (2d Cir. 1995) (finding no scienter inferred from defendant's sale of 11% of holdings); *Ronconi v. Larkin,* 253 F.3d 423, 435 (9th Cir. 2001) (finding no scienter inferred from defendant's sale of 17% of holdings); *In re Prestige Brands Holding, Inc.,* No. 05 CV. 06924(CLB), 2006 WL 2147719,

at *5 (S.D.N.Y. July 10, 2006) (holding that retaining over 80% of stock does not demonstrate unusual or suspicious trading).

Simply put, even assuming the accuracy of the Amended Complaint's allegations regarding the percentages of exercisable stock options sold during the Class Period (and the Amended Complaint fails to provide enough information to confirm that accuracy), each OshKosh Defendant sold less than half of his exercisable equity interest in Carter's during the Class Period – and in many cases substantially less than half.   Am. Compl. ¶ 293 (alleging that Mr. Casey sold 21.67%; Mr. Pacifico sold 29.01%; Mr. Rowan sold 33.06%; and Mr. Whetzel sold 43.89%).   Each OshKosh Defendant thus had far more to lose than to gain from the pump-and-dump scheme alleged in the Amended Complaint.  *See id.*[18]

---

[18] The Amended Complaint's emphasis on the proceeds gained from these stock trades is similarly unavailing.  Where, as here, the OshKosh Defendants sold only a percentage of their total holdings during the alleged (and protracted) Class Period, the dollar amount of the proceeds is irrelevant.  *See In re eSpeed, Inc. Sec. Litig.*, 457 F. Supp. 2d 266, 290 (S.D.N.Y. 2006) ("It does not suffice to point in isolation to the combined proceeds of defendants . . . and claim that this 'patently significant' dollar amount alone establishes scienter."); *In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 445 (S.D.N.Y. 2005) ($60 million sold during Class Period did not establish motive); *Frazier v. VitalWorks, Inc.*, 341 F. Supp. 2d 142, 163 (D. Conn. 2004) ("The lesson from these cases is that dollar amounts cannot be considered in isolation.") (citations omitted); *In re Keyspan Corp. Sec. Litig.*, 383 F. Supp. 2d 358, 382-83 (E.D.N.Y. 2003) ($58 million sold during Class Period did not establish motive and was "misleading, given that it comprises two sets of sales six months apart").

Furthermore, the Amended Complaint relies on an unduly long class period of 56 months (or 243 weeks), which has the effect of artificially exaggerating the volume of the OshKosh Defendants' stock sales. As the court stated in *In re Vantive Corp. Securities Litigation*:

> [T]he plaintiffs have selected an unusually long class period of sixty-three weeks. It is obvious why they have done so; it is not because the allegations found elsewhere in the complaint support an inference of fraud throughout the class period, but because lengthening the class period has allowed the plaintiffs to sweep as many stock sales into their totals as possible, thereby making the stock sales appear more suspicious than they would be with a shorter class period.

283 F.3d at 1092 (internal citations omitted); *see id.* (describing a class period of 63 weeks as "unusually long"); *Malin v. XL Capital Ltd.*, 499 F. Supp. 2d 117, 150 (D. Conn. 2007) (describing as "exceedingly lengthy" a class period that lasted 102 weeks).[19] When these distortions are corrected and considered, the stock sales simply do not raise any suspicion, much less give rise to a "compelling" inference of scienter.[20]

---

[19] The competing non-culpable inferences about the OshKosh Defendants' stock sales are especially strong in this case where the Class Period begins only a year and a half after Carter's held its initial public offering in October 2003. Prior to that time, the OshKosh Defendants had been unable to sell the hundreds of thousands of shares and stock options they had accumulated while Carter's was a privately held company. *See* Green Decl., Ex. 23 (FY 2007 10-K) at 1.

[20] The Amended Complaint also fails to allege any information about each OshKosh Defendant's trading practices prior to the Class Period. *See Edward J. Goodman Life Income Trust*, 594 F.3d at 793 (no inference of scienter where

### (b)    The OshKosh Defendants Sold Consistent With Their Personal Circumstances

When considered in their context, as required, the stock trades are by no means suspicious, and certainly not compelling.  Under *Tellabs*, courts are required to consider the entire record when weighing the competing inferences, including all factual allegations and the facts incorporated therein by reference.  127 S. Ct. at 2509.  But the Amended Complaint ignores Mr. Rowan's age and his retirement and the obvious relevance they had on his decision to divest some of his holdings.  *See In re Corning Sec. Litig.*, No. 01-CV-6580-CJS, 2004 WL 1056063, at *29 (W.D.N.Y. Apr. 9, 2004) ("When considered in the context of his announced retirement, the timing of [defendant CEO's] stock sales . . . fail[s] to support a strong inference of scienter"); *Wietchner v. Monterey Pasta Co.*, 294 F. Supp. 2d 1102, 1116-17 (N.D. Cal. 2003) (noting defendant CEO's "pending retirement" in determining that insider trading allegations did not give rise to an inference of scienter).    That Mr. Rowan would have sought liquidity in advance of his retirement is routine and expected, and simply does not give rise to any "cogent

---

plaintiffs "failed to plead any information about any [defendant's] trading history before the Class Period"); *Hubbard v. BankAtlantic Bancorp, Inc.*, 625 F. Supp. 2d 1267, 1287 (S.D. Fla. 2008) (noting that trades must be "dramatically out of line with prior trading practices" before they become "suspicious" to the extent necessary to support a strong inference of scienter) (*citing Vantive*, 283 F.3d at 1092).

and compelling" inference of fraudulent intent.    To the contrary, the fact that Mr.

Rowan continued to hold the majority of his holdings despite the fact that he was

retiring from the Company compels the more powerful, innocent inference that Mr.

Rowan thought that Carter's stock value would increase in the future, not that he

somehow knew the stock to be artificially inflated.

> *(c)   **All Trades Were Made In Trading
> Windows Or Pursuant To A 10b5-1 Plan***

Third, the Amended Complaint ignores the fact that the timing of the trades

serves to *rebut* any inference of fraud.   Mr. Rowan's, Mr. Casey's, and Mr.

Pacifico's sales were all made within certain "trading windows" established by the

Company, during which executives are permitted to trade, immediately following

an SEC periodic filing when all material information has been released to the

market.  *See* Am. Compl. ¶ 293.  Specifically, the trades were made within weeks

after Carter's released its 1Q2006 results on April 25, 2006; 3Q2006 results on

October 25, 2006; or its 1Q2007 results on April 24, 2007.  *See id.*; *Lipton v.*

*Pathogenesis Corp.*, 284 F.3d 1027, 1037 (9th Cir. 2002) (holding stock sales not

suspicious because "[o]fficers of publicly traded companies commonly make stock

transactions following the public release of quarterly earnings and related financial

disclosures").

As the Amended Complaint demonstrates, Mr. Whetzel's trades were made either during one of the trading windows or pursuant to a scheduled 10b5-1 plan. *See* Am. Compl. ¶ 293. Courts in the Eleventh Circuit consistently rule that trades made pursuant to valid 10b5-1 trading plans act to rebut any inference of scienter. *See, e.g.*, *In re Miva, Inc. Sec. Litig.*, 544 F. Supp. 2d 1310, 1316, 1316 n.1 (M.D. Fla. 2008) (noting that 10b5-1 trading plan rebutted any possible inference of scienter from the stock sales); *In re Immucor, Inc. Sec. Litig.*, No. 1:05-CV-2276-WSD, 2006 WL 3000133, at *18 n.8 (N.D. Ga. 2006) (according no weight for purposes of scienter to trades made pursuant to a 10b5-1 trading plan).

Thus, not a single trade itemized in the Amended Complaint was timed in a manner to exploit "adverse, non-public information" as so alleged. To the contrary, the trades were responsibly timed to be compliant with Carter's policies designed specifically to prevent improper trading. *See* Am. Compl. ¶ 293; *Tellabs*, 127 S. Ct. at 2509-10.

### (d) *Mr. Rowan's Employment Agreement Gave Him No Monetary Incentive To Make OshKosh A "Seeming Success"*

Fourth, contrary to the allegation that Mr. Rowan "had a powerful incentive to make the OshKosh acquisition a seeming success for Carter's" because he was entitled under the terms of his employment agreement to certain bonus incentives

if OshKosh hit various specified performance targets, the allegations in the Amended Complaint itself note that Mr. Rowan's bonus incentives were triggered by Carter's results, of which OshKosh was only a fraction. *See* Am. Compl. ¶ 202 ("[S]ubject to *the Company's achievement* of pre-determined net income . . . .") (emphasis added). Moreover, it is well-established that motives possessed by virtually all corporate executives, including the desire to maintain and increase compensation, are not the type of concrete personal benefits needed to give rise to a strong inference of scienter. *See Acito*, 47 F.3d at 54 (holding that the desire to maintain a high stock price, even if the alleged purpose is to increase executive compensation, is not a sufficient personal benefit to meet the motive requirement); *Edward J. Goodman Life Income Trust*, 560 F. Supp. 2d at 1240 ("Receipt of a standard incentive-based bonus has limited probative value for scienter.").

### (e)    *Carter's Stock Repurchase Program Shows That Defendants Believed The Stock Was Undervalued, Not Artificially Inflated*

Finally, Plaintiffs allege that the share repurchase program Carter's instituted in February 2007 is somehow evidence that the OshKosh Defendants knew the stock was inflated during the Class Period. Am. Compl. ¶¶ 5, 266, 277. This is exactly backwards. If senior management supposedly knew that Carter's stock was artificially overvalued, they would not have purchased stock back at

inflated prices.   Indeed, Carter's repurchased $40 million of its outstanding common stock during the Class Period in connection with the $100 million share repurchase program authorized by the Board of Directors on February 16, 2007. Green Decl., Ex. 21 (7/24/07 Form 8-K) at 6, 9.  Carter's continued to repurchase nearly $18 million of shares during the remainder of 2007.  *See* Green Decl., Ex. 23 (FY2007 Form 10-K) at 14, 18.

Far from giving rise to a strong inference of scienter, a company's repurchase of its own shares through a stock buyback program *undermines* any such inference.  *See Morse v. McWhorter*, 200 F. Supp. 2d 853, 898 (M.D. Tenn. 2000) (holding that company's $1 billion stock repurchase plan "undermines an inference of scienter because it presumably would make 'no sense to purchase that stock if defendants knew the prices to be inflated'") (quoting *Matthews v. Centex Telemanagement, Inc.*, No. C-92-1837-CAL, 1994 WL 269734, at *8 (N.D. Cal. June 8, 1994)), *vacated and remanded on other grounds*, 290 F.3d 795 (6th Cir. 2002); *Oppenheimer v. Novell, Inc.*, 851 F. Supp. 412, 417 (D. Utah 1994) (stock buy-back program is inconsistent with allegation that company was inflating price of its stock).

The Amended Complaint nevertheless maintains that the OshKosh Defendants devised the stock repurchase program "[a]s part of their scheme to

inflate Carter's stock price until they could unload more stock."  Am. Compl. ¶ 266.  But the OshKosh Defendants did not "dump" their stock prior to the end of the alleged Class Period.  Instead, even assuming the percentages cited in the Amended Complaint are accurate, each OshKosh Defendant held between 78.3% and 56.1% of his total holdings after the Class Period.  *See* Am. Compl. ¶ 293. Nor was the amount of stock they sold after the initiation of the stock repurchase program disproportionate to what they had sold before.  *See* Am. Compl. ¶ 293 (chart of alleged Class Period stock trades).  So if the stock repurchase program was a set-up to facilitate a "dumping" of shares, the OshKosh Defendants somehow forgot to follow through.

### D.    The Amended Complaint Fails To Plead Loss Causation

The Amended Complaint must be dismissed for yet another independently dispositive reason – it fails to plead that Plaintiffs' investment losses were caused by the revelation of any previously concealed truth about OshKosh's "growth prospects."  *See Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342 (2005); *Robbins v. Koger Props., Inc.*, 116 F.3d 1441, 1448 (11th Cir. 1997) (requiring "proof of a causal connection between the misrepresentation and the investment's subsequent decline in value"); *Edward J. Goodman Life Income Trust*, 595 F. Supp. 2d at 1279 (plaintiff must plead facts sufficient to show "that the misstatement or omission

concealed something from the market that, when disclosed, negatively affected the value of the security") (citing *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005)).

Plaintiffs allege that the purported truth – namely that "OshKosh was not the growth engine that the OshKosh Defendants had relentlessly conditioned the market to expect," Am. Compl. ¶ 285 – was revealed to the market on three separate occasions during the Class Period that span the course of a year:

- In a "partial" disclosure on July 26, 2006, when Carter's announced that OshKosh sales were projected to be down (rather than flat) for the remainder of 2006, *see* Am. Compl. ¶ 237; Green Decl., Ex. 10 (7/26/06 Earnings Call) at 5;

- In a "partial" disclosure on February 13, 2007, when Carter's announced that that OshKosh sales were forecast to be lower for all of 2007, *see* Am. Compl. ¶ 257; Green Decl., Ex. 15 (2/13/07 Form 8-K) at 2; and

- In a final revelation of "the truth" on the July 24, 2007, when Carter's announced an impairment of OshKosh's goodwill and poor quarterly results at OshKosh for the second quarter of 2007, *see* Am. Compl. ¶¶ 285-87; Green Decl., Ex. 21 (7/24/07 Form 8-K) at 2.

But each of these alleged partial "corrective" disclosures announced new developments in the relevant quarterly period concerning OshKosh's financial performance and expected future results, not the "correction" of any information from preceding periods. It is well established that a loss caused solely by a timely negative financial disclosure fails to state a claim of fraud. *See In re Faro Techs. Sec. Litig.*, No. 6:05-cv-1810-Orl-22DAB, 2007 WL 430731, at *12 (M.D. Fla.

Feb. 3, 2007) ("All businesses will eventually suffer major or minor setbacks, and such news . . . often leads to a drop in stock prices. It does not necessarily follow, however, that every downward adjustment is the result of fraud.").

Neither of the purported "partial" disclosures on July 26, 2006 and February 13, 2007 revealed anything but newly revised forecasts. And, Plaintiffs fail to identify any information withheld from earlier disclosures that was revealed in, or "corrected" by these announcements. In the final disclosure of the "truth" on July 24, 2007, Carter's announced both an OshKosh impairment charge and that OshKosh wholesale sales in the current quarter had declined 45% as compared to the second quarter of 2006. Am. Compl. ¶¶ 285-86. But the Amended Complaint includes no allegation that the impairment charge should have been recorded earlier or that the disclosure of that charge "corrected" any prior "falsity."

A timely disclosure of current earnings results or newly revised forecasts or estimates is simply insufficient to establish loss causation where those results fail to correct any prior statement. *See, e.g.*, *Cole v. Health Mgmt. Assocs., Inc.*, No. 2:07cv00484-FtM-UA-DNF, 2009 WL 2713178, at *11 (M.D. Fla. July 17, 2009) (loss causation cannot be shown where a public statement "does not constitute a corrective 'disclosure' that revealed 'true' facts which had previously been misrepresented or concealed").

- 60 -

## II.    **The Remaining Counts Fail Because There Is No Primary Violation**

Counts V and VI are alleged solely against Mr. Rowan, Mr. Casey, Mr. Pacifico, and Mr. Whetzel.  These counts are entirely derivative of Counts II and III brought pursuant to Section 10(b), and therefore fail because there is no primary violation for the reasons set forth above.  Count V, which alleges a violation of Section 20(a) for control person liability, and Count VI, which alleges a violation of Section 20A for alleged insider trading, both fail because the Amended Complaint fails to plead a primary violation.  *See Rosenberg*, 554 F.3d at 966-67 (affirming the dismissal of a Section 20(a) claim where the complaint failed to state a claim under Section 10(b)); *Edward J. Goodman Life Income Trust*, 594 F.3d at 797 (dismissing Section 20A claim for failure to plead a predicate violation).  Furthermore, the Amended Complaint must allege specific facts that demonstrate that the OshKosh Defendants made improper trades "while in possession of material, non-public information."  *See* 15 U.S.C. § 78t-1(a).  As each of the OshKosh Defendants traded either within approved trading windows or pursuant to scheduled Rule 10b5-1 trading plan, the Amended Complaint fails to allege that any trade was made on the basis of material, non-public information.  Moreover, neither Plymouth nor Mylroie has standing to assert a Section 20A claim against Mr. Rowan and Mr. Casey because they have not alleged a

contemporaneous sale of stock.  *See* Am. Compl. ¶¶ 293, 347-48; *Edward J. Goodman Life Income Trust*, 560 F. Supp. 2d at 1245-46.

For the reasons set forth above, the Amended Complaint must be dismissed to the extent it is predicated on the OshKosh Claims.

*    *    *

## SUMMARY OF ACCOMMODATIONS ALLEGATIONS

The so-called "Accommodations Fraud" involves an entirely separate and distinct set of allegations.  The term "accommodation" refers to monetary support provided by a wholesaler to a retailer to support inventory clearances and sales promotions.  Apparel that has been on a retailer's racks or shelves for an extended period of time is often sold at a discount in order to clear space for new, better-selling apparel.  Wholesalers, like Carter's, provide monetary support, known as "accommodations" or "margin support," to their retailers to compensate them for reduced revenues and profit margins when the apparel sells at reduced price points.[21]  Am. Compl. ¶ 57; Green Decl. Ex. 25  (FY2008 Form 10-K/A) at 31.

---

[21] The term "accommodations" can also refer to "co-op advertising arrangements" or "marketing support" whereby Carter's compensates retailers for expenses associated with advertisements for Carter's apparel.  Green Decl. Ex. 25 (FY2008 Form 10-K/A) at 45-46, 50.

Accommodations are negotiated on a periodic basis between Carter's sales personnel and wholesale customer representatives based on a variety of factors, including the strength of product sales and the expectation of continued future business with the customer. *See* Green Decl. Ex. 25 (FY2008 Form 10-K/A) at 50, 75-76. Carter's sales personnel are charged with informing Carter's finance department whenever such an accommodation is agreed to with a wholesale customer. *See* Am. Compl. ¶ 70; Green Decl. Ex. 25 (FY2008 Form 10-K/A) at 50, 75-76. Upon such notification, Carter's policy is to reflect the amount of any such accommodation as a reduction of its net sales. Am. Compl. ¶ 57; Green Decl. Ex. 25 (FY2008 Form 10-K/A) at 31. Carter's also prospectively records net sales reductions for accommodations in circumstances where Carter's can estimate anticipated future accommodations based on historical trends and annual forecasts. Am. Compl. ¶ 128; Green Decl. Ex. 25 (FY2008 Form 10-K/A) at 31.

## I.    **Factual Background**

Plaintiff Scott Mylroie filed the initial lawsuit advancing Plaintiffs' Accommodations Claims on November 17, 2009 (a year after the OshKosh Claims were filed). Compl., *Mylroie v. Carter's, Inc.*, No. 09-3196 (Dkt. No. 1) (N.D. Ga. filed Nov. 11, 2009). Mylroie, who held Carter's shares for only two weeks in October 2009, alleged that Carter's and certain members of its management and

board of directors had violated the securities laws in light of Carter's announcement on November 9, 2009 (the "November 9 Release"), that it intended to restate certain financial statements due to issues identified by management concerning the timing by which certain accommodations were recognized. The net effect of that restatement, which Carter's filed with the SEC in January 2010, was a 3% reduction in Carter's retained earnings over a five and one-half year period. On news of the restatement's impact, Carter's share price rose. Plaintiffs Plymouth and Mylroie filed the Amended Complaint advancing Plaintiffs' present Accommodations Claims on March 15, 2010.

### A.    The November 9 Release – Carter's Announces Intention to Restate Certain Financial Statements

The November 9 Release announced that management had determined as a result of an ongoing review of Carter's accounting for accommodations that certain of Carter's financial statements would need to be restated, but had not yet determined the amount of any restatement. Am. Compl. ¶ 100; Green Decl. Ex. 28 (Press Release, Nov. 9, 2009). In its Form 8-K filed at the same time, Carter's explained that management had identified issues with respect to the timing by which margin support payments were recognized for a certain wholesale customer due to margin support commitments that had not been communicated to the Company's finance group. Green Decl. Ex. 29 (Form 8-K, Nov. 10, 2009).

Carter's announced that its audit committee, with the assistance of outside counsel, had accordingly begun a broader review of the Company's margin support payments and commitments. *Id.* Carter's stated that the periods subject to restatement would include fiscal years 2004 through 2008 and the fiscal quarters from September 29, 2007 through July 4, 2009. Am. Compl. ¶ 100; Green Decl. Ex. 29 (Form 8-K, Nov. 10, 2009). Carter's share price had risen to $24.04 per share since the Company's earlier announcement on October 27, 2009 that it would be delaying the release of its third quarter 2009 earnings and that it was reviewing its accounting for accommodations (the "October 27 Release"), but on some speculation that the yet-undetermined restatement might be substantial, the Company's stock price fell 9% on November 10th, to close at $21.86.[22] Green Decl. Ex. 34 (Carter's Stock Chart).

## B.   Carter's Announces The 3% Impact Of The Restatement

On December 23, 2009, Carter's issued a press release (the "December 23 Release") announcing the substantial completion of the audit committee's investigation and the resulting adjustments to Carter's financial statements. Am. Compl. ¶¶ 102, 115; Green Decl. Ex. 30 (Press Release, Dec. 23, 2009). The

---

[22] The Amended Complaint erroneously alleges that the stock dropped 14% following the November 9 Release. Am. Compl. ¶¶ 24, 100; *see* Green Decl. Ex. 34 (Carter's Stock Chart).

December 23 Release stated that Carter's audit committee had determined that undisclosed deferrals of accommodations into later fiscal periods by certain members of the sales organization had led to misstatements in Carter's previously reported net sales figures.  Green Decl. Ex. 30 (Press Release, Dec. 23, 2009).  Carter's announced that its review would result in a cumulative, after-tax reduction in earnings of $7.5 million, which constituted a 3% cumulative reduction in retained earnings over the five and one-half year period.[23]  *Id.*  Carter's further explained that the review found that net sales were overstated by no more than 0.7% for any year subject to restatement.  *Id.*  Carter's added that as a result of its review, management had identified deficiencies in its internal controls associated with its accommodations processes that constituted material weaknesses.  *Id.*

Following Carter's announcement of the net impact of the restatement, Carter's stock gained $0.97, closing at $25.96 per share on December 23, 2009.  Green Decl. Ex. 34 (Carter's Stock Chart).  Market analysts later characterized the

---

[23] While this appears to be merely a typographical error, Plaintiffs' purported summary of the impact of Carter's restatement, set forth on page 53 of the Amended Complaint, misrepresents the restatement's impact on Carter's retained earnings in each of the periods subject to restatement.  For example, while in the immediately preceding paragraph in their Amended Complaint, Plaintiffs correctly note that the restatement had only a 3% cumulative impact on Carter's retained earnings, Am. Compl. ¶ 102, Green Decl. Ex. 30 (Press Release, Dec. 23, 2009), Plaintiffs state inaccurately in their summary chart that the impact was 16.8%, Am. Compl. at 53.

impact of the review and restatement as "not meaningful" and "small," with one analyst describing the restatement as "essentially a non-event."[24]

On January 15, 2010, Carter's formally filed its amended financial statements for the periods covered by the restatement. Green Decl. Ex. 25 (FY2008 Form 10-K/A); Green Decl. Ex. 35 (1Q2009 Form 10-Q/A); Green Decl. Ex. 36 (2Q2009 Form 10-Q/A). In so doing, Carter's reiterated the results of the audit committee's independent investigation, excerpted above, and reported in greater detail the restatement's impact on Carter's previously filed financial statements. Am. Compl. ¶ 102; Green Decl. Ex. 25 (FY2008 Form 10-K/A) at 50-55. Carter's also elaborated on its material weakness determinations by explaining that it had identified material weaknesses related to (i) Carter's controls for capturing the accuracy and timing of accommodations, which had "focused primarily on the review of internal Company documentation and the representations of members of the sales organization," and (ii) Carter's training and oversight of the sales organization, which had "resulted in an insufficient understanding by the sales organization regarding the impact of failing to

---

[24] Green Decl. Exs. 31 (Sterne Agee Company Report, Dec. 30, 2009), 32 (RBC Capital Markets Equity Research Report, Dec. 23, 2009), and 33 (Credit Suisse Company Update, Dec. 23, 2009). The Court may take judicial notice of analysts' reports on a motion to dismiss. *Bovee v. Coopers & Lybrand*, 272 F.3d 356, 360-61 (6th Cir. 2001).

accurately and completely account for customer accommodations in correct periods."  Am. Compl. ¶ 186; Green Decl. Ex. 25 (FY2008 Form 10-K/A) at 75. Carter's also outlined the Company's remediation plan, which focused on improving the control processes for authorizing accommodations and the reporting and tracking of accommodations commitments.  Am. Compl. ¶ 135; Green Decl. Ex. 25 (FY2008 Form 10-K/A) at 75-76.  Following the formal filing of Carter's restated financial statements, Carter's stock price essentially remained unchanged, dropping from $26.85 to $26.06 per share, or 2.9%.  Green Decl. Ex. 34 (Carter's Stock Chart).

### C.    **Plaintiffs' Holdings of Carter's Stock**

The specifics of Plymouth's and Mylroie's holdings in Carter's stock directly establish their lack of standing to bring these claims.  *See infra* pp. 72-77. Accordingly, the relevant facts are as follows:  Mylroie did not own Carter's stock at the time of the November 9 Release or thereafter.  Mylroie purchased 1000 Carter's shares on October 12, 2009.  Compl. at 75 (hereinafter "Mylroie Certification"), *Mylroie v. Carter's, Inc.*, No. 09-3196 (Dkt. No. 1) (N.D. Ga. filed Nov. 11, 2009).  He then sold all of his shares on October 27, 2009, just after the October 27 Release.  Am. Compl. ¶ 32; Mylroie Certification.

Plymouth did not own shares at the time of the November 9 Release. Nor did Plymouth hold any shares at the time of the October 27 Release. Instead, Plymouth purchased shares at a depressed price *following* the drop in price on October 27th (no doubt sensing an investment opportunity given market speculation). *See* Notice of Lead Plaintiff Plymouth County Retirement System's Financial Interest, Ex. A, *Plymouth County Retirement Sys. v. Carter's Inc.*, No. 08-2940 (Dkt. No. 45) (hereinafter "Plymouth Certification"). Plymouth then sold its shares over the next nine business days at a profit as Carter's stock rebounded, and by the November 9 Release, Plymouth had completely divested its Carter's stock holdings. *Id.*

### D. <u>Plaintiffs' Scienter Allegations</u>

Plaintiffs' principal contention is that Carter's restatement did not result from the failure of Carter's sales organization to notify the finance group of certain accommodations commitments. Instead, so the Plaintiffs' theory goes, Carter's senior most management – Messrs. Rowan, Casey, Pacifico, Whetzel, and North (the "Individual Defendants") – were the "architects" of a fraudulent scheme to improperly book accommodations. The Amended Complaint alleges that the purpose of the purported scheme was not to inflate earnings (by a mere 3% over half a decade), but rather to "smooth" earnings. Am. Compl. ¶¶ 6-7, 26. This

"smoothing" was supposedly accomplished by "cherry picking" particular quarters in which to book accommodations payments such that they "were able to manipulate Carter's reported earnings upward in the event of an earnings shortfall, or 'borrow' from earnings in the event of a surplus for use at a later date." *Id.* ¶ 7. Plaintiffs allege that Messrs. Casey and North were the "financial architects" of the fraud, but that the "entire management team [was] responsible" and "knew what was going on." *Id.* ¶¶ 68, 73.

As to why the Individual Defendants would scheme to "smooth" earnings, Plaintiffs contend that the Individual Defendants wanted to: (1) mislead the investing public into believing that the Individual Defendants were competent and could deliver consistent and predictable earnings, and (2) profit personally by triggering annual cash bonuses based on Carter's earnings and by the sale of stock options at artificially inflated prices. *Id.* ¶¶ 4, 78. Plaintiffs also allege that then-CFO Casey orchestrated the fraud because he "was vying for the CEO job" and did not want "to be responsible for missing a quarter." *Id.* ¶ 74.

## II.    The Counts Predicated on the Accommodations Claims

The Amended Complaint asserts four counts of securities fraud predicated on the Accommodations Claims, only two of which are asserted against Carter's. Counts I and III allege that Carter's, the Individual Defendants, and PwC (Count I

only) violated Section 10(b) of the Exchange Act by either allegedly disseminating materially false and misleading information, employing a scheme to defraud, or engaging in acts that operated as a fraud.  Am. Compl. ¶¶ 304-14, 325-33.  Count IV alleges that each of the Individual Defendants violated Section 20(a) of the Exchange Act as alleged controlling persons of Carter's.  *Id.* ¶¶ 334-37.  And Count VI alleges that Mr. Rowan, Mr. Casey, Mr. Pacifico, and Mr. Whetzel violated Section 20A of the Exchange Act because they allegedly traded on the basis of material, non-public information.  *Id.* ¶¶ 342-50.

**ARGUMENT – ACCOMMODATIONS CLAIMS**

Carter's restatement was rightly described by one market analyst as "essentially a non-event for this $1.5 billion company."[25]  Plaintiffs nonetheless seize upon the restatement and superimpose upon it a nefarious narrative supposedly involving Carter's most senior management.  Their effort fails as a matter of law.  As a threshold matter, neither Plymouth nor Mylroie has standing to assert the claim on behalf of the class because neither held stock at the time of the supposed "corrective" disclosure on November 9 and thus neither suffered any actionable injury.  The claim must be dismissed on that basis alone.  But even beyond that fundamental defect, the Amended Complaint comes nowhere close to

---

[25] Green Decl. Ex. 33 (Credit Suisse Company Update, Dec. 23, 2009).

pleading facts giving rise to a "cogent and compelling" inference that any of the Individual Defendants intended to commit any fraud.

## I.    The Accommodations Claims Must Be Dismissed Because Neither Plymouth Nor Mylroie Has Standing

It is axiomatic that a class action claim cannot be maintained unless at least one of the named plaintiffs suffered the injury on which the claim is based. *Griffin v. Dugger*, 823 F.2d 1476, 1483 (11th Cir. 1987) ("[A] claim cannot be asserted on behalf of a class unless at least one named plaintiff has suffered the injury that gives rise to that claim."); *see also O'Shea v. Littleton,* 414 U.S. 488, 494 (1974) ("[I]f none of the named plaintiffs purporting to represent a class establishes the requisite of a case or controversy with the defendants, none may seek relief on behalf of himself or any other member of the class.").[26]   Neither of the named plaintiffs in this case has standing to assert the Accommodations Claims because neither of them suffered an actionable injury related to those claims.  Accordingly, the Accommodations Claims must be dismissed.

---

[26] The Eleventh Circuit in *Griffin* explained that the individual injury requirement of Article III of the U.S. Constitution is not met by alleging that an "injury has been suffered by other, unidentified members of the class to which [the plaintiff] belong[s] and which [he] purport[s] to represent." *Griffin*, 823 F.2d at 1483 (quoting *Warth v. Seldin*, 422 U.S. 490, 502 (1975) (alterations in original)); *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (holding that standing requires "a causal connection between the injury and the conduct complained of").

First, as to Plymouth, it cannot allege any injury arising from the Accommodations Claims because it did not hold stock at the time of the November 9 Release (or the October 27 Release for that matter). *See supra* p. 69; *see also Dura Pharms.*, 544 U.S. at 342 ("[I]f the purchaser sells the shares quickly before the relevant truth begins to leak out, the misrepresentation will not have led to any loss."). Indeed, Plymouth directly profited from two purchases during the temporary stock dips that followed the October 27 and November 9 Releases. Plymouth thus suffered no damages arising from the Accommodations Claims.

Mylroie also cannot allege an actionable injury. He did not own shares at the time of the supposed "corrective" disclosure on November 9, but instead traded in and out of the stock in October. *See supra* p. 68. This is dispositive. *See In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 40-41 (2d Cir. 2009) (excluding "in-and-out" traders from a class because they had failed "to demonstrate that any of the information that 'leaked' into the market prior to [the date of the corrective disclosure] revealed the truth with respect to the specific misrepresentations alleged").

Having traded "in-and-out" of Carter's stock before the November 9 Release, Mylroie's standing depends entirely on the notion that the October 27 Release constituted a "corrective" disclosure. But to be a "corrective" disclosure,

the substance of the October 27 Release would have had to correct a prior misstatement. *See Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 175 n.4 (2d Cir. 2005); *Durham v. Whitney Info. Network, Inc.*, No. 06-CV-00687, 2009 WL 3783375, at *19 (M.D. Fla. Nov. 10, 2009) (to be "corrective" the statement must "identify, reveal, or correct [a] prior misstatement, omission or improper accounting practice" (citation omitted)); *see also In re Impax Labs., Inc. Sec. Litig.*, 2007 WL 5076983, at *4 (N.D. Cal. Jan. 3, 2007) (holding that "it is the content of the [] press release, rather than its mere issuance, that is critical to the loss-causation analysis"). The October 27 Release did not do so. It contained only two substantive announcements: (1) there would be a delay in Carter's third quarter earnings release, and (2) the Company would conduct an internal review of Carter's accounting for margin support. Green Decl. Ex. 27 (Press Release, Oct. 27, 2009).[27] Numerous district courts have affirmed the self-evident proposition

---

[27] The October 27 Release stated in its entirety:

> Carter's, Inc., today announced that it will delay its earnings release previously scheduled for this evening and its related investor conference call scheduled for Wednesday, October 28, 2009. The Company is delaying its earnings release in order to complete a review of its accounting for margin support to its wholesale customers. A matter arose late in the Company's preparation for its scheduled earnings release, and more time is required to fully evaluate this matter. The Company anticipates that it will complete its review and report its third quarter earnings by November 12, 2009.

Green Decl. Ex. 27 (Press Release, Oct. 27, 2009).

that the mere announcement of a delay in a company's release of earnings or an internal review does not "correct" a prior statement and thus cannot constitute a "corrective" disclosure.[28]

The *Impax* case is particularly instructive. *Impax*, 2007 WL 5076983 at *4. The plaintiffs in *Impax* relied on a press release that is strikingly similar to the October 27 Release here, announcing that the company had "postponed its release of 2004 third quarter financial results to Tuesday, November 9, 2004 in order to allow its independent auditors more time to complete their review of the Company's third quarter financial statements, including the timing of certain

---

[28] *See*, *e.g.*, *In re Maxim Integrated Prods. Inc. Sec. Litig.*, 639 F. Supp. 2d 1038, 1046-47 (N.D. Cal. 2009) (holding that the announcement of a delay in filing a 10-K, and the disclosure of an SEC investigation, subpoenas from the U.S. Attorney's office, and the formation of a Special Committee to investigate options granting practices did not constitute corrective disclosures); *In re Dell Inc. Sec. Litig.*, 591 F. Supp. 2d 877, 910 (W.D. Tex. 2008) (holding that "the disclosure of an investigation, whether conducted internally or by the SEC, absent a revelation of prior misrepresentations, [does not] constitute a corrective disclosure"); *Rudolph v. UTStarcom*, 560 F. Supp. 2d 880, 888 (N.D. Cal. 2008) (holding that "the announcement of an internal investigation cannot support an allegation of loss causation"); *In re Hansen Natural Corp. Sec. Litig.*, 527 F. Supp. 2d 1142, 1162 (C.D. Cal. 2007) (holding that the announcement of an SEC investigation and an internal investigation were insufficient to plead causation of actionable damages); *Weiss v. Amkor Tech., Inc.*, 527 F. Supp. 2d 938, 947 (D. Ariz. 2007) (holding that the announcement of an internal investigation regarding stock options accounting did not disclose the alleged fraud); *In re Avista Corp. Sec. Litig.*, 415 F. Supp. 2d 1214, 1221 (E.D. Wash. 2005) (holding that "the announcement by a regulatory agency that it intends to investigate is insufficient, on its own, to plead loss causation").

customer credits on [certain pharmaceutical] products marketed by a strategic partner." *Id.* Like Carter's October 27 Release, Impax's press release announced only a delay in the release of quarterly earnings that resulted from the need to complete a review of a specific issue. *Id.* It said nothing about whether earnings would be different than expected, and said nothing about the nature or extent of the "review." The *Impax* court dismissed the plaintiffs' claims, holding that the press release did not constitute a partial "corrective" disclosure because it "did not disclose a previously made misstatement or omission." *Id.*

This reasoning is sound. Any change in the stock price following the announcement of an earnings delay or the beginning of an internal review is pure market speculation, not a "correction" of some prior artificial inflation.[29] To be sure, Mylroie lost money on his brief investment in Carter's stock. But investment losses are not, of course, the same as actionable damages. *See Dura Pharms.*, 544 U.S. at 345 (explaining that the securities laws were not intended "to provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause"). Mylroie's

---

[29] Indeed, this case is a perfect illustration of the point. When Carter's announced the restated numbers in December 2009, the Company's stock price increased, reversing the earlier price decline that was driven by the market's speculation about the October 27 Release.

investment losses are not actionable damages because the October 27 Release did not "correct" any prior alleged misrepresentation and did not therefore remove any alleged fraudulent inflation in the price of Carter's stock.  Accordingly, Mylroie has not suffered any injury arising from the Accommodations Claims and, like Plymouth, does not have standing to assert them.  The counts predicated on the Accommodations Claims must therefore be dismissed.

## II.    The Accommodations Claims Must Also Be Dismissed Because the Amended Complaint Fails to Allege a Strong Inference of Scienter

Plaintiffs' Accommodations Claims must also be dismissed because the Amended Complaint fails to allege with particularity a strong inference of scienter.

### A.    The Amended Complaint Fails to Allege Actual Knowledge or Recklessness

Because the Plaintiffs cannot sustain a claim in circumstances where the Individual Defendants were unaware of the underlying conduct, the Plaintiffs simply attempt to impute knowledge to the Individual Defendants.  Plaintiffs assert that the Individual Defendants knew about and directed the deferral of accommodations into incorrect quarterly periods.  The Plaintiffs make that assertion solely on the basis of purported statements from two confidential witnesses ("CWs").  But neither CW had personal knowledge of the matters

alleged, and none of their statements has the requisite particularity. Indeed, many of the allegations are rank hearsay.

### 1. The CWs' Allegations Are Insufficient To Establish That The Individual Defendants Knew About the Deferral of Accommodations

The weight to be afforded allegations advanced by a CW depends on two principal factors: (1) the particularity of the CW's allegations, and (2) the extent to which the complaint "unambiguously provides in a cognizable and detailed way the basis" of the CW's personal knowledge. *Mizzaro*, 544 F.3d at 1239-40 (noting that there are multiple reasons to be "skeptical of confidential sources cited in securities fraud complaints"). CW accounts that lack specificity or that are not based on personal knowledge, but rather on hearsay, rumors, gossip, or speculation, must be steeply discounted. *Id.* at 1247 n.2 (allegations that fail to establish whether a CW "based his opinion on personal observations . . . or instead just repeated scuttlebutt he overheard around the office" are insufficient to support an inference of scienter); *Garfield*, 466 F.3d at 1265 (confidential witness averments that fail to allege "what was said . . ., to whom it was said, or in what context . . . lack[] the requisite particularity"); *CA Pub. Employees' Ret. Sys. v. Chubb*, 394 F.3d 126, 148 (3d Cir. 2004) (refusing to credit confidential sources where allegations required the Court to "speculate whether the anonymous sources

obtained the information they purport to possess by firsthand knowledge or rumor"); *In re Metawave Commc'ns Corp. Sec. Litig.*, 298 F. Supp. 2d 1056, 1068 (W.D. Wash. 2003) ("The Court must be able to tell whether a confidential witness is speaking from personal knowledge, or 'merely regurgitating gossip and innuendo.'" (citation omitted)).

Plaintiffs rely principally on CW1, a purported former Vice President of Investor Relations at Carter's, to support their scienter theory. CW1's allegations are set forth in Paragraphs 68, 70, 71, and 96 of the Amended Complaint. CW1 first alleges, based on unspecified "meetings" and "conversations," that Casey and North "would book . . . accommodations in a way to manipulate or control the earnings by quarter." Am. Compl. ¶ 68. CW1 next alleges, based on double hearsay, that "I was told by certain people in Sales that they were instructed by, it's my understanding with the blessing of Mike [Casey], to re-book the timing of when those accommodations should hit." *Id.* ¶ 71. In an allegation that cuts against Plaintiffs' theory, CW1 acknowledges that certain members of the sales group did not "care" about the proper accounting for their accommodations, asserting that "all [the sales guys] focus in on is getting the orders. There's a simple form they got to fill out and submit, you know, after that they don't know what goes on with the accounting. They don't even care." Am. Compl. ¶ 70. And

compounding hearsay with speculation, CW1 adds that "I think certain people if you talk to them, they had a number of conversations with Andy [North] or Mike [Casey] or their direct bosses, but I think a lot of that was pushed back down from the top because they didn't want those expenses to hit during a certain period." *Id.*

These allegations are woefully deficient. To begin, CW1's views, as facially insufficient as they are, deserve even less weight in assessing whether there is a strong inference of scienter in view of the fact that CW1 was terminated by Carter's. Am. Compl. ¶ 70. Allegations from former employees who may have an axe to grind must be steeply discounted. *See Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 757 (7th Cir. 2007) ("Perhaps these confidential sources have axes to grind. Perhaps they are lying. Perhaps they don't even exist."); *In re Cabletron Sys., Inc.*, 311 F.3d 11, 29-30 (1st Cir. 2002) (a complaint that relies "unduly on the stories of just one or two former employees, possibly disgruntled," is unlikely to sufficiently allege scienter).

Even putting that aside, each of CW1's allegations is deficient on its face. CW1's assertions are based on unreliable hearsay rather than personal knowledge. *See, e.g.*, Am. Compl. ¶ 68 ("[B]ased on sitting in meetings, based on conversations that I've had with people . . . ."); *id.* ¶ 70 ("I think certain people if you talk to them, they had a number of conversations with Andy or Mike or their

direct bosses . . . ."); *id.* ¶ 71 ("I was told by certain people in Sales that they were instructed by . . . ."). Such allegations simply lack any reliability. *See Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 996 (9th Cir. 2009) (allegations based on hearsay "are not sufficient to raise a strong inference of scienter because they demonstrate that the confidential witnesses are not reliable"); *Limantour v. Cray Inc.*, 432 F. Supp. 2d 1129, 1142-43 (W.D. Wash. 2006) (refusing to credit CW statement that "talk that [the company] was 'fudging its books' spread like wildfire" because the statement was "merely regurgitating gossip and innuendo" and was hearsay).

CW1's allegations are also not particularized. CW1 supposedly states that he attended "meetings" and had "conversations," but fails to allege facts required by the Eleventh Circuit establishing the context of such meetings or conversations, who attended, when they occurred, or even what was said. *Garfield*, 466 F.3d at 1265 (allegation that CW would testify that company officials knew about, but ignored, a potential accounting problem in order to "make [the company's] numbers" could not be credited because it failed to identify "what was said at the meeting, to whom it was said, or in what context"); *see also Metawave Commc'ns*, 298 F. Supp. 2d at 1068-70 (CW allegations that fail to "contain the dates of [the] meetings, lists of attendees of [the] meetings, or the substance of the matters

discussed" are not credible). In addition, while CW1 alleges in Paragraph 96 of the Amended Complaint that certain JCPenney and Belk accommodations were booked in improper periods, CW1 fails to allege that any of the Individual Defendants had any knowledge of those transactions, the crux of the scienter inquiry.[30] *Cf. Spectrum Brands*, 461 F. Supp. 2d at 1313 (refusing to credit allegations missing "the who, why, and how required by the PSLRA, leaving only a lengthy, vague, and conclusory allegation that fails to identify customers in the one instance where it alleges a specific date and transaction, and, conversely, fails to identify any specific transactions or dates where it identifies customers").

Finally, Plaintiffs also fail to establish that CW1 had any personal knowledge whatsoever of the accounting matters at issue. Plaintiffs offer no facts to establish that CW1 had any involvement with, exposure to, or even understanding of Carter's accounting treatment for accommodations, or that CW1 had any knowledge of or involvement with the sales department's reporting responsibilities for accommodations. Having failed to identify the basis for CW1's

---

[30] Similarly, while CW1 later references a "flux balance sheet," which purportedly showed that an unspecified "they" were "moving . . . dollars around between [reserve] accounts," Am. Compl. ¶ 129, the allegation is made without any specificity as to any Individual Defendant or as to whether (and how) any improper accounting occurred. *See Mizzaro*, 544 F.3d at 1248-49 (refusing to credit uncorroborated allegations based on a CW's vague description of Strategic Operating Plan purportedly revealing the defendants' fraud).

purported knowledge regarding the accounting for accommodations, much less in the requisite "cognizable and detailed way," CW1's statements can be afforded no weight. *Mizzaro*, 544 F.3d at 1239-40; *see also Zucco Partners, LLC*, 552 F.3d at 996 (refusing to credit CW allegations where CW had "only secondhand information about accounting practices at the corporation"); *Limantour*, 432 F. Supp. 2d at 1142 (refusing to credit CW statement about modification of journal entries where Amended Complaint alleged that CW was not involved in their preparation).

The allegations of CW2, a purported former Manager of Financial Analysis at Carter's, are even less reliable. Plaintiffs rely on CW2 for two statements, each wholly lacking the required particularity and foundation of personal knowledge:

> [T]he entire management team is responsible. It's not just, it's kind of not just one person because they all knew what was going on. Every single executive.

> [W]hen Joe P[acifico] was president he was involved in setting up a lot of these accommodations.

Am. Compl. ¶ 73. No meetings, conversations, or documents are referenced, much less described with particularity, and CW2 fails to even allege what it was that the management was purportedly "responsible" for. And while CW2 mentions Mr. Pacifico by name, CW2's allegation that he was "involved in setting up . . . accommodations" alleges nothing of relevance regarding fraudulent intent. *Id.*

In short, none of the CW allegations purporting to support an inference that the Individual Defendants knew about, let alone actively orchestrated, the improper deferral of accommodations has the requisite specificity or indicia of personal knowledge to afford them any weight. *See Ley v. Visteon Corp.*, 543 F.3d 801, 811 (6th Cir. 2008) (scienter not alleged where CW allegations "fail to allege who at [the company] knew about these alleged accounting improprieties and what, when, where, and how they knew").

### 2. Plaintiffs Allege No Facts Sufficient To Support An Inference That Any Individual Defendant Was Severely Reckless

The Amended Complaint also fails to allege facts sufficient to support a "cogent and compelling" inference that any of the Individual Defendants "should have known" about the improper deferral of accommodations, much less that their failure to know constituted an "extreme departure from the standards of ordinary care." *Bryant*, 187 F.3d at 1282 n.18 (citation omitted).

Plaintiffs contend that Carter's material weakness disclosures and the "nature of the Restatement" support an inference of recklessness. Am. Compl. ¶¶ 109-11, 116-36. But neither the existence of an internal control weakness nor a violation of GAAP are alone sufficient to infer fraudulent intent. *Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 432 (5th Cir. 2002) (allegations that the defendants

- 84 -

should have known about internal control problems based on corporate positions within the company are inadequate to establish scienter); *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1208-09 (11th Cir. 2001) ("[A]llegations of violations of . . . GAAP, standing alone, do not satisfy the particularity requirement of Rule 9(b)."). Nor does the fact that Mr. Rowan and Mr. Casey signed Sarbanes-Oxley certifications support an inference of scienter alone, absent a missed "red flag," which Plaintiffs have not alleged.[31]  *See Garfield*, 466 F.3d at 1266 (Sarbanes-Oxley certification is only probative of scienter if "the person signing the certification had reason to know, or should have suspected, due to the presence of glaring accounting irregularities or other 'red flags,' that the financial statements contained material misstatements or omissions"); *see also Cent. Laborers' Pension Fund v. Integrated Elec. Servs. Inc.*, 497 F.3d 546, 554-55 (5th Cir. 2007) (same).

---

[31]  Plaintiffs' lone allegation concerning what the Individual Defendants were purportedly reckless in not knowing – that Carter's Accounts Receivable (A/R) figures were overstated – is conclusory and entitled to no credit.  Am. Compl. ¶ 106.  Plaintiffs fail to state how or why any of the Individual Defendants could have or should have known that the A/R figures were overstated, much less any metric the Individual Defendants reviewed or could have reviewed that would have shown a potentially overstated A/R.  Moreover, Plaintiffs' focus on Carter's A/R figures is nothing more than an attempt to "pick[] the metric that will yield the highest percentage values," which is a pleading strategy that "adds nothing to the inference of scienter."  *Edward J. Goodman Life Income Trust*, 594 F.3d at 792.

**B.    The Amended Complaint's Allegations Regarding Motive
And Opportunity Fail To Support Any Inference Of Scienter**

Having failed to plead actual knowledge or recklessness, Plaintiffs are left
only with their conclusory allegations that the Individual Defendants were
somehow motivated to engage in the alleged fraud.  But, as covered *supra* pp. 49-
50, in the Eleventh Circuit, allegations of motive and opportunity to commit fraud,
without further allegations that establish knowledge or severe recklessness, are
insufficient to establish scienter.  *Bryant*, 187 F.3d at 1285-86 ("[W]e reject the
notion that allegations of motive and opportunity to commit fraud, standing alone,
are sufficient to establish scienter in this Circuit.").  That ends the analysis.

Even so, Plaintiffs' motive and opportunity allegations, looking at them on
their own, still fail to support a cogent and compelling inference of fraudulent
intent.

**1.    Plaintiffs' Allegations Concerning The Individual
Defendants' Ordinary Compensation Incentives
Fail to Support A Strong Inference of Scienter**

The Amended Complaint fails to allege any facts to establish that the terms
of the Individual Defendants' compensation packages somehow motivated them to
book accommodations in incorrect periods.  In fact, Plaintiffs' allegations actually
*contradict* their theory that the Individual Defendants were motivated to
manipulate accommodations in order to "meet Company guidance."  Am. Compl. ¶

104.  As detailed below, the Individual Defendants' compensation had no relation to such guidance whatsoever.  *Id.* ¶¶ 78, 83-87.

As an initial matter, absent facts establishing that a compensation package is out of the ordinary, the mere fact that the Individual Defendants received performance-based compensation fails to provide any inference of fraudulent intent.  *See Abrams*, 292 F.3d at 434 ("Incentive compensation can hardly be the basis on which an allegation of fraud is predicated." (quoting *Tuchman v. DSC Commc'ns Corp.*, 14 F.3d 1061, 1068-69 (5th Cir. 1994) ("It does not follow that because executives have components of their compensation keyed to performance, one can infer fraudulent intent." (citation omitted))).  If the opposite were true, every corporate officer who receives a performance-based bonus would be subject to an inference of fraudulent intent.  *Id.*; *Druskin*, 299 F. Supp. 2d at 1335 ("[M]otives such as greed can be ascribed to any company insider and are thus fundamentally inconsistent with the provisions of the Reform Act that require allegations of specific facts that establish scienter.").  Here, Plaintiffs have made no attempt to allege any facts distinguishing the Individual Defendants' performance-based compensation packages from those ordinarily afforded individuals in their positions.  As such, the compensation packages fail to support any inference of fraudulent intent, much less a strong inference.  *See Aldridge v.*

*AT Cross Corp.*, 284 F.3d 72, 83 (1st Cir. 2002) (only "[w]hen financial incentives to exaggerate earnings go far beyond the usual arrangements of compensation based on the company's earnings" do performance-based compensation packages support an inference of scienter).

In addition, while Plaintiffs assert that the Individual Defendants orchestrated the fraud "to meet the Company's guidance, on which the majority of their annual cash income depended," Am. Compl. ¶ 78, Plaintiffs provide no allegations of fact sufficient to support this bald claim. Nor can they. The allegation is completely belied by the documents referenced in the Amended Complaint itself. Carter's proxy statements, cited by Plaintiffs in Paragraphs 83-87, provide that the Individual Defendants' bonuses were based on internal, non-public performance goals, *not* on the Company's ability to meet the public guidance that it provided to Wall Street. Thus, CW1's contention that the Individual Defendants "wanted to make sure they met their guidance numbers [because] it also pertained around [sic] bonuses," *Id.* ¶ 82, is unfounded, has no factual support, and indeed is at war with the Amended Complaint itself.[32]

---

[32] CW1's contention is further undercut by the fact that, as Plaintiffs concede, Carter's ceased providing guidance to investors in the Fourth Quarter of 2007, which falls in the middle of Plaintiffs' purported class period. *See* Am. Compl. ¶ 103.

Having failed to connect the Individual Defendants' compensation packages to the deferral of accommodations, there can be no inference of fraudulent intent. *See In re BellSouth Corp. Secs. Litig.*, 355 F. Supp. 2d 1350, 1379 (N.D. Ga. 2005) (inference of scienter not supported where plaintiffs made "no allegation to show how the misrepresentation and omissions alleged impacted the incentive compensation any Defendant received"); *see also ECA & Local 134 IBEW Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009) (plaintiff "must allege that [the defendants] 'benefited in some concrete and personal way from the purported fraud'" (citation omitted)).

### 2. Generalized Motives to Perform Well Do Not Support A Strong Inference of Scienter

Plaintiffs are left asserting only that the Individual Defendants were motivated to engage in the alleged accommodations fraud to "portray a misleadingly positive picture of the Company's (and management's) performance" and because Mr. Casey was "vying for the CEO job." Am. Compl. ¶¶ 74, 78. But these generalized motivations, which fail to differentiate the Individual Defendants from senior management at every publicly-owned company, similarly fail to support a strong inference of scienter.

Plaintiffs again rely on CW1 to support these allegations. Am. Compl. ¶¶ 74, 94, 96, 109, 130. But, as covered above, the Amended Complaint provides

no allegations to establish CW1's purported knowledge of Carter's accounting for accommodations, nor any specificity as to what documents or direct conversations supposedly support CW1's statements. These allegations, accordingly, should be afforded no weight. *See Garfield*, 466 F.3d at 1264-65 (CW allegation that defendants ignored accounting problem in order to "make [the company's] numbers" failed to allege scienter where allegation lacked any specificity).

In addition, a motivation to meet expectations, perform well, or advance oneself in a company cannot give rise to an inference of fraudulent intent, otherwise the stringent pleading requirements for scienter set forth in the PSLRA would be eviscerated. *See Chill v. Gen. Elec. Co.*, 101 F.3d 263, 268 (2d Cir. 1996) ("[A] generalized motive, one which could be imputed to any publicly-owned, for-profit endeavor, is not sufficiently concrete for purposes of inferring scienter."); *In re Great Atlantic & Pacific Tea Co., Inc. Sec. Litig.*, 103 Fed. Appx. 465, 469 (3d Cir. 2004) (unpublished) (a "desire to manage its earnings in order to meet analyst and market expectations . . . is a general corporate motive, and is not sufficient to give rise to a strong inference of scienter"). Plaintiffs' allegations concerning Carter's apparent success in meeting its guidance to investors does not alter this proposition. Meeting market expectations does not establish an inference of fraudulent intent merely because the restated earnings fell short; a plaintiff must

also allege "specific facts . . . that lead to a strong inference that [the defendants] *knew* that the company's books were being manipulated to meet market expectations" in order to establish scienter. *In re AFC Enters., Inc. Sec. Litig.*, 348 F. Supp. 2d 1363, 1374 (N.D. Ga. 2004) (emphasis added); *see also In re Fed. Nat. Mortg. Ass'n Sec.*, 503 F. Supp. 2d 1, 3 n.1 (D.D.C. 2007) (allegations that defendant improperly used real estate mortgage investment conduits in order to "smooth earnings volatility" failed to plead scienter where complaint failed to allege defendant had knowledge of GAAP violations).  As discussed above, Plaintiffs have utterly failed to allege any facts establishing that the Individual Defendants knew, or were severely reckless in not knowing, about the deferral of accommodations.  Accordingly, Plaintiffs' allegations that Carter's restatement revealed that Carter's missed its previously provided guidance in 2005 and 2006, rather than exceeded it, cannot support an inference of fraudulent intent.  *See* Am. Compl. ¶¶ 103-104.

Because the Amended Complaint fails to allege scienter as to any Individual Defendant, and because the Amended Complaint does not allege that any other member of Carter's organization engaged in conduct in violation of the securities laws, Plaintiffs' Accommodations Claims against Carter's must be dismissed.  *See Mizzaro*, 544 F.3d at 1254 (dismissing securities fraud claims against company

where complaint did not allege that any unnamed company officials were both responsible for the allegedly misleading statements and aware of the alleged fraud); *Southland Secs. v. INSpire Ins. Solutions Inc.*, 365 F.3d 353, 366 (5th Cir. 2004) (court's assessment of the scienter allegations as to individual defendants applies to corporation where complaint "does not assert that any particular individual . . . director, officer or employee, other than the named individual defendants, acted with scienter").

## III.    <u>The Remaining Counts Fail Because There Is No Primary Violation</u>

Counts IV and VI are alleged only against certain of the Individual Defendants.  They are entirely derivative of Counts I and III brought pursuant to Section 10(b), and thus fail because there is no primary violation for the reasons set forth above.  The Plaintiffs' Section 20(a) claim, asserted against each of the Individual Defendants for control person liability, and their Section 20A claim, asserted against Mr. Rowan, Mr. Casey, Mr. Pacifico, and Mr. Whetzel for insider trading, both fail because the Amended Complaint fails to state a claim of a primary violation.  *See Rosenberg*, 554 F.3d at 966-67 (affirming the dismissal of a Section 20(a) claim where the complaint failed to state a claim under Section 10(b)); *Edward J. Goodman Life Income Trust*, 594 F.3d at 797 (dismissing Section 20A claim for failure to plead a predicate violation).

## CONCLUSION

For the reasons provided above, the Court should grant Carter's, Inc.'s Motion to Dismiss With Prejudice the Plaintiffs' Amended Class Action Complaint.

Dated: April 30, 2010

| | By: /s/ Patrice Russell Walker |
|---|---|
| Randall W. Bodner (pro hac vice) | J. Marbury Rainer |
| Christopher G. Green (pro hac vice) | Ga. Bar No. 592225 |
| James R. Drabick | Patrice Russell Walker |
| Heather B. Sanborn | Ga. Bar No. 266983 |
| William J. Dunn | PARKER HUDSON RAINER |
| ROPES & GRAY LLP | & DOBBS LLP |
| One International Place | 285 Peachtree Center Avenue, N.E. |
| Boston, MA 02110-2624 | 1500 Marquis II Tower |
| (617) 951-7000 | Atlanta, GA 30303 |
| RBodner@ropesgray.com | (404) 420-5564 |
| Christopher.Green@ropesgray.com | jmr@phrd.com |
| | pwalker@phrd.com |
| Russell L. Lippman (pro hac vice) | |
| ROPES & GRAY LLP | |
| 1211 Avenue of the Americas | |
| New York, NY 10036-8704 | |
| (212) 596-9000 | |
| Russell.Lippman@ropesgray.com | *Attorneys for Defendant Carter's, Inc.* |

## <u>CERTIFICATION OF COMPLIANCE WITH LR 7.1D, N.D. GA.</u>

Counsel hereby certifies that, pursuant to LR 7.1D, N.D. Ga., this filing has been prepared in an approved font, namely Times Roman 14. Counsel hereby certifies that the margins are in compliance with LR 7.1D.

PARKER HUDSON RAINER & DOBBS LLP

By: /s/ Patrice Russell Walker
       Patrice Russell Walker

## CERTIFICATE OF SERVICE

I hereby certify that on April 30, 2010, I filed a copy of the foregoing MEMORANDUM OF LAW IN SUPPORT OF CARTER'S, INC.'S MOTION TO DISMISS WITH PREJUDICE THE FIRST AMENDED AND CONSOLIDATED CLASS ACTION COMPLAINT with the Clerk of Court using the CM/ECF system, which automatically sent e-mail notification of such filing to the following attorneys of record, who are registered participants in the Court's electronic notice and filing system:

James M. Evangelista
(Ga. Bar No. 707807)
David J. Worley
(Ga. Bar No. 707807)
EVANGELISTA &
  ASSOCIATES, LLC
One Glenlake Partkway
Atlanta, GA 30328

Alan I. Ellman, Esq.
Christopher J. Keller, Esq.
Jonathan Gardner, Esq
LABATON SUCHAROW LLP
140 Broadway
New York, NY 10005

R. Matthew Martin
(Ga. Bar No. 473450)
Walter E. Jospin
(Ga. Bar No. 405450)
PAUL, HASTINGS, JANOFSKY &
WALKER, LLP
600 Peachtree Street, N.E.
Twenty-Fourth Floor
Atlanta, GA 30308

W. Scott Sorrels
(Ga. Bar No. 667074)
Luke A. Lantta
(Ga. Bar No. 141407)
BRYAN CAVE LLP
One Atlantic Center
Fourteenth Floor
Atlanta, GA 30309

Lionel Z. Glancy, Esq.
Michael G. Goldberg, Esq.
GLANCY BINKOW &
  GOLDBERG, LLP
Suite 311
1801 Avenue of the Stars
Los Angeles CA 90067

John A. Chandler
(Georgia Bar No. 120600)
Juanita P. Kuhner
(Georgia Bar No. 444648)
KING & SPALDING LLP
1180 Peachtree St., N.E.
Atlanta, GA 30309

William W. Stone
(Ga. Bar No. 273907)
HOLZER, HOLZER & FISTEL, LLC
200 Ashford Center North
Suite 300
Atlanta, GA 30338

Diana L. Weiss
KING & SPALDING LLP
Suite 200
1700 Pennsylvania Avenue, NW
Washington, DC 20006

Lisa T. Millican
GREENFIELD MILLICAN, P.C.
607 the Grant Building
44 Broad Street, NW
Atlanta, GA 30303

This 30th of April, 2010

/s/ Patrice R. Walker
Patrice Russell Walker