# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF GEORGIA

| | |
|---|---|
| In re<br>CARTER'S, INC.<br>SECURITIES LITIGATION | )<br>)<br>)<br>)<br>) Civil Action No. 1:08-CV-2940-JOF |

## LEAD PLAINTIFF'S OMNIBUS MEMORANDUM OF LAW IN OPPOSITION TO THE DEFENDANTS' MOTIONS TO DISMISS

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. v

PRELIMINARY STATEMENT ............................................................ 1

STATEMENT OF RELEVANT FACTS ............................................... 7

    A.  Carter's IPO is a Huge Success, and the Company's Stock Price
        Soars.............................................................................................. 7

    B.  The Defendants "Smooth" Carter's Core Financials by Booking
        Accommodation Payments in the Wrong Periods........................ 8

        1.  The Effect of "Smoothing"................................................... 9

        2.  Defendants Ensure that Adjusted EPS Exceeds Company
              Guidance ............................................................................ 11

    C.  The Defendants Take Advantage of the Public's Confidence in
        Carter's and Tout OshKosh as a "Growth Engine"................... 12

        1.  The Market Credits Defendants' OshKosh "Growth" Story.............. 13

    D.  Existing Facts Known By Defendants Rendered Their
        Misrepresentations Regarding OshKosh's Growth False When
        Made ........................................................................................... 14

        1.  Defendants' OshKosh Design Strategy Was A Failure..................... 14

        2.  Defendants Receive Advance Booking Information Showing
              Negative Feedback and Decreasing Sales ......................... 15

    E.  False Statements Of Existing Fact Regarding OshKosh's "Growth" ....... 16

    F.  The Partial Disclosures Of The Truth Regarding OshKosh
        Demonstrate The Importance Of The OshKosh Growth Opportunity
        To The Market .......................................................................... 21

G.  Capitalizing on Their Continuing "Smoothing," and Trading on Their Inside Information Regarding OshKosh, Defendants Sell Their Shares For Unusually Large Proceeds ............................................. 22

H.  Defendants' Stock Repurchase Plan .......................................................... 23

I.  The Defendants Sold Their Shares At Suspicious Times ........................... 24

J.  The Full Truth about OshKosh is Revealed .............................................. 25

K.  The Truth about Defendants' Fraudulent Manipulation of Accommodations Begins to Emerge ......................................................... 27

L.  The Full Truth about Accommodations is Revealed ................................. 28

M.  Post Class Period Events ........................................................................... 29

    1.  Carter's Restatement ......................................................................... 29

    2.  The Manipulation of Carter's Financials Through Accommodations Prompts Government Investigations .................... 32

N.  The Extent of Defendants' Financial Manipulations Underscores PwC's Severe Recklessness in Auditing Carter's ..................................... 33

    1.  PwC Represents over Five Years that Carter's Financials Conform with GAAP .......................................................................... 33

    2.  PwC Ignores Known Fraud Risk Factors and Fails to Conduct Basic Testing........................................................................................ 34

    3.  PwC Ignores Glaring Red Flags .......................................................... 35

    4.  PwC Was Not An Independent Auditor .............................................. 36

ARGUMENT ................................................................................................................ 37

I.  The Complaint Establishes Threshold Article III Standing ............................. 37

    A.  Article III Standing and Loss Causation under *Dura* ............................... 39

    B.  The October 27, 2009 Disclosure Was a Corrective Disclosure .............. 41

C.  Plymouth Has Article III Standing ........................................................... 47

II.  General Standard for a Motion to Dismiss a Section 10(b) Claim .................. 50

III.  The Fraudulent Misstatements and Omissions Regarding the OshKosh
Aspect of Defendants' Fraud are Actionable .................................................... 51

A.  The Safe Harbor Does Not Apply to Misrepresentations and
Omissions of Then-Current Fact ..................................................... 53

1.  Defendants Ignore the Then-Current Facts and Misleadingly
Focus on Numerical "Projections" ....................................... 57

2.  The Misstatements Were Not Mere Optimistic Puffery.................... 64

B.  There Was No Meaningful Cautionary Language Accompanying the
Statements ........................................................................... 65

IV.  The Complaint Properly Relies on Confidential Witness Testimony............. 69

A.  Confidential Testimony Demonstrates Defendants' Knowledge of
Facts Relating to the OshKosh Misrepresentations................................... 72

B.  Confidential Testimony Demonstrates That Defendants Knew
Accommodations Were Manipulated ......................................... 74

V.  The Complaint Adequately Alleges Scienter ................................................... 79

A.  The Complaint Pleads Actual Knowledge By Defendants of Their
Scheme........................................................................... 81

B.  The Complaint Establishes Defendants' Recklessness ............................ 85

1.  Core Operations ................................................................. 85

2.  Rowan and Casey's Certification of Carter's Financial
Statements Establishes Recklessness.................................... 90

C.  The Complaint's Allegations of Motive and Opportunity Further
Support Scienter.............................................................. 92

1.    Each Individual Defendant Had The Financial Incentive To Fraudulently Manipulate Accommodations ........................................ 93

2.    Defendants' Insider Trading Supports an Inference of Scienter ........ 96

D.    The Stock Repurchase Program Further Supports an Inference of Scienter ............................................................................................... 103

E.    Other Factors Supporting Defendants' Scienter ..................................... 106

F.    The Complaint Establishes PwC's Scienter ............................................ 107

1.    Scienter Standard Applicable to PwC ............................................. 109

2.    The Detailed GAAP and GAAS Violations and the Duration of the Fraud are Evidence of PwC's Scienter ....................................... 110

3.    PwC's Failure to Heed Multiple "Red Flags" is Evidence of Its Scienter ............................................................................................. 116

4.    PwC's Lack of Independence Creates a Strong Inference of Scienter ............................................................................................. 123

VI.   The Complaint Establishes Loss Causation With Respect to the OshKosh Claims .............................................................................................. 128

1.    The July 26, 2006 Disclosure was Corrective ................................. 131

2.    The February 13, 2007 Disclosure was Corrective ......................... 132

3.    The July 24, 2007 Disclosure was Corrective ................................. 134

VII.  The Complaint Sufficiently Alleges a 20A Violation .................................... 137

VIII. The Complaint Sufficiently Alleges a 20(a) Violation ........................... 139

CONCLUSION .................................................................................................... 140

# TABLE OF AUTHORITIES

## CASES

*In re AFC Enterprises,  Inc. Sec. Litig.*,
  348 F. Supp. 2d 1363 (N.D. Ga. 2004) ........................................................... 111

*Acito v. IMCERA Group, Inc.*,
  47 F.3d 47 (2d Cir. 1995) .................................................................................. 98

*Alaska Electric Pension Fund v. Adecco S.A.*,
  434 F. Supp. 2d 815 (S.D. Cal. 2006) ............................................................... 73

*Aldridge v. A.T. Cross Corp.*,
  284 F.3d 72 (1st Cir. 2002) ............................................................................... 83

*Alfus v. Pyramid Tech. Corp.*,
  764 F. Supp. 598 (N.D. Cal. 1991) .................................................................... 99

*Amalgamated Bank v. Coca-Cola Co.*,
  2006 WL 2818973 (N.D. Ga. Sept. 29, 2006) ...................................... 57, 64, 65

*In re Am. Serv. Group, Inc.*,
  2009 WL 1348163 (M.D. Tenn. Mar. 31, 2009) ........................................ 77, 78

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
  324 F. Supp. 2d 474 (S.D.N.Y. 2004)...................................................... 86, 131

*In re  Avista Corp. Sec. Litig.*,
  415 F. Supp. 2d 1214 (E.D. Wash. 2005) .......................................................... 44

*Barr v. Matria Healthcare, Inc.*,
  324 F. Supp. 2d 1369 (N.D. Ga. 2004) .............................................................. 40

*Barrie v. Intervoice-Brite, Inc.*,
  397 F.3d 249 (5th Cir. 2005)............................................................................. 94

*Bay v. Palmisano*,
    2002 WL 31415713 (E.D. La. Oct. 24, 2002) ................................................ 100

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007) ...................................................................................... 50

*Berson v. Applied Signal Tech., Inc.*,
    527 F.3d 982 (9th Cir. 2008)......................................................................... 89

*In re Biogen Idec, Inc. Sec. Litig.*,
    2008 WL 4810045 (D. Mass. Oct. 25, 2007).................................................. 103

*In re Bristol Myers Squibb Co. Sec. Litig.*,
    586 F. Supp. 2d 148 (S.D.N.Y. 2008).................................................. 45, 46, 130

*In re Cabletron System Inc.*,
    311 F.3d 11 (1st Cir. 2002) ........................................................................... 75

*Central Laborers' Pension Fund v. Integrated Electric Services Inc.*,
    497 F.3d 546 (5th Cir. 2007).................................................................. 103, 138

*In re Connetics Corp. Sec. Litig.*,
    542 F. Supp. 2d 996 (N.D. Cal. 2008) .......................................................... 47

*In re Corning Sec. Litig*,
    2004 WL 1056063 (W.D.N.Y. Apr. 9, 2004)................................................. 101

*Danis v. USN Commc'ns, Inc.*,
    73 F. Supp. 2d 923 (N.D. Ill. 1999) ........................................................ 120, 121

*In re Dell Inc. Sec. Litig.*,
    591 F. Supp. 2d 877 (W.D. Tex. 2008)........................................................... 45

*Dura Pharms., Inc. v. Broudo*,
    544 U.S. 336 (2005).............................................................................40, 129, 130

*Durham v. Whitney Information Network, Inc.*,
    2009 WL 3783375 (M.D. Fla. Nov. 10, 2009) ............................................... 45

*Eastwood Enters., LLC v. Farha*,
    2009 WL 3157668  (M.D. Fla. Sept. 28, 2009) ............................................... 106

*Edward J. Goodman Life Income Trust v. Jabil Circuit*,
    594 F.3d 783 (11th Cir. 2010) .................................................................. 98, 106

*Edward J. Goodman Life Income Trust v. Jabil Circuit, Inc.*,
    595 F. Supp. 2d 1253 (M.D. Fla. 2009) ........................................................ 93

*In re Enron Corp. Sec., Deriv. & ERISA Litig.*,
    235 F. Supp. 2d 549 (S.D. Tex. 2002) ................................................... 124, 125

*In re eSpeed, Inc. Sec. Litig.*,
    457 F. Supp. 2d 266 (S.D.N.Y. 2006) ........................................................... 85

*Frazier v. VitalWorks, Inc.*,
    341 F. Supp. 2d 142 (D. Conn. 2004) ........................................................... 98

*Freudenberg v. ETrade Fin. Corp.*,
    2010 WL 1904314 (S.D.N.Y. May 11, 2010) ....................... 102, 103, 129, 130

*In re Friedman's, Inc. Sec. Litig.*,
    385 F. Supp. 2d 1345 (N.D. Ga. 2005) .................................................... 85, 111

*Grand Lodge of Pa. v. Peters*,
    550 F. Supp. 2d 1363 (M.D. Fla. 2008) ................................................. 117, 120

*Gross v. Medaphis Corp.*,
     977 F. Supp. 1463 (N.D. Ga. 1997) ............................................................. 56

*In re Guilford Mills, Inc. Sec. Litig.*,
    1999 WL 33248953 (S.D.N.Y. July 21, 1999) ............................................. 104

*In re Gupta Corp. Sec. Litig.*,
    900 F. Supp. 1217 (N.D. Cal. 1994) ............................................................. 99

*Harris v. Ivax Corp.*,
    182 F.3d 799 (11th Cir. 1999) ....................................................... 51, 54, 56, 68

*Hevesi v. Citigroup, Inc.*,
  366 F.3d 70 (2d Cir. 2004).............................................................. 48

*Higginbotham v. Baxter Int'l, Inc.*,
  495 F.3d 753 (7th Cir. 2007)........................................................... 75

*Hubbard v. BankAtlantic Bancorp, Inc.*,
  625 F. Supp. 2d 1267 (S.D. Fla. 2008) .............................. 88, 89, 137

*In re Ibis Tech. Sec. Litig.*,
  422 F. Supp. 2d 294 (D. Mass. 2006) ................................................ 95

*In re Immucor Inc. Sec. Litig.*,
  2006 WL 3000133 (N.D. Ga. Oct. 4, 2006) .................................... 101

*In re Impax Labs., Inc. Sec. Litig.*,
  2007 WL 5076983  (N.D. Cal. Jan. 3, 2007)............................... 42, 43

*In re Impax Labs., Inc. Sec Litig.*,
  2008 WL 1766943 (N.D. Cal. Apr. 17, 2008)  .................... 39, 43, 44

*In re Initial Public Offering Sec. Litig.*,
  241 F. Supp. 2d 281 (S.D.N.Y. 2003).............................................. 57

*Institutional Investors Group v. Avaya, Inc.*,
  564 F.3d 242 (3d Cir. 2009)............................................................ 75

*In re Keyspan Corp. Sec. Litig.*,
  383 F. Supp. 2d 358 (E.D.N.Y. 2003) .............................................. 98

*Laperriere v. Vesta Insurance Group, Inc.*,
  526 F.3d 715 (11th Cir. 2008).......................................................... 139

*Lipton v. Pathogenesis Corp.*,
  284 F.3d 1027 (9th Cir. 2002).......................................................... 102

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992) .......................................................................... 39

*Maiden v. Merge Techs.,*
    2008 WL 4643538 (E.D. Wis. Oct. 20, 2008) ................................. 109

*Makor Issues & Rights, Ltd. v. Tellabs Inc.,*
    513 F.3d 702 (7th Cir. 2008) ........................................... 71, 72, 74, 75

*Malin v. XL Capital Ltd.,*
    499 F. Supp. 2d 117 (D. Conn. 2007) ............................................. 100

*Marksman Partners L.P. v. Chantal Pharms. Corp.,*
    927 F. Supp. 1297 (C.D. Cal. 1996) ................................................. 98

*Marsden v. Select Med. Corp.,*
    2006 WL 891445 (E.D. Pa. Apr. 6, 2006) ...................................... 73, 74, 77, 78

*Matrix Capital Management Fund, LP v. BearingPoint, Inc.,*
    576 F.3d 172 (4th Cir. 2009) ........................................................... 79

*In re Maxim Integrated Prods. Inc. Sec. Litig.,*
    639 F. Supp. 2d 1038 (N.D. Cal. 2009) ........................................... 45

*McBride v. Vision Twenty-One, Inc.,*
    2000 WL 33996239 (M.D. Fla. Aug 21, 2000) ............................... 65

*In re MicroStrategy, Inc. Sec. Litig.,*
    115 F. Supp. 2d 620 (E.D. Va. 2000) ...................................... 111, 113

*Mizzaro v. Home Depot, Inc.,*
    544 F.3d 1230 (11th Cir. 2008) ................................................. *passim*

*In re Netbank, Inc. Sec. Litig.,*
    2009 WL 2432359 (N.D. Ga. Jan. 29, 2009) .............................. 50, 52

*No. 84 Employer-Teamster Joint Council Pension Trust Fund*
    *v. Am. W. Holding Corp.*,
    320 F.3d 920 (9th Cir. 2003)............................................................... 103

*In re Northpoint Commc'ns Group, Inc., Sec. Litig.*,
    221 F. Supp. 2d 1090 (N.D. Cal. 2002) ............................................ 89

*Openwave Sys. Inc. v. Fuld*,
    2009 WL 1622164 (N.D. Cal. June 6, 2009) ..................................... 52

*In re Openwave System Sec. Litig.*,
    528 F. Supp. 2d 236 (S.D.N.Y. 2007)............................................... 139

*In re Oxford Health Plans, Inc., Sec. Litig.*,
    51 F. Supp. 2d 290 (S.D.N.Y. 1999)................................................ 116

*In re Oxford Health Plans, Inc. Sec. Litig.*,
    187 F.R.D. 133 (S.D.N.Y.  1999) ...................................................... 97

*In re PSS World Med., Inc. Sec. Litig.*,
    250 F. Supp. 2d 1335 (M.D. Fla. 2002)............................................. 96

*In re Paincare Holdings Sec. Litig.*,
    541 F. Supp. 2d 1283 (M.D. Fla. 2008)............................... 93, 129, 135

*In re Pegasus Wireless Corp. Sec. Litig.*,
    2009 WL 3055210 (S.D. Fla. Sept. 21, 2009) ................................. 110

*Plumbers & Pipefitters Local 572 Pension Fund v. Cisco Sys., Inc.*,
    2004 WL 5326262 (N.D. Cal. May 27, 2004) ................................. 138

*In re Premiere Techs. Inc.*,
    2000 WL 33231639 (N.D. Ga. Dec. 8, 2000).................................... 54

*In re Prestige Brands Holding, Inc.*,
    2006 WL 2147719 (S.D.N.Y. July 10, 2006) ................................... 98

*In re Rent-Way Sec. Litig.*,
    209 F. Supp. 2d 493 (W.D. Pa. 2002) ...................................................... 107, 111

*Ronconi v. Larkin*,
    253 F.3d 423 (9th Cir. 2001) ................................................................... 98

*Rosenberg v. Gould*,
    554 F.3d 962 (11th Cir. 2009) ............................................................. 79, 83

*Rosky v. Farha*,
    2009 WL 3853592 (M.D. Fla. Mar. 30, 2009) .................................... 87, 91, 106

*Rubinstein v. Collins*,
    20 F.3d 160 (5th Cir. 1994) ..................................................................... 99

*Schultz v. Applica Inc.*,
    488 F. Supp. 2d 1219 (S.D. Fla. 2007) ............................................... 87

*In re Scientific-Atlanta, Inc. Sec. Litig.*,
    239 F. Supp. 2d 1351 (N.D. Ga. 2002) ........................................... 53, 69

*Silverman v. Motorola, Inc.*,
    2008 WL 4360648 (N.D. Ill. Sept. 23, 2008) ....................................... 135, 136

*Skubella v. Checkfree Corp*,
    2008 WL 1902118 (N.D. Ga. Apr. 25, 2008) ..................................... 68

*South Cherry Street, LLC v. Hennessee Group LLC*,
    573 F.3d 98 (2d. Cir. 2009) ............................................................. 116, 121, 123

*South Ferry LP, No. 2 v. Killinger*,
    542 F.3d 776 (9th Cir. 2008) ................................................................. 98

*In re Sunterra Corp. Sec. Litig.*,
    199 F. Supp. 2d 1308 (M.D. Fla. 2002) ............................................. 116

*In re Suprema Specialties Inc. Sec. Litig.*,
    438 F.3d 256 (3d Cir. 2006) ............................................................. 111, 112

*Takara Trust v. Molex Inc.*,
   429 F. Supp. 2d 960 (N.D. Ill. 2006) ............................................................... 104

*In re Take-Two Interactive Sec. Litig.*,
   551 F. Supp. 2d 247 (S.D.N.Y. 2008) ............................................................. 130

*Teamsters  Local 617 Pension & Welfare Funds v. Apollo Group, Inc.*,
   633 F. Supp. 2d 763 (D. Ariz. 2009)  ........................................................ 80, 81

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (D. Ariz. 2009) ....................................................................*passim*

*In re Thornburg Mortgage, Inc. Sec. Litig.*,
   2010 WL 378300 (D.N.M. Jan. 27, 2010) .................................................. 75, 76

*In re Towne Services, Inc. Sec. Litig.*,
   184 F. Supp. 2d 1308 (N.D. Ga. 2001) ................................................. 53, 56, 86

*United States v. Arthur Young & Co.*,
   465 U.S. 805 (1984) ............................................................................... 124, 127

*United States v. Schiff*,
   602 F.3d 152 (3d Cir. 2010) ............................................................................ 67

*In re ValuJet, Inc. Sec. Litig.*,
   984 F. Supp. 1472 (N.D. Ga. 1997) ................................................................. 54

*In re Vantive Corp. Sec. Litig.*,
   283 F.3d 1079 (9th Cir. 2002) .................................................................. 98, 99

*In re VeriSign, Inc.*,
   2005 WL 88969 (N.D. Cal. Jan. 13, 2005) ...................................................... 48

*In re Vivendi Universal, S.A. Sec. Litig.*,
   605 F. Supp. 2d 586 (S.D.N.Y. 2009) ............................................................ 130

*Watts v. Fla. Int'l Univ.*,
   495 F.3d 1289 (11th Cir. 2007)...........................................................50

*W. Palm Beach Firefighters' Pension Fund v. Startek, Inc.*,
   2008 WL 4838671 (D. Colo. Nov. 6, 2008)....................................135

*Wietschner v. Monterey Pasta Co.*,
   294 F. Supp. 2d 1102 (N.D. Cal. 2003)..........................................101

*Ziemba v. Cascade International, Inc.*,
   256 F.3d 1194 (11th Cir. 2001).......................................................109

## STATUTES AND RULES

15 U.S.C. § 78t.................................................................................137, 139

15 U.S.C. § 78u-4...............................................................................51, 80

15 U.S.C. § 78u-5...............................................................................51, 53

Fed. R. Civ. P. 8 ....................................................................................129

Fed. R. Civ. P. 12(b)...............................................................................50

## OTHER AUTHORITIES

Alba Conte & Herbert Newberg,
   *Newberg on Class Actions* § 2.5 (4th ed. 2002)...............................48

Lead Plaintiff Plymouth County Retirement System respectfully submits this omnibus opposition to the motions to dismiss[1] (the "Opposition") the First Amended and Consolidated Class Action Complaint (the "Complaint")[2] made by defendants Carter's, Inc. ("Carter's" or the "Company"), Frederick J. Rowan, II ("Rowan"), Joseph Pacifico ("Pacifico"), Michael D. Casey ("Casey"), Andrew North ("North"), Charles E. Whetzel, Jr. ("Whetzel"), and PricewaterhouseCoopers LLP ("PwC").[3]

## PRELIMINARY STATEMENT

From the moment Carter's went public in October 2003, and for more than half a decade thereafter, Defendants engaged in fraudulently manipulating the market in order to inflate – and keep – Carter's stock price artificially high. Lead Plaintiff has identified two specific ways in which this occurred: Defendants first fraudulently "smoothed" Carter's core financials through improperly booked

---

[1] Lead Plaintiff uses the following to refer to the respective motions to dismiss: Company's brief as "Br. __"; Individual Defendants' Brief as "Ind. Defs. Br. __"; Pacifico's Brief as "Pacifico Br. __"; and PricewaterhouseCooper's Brief as "PwC Br. __".

[2] All citations to "¶" herein are to paragraphs of the Complaint.

[3] Excluding PwC, this memorandum refers collectively to the "Defendants" and, excluding the Company and PwC, the "Individual Defendants." Lead Plaintiff respectfully refers the Court to ¶¶39-40 for a more detailed definition of the respective Defendants involved in the accommodations prong and the OshKosh prong of the overall fraudulent scheme.

customer accommodation payments, then – after the smoothing had produced a few years of impressively consistent financial results for the newly public Company – Defendants used their falsely-gained market credibility and investor confidence to falsely promote OshKosh B'Gosh, Inc. ("OshKosh"), another children's clothing brand that Carter's acquired in July 2005, as an essential "growth engine" for Carter's. Defendants' ongoing "smoothing" and repeated touting of OshKosh's "growth" caused Carter's share price to soar during the Class Period,[4] and Defendants took advantage by dumping significant portions of their stock, reaping a staggering combined profit of $54.6 million and earning millions of dollars in performance-based bonuses. In the end, it took two management outsiders who were not part of Defendants' close-knit clique, to uncover both the OshKosh deception and the prolonged financial manipulation of Carter's core financials (which had continued unabated even after the OshKosh deceit was exposed) both within a few short months of joining the Company. In contrast, PwC, Carter's purportedly independent auditor, repeatedly issued "clean" opinions for each fiscal year within the Class Period. Each partial revelation of the truth about both OshKosh's "growth," and about Carter's falsely stated financials (which necessitated a Restatement spanning five and a half years) triggered huge

---

[4]  March 16, 2005 through  November 10, 2009, inclusive. ¶2.

2

losses, on extremely heavy trading, in Carter's stock.

The Defendants, attempting to rebut the clear and compelling inference of fraud raised by the Complaint, argue that: (1) Lead Plaintiff lacks standing for the accommodations aspect of the fraud; (2) Defendants were unaware of the years-long fraudulent smoothing and manipulation of accommodations; (3) the Complaint fails to adequately allege scienter; (4) Defendants' repeated OshKosh misrepresentations were forward-looking statements protected under the safe harbor; and (5) the Complaint does not establish loss causation with respect to the OshKosh disclosures (Defendants do not contest loss causation with respect to the accommodations disclosures). Defendants' efforts fail. The Complaint, fairly read, amply alleges the elements of the securities fraud causes of action asserted. Accordingly, Defendants' motion to dismiss should be denied.

*First*, under applicable case law, because Lead Plaintiff has undisputed standing with respect to the OshKosh aspect of the fraud, Lead Plaintiff has standing with regard to the entire alleged fraudulent scheme for purposes of a motion to dismiss. Moreover, contrary to Defendants' assertions, Named Plaintiff Scott Mylroie held Carter's stock through at least one corrective disclosure that specifically references accommodations, and thus has the requisite standing, even

under Defendants' erroneous application of the Dura loss causation standard to the constitutional standing inquiry.

*Second*, Defendants cannot claim ignorance of the years-long fraudulent "smoothing." Defendants admit accommodations are a fundamental and core part of their business, and it is wholly implausible that management would have been ignorant of the longstanding manipulation regarding such a key metric, especially when the improper booking of accommodations resulted in gross overstatements of the Company's accounts receivable, another core metric. Indeed, the constant periodic manipulations *required* the participation of senior-level management with access and control over the Company's internal accounting, such as Casey and North had here. Moreover, the Restatement reveals that the "smoothing" enabled the Defendants to consistently meet guidance, further undermining Defendants' implausible assertion that "rogue" salespeople with no accounting expertise were somehow responsible for the improper booking of accommodations (over more than half a decade).

*Third*, the Complaint provides sufficient evidence of scienter to allow the Court to conclude that the entire fraud alleged is at least as plausible as any competing inference. In addition to demonstrating Defendants' actual knowledge of the fraudulent financial manipulation and OshKosh's non-existent "growth," the

Complaint also details, *inter alia*: (1) facts supporting a strong inference of insider trading; (2) the millions earned by Defendants in performance-based bonuses that were tied to Carter's financials, given them ample motive to "smooth"; (3) how Defendants adopted their trading plans well within the Class Period, which enabled them to dump large amounts of stock for huge proceeds; and (4) the suspiciously-timed share repurchase program instituted by Defendants, which resulted in a 32% increase in Carter's stock price prior to a sell-off by Defendants of Carter's stock.

*Fourth*, Defendants' misrepresentations regarding OshKosh's growth were made when Defendants already had received booking information and feedback from OshKosh wholesale customers, months in advance of having to report actual sales, indicating their redesigned OshKosh line was a failure and that sales were slumping, not growing as asserted. Defendants' OshKosh misrepresentations were thus of existing fact, not future projections, because they were verifiably false when made. Defendants cannot invoke the safe harbor merely by cloaking their misrepresentations in language of the future.

*Fifth*, Lead Plaintiff adequately has alleged loss causation with regard to the OshKosh disclosures, demonstrating that the market reacted significantly, and negatively, to the series of partial corrective disclosures about the true nature of OshKosh and its inability to be a growth engine for Carter's. Further, the

Complaint specifically ties the cause of the loss from all the OshKosh disclosures to Defendants' misrepresentations regarding OshKosh's growth prospects.

*Finally*, the Complaint also establishes that PwC's audits were tantamount to no audit at all, and that PwC is accordingly liable under the applicable standard. The Complaint demonstrates that PwC utterly lacked independence from Carter's management, instead relying excessively on management representations and failing to conduct the most basic auditing tests, such as confirming accommodations and receivables directly with customers. Not only were most of Carter's finance department, including Casey, North, and the head of internal audit, all former employees at the same PwC office that was auditing Carter's, but PwC auditors even reported to North. PwC's defense that there were no "red flags" because PwC did not notice any turns the applicable "reasonable auditor" standard on its head and would give any auditor the ability to avoid liability merely by claiming not to have seen fraudulent activity that would be obvious to a reasonable, uncompromised auditor.

Accordingly, PwC's recklessness enabled the Defendants to perpetuate their years-long scheme of market manipulation, both through the fraudulent "smoothing" of Carter's financials that established their false market credibility,

allowing them to reap millions in performance-based bonuses, and then through their repeated touting of OshKosh's non-existent growth prospects.

## STATEMENT OF RELEVANT FACTS

### A.  Carter's IPO is a Huge Success, and the Company's Stock Price Soars

Based in Atlanta, Georgia, Carter's is a leading marketer of apparel for babies and young children in the United States.  Carter's designs, sources, markets, and manufactures a broad array of baby and children's apparel.  ¶56.  The Company distributes its products through the discount and department store channel, Company operated stores, and mass channel stores such as Target and Wal-Mart. *Id*.

On October 24, 2003 Carter's went public in an Initial Public Offering ("IPO").  *Id*.  The IPO was a huge success, with Carter's stock price shooting up 30% in the first day of trading.  *Id*.  As a result,  Carter's stock and stock options owned by the Individual Defendants suddenly became much more valuable.  ¶4. Indeed, this increase in value was amplified for the Defendants, because Carter's required its named executives to own a certain multiple of their base salary in Carter's stock – in 2007, for example, the minimum ownership guidelines required Carter's Chief Executive Officer and President to own *at least ten times* their base

salary in Company stock, and the remaining named executive officers to each own five times their base salary. ¶91.

**B.    The Defendants "Smooth" Carter's Core Financials by Booking Accommodation Payments in the Wrong Periods**

Accommodation payments,[5] also known as "margin support," are a standard, core business feature in the retail industry. ¶57. In its annual Form 10-K filings, Carter's explains that in the normal course of business, it grants certain accommodations to its wholesale and mass channel customers to assist with inventory clearance or promotions (in effect, paying its customers to help sell Carter's goods.) *Id*. Thus, the total net sale made to the customer is consequently reduced by the amount used to accommodate the customer's costs.[6] *Id*. Carter's kept track of its accommodation payments in detailed quarterly "flux" balance sheets that were made available to the Defendants and PwC, which showed accommodations by customer account. ¶129. The Defendants also had access to a

---

[5]    This memorandum uses the terms "accommodation payments" and "accommodations" interchangeably.

[6]    Defendants acknowledge that accommodations are a necessary and integral part of business in their industry. *See, e.g.*, Br. 62 ("Wholesalers, like Carter's, provide monetary support, known as 'accommodations' or 'margin support,' to their retailers to compensate them for reduced revenues and profit margins when the apparel sells at reduced price points); *see also* Pacifico Br. 2 ("Of course Pacifico was involved in setting up accommodations, they are a fundamental part of the retail business.")

master spreadsheet on a shared drive known as the "accommodations list."  ¶63.

Because net sales is the basis for each core financial metric reported by Carter's (and relied on by investors), all of Carter's key financial metrics deriving from net sales – including year-to-date sales figures, year-over-year sales figures, and most importantly, earnings per share ("EPS") – are affected by reductions in net sales due to accommodations.  ¶76.  Notably, net sales figures also directly affect Carter's Accounts Receivable ("A/R") numbers – an inflated net sales figure that fails to reflect an accommodation payment results in a corresponding overstatement of A/R, because A/R represents the end-amount owed to Carter's by the customer.  *Id*.  Moreover, because A/R constantly changes as cash is received (*i.e.*, it measures liquidity), it is a good *periodic* reflection of net sales.

Utilizing the ripple effect that accommodations have on Carter's key financials, the Defendants manipulated accommodations in order to "smooth" those financials over a period of almost six years.  The resulting false and misleading core financials that Defendants issued during the Class Period, which comprise multiple materially false statements, are summarized in the table at ¶77.

### 1.    <u>The Effect of "Smoothing"</u>

Instead of booking the payments in the *same* quarter that a sale was made, as required by undisputed accounting rules, the Defendants selected particular

quarters in which to book the accommodation payments, thus permitting them to meet earnings guidance in a particular quarter, or to book charges in quarters that had a surplus of income to mask and absorb the cumulative payments. ¶8. In so doing, the Defendants portrayed the impression that Carter's could deliver consistent and predictable earnings – a quality regarded by the investing public as a good indicator of management's skill and credibility. ¶4. Moreover, because Defendants only needed to manipulate amounts sufficient to meet issued guidance numbers and to maintain the image of consistency by meeting or exceeding investor expectations, the net cumulative discrepancy over the Class Period was relatively small. *See* ¶114.

Defendants' smoothing of Carter's financials had an additional benefit – Carter's made cash performance bonuses a significant component of its executive officers' total compensation, setting bonus targets before the end of the first quarter of each fiscal year. *See* ¶¶79-96. These bonuses were, in turn, tied to Carter's core financials, including earnings per share and, notably, net sales. ¶¶81-88. The Defendants could earn cash bonuses, for example, of up to as much as 200% of their base salaries, and their actual bonuses were frequently more than double their base salaries, meaning the Defendants earned millions in cash payouts from their smoothing. ¶¶79-80. Moreover, at least a portion of the significant stock options

Carter's required the Individual Defendants to own were also  "performance-based," vesting on the Company's achievement of certain defined earnings measurements.  ¶¶89-92.

### 2.    Defendants Ensure that Adjusted EPS Exceeds Company Guidance

Adjusted earnings-per-share, or EPS, reported by the Company in its quarterly and annual press releases announcing the Company's performance, was a critical measure of the Defendants' perceived success and a key basis for determining their bonuses and stock option grants from 2006 onwards.[7]  ¶¶93, 95.

In at least one instance in the fourth quarter of 2006, the Defendants booked fall accommodation payments in later quarters for JC Penney and Belks when those two important customers asked for more money due to poor Fall 2006 performance by Carter's products, because Defendants wanted to meet end-of-year guidance.  ¶96.  During the Class Period, the reported adjusted EPS figures consistently exceeded the Company's guidance (where publicly announced) even when the reported EPS figures did not (the only exception being for fiscal year 2007, which involved significant losses related to the OshKosh business, including the second quarter goodwill writedown).  In at least two instances where the

---

[7]  Adjusted EPS provides an "apples to apples" comparison for investors to gauge companies' performance within an industry.

reported EPS figures did not meet guidance, the adjusted EPS figures exceeded guidance by only a penny (4Q and FY 2006).  ¶95.

### C. The Defendants Take Advantage of the Public's Confidence in Carter's and Tout OshKosh as a "Growth Engine"

After approximately two years of Carter's consistent financial performance, the Defendants took advantage of the public's confidence and expanded on their "smoothing" and improper booking of accommodations by acquiring and touting OshKosh as a "growth engine" for Carter's.  ¶4.

On July 14, 2005, Carter's acquired OshKosh for $312.1M.  ¶¶15, 192. Included in the purchase price was goodwill of $151M.  *Id*.  Although OshKosh had a recent history of financial difficulties, Defendants emphasized its substantial brand recognition, and stated that they had a definite plan to fix the brand and turn Oshkosh into the growth engine that would drive Carter's profitability going forward.  *Id*.  Based on the market confidence Defendants had built from their "smoothing," this statement was credible in light of the Defendants' perceived management skill at delivering consistent financial performance.   Indeed, the amount of goodwill paid – over 48% of the total acquisition cost – was a strong signal to investors that the Oshkosh brand represented substantial future value to Carter's.  ¶¶15, 193-195.

### 1.    The Market Credits Defendants' OshKosh "Growth" Story

Due to the market credibility from Defendants' smoothing of Carter's financials, and their continual touting of the growth prospects of OshKosh, the market was poised to believe the Defendants and view the OshKosh growth opportunity as an important one.

Priming the market for OshKosh's purported growth prospects, only three months after acquiring Carter's, Rowan delivered a positive progress report on OshKosh product design during Carter's October 26, 2005 Third Quarter 2005 earnings call, stating that "[t]he OshKosh integration is going very well and is on schedule…. We are executing well."   ¶203.   Rowan also emphasized that the Company had spoken with wholesale retailers about OshKosh, with all indications for growth being good: "They all had great respect for OshKosh. They view OshKosh as a firehouse in toddler and the older segments." ¶206.

As a result of this market conditioning, by early 2006, Carter's stock was up 61% from the time the OshKosh acquisition was announced, and a February 9, 2006 Credit Suisse First Boston report indicated that the market had absorbed the Defendants' "growth engine" story: "We regard OshKosh as a significant component of the company's top- and bottom-line growth story…." ¶221.

**D.    Existing Facts Known By Defendants
Rendered Their Misrepresentations Regarding
OshKosh's Growth False When Made**

**1.    Defendants' OshKosh Design Strategy Was A Failure**

As part of their announced plan to "fix" OshKosh, Defendants "played around" with the styling of the OshKosh brand by placing more "needles, bells and whistles" into the product in order to position OshKosh at a higher price point. ¶212.  However, employees inside the Company observed first-hand that Carter's was making the OshKosh product worse.  ¶213.  The first OshKosh line under Carter's design team was the Fall 2006 line, and after the acquisition, employees noticed a substantial deterioration of quality in OshKosh clothing, including fading and shredding, together with a corresponding increase in returns.  *Id*.  The OshKosh products before the Fall 2006 line, by contrast, had been "double seamed" and more durable.  *Id*.  In addition to decreasing its quality and durability, the Defendants' decision to change the colors and embroidering of the clothing had a markedly negative effect on actual sales.  ¶214.  Compounding the design and quality problems, Carter's wholesale customers, including Kohl's and JC Penney, could not get desirable price points with the new Carter's-designed OshKosh line. ¶213.

Confirming that the Defendants' design changes at Oshkosh were not well-

received, on September 14, 2006, a Morgan Keegan analyst reported that she was shocked to discover – contrary to the Defendants' assertions that wholesalers were reacting positively to their OshKosh designs – that Macy's West, a leading account for Carter's, had decided not to carry any OshKosh clothing. ¶242. Carter's Vice President for Investor Relations at the time confirmed that the Defendants stated Macy's would carry their OshKosh line when they knew the opposite was true. ¶243.

### 2.   Defendants Receive Advance Booking Information Showing Negative Feedback and Decreasing Sales

It became evident to Defendants during 2006 that OshKosh sales were slumping. *Id*. Because wholesalers placed orders several months in advance of actual sales (the "Fall sell-through"), ¶216, the Defendants received accurate indications of what OshKosh sales would be months before actual sales were reported. *Id*., *see also* ¶224 (Pacifico confirming that wholesale orders are placed months in advance.)

The Fall 2006 OshKosh line suffered from quality and design problems and flaws, ¶¶223, 224, and based on the booking information Defendants possessed at the end of February 2006, they knew the line would not result, contrary to their statement to the investing public, in a double digit increase in sales. ¶¶225, 229. In addition to the quality and design problems, wholesale customers reacted

negatively to the higher price points.  ¶¶227, 229, 232.  Former employees confirmed that wholesale accounts, placed months in advance of actual sales, continued to provide negative feedback on the Fall 2006 line throughout the summer of 2006.  ¶234.  By late July 2006, then-current booking information showed declining sales figures, and Defendants were fully aware that OshKosh would not be profitable.  ¶240.

Similarly, by late October 2006, then-current booking information showed a continuing decline in sales figures, contrary to Defendants' misleading assertions that spring bookings were up 10% and summer bookings were up by double digits. ¶246.  By February 2007, Defendants knew that: (1) then-current OshKosh bookings, representative of future sales, were slumping rather than growing; (2) customers like Macy's were abandoning the OshKosh line; and (3) as a result, Oshkosh would not be a growth engine for Carter's.  ¶¶263, 265.  By the time of Defendants' mid-March 2007 Investor Conference, OshKosh sales had plummeted drastically, such that Defendants knew OshKosh could not possibly be the growth opportunity the Defendants publicly claimed.  ¶¶271, 273.

   E.   **False Statements Of Existing Fact Regarding OshKosh's "Growth"**

February 22, 2006 Earnings Call

On the Fourth Quarter 2005 earnings call in February 2006, the Defendants

continued to emphasize the OshKosh growth story, with Rowan stating that "holiday '06 and Spring and Fall of next year will move well ahead of Fall '06." ¶222. Pacifico, in addition to continued assertions about growth opportunities with OshKosh, announced a new head of design at OshKosh and confirmed that Carter's received wholesale orders several months before actual sales. ¶224. Pacifico stated that feedback on the new OshKosh line had been "very good": "We had good, very good customer feedback." ¶226. Casey stated that the Company had "stopped the decline" in OshKosh earnings, reiterated that Carter's was on track to double OshKosh's operating margin by 2007, and echoed Pacifico's assertion that Carter's was receiving good customer feedback for the new OshKosh designs, and that Defendants had "corrected" the OshKosh business. Casey pronounced OshKosh a growth engine for the "foreseeable future." ¶228.

### April 26, 2006 Earnings Call

In late April 2006, the Defendants remained on message about the OshKosh growth opportunity. On the April 26, 2006 First Quarter 2006 earnings call, Pacifico stated that OshKosh profitability had still increased, and that Carter's had received "excellent feedback" from customers regarding the OshKosh line. ¶231.

### July 26, 2006 Earnings Call

In late July 2006, Rowan belatedly confirmed that the Fall 2006 OshKosh

redesign was a failure, something Defendants had known as early as February 2006 (*see* ¶¶223, 224, 227, 229), admitting that Carter's had "positioned fall too high." ¶238. However, Rowan again reiterated the growth story, this time with respect to the Spring 2007 line: "[Orders for Spring] will be due mid-August and we are receiving *a very positive reaction from our key accounts* and we will project *double-digit growth* in the spring '07 bookings." *Id*. (Emphasis added). Similarly, Casey continued to emphasize OshKosh growth and profitability: "In terms of OshKosh, that is a 10% to 15% growth business. That is the growth objective for purposes of guidance. Wholesale will be at 10% to 15% growth business…. So there is no question in our mind that OshKosh can be a significantly larger business in the wholesale sector." ¶239.

　　September 19, 2006 Investor Conference

　　At the September 19, 2006 Bank of America Investment Conference, Rowan stated: "[W]e have materially changed the spring '07 [OshKosh] agenda, and we're excited about the possibilities there. Our bookings are up there. It's the first time in OshKosh's five or six-year recent history that there's not been a decline in that business." ¶245. At the time, however, existing booking information showed declining sales figures and that OshKosh would be losing money. ¶246. Moreover, at management meetings prior to this investor conference and

subsequent earnings calls, Defendants had discussed the sales decline apparent

from the advance booking information, and made the decision to make statements

that were not supported by the current budget or orders by the wholesale channel.

*Id*.

October 25, 2006 Earnings Call

On the late October 2006 earnings call, Pacifico stated that bookings for

Spring and Summer 2007 were up, and that Carter's had made great progress in

increasing OshKosh's profitability.    He also asserted that the new OshKosh

clothing had positive feedback from customers and stressed its impact on future

growth:

> Overall, we are making good progress at OshKosh. I
> believe we have improved the quality and the
> profitability of the business. We are consistently
> improving the product and the price value equation in
> addition to reducing the complexity associated with the
> old business model….We made a lot of changes based on
> fall and it has significantly improved the product by also
> changing the positioning and pricing for spring '07. Our
> spring bookings are up 10% in dozens and 3% in dollars.
> Our summer bookings show further improvement and we
> are projecting they will be up double-digits. Our
> customers have provided a lot of positive feedback for
> our creative expansion of the core items and key
> priceline. So, we are executing the right strategies in
> OshKosh.  ¶248.

19

On this same call, Casey spoke again about the growth story: "now that we have an opportunity to turn the OshKosh business around, that would be the growth vehicle for [Carter's]." ¶250.

February 21, 2007 Earnings Call

By late February 2007, the Defendants continued to assert that OshKosh was a growth engine for the Company, and that they had had no problems with any of their customers. ¶262. Pacifico stated: "Our spring bookings were up 2% and our summer bookings, which represent close to 15% of our annual business, increased 20 percent over last year….We still believe the Oshkosh brand has great potential." *Id.*, ¶264.

March 14, 2007 Investor Conference Statements

Rowan stated at a March 14, 2007 investor conference: "we have high confidence level that this new product agenda will be much more dominant. That is, however, spring '08, which launched in the fourth quarter, but I don't want you to think that everything is fixed March 10 or 11. That's not the case but business is pretty good because we've got strong promotional and our business is moving pretty well – and I'm speaking – referring to our stores – it's currently pretty good." ¶270.

Casey continued: "Our experience has been good. We had a nice benefit of picking up OshKosh. We increased our unit volume by 25%. So there's a lot of opportunity on the OshKosh side." ¶272.

April 25, 2007 Earnings Call

By the time of the First Quarter 2007 earnings call in late April 2007, the Defendants admitted that "our over-the-counter selling of [OshKosh] spring product is below our expectations" but emphasized that "summer bookings…were up 20% to last year." ¶279. Thus, Defendants were still asserting that wholesale growth would be in the double digits for summer, even though current booking information predicted a large sales slump, and weak demand for OshKosh's spring line. *See* ¶246. Nevertheless, Pacifico added that "I feel very good about the progress we've made and the line's potential." *Id*.

### F. The Partial Disclosures Of The Truth Regarding OshKosh Demonstrate The Importance Of The OshKosh Growth Opportunity To The Market

The Defendants were forced to partially reveal the truth about OshKosh to the market on two occasions. On July 25, 2006, after the market closed, Carter's released lower than expected fall sales figures for OshKosh, and Rowan belatedly confirmed the failure of the Fall 2006 line on the earnings call the next day – facts which the Defendants had known since at least February 2006. *See* pp. 15-18,

*supra*. This partial disclosure of the truth concerning the OshKosh growth opportunity caused Carter's stock price to plummet 12% on July 26, 2006, resulting in a 52-week low in heavy volume trading (over 4 million shares traded compared to an average of 753,000 shares/day during the Class Period). ¶237.

Defendants subsequently announced, after the market closed on February 13, 2007, that they expected "no growth in comparable store sales, fewer store openings and less contribution from our OshKosh wholesale segment than previously planned." ¶237. This direct reference to "no growth" had a substantial impact on the market, sending Carter's stock price down 16.7% in heavy volume, with 6.2 million shares being traded. ¶258. As a February 14, 2007 Credit Suisse report noted: "*the market was clearly surprised* by the magnitude of the impact these issues will have on 2007." *Id*. (emphasis added).

### G. Capitalizing on Their Continuing "Smoothing," and Trading on Their Inside Information Regarding OshKosh, Defendants Sell Their Shares For Unusually Large Proceeds

Throughout the Class Period, the Defendants had used the market credibility resulting from their "smoothing" to tout OshKosh as Carter's growth engine, even when they possessed inside information, gained from advance wholesale orders and customer feedback, that the OshKosh growth opportunity was non-existent.

Benefiting from the public's confidence in them, Defendants' statements regarding the growth prospects for OshKosh inflated Carter's stock prices even further.

Two days after the October 2006 conference call in which Defendants stressed that OshKosh remained on the verge of a turnaround, with spring bookings up 10% and summer bookings up double digits, on October 27, 2006, Rowan began to unload his Carter's shares, selling 105,000 shares on October 27; 195,000 shares on October 30; 120,000 shares on October 31; 104,400 shares on November 1;100,000 shares on November 2; and 12,000 shares on November 3. ¶251. In the eight days following the earnings call, Rowan reaped $18 million dollars.

Similarly, Whetzel unloaded 53,500 shares from October 9, 2006 through November 16, 2006, realizing $1.5 millions dollars in proceeds. ¶251. Pacifico sold a total of 150,000 shares over 10 days in November 2006, worth $3.85 million. ¶252. The Individual Defendants all continued to dump their Carter's stock at artificially inflated prices throughout the Class Period. By the end of the Class Period, Rowan had reaped $28.8 million in proceeds. *Id*.

## H.    Defendants' Stock Repurchase Plan

On February 21, 2007, immediately after the market was beginning to lose confidence in their OshKosh growth story following the partial disclosure on February 13, 2007, Defendants announced a $100 million stock repurchase plan.

¶266.    The announcement accompanied the admission that, in effect, the Defendants had close ties going back more than 20 years, and that each Individual Defendant was heavily invested in Carter's stock and did not want to see it at depressed prices.  *Id*.  The Defendants later announced on April 24, 2007 that "[d]uring the first quarter of fiscal 2007, the Company repurchased 1,252,832 shares of its common stock for approximately $30 million at an average price of $23.95 per share."  ¶277.

The repurchase program had an immediate impact, resulting in a 32% increase in stock price by April 26, 2007.  ¶278.  One analyst found the timing of the repurchase program "somewhat curious, as we would have expected the majority of free cash flow generated this year to go toward internal programs such as product innovation, CRM system upgrades, more efficient pricing mechanisms, and/or improved in-store execution (including additional sales associate hires and/or training)."  ¶267.

## I.    The Defendants Sold Their Shares At Suspicious Times

Following the Defendants' positive statements about OshKosh growth during the April 25, 2007 earnings call and the 32% increase in stock price resulting from their share repurchase program, the Individual Defendants sold

more stock.[8]  Rowan sold 272,000 shares on April 27, 2007; 64,100 shares on May 1, 2007; and 73,900 shares on May 2, 2007, for a total of $11 million.  ¶280. Whetzel sold 100,000 shares over a two-week period from May 3 to May 18, 2007, for a total of $2.6 million; Pacifico sold 40,000 shares over a three day period from May 18, 2007 to May 21, 2007, for a total of $1.03 million; and Casey sold 146,200 shares on April 27, 2007 for $4 million.  *Id.*

By the time the full truth about OshKosh was revealed, the Individual Defendants had sold 1,552,000 shares of Carter's stock (for aggregate proceeds of more than $43,047,999.16) at inflated prices, with Rowan reaping an additional $1.5 million in bonuses on the "success" of the OshKosh integration.  *Id.*

## J.    The Full Truth about OshKosh is Revealed

On July 24, 2007, Carter's finally disclosed that OshKosh was not the growth engine that the Defendants had conditioned the market to expect:

> As a result of the continued negative trends in sales and profitability of the Company's OshKosh B'Gosh wholesale and retail segments and projections for such segments for the balance of fiscal 2007, the Company conducted an interim impairment test on the value of the intangible assets that the Company recorded in

---

[8]    A former employee further revealed the existence of a "buddy pact" between the Defendants regarding their stock sales.  ¶253.  According to this former employee, certain senior Carter's executives were told not to exercise their stock options during a window of opportunity until Rowan had exercised his own options, under an internal "buddy pact."  *Id.*

connection with the acquisition of OshKosh B'Gosh, Inc. in July 2005. As a result of this analysis, on July 19, 2007, the Company determined that these intangible assets were impaired and that a material charge would be required. The Company determined that its Cost in Excess of Fair Value of Net Assets Acquired assets [goodwill] related to both the OshKosh wholesale and retail segments were fully impaired in the approximate amount of $142.9 million, and that its Tradename asset is impaired in the amount of $12 million. ¶285.

The second quarter 2007 financial results also revealed that OshKosh wholesale had dropped 45% from the same period the prior year, plummeting from $20.4 million in the second quarter 2006 to $9.9 million in the second quarter 2007, and the market belatedly learned what Defendants had known throughout the Class Period – that wholesale orders, placed in advance of actual sales, had been in decline throughout the Class Period. ¶286. The final disclosure of the truth caused the Company's stock to fall sharply on July 25, 2007, from $24.87 per share to $22.75 per share on heavy volume (4.4 million shares traded compared to an average of 753,000 shares/day during the Class Period). ¶288.

The end of the OshKosh deceit was precipitated by James Petty, the new President of Retail who joined the Company on June 4, 2007, shortly before the July 24, 2007 announcement. ¶289. Petty was not an inside member of the management team who had worked together for more than 20 years and who had collectively dumped stock during the Class Period. *Id.* Petty "refused to sign off"

26

on management's plans for OshKosh, and was a "major contributor" to the final disclosure that OshKosh could not be a growth engine for Carter's. *Id.*

Less than a year after the Defendants were forced to reveal the truth about OshKosh, Carter's announced Rowan's retirement on June 11, 2008. ¶291. A June 12, 2008 RBC analyst report said: "we do believe that the under-performance of the OshKosh division since its acquisition in 2005 may have played a role in his and the Board's decision for him to retire at the current time." *Id.*

### K.    The Truth about Defendants' Fraudulent Manipulation of Accommodations Begins to Emerge

Even after the truth about OshKosh was revealed, the Defendants continued to improperly book accommodations and "smooth" the Company's core financials for a few more years until, as with the OshKosh deception, a management outsider discovered the Defendants' ongoing manipulation of accommodations. Carter's new CFO, Westenberger, was hired in January 2009 to replace interim CFO North, because the Board felt that North did not have the skill set to be CFO. ¶97. Westenberger's attempts to "get behind the accounting practices and how certain things were treated" made North especially nervous. ¶98.

Westenberger's independent review led him to Kohl's, one of Carter's largest customers, to discuss a disputed accommodations payment that Pacifico had been trying to resolve. *Id.* Westenberger's trip to Kohl's, which occurred without

Pacifico's knowledge, was only a few weeks before Carter's was due to release its third quarter results for 2009. ¶99. Following Westenberger's return, and his demand for a review into the Company's accounting practices, Carter's issued a press release on the morning of October 27, 2009, announcing that it would delay its third quarter earnings release in order to complete a review of its accounting for margin support to its wholesale customers. *Id*. The stock plummeted 23% the day of the announcement on extremely heavy trading (14.2 million shares), and Goldman Sachs, a prominent analyst covering Carter's, suspended coverage of the Company following the announcement, citing "the lack of visibility around the magnitude and potential impact of this review."

### L.     The Full Truth about Accommodations is Revealed

On November 9, 2009, after the market had closed, the Defendants issued another press release stating that, following the accounting review, the Company would restate its financials for a period of *almost six years*, covering fiscal years 2004-2008, and the first two quarters of 2009 – in short, the vast majority of the time since the Company's IPO in late 2003. This announcement triggered a further drop of 14% in Carter's stock price, with 5.5 million shares traded in one day (compared to an average daily trading volume during the Class Period of approximately 753,000 shares.) ¶100.

**M.**   **Post Class Period Events**

    **1.**   **Carter's Restatement**

Carter's issued its Restatement on January 15, 2010, filing its amended Form 10-K/A the same day.  ¶101.  Carter's restated its annual figures for fiscal years 2004-2006 without restating the quarterly figures for those years, its quarterly and annual figures for 2007 and 2008, and its figures for the first two quarters of 2009, indicating that the improper booking of accommodations continued throughout the Class Period.  *Id.*

The Restatement also revealed that Carter's began 2004 with a material overstatement of earnings, *such that its 2003 financials were **also** materially false and misleading*.  ¶102.  Although Carter's failed to give an explanation for the material overstatement of earnings at the end of 2003 in its amended Form 10-K/A, the Company did, in its December 23, 2009 press release, explicitly label the 2003 overstatement amount an "Accommodations adjustment," thus revealing that the Defendants' manipulations and "smoothing" existed prior to 2004.  *Id.*

    **(a)**   **The Restatement Provides Evidence that Defendants Manipulated Carter's Core Financials to Meet Guidance**

An analysis of the restated figures is complicated by Carter's failure to provide quarterly restated figures for 2004-2006, and the lack of publicly-issued

Company guidance for 2008 and the first two quarters of 2009. ¶103. Ignoring 2007, an aberrant year because of the Company's problems with the OshKosh business, including the writedown of almost all the goodwill associated with the OshKosh acquisition, the Restatement reveals that in both 2005 and 2006, the restated EPS (adjusted for one-time, non-recurring events per the originally reported adjustment amounts) was less than Company guidance, while the originally reported adjusted EPS was greater than Company guidance. *Id.*, *see also* ¶104. Thus, in at least those two years, the Defendants' manipulation of the Company's core financials through improper booking of accommodations enabled them to meet Company guidance and portray to the marketplace that (1) Carter's was performing well financially; and (2) the Individual Defendants' were superior managers in seeming to consistently beat guidance.[9] ¶104. A Credit Suisse analyst report on April 27, 2005 stated: "Carter's exceeded earnings expectations again in the first quarter of 2005. *The company has reported above consensus earnings in*

---

[9] The Restatement further reveals that the Defendants' accounting manipulations allowed them to increase adjusted EPS by $0.06 in 2005 and $0.10 in 2006. Even in 2007, an otherwise terrible year overall because of problems with the OshKosh business, the Individual Defendants were able to increase adjusted EPS by $0.08, putting the Defendants within $0.05 of Company guidance. Although the Company suspended guidance in 2008, the Individual Defendants continued to reap significant cash bonuses by meeting their internal adjusted EPS targets. *See* ¶¶8, 10, 11, 13, 14, 22-26, 56-115.

*each quarter since its October '03 IPO*. We believe this trend will continue throughout the remainder of 2005, which should further elevate investor expectations." *Id*.

### (b) Restated A/R Reveals the True Extent of Defendants' Financial Manipulations

The significant effects of the Defendants' improper accounting of accommodation payments on the Company's core financials were fully revealed in it's A/R figures, which had been consistently overstated during the Class Period, by as much as 26%. As explained at p. 9, *supra*, A/R is a periodic measure, and accordingly is the metric that most accurately reflects the effects of the Defendants' "smoothing" from quarter to quarter. The following chart demonstrates the impact of the Defendants' improper booking of accommodations on A/R (¶106):

| Period Ending | Restatement Adjustment | Previously Reported | Restated | Overstatement [Adjustment/ Restated] |
|---|---|---|---|---|
| 7/9/2009 | (11,813) | 96,864 | 85,051 | 13.9% |
| 4/3/2009 | (20,233) | 112,931 | 92,698 | 21.8% |
| 1/3/2009 | (20,608) | 106,060 | 85,452 | 24.1% |
| 12/29/2007 | (25,112) | 119,707 | 94,595 | 26.5% |
| 12/30/2006 | (16,892) | 110,615 | 93,723 | 18.0% |
| 12/31/2005 | (7,353) | 96,144 | 88,791 | 8.3% |

### (c)    The Restatement Reveals How the Accommodations and OshKosh Deceptions Fed Each Other

The Restatement resulted in a downward revision to OshKosh revenue of $2.48 million in 2006, a 7.64% reduction.  Because the OshKosh revenue was inflated from the Defendants' ongoing "smoothing," the Defendants were able to delay writing down the goodwill associated with the OshKosh acquisition, and put off revealing to the market that OshKosh had no growth potential. Absent the Defendants' financial "smoothing," the Defendants would not have been able to misrepresent OshKosh's growth potential for as long as they did, or profit as much from selling their stock.

### 2.    The Manipulation of Carter's Financials Through Accommodations Prompts Government Investigations

On December 23, 2009 the Company issued a press release regarding its investigation into the improper booking of accommodation payments, stating that "[t]he Company has self-reported information concerning this investigation to the Securities and Exchange Commission. The Company has also been informed that the United States Attorney's Office is conducting an inquiry into this matter. The Company will continue to cooperate with these inquiries." ¶115.

### N.    The Extent of Defendants' Financial Manipulations Underscores PwC's Severe Recklessness in Auditing Carter's

#### 1.    PwC Represents over Five Years that Carter's Financials Conform with GAAP

The Defendants' "smoothing" and financial manipulations occurred over at least five and a half years, and was discovered not by the Company's outside auditor, PwC, but by Westenberger, a management outsider, only a few months after he had joined Carter's. ¶99.

PwC has been Carter's outside auditor since at least Carter's IPO in October 2003, and was responsible for conducting annual audits and quarterly reviews of Carter's financial statements under the relevant accounting standards in order to obtain reasonable assurance that Carter's financial statements were free of material misstatements caused by error or fraud. ¶41.

For each of Carter's fiscal years from 2004 through 2008, PwC issued unqualified or "clean" opinions on Carter's financial statements, stating in each that (1) Carter's financial statements were prepared in accordance with Generally Accepted Accounting Principles or "GAAP"; (2) Carter's financial statements were free of material misstatement; (3) Carter's maintained effective internal controls over financial reporting and Carter's internal controls were free of material weaknesses; and (4) PwC conducted its audits in accordance with the

standards of the Public Company Oversight Accounting Board (PCAOB) and Generally Accepted Auditing Standards ("GAAS").[10]  ¶¶149, 150, 151, 152, 153. By issuing these opinions, PwC further represented that it (1) obtained an understanding of Carter's internal controls over financial reporting; (2) evaluated management's assessment of internal controls; (3) tested and evaluated the design and operating effectiveness of Carter's internal controls; and (4) performed other necessary audit procedures. *Id*.

Carter's Restatement, however, is an admission that its financial statements violated GAAP and were materially false and misleading when originally issued. ¶127.  Carter's also confirmed the existence of several glaring internal control weaknesses relating to accommodations and financial reporting by admitting the Company planned numerous corrective measures for 2009.  ¶135.

### 2.    PwC Ignores Known Fraud Risk Factors and Fails to Conduct Basic Testing

Over the course of almost six years, PwC failed to comply with audit documentation standards by ignoring financial evidence that would have alerted a

---

[10] The PCAOB is responsible for the development of auditing and related professional practice standards for public accounting firms.  On April 16, 2003, the PCAOB adopted as its interim standards GAAS, as described by the AICPA Auditing Standards Board's SAS No. 95.  A reference in an auditor's report to "the standards of the Public Company Accounting Oversight Board (United States)" includes a reference to GAAS.  All references to GAAS or AU sections herein are intended to reference the PCAOB Standards.

reasonable auditor to the existence of fraud.  For example, PwC failed to: (1) notice any suspicious discrepancies in Carter's quarterly flux balance sheet/income statements, even when such discrepancies were obvious to Carter's current employees and third parties, ¶162; (2) obtain customer confirmations of Carter's A/R, a basic test in the retail industry – the same evidence that quickly alerted Westenberger, who was not even an auditor, to the existence of fraud, ¶99, 164; *see also* ¶¶190 (outlining basic audit tests normally undertaken in sales context that would have detected Defendants' manipulation of accommodations); and (3) consider known risk factors present here, including management's excessive focus on maintaining Carter's stock price, and the incentives created by tying a significant portion of Defendants' cash earnings to Carter's core financial metrics. ¶¶168, 170, 171.

### 3.    PwC Ignores Glaring Red Flags

PwC failed to discover several glaring red flags that would have alerted a reasonable auditor to the possibility of fraud, including: (1) A/R, a key financial metric in the retail industry, that was grossly overstated over a period of almost six years, ¶ 174; (2) Carter's material overstatement of earnings of $3.1 million at the end of 2003, ¶178; (3) the obvious manipulation of dollars among reserve accounts on the quarterly flux balance sheets, ¶¶ 180, 181; and (4) the multiple material

weaknesses in internal controls of revenue recognition and oversight of the sales organization identified in the Restatement (including the complete lack of a written policy on accommodations payments). ¶186.

### 4. PwC Was Not An Independent Auditor

PwC's failure to detect any indications of fraud over almost six years took place in the context of its lack of independence with regard to the Defendants, which in turn stemmed from PwC's inappropriately close relationship with Carter's management. Key financial positions at Carter's were filled with former PwC auditors. Casey, Carter's CFO, was formerly a senior manager at the Connecticut office of PwC's predecessor company, Price Waterhouse LLP, and North, Carter's VP of Finance, was also a former PwC auditor at the same Connecticut office, and the same Connecticut office was responsible for auditing Carter's. ¶11. Moreover, prior to joining Carter's, Casey was the lead accountant responsible for the Carter's account. ¶144. Indeed, the majority of Carter's finance and accounting personnel were Casey's former PwC colleagues. ¶66. One of these former colleagues, Christina DeMarvel, was in charge of Carter's internal audit department and reported directly to North, such that the auditor reported to the entity it was supposed to audit. Both Casey and North were the chief architects of the fraudulent "smoothing," ¶68, and Casey controlled every financial aspect of

the Company, including running the internal accounting group that calculated the numbers for the Company's SEC filings. ¶64, 66.

Carter's employees observed that PwC did not have an independent relationship with management. *See, e.g.*, ¶¶11, 61, 66, 145, 189. Carter's financial executives controlled both internal auditors and PwC, and North, as VP of Finance, would supervise both internal and external audit functions at Carter's, with PwC reporting directly to him. ¶61.

Carter's former Vice President of Investor Relations during the Class Period noted that Casey and North were close with Don Brenner, the engagement partner for the Carter's account, who "allow[ed] certain things to slide." ¶¶11, 144. Former employees observed that the PwC auditors had "a very easy relationship" with the finance executives, and that "if North said 'we've got it under control' then PwC would take his word for it and not actually perform the additional testing." ¶¶145, 146.

## ARGUMENT

### I.  The Complaint Establishes Threshold Article III Standing

Defendants' misleading portrayal of this consolidated action and cohesive fraudulent scheme as two disparate frauds provides the spurious basis for their assertion that no named plaintiff has standing to pursue claims related to the

accommodations portion of their fraud.[11]    *See, e.g.*, Br. 10-62, (discussing OshKosh allegations) and Br. 62-92 (separately discussing accommodations allegations).[12]    As explained below, however, as long as a named plaintiff has standing for some claims, courts consider Article III standing established, at this early stage of the litigation, for the entire alleged fraud.

Moreover, named Plaintiff Scott Mylroie ("Mylroie") held Carter's stock through the first negative disclosure regarding accommodations alleged in the Complaint,[13] and therefore has standing, even under the Defendants' theory, to pursue the accommodations claims.    *See* Br. 73.    Indeed, Defendants misread *Impax* to support their erroneous conclusion, because the *Impax* court, in a later

---

[11] Even if Defendants were to somehow prevail on their argument that no named plaintiff has standing, Lead Plaintiff stands ready to amend the Complaint, if necessary, to add the Greater Pennyvania Carpenters' Pension Fund ("GPCPF") as an additional named plaintiff who held Carter's stock through all relevant disclosure dates, and whose standing is, therefore, incontrovertible. *See* Exhibit 1 (Certification of GPCPF) to the Declaration of Jonathan Gardner in Support of Lead Plaintiff's Opposition, filed concurrently herewith (the "Gardner Declaration"). All references to "Gardner Decl. Ex. __" are to exhibits to the Gardner Declaration. Lead Plaintiff intends to request in its motion for class certification that Plymouth County Retirement System, Mylroie and GPCPF be named class representatives.

[12] Defendants contest standing *only* with respect to their defined "Accommodations Claims."

[13] Notably, Defendants do not cite any authority from this Circuit supporting their contention that the injury requirement of Article III is equivalent to loss causation under *Dura*.

decision, found the very press release that Defendants emphatically argue is "strikingly similar" (Br. 75) to the first accommodations disclosure here as "*the controlling date for loss causation*," and thus the source of Article III injury. *In re Impax Labs., Inc. Sec Litig.*, 2008 WL 1766943, at *6 (N.D. Cal. Apr. 17, 2008) ("*Impax II*").

## A.    <u>Article III Standing and Loss Causation under *Dura*</u>

Constitutional standing is a doctrine rooted in the Article III requirement that courts exercise jurisdiction only over "cases or controversies" as defined by the Supreme Court. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). "[This] irreducible constitutional minimum of standing," *id*., contains three elements:  (1) an injury in fact, which is an invasion of a legally protected interest that is concrete and particularized and, thus, actual or imminent, not conjectural or hypothetical;  (2) a causal relationship between the injury and the challenged conduct, such that the injury can be *fairly traced* to the challenged action of the defendant; and (3) a likelihood that the injury will be redressed by a favorable decision. *Id*. (emphasis added).

Defendants' standing argument rests on the requirement that the injury be "fairly traced" to the misrepresentations and omissions – they do not argue that Plaintiffs fail to meet the other elements of constitutional standing. *See, e.g*., Br.

76 (conceding Mylroie's injury-in-fact: "Mylroie lost money on his brief investment in Carter's stock.")   It is far from clear, however, that the "fairly traceable" requirement is automatically equivalent to loss causation under *Dura*, which discusses loss causation as an element of a securities fraud claim brought under Section 10(b), and not in the context of standing.  *See Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341 (listing elements).  Certainly, no court in this Circuit has so concluded.  Indeed, importing the *Dura* loss causation standard into Article III standing impermissibly empowers defendants to transform an element of a claim on the merits into a *threshold* jurisdictional inquiry – a novel legal theory that *Dura* does not contemplate.  This court should deny the Defendants' invitation to erroneously conflate loss causation under *Dura* with the threshold Article III standing inquiry.

In *Barr v. Matria Healthcare, Inc.*, 324 F. Supp. 2d 1369 (N.D. Ga. 2004) (Thrash, J.), this court found that out-of-pocket damages – in the Article III standing context – was sufficient to meet the "fairly traceable" injury requirement. *See id*. at 1375-77:

> [A]n in-and-out trader, one who both buys and sells his stock within the class period, can have standing as a class representative….a plaintiff's injury is not the loss of what he might have gained if the false facts had been true, but rather what he has actually lost by being deceived into the purchase.

40

To be sure, *Barr* was decided prior to *Dura*.  It bears emphasis, however, that after concluding Article III standing existed, the *Barr* court conducted a properly separate loss causation inquiry on the merits, and – using a loss causation standard very similar to the standard adopted by *Dura* – found that the Complaint *failed to allege loss causation*.  *See id*. at 1379-1380:

> [T]he Plaintiff fails to plead that the Defendants' alleged misrepresentations proximately caused or even "touched upon the reasons for" his loss, as these misrepresentations were not disclosed until after the Plaintiff had sold his stock at the still artificially inflated price….[this] *is a failure to state a claim on the merits of the case*.  (Emphasis added).

Thus, the *Barr* decision underscores that the "fairly traceable" injury requirement of Article III is a different inquiry than the consideration of loss causation as an element of a 10(b) claim.  Accordingly, this Court should not apply the *Dura* loss causation test to determine jurisdictional standing here, but instead should adopt an out-of-pocket standing inquiry.

### B.    The October 27, 2009 Disclosure Was a Corrective Disclosure

Even under the Defendants' approach, however, Mylroie would have standing because he held shares through at least one corrective disclosure, thereby suffering the requisite injury from Defendants' misrepresentations regarding

41

accommodations. Moreover, if the Complaint establishes standing under this approach, the Complaint also establishes loss causation under *Dura*.[14]

Defendants argue, Br. 74-75, that the October 27, 2009 disclosure cannot be a corrective disclosure because "the mere announcement of a delay in a company's release of earnings or an internal review does not 'correct' a prior statement and thus cannot constitute a 'corrective' disclosure." For support, the Defendants rely heavily on *In re Impax Labs., Inc. Sec. Litig.*, 2007 WL 5076983, at *4 (N.D. Cal. Jan. 3, 2007) ("*Impax*"), arguing at length how the press release at issue in Impax "is strikingly similar to the October 27 Release here," Br. 75, because:

> Like Carter's October 27 Release, Impax's press release *announced only a delay in the release of quarterly earnings that resulted from the need to complete a review of a specific issue. It said nothing about whether earnings would be different than expected, and said nothing about the nature or extent of the 'review.'*

Br. 76 (emphasis added).

According to the Defendants, the *Impax* court rightly held that the press release was not a corrective disclosure because it "did not disclose a previously made misstatement or omission." *Id*. The Defendants then interpolate their own reasoning into the court's holding, stating that "[a]ny change in the stock price

---

[14]  Indeed, Defendants cite almost exclusively to cases discussing loss causation as a required element of a 10(b) claim, and not in the standing context.

following the announcement of an earnings delay or the beginning of an internal review is pure market speculation, not a 'correction' of some prior artificial inflation." Br. 76. The *Impax* court, however, did not base its holding on this reasoning. Indeed, a careful reading of the "particularly instructive" (Br. 75) *Impax* opinion reveals that the court reached its conclusion because the press release concerned third quarter earnings, whereas the Impax plaintiffs had *only* alleged misstatements with respect to first quarter and second quarter earnings. Thus, the court rightly held that the press release could not possibly have corrected the earlier misrepresentations about the different quarters. 2007 WL 5076983 at *4.

Subsequently, the *Impax* plaintiffs amended their complaint to include misrepresentations about the third quarter earnings that were the subject of the press release, thereby making for a truer comparison with the October 27, 2009 press release here, which concerns properly alleged misrepresentations. *See Impax II*, 2008 WL 1766943, at *2. Ruling on the amended complaint, the *Impax II* court found the date of the press release "the *controlling date for loss causation*," precisely because, like Carter's October 27, 2009 release, the *Impax* release stated that the reason for the delay in earnings was a "specific issue," Br. 76, that was the subject of the properly pled prior misrepresentation. *Id.* at *6 (emphasis added).

43

In *Impax*, the issue related to customer credits, much like the issue here concerns accommodation payments to customers.  And, as Defendants have noted, the *Impax* press release is "strikingly similar" to the press release here because it "said nothing about whether earnings would be different than expected, and said nothing about the nature or extent of the 'review.'"  Br. 75-76.  As the *Impax II* court held, a press release of this nature suffices as "the controlling date for loss causation," and thus, under Defendants' approach, establishes Mylroie's standing. 2008 WL 1766943, at *6.

Defendants' assertion that "[n]umerous district courts have affirmed the self-evident proposition that the mere announcement of a delay in a company's release of earnings or an internal review does not 'correct' a prior statement" (Br. 74-75, n. 28) is similarly unavailing.  As Defendants recognize, the October 27, 2009 press release announced a "review of a specific issue," (Br. 76), namely, a review of the Company's accounting for accommodation payments to customers.  At least one of the cases cited by Defendants, however, concerns press releases that did not identify a specific issue as the October 27, 2009 release does here.  *See, e.g., In re Avista Corp. Sec. Litig.*, 415 F. Supp. 2d 1214, 1220-21 (E.D. Wash. 2005) (the two disclosures did not contain "any factual information.").

Moreover, as the court in *Durham v. Whitney Information Network, Inc.*, 2009 WL 3783375, at *21 (M.D. Fla. Nov. 10, 2009) explained, cases such as *In re Dell Inc. Sec. Litig.*, 591 F. Supp. 2d 877, 910 (W.D. Tex. 2008) and *In re Maxim Integrated Prods. Inc. Sec. Litig.*, 639 F. Supp. 2d 1038, 1046-47 (N.D. Cal. 2009) are distinguishable from the facts presented here, because the October 27, 2009 disclosure was confirmed by a subsequent disclosure in which Carter's announced it was restating its financials *due to its accounting review*.   ¶100.   The *Durham* court distinguished between cases where "[t]he revelation of the 'truth' about the [accounting issue] did not take the form of a single, unitary disclosure, *but occurred through a series of disclosing events*' that culminated in the press release announcing [a] restatement," and cases where there was no subsequent confirming disclosure, holding loss causation is established in the former but not the latter. *Durham*, 2009 WL 3783375, at *21 (emphasis added, internal citation omitted).

Indeed, Defendants predictably ignore that "a corrective disclosure need not take the form of a single announcement, but rather, can occur through a series of disclosing events."  *In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 165 (S.D.N.Y. 2008); *see also Dura*, 544 U.S. at 342 (recognizing that the relevant truth can "leak out" into the market).  In *Bristol Myers*, for example, the court held that a press release announcing a Justice Department investigation was

"corrective" because the plaintiffs had alleged the basis for the investigation (further confirmed by the company's press release), and "link[ed] the announcement of the investigation to the purportedly fraudulent misconduct." 586 F. Supp. 2d at 164. The *Bristol Myers* court concluded that:

> Drawing all reasonable inferences in [p]laintiffs' favor, it is plausible that the announcement of a criminal investigation into Bristol-Myers's efforts to settle the Apotex litigation *marked the first in a series of corrective disclosures* which would reveal to the market that the Company had engaged in misconduct with respect to the settlement negotiations. In essence, *the announcement of the investigation was not an isolated event in itself*, it was instead the "tip of the iceberg" – *the first in a series of revelations which would ultimately expose the Company's entire fraudulent scheme*…. *Id.* at 165 (emphasis added).

Similarly, here, the October 27, 2009 disclosure was "not an isolated event in itself," *id.*, but the initial revelation regarding the Defendants' fraudulent manipulation of accommodations.[15] As in *Bristol Myers*, the Complaint here links the announced earnings delay and accounting review to the Defendants' omissions regarding accommodation payments, and the press release itself identifies accounting for accommodation payments as the reason for the delay and review. *See* Green Decl. Ex. 27 ("The Company is delaying its earnings release in order to

---

[15] Apart from referring to the November 9, 2009 disclosure as "purportedly" corrective, the Defendants fail to argue that it is *not* corrective. *See generally* Br. 72-76.

complete a review of its *accounting for margin support* to its wholesale customers.") (emphasis added).

Accordingly, the October 27, 2009 disclosure was a partial corrective disclosure that, under the Defendants' approach, confers standing on Mylroie.

### C.    Plymouth Has Article III Standing

Because Plymouth has undisputed standing with regard to the claims regarding the Defendants' fraudulent promotion of OshKosh as a growth engine for Carter's, Plymouth has standing, at this stage of the litigation, with respect to the other claims in this consolidated action. *See In re Connetics Corp. Sec. Litig.*, 542 F. Supp. 2d 996, 1003-04 (N.D. Cal. 2008). In *Connetics*, the lead plaintiff did not own shares at the time of at least one of the corrective disclosures, but did own shares during other corrective disclosures in the Class Period. *Id*. The *Connetics* court recognized that it was, therefore, "squarely presented with a situation in which the lead plaintiff has individual standing as to some claimed injuries of the class but not as to all claimed injuries of the class," and concluded:

> [T]he better rule is that a lead plaintiff with some injuries in fact has established standing for purposes of Article III; once the general standing requirement is satisfied, any additional questions related to particular injuries are relevant only in the context of class certification under Federal Rule of Civil Procedure 23. *Id.*

Other courts have similarly held, reasoning that "[n]othing in the PSLRA indicates that district courts must choose a lead plaintiff with standing to sue on every available cause of action." *Hevesi v. Citigroup, Inc.*, 366 F.3d 70, 82, 83 n.13 (2d Cir. 2004). "Rather, because the PSLRA mandates that courts must choose a party who has, among other things, the largest financial stake in the outcome of the case, it is inevitable that, in some cases, the lead plaintiff will not have standing to sue on every claim." *Id*; *see also* Alba Conte & Herbert Newberg, Newberg on Class Actions § 2.5 (4th ed. 2002) ("[o]nce threshold individual standing by the class representative is met, a proper party to raise a particular issue is before the court, and there remains no further separate class standing requirement in the constitutional sense"); *In re VeriSign, Inc.*, 2005 WL 88969, at *4-5 (N.D. Cal. Jan. 13, 2005) (once the lead plaintiff is found to have individual standing, any remaining questions about the lead plaintiff's ability to bring the case should be considered at the class certification stage).

In an attempt to undermine Plymouth's constitutional standing, and in direct contravention of the applicable case law set forth above, the Defendants portray their manipulation of accommodations payments as a standalone fraud – even though that manipulation and consequent "smoothing" were necessary for the perceived market credibility of their subsequent OshKosh "growth engine"

misrepresentations – and then claim that Plymouth has no Article III standing with respect to the accommodations claims. However, the Complaint explains how the two aspects of Defendants' fraud worked in tandem, describing how the Defendants, flush with stock and stock options that were newly valuable after Carter's IPO in 2003, engaged in a single overall scheme to wring as much profit as possible from unsuspecting investors: (1) first smoothing Carter's financials by manipulating accommodations in order to give the investing public the false impression that the Company could deliver consistent and predictable earnings, and to mislead the public as to management's skill and credibility; then (2) capitalizing on the market's misplaced confidence in Carter's and its management to fraudulently promote OshKosh as a growth engine for Carter's. ¶4.

Indeed, as this Court has found, the OshKosh aspect and the accommodations aspect "involve common questions of law and fact," including the same core group of officer Defendants, who made tens of millions from the overall scheme to inflate Carter's stock price. November 29, 2009 Order Consolidating the Mylroie and Plymouth actions (Docket No. 39); ¶5.

Accordingly, because Plymouth has standing with respect to some of the claims in this case, the Article III jurisdictional threshold is satisfied at this stage of

the litigation, and Defendants' arguments regarding the accommodations claims

should properly be reserved for the class certification stage.

## II.   General Standard for a Motion to Dismiss a Section 10(b) Claim

To withstand a motion to dismiss under Federal Rule of Civil Procedure

12(b)(6), a complaint need not contain "detailed factual allegations," but must only

"'give the defendant fair notice of what the...claim is and the grounds upon which

it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007) (quoting *Conley v.*

*Gibson*, 355 U.S. 41, 47 (1957)).  The court must determine whether the plaintiff

"has alleged enough facts to suggest, raise a reasonable expectation of, and render

plausible" its claims.   *Watts v. Fla. Int'l Univ.*, 495 F.3d 1289, 1296 (11th Cir.

2007).  The court must also construe the complaint in the plaintiff's favor, and

accept the facts alleged as true.  *See In re Netbank, Inc. Sec. Litig.*, 2009 WL

2432359, at *3 (N.D. Ga. Jan. 29, 2009) (Martin, J.) (citation omitted).  The court

considers the complaint in its entirety, including documents incorporated by

reference into the complaint, and matters of which courts may take judicial notice.

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

Under the Private Securities Litigation Reform Act (PSLRA), a private

securities complaint alleging that the defendant made a false or misleading

statement must also: (1) specify each statement alleged to have been misleading

[and] the reason or reasons why the statement is misleading, 15 U.S.C. § 78u-4(b)(1); and (2) state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind. § 78u-4(b)(2).

For the reasons below, Defendants' arguments fail to demonstrate that the Complaint should be dismissed under the applicable standards.

## III.    The Fraudulent Misstatements and Omissions Regarding the OshKosh Aspect of Defendants' Fraud are Actionable

The Complaint sufficiently alleges actionable false statements and omissions by the Defendants concerning the OshKosh growth opportunity, upon which the Plaintiffs "justifiably relied."[16] ¶¶222, 224, 226, 228, 231, 238, 239, 250, 262, 264, 279. *Netbank,* 2009 WL 2432359, at *4.

The Defendants argue that the "OshKosh Claims are predicated entirely upon forward-looking statements," Br. 27, which are not actionable under § 10(b) because they are protected under the safe harbor provision of the PSLRA. 15 U.S.C. § 78u-5(c)(1); *Harris v. Ivax Corp.*, 182 F.3d 799, 803 (11th Cir. 1999).

This argument fundamentally misapprehends the Plaintiffs' core allegation – that the misstatements and omissions regarding the OshKosh growth opportunity were based *on then-current facts known to the Defendants at the time* they misled

---

[16]   The Defendants do not challenge the misrepresentations relating to their fraudulent booking of accommodations on statutory safe harbor grounds.

the market.  Accordingly, the statements are not forward-looking statements based

on future risk, and Defendants' fraudulent misstatements and omissions[17] cannot

fall within the PSLRA safe harbor.  Moreover, the cautionary language identified

by Defendants is inapposite because it addresses future economic risk, not the risk

that Defendants would misrepresent then-current facts about the OshKosh growth

opportunity that were  known only to them.

---

[17] Although Defendants argue that the Complaint "does not allege that Mr. Whetzel made any of the alleged misstatements, thereby requiring dismissal in his favor," Br. 28, n.8, "there is no absolute requirement that where several defendants are sued in connection with an alleged fraudulent scheme, the complaint must identify false statements made by each and every defendant." *Openwave Sys. Inc. v. Fuld*, 2009 WL 1622164, at *5 (N.D. Cal. June 6, 2009) (citing *Swartz v. KPMG LLP*, 476 F.3d 756, 765 (9th Cir. 2007)).  Moreover, this is not a case where the complaint "lump[s] multiple defendants together," because the Complaint here "inform[s] each defendant separately of the allegations surrounding his alleged participation in the fraud." *Id*. (internal citation omitted).  The Complaint alleges that as Chief Sourcing Officer and Executive Vice President, Whetzel was a direct participant in the Defendants' fraudulent scheme to mislead the market about the OshKosh growth opportunity.  ¶37.  The Complaint also details Whetzel's insider sales, ¶¶244, 251, 280, 289, 293.

In addition, Plaintiffs are entitled to rely on the group pleading doctrine in this Circuit. *Netbank*, 2009 WL 2432359, at *15 (explaining that "[t]he group pleading doctrine in securities litigation ... can be broadly characterized as a presumption of group responsibility for statements and omissions in order to satisfy the particularity requirements for pleading fraud under [Rule] 9(b)….The doctrine has been used to impute the actions or knowledge of some defendants to other defendants, or to presume action or knowledge solely from a defendant's title or position.") (internal citation omitted).

A.    **The Safe Harbor Does Not Apply to**
      **Misrepresentations and Omissions of Then-Current Fact**

The PSLRA's safe harbor provision applies *only* to forward-looking statements. *See* 15 U.S.C. § 78u-5(c)(1); *In re Scientific-Atlanta, Inc. Sec. Litig.*, 239 F. Supp. 2d 1351, 1361 (N.D. Ga. 2002). Notably, courts have rejected attempts, through defendants' artful use of language implicating the future, to disguise misrepresentations of current and existing fact as forward-looking statements eligible for protection under the safe harbor. *See, e.g., In re Towne Servs., Inc. Sec. Litig.*, 184 F. Supp. 2d 1308, 1320 (N.D. Ga. 2001) ("An otherwise actionable omission concerning past or present problems, however, cannot be sanitized by forward-looking statements about similar problems").

Indeed, courts have consistently held that where purportedly forward-looking statements are based on existing facts that render those statements false and misleading, they are not protected under the PSLRA's safe harbor. *See Scientific-Atlanta*, 239 F. Supp. 2d at 1356 (holding safe harbor not applicable because "[d]efendants… had access to adverse information about the business, finances, markets, *and present and future prospects* of [Scientific-Atlanta] during the class period") (emphasis added); *see also Towne Servs.*, 184 F. Supp. 2d at 1320-21 ("The plaintiffs do not contend that the statements in the prospectus are false or misleading because of later events, but rather, that they are false or

misleading because of events that had already occurred.... A claim of this type is not barred by the safe harbor for 'forward-looking' statements or the 'bespeaks caution' doctrine").

In *In re Premiere Techs. Inc*., 2000 WL 33231639, at *17 (N.D. Ga. Dec. 8, 2000), the court recognized the distinction between a valid forward-looking projection made in the absence of fraud, and a "projection" based on misrepresentations of current fact, holding that "[t]he statements about Premiere's *projected* success in integrating Voice-Tel and offering local access to its services were allegedly false and misleading due to *existing* problems that were omitted from the public statements.   Statements and omissions of past and current circumstances cannot be cured by reference to future difficulties and undetected problems.") (emphasis added).   The court in *In re ValuJet, Inc. Sec. Litig.*, 984 F. Supp. 1472, 1479 (N.D. Ga. 1997) drew the same distinction, finding that "[p]laintiffs [did] not allege that [d]efendants fraudulently announced expansion plans and then failed to follow through on these plans. Instead, [p]laintiffs allege[d] misrepresentation of existing facts."

The Eleventh Circuit has endorsed this logical approach, holding that "a statement about the state of a company whose truth or falsity is discernible *only after* it is made necessarily refers only to future performance." *Harris*, 182 F.3d at

805 (emphasis added).  In other words, a statement is not forward-looking if its accuracy can be determined *at the time it is made*, as Defendants acknowledge. *See* Br. 29 ("statements are plainly forward-looking [when] they implicate possible events and performance in the future, *and* the accuracy of the projections is discernable only at a time *after* its disclosure.") (emphasis added).

Here, Defendants mask their misstatements of existing facts in language implicating the future, then claim they are entitled to safe harbor protection.  Thus, Defendants focus on the term "projecting" in statements such as "[w]e are projecting a double-digit increase for Fall '06," Br. 29, and argue that the statement is "plainly forward-looking because [it] implicates possible events and performance in the future." *Id*., *see also* Green Decl., Ex. 1 (collecting and emphasizing terms such as "plan," "anticipate," "expect").  However, the safe harbor is not so easily invoked – as explained *supra*, Defendants cannot simply use such terms to avoid liability from misrepresentations of *existing* facts – otherwise, defendants have license to avoid 10(b) liability simply by couching all misrepresentations of facts then known to defendants in futuristic language.

Here, Defendants ignore that the Complaint clearly alleges how these purportedly forward-looking statements are misrepresentations and omissions of existing facts, and not "projections." *See, e.g.*, ¶212 (because wholesalers placed

orders several months in advance of actual sale, facts extant at the time of the misstatements established that the OshKosh fall line would be a failure in sales terms); ¶¶213-14 (establishing that Defendants' design strategy for OshKosh was resulting in clothes of poorer quality, with a concomitant slump in advance wholesale orders). Thus, the Defendants' statements about the growth potential and opportunity of OshKosh were false, not because their projections later turned out to be wrong, *Towne Servs.*, 184 F. Supp. 2d at 1320-21, but because those "projections" misrepresented and masked *existing* problems known by Defendants at the time, such as: (1) the loss of customers like Macy's; (2) customers' negative reactions to the Defendants' designs; and (3) weak advance orders that provided *verifiable, empirical evidence* contradicting Defendants' claims of "double digit" growth in bookings. *See, e.g.*, ¶¶212-214, 223, 225, 227, 232, 234, 240, 249, 262, 263. Because the misrepresentations and omissions were based on known existing facts, the Defendants' statements regarding OshKosh's growth potential were demonstrably false *at the time* they were made, and therefore, cannot be forward-looking statements under the PSLRA or the bespeaks caution doctrine. *See Harris*, 182 F.3d at 805; *see also See Gross v. Medaphis Corp.*, 977 F. Supp. 1463, 1473 (N.D. Ga. 1997) ("the statutory safe harbor, like the 'bespeaks caution' doctrine, does not insulate defendants from private securities liability based on statements

that misrepresent historical/hard or current facts.")   Accordingly, Defendants'

citations are inapposite, because those cases involved misrepresentations that were

not misrepresentations of then-current fact, and were not verifiable by extant

information. *See, e.g.*, *Amalgamated Bank v. Coca-Cola Co.*, 2006 WL 2818973,

at *6 (N.D. Ga. Sept. 29, 2006), Br. 30 (finding statements regarding whether

company was "well positioned" incapable of verification by then-current facts.).

### 1.   Defendants Ignore the Then-Current Facts and Misleadingly Focus on Numerical "Projections"

In an effort to deflect the proper analysis, *supra*, of whether the safe harbor

applies, the Defendants claim that their purportedly forward-looking statements

"were consistent with the known facts and…proved to be accurate."  Br. 14, 37.

Defendants, however, focus only on Carter's numerical projections.   Although

Defendants correctly observe that the "Complaint *completely ignores* the actual

numerical forecasts of OshKosh's 'growth prospects,'" *id.*,  they proceed to detail

how those numerical forecasts were "accurate," even though (as they recognize)

the numerical forecasts are *not* the basis of the alleged misrepresentations.

Plaintiffs, however, "are the master of their complaint," and the Defendants

may not rewrite the Complaint to suit their ends.  *See In re Initial Pub. Offering*

*Sec. Litig.*, 241 F. Supp. 2d 281, 332 (S.D.N.Y. 2003).   As shown in the chart

below, the Complaint clearly alleges that Defendants' misrepresentations centered

*not* on their numerical projections, but on the growth opportunity presented by OshKosh.    Specifically, the Defendants falsely touted that opportunity by misleadingly stating that advance bookings showed large increases, when the opposite was true.    The Defendants also deliberately stated that their redesigned line was being well received by customers, again when the opposite was true at the time the statement was made.[18]

| Statement | Allegations Establishing Falsity Based On Known Current Facts |
|---|---|
| ¶222:  We feel the brand has a billion dollar potential….Fall '06 product is materially better but holiday '06 and Spring and Fall of next year will move well ahead of Fall '06. | ¶¶212-214, 224:  showing Defendants knew from advance wholesale orders and customer feedback that upcoming lines were not "materially better", but, in fact, lower in quality and design. |
| ¶224:  Most importantly we significantly upgraded the product for Fall '06. …<br><br>We are projecting a double-digit increase for Fall '06.  All the orders are due by the end of the month [February]. | ¶¶212-214:  showing Defendants knew from advance wholesale orders and customer feedback that upcoming lines were not "significantly upgraded," but, in fact, lower in quality and design. Defendants also knew from advance wholesale orders that sales would decrease, not increase by "double digits." |

---

[18] Defendants    demonstrate    their    understanding    of    these    allegations, acknowledging that "Plaintiffs rely primarily on statements looking months ahead not even to sales, *but to bookings* for potential future sales of the Spring and Summer 2007 product lines,"  Br. 20 (emphasis added), which only underscores their blatant recasting of Plaintiffs' claims.

| | |
|---|---|
| ¶226:  Yes, Fall '06, like I said, we have a double-digit increase planned for the wholesale line. We would anticipate the same for holiday…. We had good, very good customer feedback. We placed the product in the accounts we wanted to place it in so we feel very good about that…. | ¶¶212-214:  showing Defendants knew from advance wholesale orders that there would be no "double-digit increase." Customer feedback was poor, reflecting the deterioration in quality and design, and leading Carter's accounts, including JC Penney and Kohl's, had difficulty with the price point. |
| ¶228:  We've made significant changes to Oshkosh's business. We've stopped the decline in earnings and we have begun rebuilding Oshkosh to the profitable growth business that it was not that long ago.…  The more powerful story is the second half of the year, again, exclusive of these off price customers, we're planning double digit growth in the wholesale busines….What we love about Oshkosh it's going to enable us to continue putting up good revenue and earnings growth numbers for the foreseeable future… | ¶¶212-214:  showing Defendants knew from advance wholesale orders and customer feedback that earnings would decrease, not increase by "double digits," and that OshKosh would not be profitable.  Contrary to "getting good support for the product," customer feedback was poor and reflected the deterioration in quality and design. |
| ¶231:  [W]e continue to make progress with the OshKosh integration and are encouraged by our results.  As you know, we recently finished booking fall, 2006 and are in the middle of booking holiday, 2006…. We have received excellent feedback from our accounts, and we're building that into our future lines…..Every season is getting stronger as OshKosh -- as we | ¶¶212-214, 242:  showing Defendants knew from advance wholesale orders and customer feedback that upcoming lines had not received "excellent feedback," but was poorly received because of the deterioration in quality and design, and that wholesale orders indicated a decrease in sales. In addition, Carter's accounts like JCPenney and Kohl's were having difficulty with the price point, and at |

| | |
|---|---|
| refine the product mix and pricing strategy, narrow the complexity and begin to experience the benefits of our joint leverage. | least one leading account, Macy's, had opted not to carry the Fall line at all. |
| ¶238:  [Orders for Spring] will be due mid-August and we are receiving a very positive reaction from our key accounts and we will project double-digit growth in the spring '07 bookings. | ¶¶212-214, 242:  showing Defendants knew that their new OshKosh designs were received poorly by their accounts, including Macy's.  Advance wholesale orders also indicated sales would decrease, and that there could be no "double digit growth." |
| ¶239:  In terms of OshKosh, that is a 10% to 15% growth business. That is the growth objective for purposes of guidance. Wholesale will be at 10% to 15% growth business…..So there is no question in our mind that OshKosh can be significantly larger business in the wholesale sector. | ¶¶212-214:  showing Defendants knew from advance wholesale orders and customer feedback that upcoming lines were lower in quality and design, and that wholesale orders indicated a decrease in sales. |
| ¶248:  Overall, we are making good progress at OshKosh. I believe we have improved the quality and the profitability of the business. We are consistently improving the product and the price value equation….We made a lot of changes based on fall and it has significantly improved the product by also changing the positioning and pricing for spring '07. Our spring bookings are up 10% in dozens and 3% in dollars. Our summer bookings show further improvement and we are projecting they will be up double-digits. Our customers have provided a lot of positive feedback for our creative expansion of the core items and key | ¶¶212-214:  showing Defendants knew from advance wholesale orders and customer feedback that, contrary to a "consistently" improved product, upcoming lines were lower in quality and design, and that wholesale orders indicated a corresponding decrease in sales.  Further, accounts such as JCPenney and Kohl's were having difficulty with the price point. |

| | |
|---|---|
| priceline. So, we are executing the right strategies in OshKosh. | |
| ¶250:  Now that we have an opportunity to turn the OshKosh business around, that would be the growth vehicle for [Carter's]. | ¶¶212-214:  showing Defendants knew from advance wholesale orders and customer feedback that wholesale orders indicated a decrease in sales, and that OshKosh could not be a growth vehicle for Carter's. |
| ¶262:  [W]e will continue to grow our Carter's business and we will position Oshkosh for bigger things.… Joe Pacifico is president of retail and made significant strides to get that business turned around and also to reposition the Oshkosh brand for continued growth.… Our inventories are in good shape, meaning in addition to rebuilding our retail store deficiencies, which we are catching up, we have no problems with any of our customers. Our supply chain is of high quality. | ¶¶212-214, 242:  showing Defendants knew from advance wholesale orders and customer feedback that sales would decrease, and that OshKosh could not be "reposition[ed]…for continued growth."  Further, the new OshKosh lines were of lower quality and exhibited "fading and shredding," contrary to the assertion that the "supply chain if of high quality." Contrary to the assertion that "we have no problems with any of our customers," accounts like Macy's had decided not to carry the OshKosh line from Carter's. |
| ¶264:  Our spring bookings were up 2% and our summer bookings, which represent close to 15% of our annual business, increased 20 percent over last year.…We still believe the Oshkosh brand has great potential.…summer bookings… increased  20% over last year. | ¶¶212-214:   showing Defendants knew from advance wholesale orders and customer feedback that wholesale orders were down, not "up 20%." |

Defendants make much of the "revised downward guidance" that inevitably – *months* later – followed the initial false booking projection, Br. 38, but that merely establishes how Defendants were able to prolong the OshKosh deception. The Defendants would  issue misstatements about advance bookings, then "adjust downward" months later and, by doing so, bring their sales projections in line with the real booking figures they already possessed months before, thus eking out as much credibility as possible and extending the length of the fraud.  A former Vice President of Investor Relations, who was at Carter's for the entire length of the Class Period, described how this tactic "fed [the investors] a bunch of false hope," because  "the message was we're making a lot of progress. You know, the key accounts love the brand and we're seeing positive traction and we just need another season to learn from the prior season, and so there's always this what-if scenario. I mean there's always the next year's scenario."  ¶217.

Contrary to the Defendants' assertion that the always-belated downward revisions placed their previous falsehoods into "context," and that no "reasonable investor could be misled into thinking that OshKosh's growth prospects were anything but uncertain," Br. 39-40, the same Investor Relations manager confirmed that the market relied on the Defendants' assurances regarding OshKosh's growth, which were repeated after each downward revision – as late as a month before the

final Oshkosh disclosure, the manager received questions from analysts expressing bewilderment at "how we could be so off with OshKosh."   ¶219.

Indeed, for the belated downward revisions to provide relevant "context" to the misstatements relating to booking and customer reaction to the redesigned line, the revisions should have come *at the same time* the statements they were revising were issued, not months later, *after* investors had already relied on managements' misstatements regarding growth potential.  Defendants' argument that a downward revision relating to a *previously issued* statement provides "context" for the *next* false statement of a new "projection," expands the concept of relevant "context" to the point where it becomes meaningless.[19]  *See, e.g.*, Br. 39:

> Now armed with additional information, Carter's once again downwardly revised its guidance for the second half of [2006]….Despite that development, Plaintiffs nonetheless maintain that investors were misled on the call about OshKosh's "growth prospects" – *not, however, about the "second half of 2006," but rather about "spring '07 bookings*."  (Emphasis added).

As Defendants note, the revised downward guidance regarding the previous misstatement of  "double digit increase for Fall '06," ¶224, is not related to the relevant misstatement about "spring '07 bookings," and thus cannot provide any

---

[19] Defendants, in effect, posit the absurd defense that investors should have known not to rely on their falsehoods, even when the investors at the time had no reason to believe Defendants were lying.

meaningful "context" to the new misstatement.  For Defendants to provide true context to their misstatements, they would have to state that each downward revision reflected information known by the Defendants *at the time they made the misstatement* that rendered it false when made.  In other words, they would have to admit to a deliberate misrepresentation, which would then give investors grounds for not believing the *next* misrepresentation.  Clearly, the Defendants did not issue such a clarification during the Class Period.  Instead, as the former Vice President for Investor Relations observed, the Defendants were exploiting investors' hopes for the next season.  ¶217 ("there's always the next year's scenario.")

## 2.    The Misstatements Were Not Mere Optimistic Puffery

Defendants' argument that the misstatements regarding advance bookings (as opposed to Defendants' preferred sales projections) are not actionable because they are "mere expressions of corporate optimism", Br. 29 n.9, is misplaced. Defendants overlook a crucial qualification in the applicable legal standard: "Subjective characterizations of a company's current performance or predictions about future performance, ***absent a false misstatement of fact***, are generally not actionable."  *Amalgamated*, 2006 WL 2818973, at *3 (emphasis added).

Here, as explained above, Defendants issued rosy statements about the growth prospects and projected booking numbers of OshKosh, as well as customer

64

reception to the new OshKosh lines from Carter's, when they were in possession of advance wholesale orders and customer reactions that made those statements verifiably false. *See* pp. 14-16, *supra*; *see also McBride v. Vision Twenty-One, Inc.*, 2000 WL 33996239, at *4 (M.D. Fla. Aug 21, 2000) (statements "concerning the benefits of the acquisition of Block Vision and [assertions] that [defendants] looked forward to reaping the benefits of the synergies of the combined company" were actionable where [p]laintiff alleged "that [d]efendants made the statement[s] with the knowledge that it was false.")

Defendants cite to cases involving statements about "growth" generally, but ignore that in Carter's specific industry, Defendants were privy to advance booking information (*i.e.*, current facts that were known by Defendants) from wholesale customers that rendered their own statements about growth false when made. Accordingly, under the proper legal standard, Defendants' statements regarding growth are not mere expressions of corporate optimism. *Amalgamated Bank*, 2006 WL 2818973, at *3.

**B.    There Was No Meaningful Cautionary
Language Accompanying the Statements**

As shown *supra*, Defendants' statements were fraudulent misrepresentations of current facts. Thus the "cautionary" language identified by Defendants, Br. 31-

34, wholly fails to warn against the current risks presented.[20]  Although Defendants

argue that the quoted boilerplate language sufficiently warns against the risk of an

eventual goodwill impairment and writedown, they ignore that the core allegations

of the Complaint are not about the future risk of a writedown,[21] but rather about

Defendants' continuing misrepresentations of *current* fact – that the purported

OshKosh "growth opportunity" and "projections" of increased sales did not exist at

the time the Defendants made the statements.

Defendants again rewrite the Complaint to suit their needs, tailoring the

relevant "risk" to their boilerplate cautionary language.  Thus, the Defendants point

to language "warn[ing] of the precise difficulties in the OshKosh integration

process that ultimately came to pass," Br. 32, and that "the risk that OshKosh's

failure to meet anticipated financial performance could impact the carrying value

---

[20] Indeed, even if the misstatements and omissions could be considered forward-looking, which they are not for the reasons given at pp. 51-65, *supra*, they would still not be entitled to protection under the safe harbor provision because: (1) the Defendants had actual knowledge that the statements were false when made, *see* pp. 58-61, *supra*; and (2) there was no meaningful cautionary language, as explained above, warning against the risk that the OshKosh growth opportunity was non-existent.  *See Scientific-Atlanta*, 239 F. Supp. 2d at 1361 (discussing the two conditions that must apply to statements accorded protection under the safe harbor).

[21] The goodwill writedown is related to OshKosh's growth potential only in the sense that the writedown revealed that the OshKosh acquisition was a failure, and hence OshKosh could not be the "growth engine" Defendants had falsely portrayed.  ¶287.

of OshKosh's intangible assets is precisely what came to be."  Br. 34.

However, the Complaint does not assert that Defendants should have taken a writedown sooner (*i.e.*, the Complaint does not make claims relating to "the carrying value of OshKosh's intangible assets"), and does not assert claims based on the OshKosh "integration process."   Instead, Lead Plaintiff alleges that Defendants knowingly misled the investing public by issuing falsely optimistic statements about OshKosh's growth, even when Defendants knew those statements were directly contradicted, when made, by wholesale order figures and advance feedback from wholesale customers.[22]    *See, e.g.,*    ¶¶ 215-220.    However, Defendants failed to convey this material information to the public, and instead, continued to paint a false and misleading picture of OshKosh's "projected" sales and the growth opportunity purportedly represented by those "projected" sales. *See, e.g.*, ¶¶223, 225, 227, 232, 234, 240, 249.  In other words, the relevant "risk"

---

[22] Defendants question, Br. 44 at n. 16, the "materiality of the purportedly concealed information" regarding the advance wholesale figures and customer feedback.  However, the Complaint clearly establishes materiality by alleging corresponding drops in Carter's stock price upon each corrective disclosure relating to the OshKosh aspect of Defendants' fraud, and tying those disclosures to the misrepresentations of OshKosh as a growth engine.  ¶¶ 285-288.  *See United States v. Schiff*, 602 F.3d 152, 172 (3d Cir. 2010) (Where, as here, the stock was traded on an efficient market, ¶296, "the materiality of disclosed information may be measured post hoc by looking to the movement, in the period immediately following disclose, of the price of the firm's stock") (internal citation omitted).

here is the risk that Defendants would issue misstatements rendered false by existing facts, known to the Defendants, at the time they were made.  Not surprisingly, Defendants do not identify any cautionary language regarding such a risk.

The purported cautionary language identified by the Defendants, therefore, is irrelevant to the alleged fraud, and Defendants' reliance on *Harris* is accordingly misplaced.  Br. 34.  There, the cautionary language regarding factors that could affect economic projections did, in fact, relate to the allegedly fraudulent failure to take a timely writedown of goodwill.  *Harris*, 182  F.3d at 804-07.  Similarly, Defendants cannot rely on *Skubella v. Checkfree Corp*, 2008 WL 1902118 (N.D. Ga. Apr. 25, 2008) (Br. 32), because the "projections" here are not really "projections" at all, but misrepresentations of current financial fact.  In sum, any cautionary language regarding either goodwill or the integration process is simply inapposite.

Because Plaintiffs have sufficiently alleged that (1) the Defendants' statements were not forward-looking because they were verifiably false when made; (2) Defendants knew, from then-current facts, that their statements were false at the time they made them; and (3) there was no meaningful cautionary

language regarding Defendants' false "projections," dismissal on safe harbor grounds is not warranted. *See Scientific-Atlanta*, 239 F. Supp. 2d at 1362.

## IV.   The Complaint Properly Relies on Confidential Witness Testimony

This Circuit in *Mizzaro*, 544 F.3d at 1240, endorsed the use of confidential testimony, holding that "confidentiality…should not eviscerate the weight [of the testimony] given if the complaint otherwise fully describes the foundation or basis of the confidential witness's knowledge, including the position(s) held, the proximity to the offending conduct, and the relevant time frame."

Here, Plaintiffs have met the *Mizzaro* standard by specifically identifying the positions held by the confidential witnesses, the time periods in which they were employed, and the basis for the knowledge the Complaint attributes to them:

| CW | Description | Basis for Knowledge |
|---|---|---|
| 1 [¶58] | Former Vice President of Investor Relations who worked at Carter's from 2003 through March 2009 | CW1 reported directly to Casey, and was responsible for interfacing with investors, being the Company's spokesperson and presenting financial results to investors as well as analysts. In this capacity, CW1 attended many of the meetings where the preparation of the financial statements and analyst calls were discussed.  In particular, CW1 was required to attend frequent "budget" or "forecast" meetings, in which CW1 said  "there was [sic] always heated conversations" about accommodations |
| 2 [¶60] | Former Manager of | CW2 analyzed Carter's budgeting |

|  | Financial Analysis at Carter's from October 2006 through December 2008. | models, was responsible (among other things) for the reporting of financials, and helped prepare the presentation "books" of financials given to the Board of Directors at their meetings with management. CW2 reported to the Vice President of Finance, (North was VP of Finance during CW2's last six months at Carter's), who in turn reported to Carter's CFO. Casey was Carter's CFO during CW2's time at the Company |
|---|---|---|
| 3 [¶212] | Former Inventory Control and Cost Account Manager who worked at OshKosh from 1988 through September 2007 and who reported to the former OshKosh CFO | As Manager for Inventory Control and Cost Account, CW3 directly observed the quality of OshKosh inventory and received advance wholesale order information. CW3 would also know Carter's policies and procedures regarding wholesale orders |
| 4 [¶213] | Former Director of Cost Accounting and Budgeting, worked for OshKosh from June 1985, through the acquisition by Carter's, to March 2006 | Would have known about price point strategy and how it was received by Carter's customers, as well as general information about Carter's designs and associated costs |
| 5 [¶213] | Assistant Store Manager who worked at Carter's from November 2005 to March 2008 | In a position to observe quality of OshKosh merchandise and track returns at store |
| 6 [¶214] | Former District Manager for OshKosh from 1998, through the acquisition, to March 2006 | In a position to observe merchandise quality and design, and track return rates |
| 7 [¶253] | Former Senior Vice President in charge of field operations at the regional and district levels from | Was responsible for real estate acquisition and the representative connection between the stores and the corporation for communications, policy |

| | January 2006 through September, 2007 | and pay |
|---|---|---|

Moreover, Lead Plaintiff relies on confidential witnesses only for the substance of their statements, which in each instance is limited to the time and scope of their respective employment.  As shown above, all the confidential witnesses, by virtue of their positions and the times during which they were employed, had more than sufficient basis for making their statements.  Therefore, this Court must accord the statements the appropriate weight.  *Mizzaro*, 544 F.3d at 1240; *see also Makor Issues & Rights, Ltd. v. Tellabs Inc*., 513 F.3d 702, 712 (7th Cir. 2008) ("*Tellabs II*") (the confidential witnesses "from the description of their jobs were in a position to know at first hand the facts to which they [were] prepared to testify, such as the returns of the [product], [and] that sales of the [product] were dropping off a cliff while the company pretended that demand was strong….").  Further, courts accord greater weight to testimony that is corroborated from multiple sources, as several facts are here.  *See Tellabs II*, 513 F.3d at 712; *see, e.g.*, ¶¶212-214 (CWs 3 and 4 separately observing that Carter's-designed OshKosh lines were lower in quality and durability.)

Thus, because the confidential witnesses here have a sufficient basis for "the facts to which they are prepared to testify," "the absence of proper names does not

invalidate the *drawing of a strong inference* from informants' assertions." *Tellabs II*, 513 F.3d at 712 (emphasis added).

**A.    Confidential Testimony Demonstrates Defendants'
Knowledge of Facts Relating to the OshKosh Misrepresentations**

Defendants attack the confidential witness testimony supporting the OshKosh aspect of Defendants' fraud, claiming "that not one confidential witness advances any particularized fact that was communicated to or known by any OshKosh Defendant that rendered a forward-looking statement false." Br. 42. This argument ignores CW1, who as Vice President of Investor Relations (for the duration of the Class Period) was a senior-level employee with direct and daily interactions with the Defendants (especially Casey). ¶58. CW1 detailed Defendants' knowledge that their redesigned OshKosh line was a failure months in advance of their public "projections." ¶216 ("once the Fall sell-through started to come through, that's when everyone realized that there was issues….Mike [Casey] and Fred [Rowan] realized that all of the representations were probably off, and there was lots of heated debate and finger pointing.") This argument also ignores CW1's detailed testimony regarding how CW1 was instructed to sell a message of "false hope" to unsuspecting investors promoting the OshKosh growth opportunity, ¶217, including CW1's expressed discomfort at the request. ¶218 ("And I reported to [Rowan and Casey], but you know there's an ethics part behind

it as well…you got a whole bunch of other legal issues where I can't just come out and say, look the business sucks.")

Defendants further argue that CWs 3, 4, 5, and 6 were "low-level" employees who had no "direct personal knowledge of OshKosh's business as a whole, much less Carter's company-wide financial forecasts for OshKosh."  Br. 42-43.  However, the Complaint does not offer this CW testimony on "OshKosh's business as a whole," or on the Company's "financial forecasts," rendering cases such as *Alaska Elec. Pension Fund v. Adecco S.A.*, 434 F. Supp. 2d 815, 825 (S.D. Cal. 2006), Br. 42, inapposite.  Instead, the Complaint offers their testimony on matters of which they had direct personal knowledge, such as the lesser quality of the Defendants' OshKosh redesign, and the impact on sales that they directly observed, precisely because of their positions.[23]    ¶¶212-214, pp. 69-71, *supra* (outlining bases for such personal knowledge); *see also Marsden v. Select Med. Corp.*, 2006 WL 891445, at *14 (E.D. Pa. Apr. 6, 2006) (vacated in part on other grounds) ("For example, while regional billing specialists might not have national

---

[23] Defendants assert that testimony regarding the negative customer reaction to OshKosh's design should be discounted because the CWs did not specifically detail customers' reactions.  Br. 45.  However, Defendants ignore that these CWs, are the exact "low-level" employees who would have *direct* interaction with customers (*e.g.*, CWs 3, 4 and 5), and who could observe the corresponding impact on sales, and thus have a legitimate first-hand basis for their assertions regarding Defendants' redesigned OshKosh merchandise.

statistics regarding customer retention, it is plausible that they were privy – and likely subject – to billing policies, and aware of billing trends.")  Moreover, the testimony is corroborative, which lends it greater weight.  *Tellabs II*, 513 F.3d at 712; *Marsden*, 2006 WL 891445, at *14.

Indeed, it is of no moment that CWs 3, 4, 5, and 6 had no interaction with the Defendants, because none of their testimony relies on such interaction, nor does their testimony assert that the confidential witnesses "knew" what the Individual Defendants "knew."  Rather, the testimony alleged, when evaluated holistically with the entire Complaint, permits the "*drawing of a strong inference*" regarding the Defendants' knowledge of the facts underlying the OshKosh claims. *Tellabs II*, 513 F. 3d. at 712.

### B. Confidential Testimony Demonstrates That Defendants Knew Accommodations Were Manipulated

Defendants' efforts to undermine CW1's credibility also fail.  CW1, a high-level employee who interacted daily with Defendants, particularly Casey (one of the chief architects of the accommodations fraud, ¶68), offers particularized testimony, based on CW1's first-hand knowledge, that demonstrates Defendants knew that accommodations were being manipulated, and the Company's core financials "smoothed."  Defendants argue that this detailed testimony is somehow insufficient because CW1 "was terminated by Carter's," asserting that "allegations

from former employees who may have an axe to grind must be steeply

discounted." Br. 80. Defendants rely[24] on *Higginbotham v. Baxter Int'l, Inc.*, 495

F.3d 753, 757 (7th Cir. 2007), a case later discredited by the same circuit. *See*

*Tellabs II*, 513 F.3d at 712 (clarifying that the weight awarded anonymous sources

largely depends on the detail provided about those sources.)  Other circuits have

also discredited *Higginbotham*. *See, e.g., Institutional Investors Group v. Avaya,*

*Inc.*, 564 F.3d 242, 262 (3d Cir. 2009):

> Other courts, however, have qualified Higginbotham's
> strong skepticism of confidential sources. The Seventh
> Circuit itself distinguished Higginbotham in *Tellabs II*….
> *Tellabs II* apparently circumscribes Higginbotham's
> broad  pronouncement  that  confidential  witness
> allegations  will  "usually"  be  steeply  discounted,
> clarifying that the weight accorded to anonymous sources
> will depend in large part on the level of detail with which
> they are described.

The court in *In re Thornburg Mortgage, Inc. Sec. Litig.*, 2010 WL 378300,

at *5 n.11 (D.N.M. Jan. 27, 2010) further explains why Defendants' logic, and

*Higginbotham*'s, is flawed:

> *"When a complaint is filed, a court has no way of*
> *knowing whether even named witnesses have axes to*
> *grind, are lying, and/or exist; indeed, the Court has to*

---

[24] The other case cited by Defendants, *In re Cabletron Sys. Inc.*, 311 F.3d 11
(1st Cir. 2002), Br. 80, actually supports Plaintiffs' allegations, holding that
"consistent accounts reinforce one another."  *Id.* at 32.  *See also Tellabs II*, 513
F.3d at 712.

> *assume what named witnesses say is true when ruling on*
> *a motion to dismiss.* Nevertheless, the Court will decide
> what weight to give such statements [from confidential
> sources] based upon the information the Plaintiffs give
> about the source and the detail of the information.
> (Emphasis added).

Thus, rather than speculating on whether a CW has a proverbial axe to grind (which, as the *Thornburg* court observed, is not necessarily limited to anonymous sources), the majority of the courts (including this Circuit in *Mizzaro*) will instead look to the particularity with which the CW is described, and the corresponding basis for his or her knowledge. Here, as explained *supra*, p. 69, CW1 was a Vice President of Investor Relations throughout the Class Period, who interacted daily with Defendants and investors, and was involved in numerous executive-level meetings where accommodations were a frequent topic of discussion.

Defendants' generalized argument that CW1's allegations are facially deficient, Br. 80, because "CW1's assertions are based on unreliable hearsay rather than personal knowledge," discounts those assertions that are clearly based on CW1's personal interactions with Defendants. *See, e.g.*, ¶217 (describing how CW1 received instructions from Rowan and Casey to promote false OshKosh growth story); ¶69 (describing Casey and North's reactions in budget meetings CW1 attended.) Moreover, courts do not automatically dismiss allegations

containing some element of hearsay. In *Marsden*, 2006 WL 891445, at *13, the

defendants made a very similar hearsay argument that the court rejected:

> Defendants argue that various confidential witnesses lacked personal knowledge of any alleged wrongdoing, and can, at most, repeat "hearsay" in support of Plaintiffs' claims. Defendants, however, present no legal authority for the categorical exclusion of second-hand knowledge. Although the *Chubb* court [Br. 78-79] admonished the plaintiffs in that case for failing to describe whether alleged knowledge was first- or second-hand, the court did not establish that all testimony of the latter sort was inherently insufficient. *Chubb*, 394 at 150. Rather, the type of "rumors and speculation" deemed categorically insufficient under *Chubb* consisted of statements "attributed to no source...." *Id*. at 155. *Because the confidential witness information at issue here is attributed to specific sources and does not leave to speculation whether the information was first-or second-hand, it cannot be categorically rejected as insufficiently plead*. (Emphasis added).

Courts also recognize that high-level employees often are approached by

lower-level employees who wish to relate problems, distinguishing this type of

hearsay from "rumor." *See, e.g.*, *In re Am. Serv. Group, Inc.*, 2009 WL 1348163,

at *58 (M.D. Tenn. Mar. 31, 2009) ("statements of former vice presidents are

permissible to describe the information they personally related to Catalano about

problems at sites where they were personally responsible for overseeing

operations…*Hearsay is a sufficient basis on which to allege such facts in a

complaint*.") (emphasis added).

Here, as in *Marsden*, CW1's alleged hearsay is always attributed to a source, "and does not leave to speculation whether the information was first-or second-hand." 2006 WL 891445, at *13; *see, e.g.,* ¶71 ("I was told by certain people *in Sales*…"). In other words, it is clear when CW1 is relaying information CW1 obtained from others, and when CW1 is speaking from personal experience. Accordingly, CW1's hearsay testimony "cannot be categorically rejected as insufficiently plead." Moreover, because CW1 was a high-level employee, it is less likely that CW1 is merely rumor-mongering, and much more likely that CW1 did, indeed, have conversations with lower-level employees about their concerns with management. *Am. Serv. Group,* 2009 WL 1348163, at *58.

The Individual Defendants also attack the particularity of the confidential witness statements, asserting that they do not allege "who in upper management instructed sales people to commit fraud." Ind. Defs. Br. 19. On the contrary, CW1 notes "Casey would instruct senior sales people to rebook the accommodations in order to make the numbers for that particular quarter" and that "Casey would often use North to instruct the sales people on improperly rebooking their accommodations." ¶72. Similarly, CW1 describes how accommodations payments made to JC Penny and Belks were improperly booked in fall of 2006, ¶96, belying the inaccurate assertion that Plaintiffs do not allege "*when* the

accommodations were misbooked [or] *which* companies' accommodations were misbooked." Ind. Defs. Br. 19 (emphasis in original).

## V.    The Complaint Adequately Alleges Scienter

In this Circuit, "it is…well-established that § 10(b) and Rule 10b-5 require a showing of either an 'intent to deceive, manipulate, or defraud,' or 'severe recklessness.'" *Mizzaro*, 544 F.3d at 1238.  "Severe recklessness is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *Rosenberg v. Gould*, 554 F.3d 962, 965 (11th Cir. 2009) (internal citation omitted).

"The inquiry… is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 322-23.  Indeed, "allegations of scienter that would not independently create a strong inference of scienter might [complement] each other to create an inference of sufficient strength to satisfy the PSLRA." *Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc.*, 576 F.3d 172, 187-88 (4th Cir. 2009).

In determining whether the pleaded facts give rise to a "strong" inference of scienter, § 78u-4(b)(2), courts must take into account plausible opposing inferences. *Tellabs*, 551 U.S. at 323. "The inference that the defendant acted with scienter need not be irrefutable, i.e., of the 'smoking-gun' genre, or even the 'most plausible of competing inferences'….but it must be more than merely reasonable or permissible." *Id*. at 324. (internal citations omitted). Moreover, a "lack of direct evidence connecting the defendants to the alleged fraud is not fatal, because plaintiffs may create a 'strong inference' of scienter by circumstantial evidence alone." *Mizzaro*, 544 F.3d at 1249 (citing *Tellabs*, 551 U.S. at 324). A complaint will survive if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference possibly drawn from the facts alleged. *Tellabs*, 551 U.S. at 324. Thus, on a motion to dismiss, it is the defendant's burden to demonstrate that the allegations give rise to an inference of non-culpable conduct that is *stronger* than the inference of scienter. *Id.* In other words, "a tie goes to the plaintiffs in terms of competing inferences." *Teamsters Local 617 Pension & Welfare Funds v. Apollo Group, Inc.*, 633 F. Supp. 2d 763, 792 (D. Ariz. 2009).[25]

---

[25] The Individual Defendants argue that Plaintiffs do not articulate a theory of scienter "that does not have at least an equally-plausible, non-culpable opposition

A.    **The Complaint Pleads Actual**
      **Knowledge By Defendants of Their Scheme**

With regard to accommodations, the Complaint describes how Defendants,

in particular Casey and North, fraudulently manipulated the booking of

accommodations in order to "smooth" the Company's earnings over an

extraordinarily long period of five and a half years.

CW1, who was present at budget meetings with the Defendants throughout

this period because of CW1's role as Vice President of Investor Relations,

observed that on at least one specific occasion, Defendants booked

accommodations in a later time period because they were concerned with meeting

year-end guidance, even though several of Carter's key accounts had asked for the

accommodations in prior periods.    ¶96 (In CW1's words, JC Penney and Belks

"asked for more money due to poor Fall performance but [accommodation]

expenses was [sic] booked" in later periods.")    CW1 also relayed information

_____

inference of non-fraudulent intent," and imply such circumstance would require
dismissal.    Individual Defs. Br. 17.    This argument misstates the applicable
standard: if Plaintiffs' allegations create an inference of scienter that is "equally-
plausible," *id*., to an opposing inference of non-fraudulent intent, Plaintiffs have
demonstrated there is "*at least* a fifty-fifty chance that the individual defendants
knew about the alleged fraud" and have properly alleged scienter.    *Mizzaro*, 544
F.3d at 1249 (emphasis added); *see also Apollo*, 633 F. Supp. 2d at 792 ("a tie goes
to the plaintiff[s] in terms of competing inferences.")    The Individual Defendants
repeat this error elsewhere in their brief.    *See, e.g.* Individual Defs. Br. 21 (arguing
"allegations cannot support a strong inference of scienter because there are equally
plausible, non-fraudulent inferences that can be drawn" from allegations).

given to CW1 by the sales department that they had been instructed specifically by Casey and North to improperly book accommodation payments. ¶¶71-72. As explained *supra*, pp. 76-78, this type of "hearsay" is accepted by courts because it is coming from a high-level employee, who has clearly identified the source of the information and is much less likely to spread idle rumor.

CW2 further testified that the Defendants "all knew what was going on. Every single executive." ¶73. CW1 also identified and provided a detailed description of a particular document, the "flux balance sheet," that was prepared every quarter and provided to every Individual Defendant (including Whetzel and Rowan), and which clearly showed large discrepancies in accommodation payments from one customer account to another.[26] ¶129.

Bolstering the evidence of direct knowledge are allegations that Casey "was the sole person responsible for the accounting and he was pretty tightly in control of that along with Andy North," ¶66, and that "there wasn't a thing that was done from a finance perspective without [Casey] reviewing it, editing it and approving it." ¶64. Further, "Casey ran the internal accounting group that actually calculated the numbers for the Company's SEC filings," ¶66, and North "[was] the one that

---

[26] That the Individual Defendants monitored the Company's accommodation payments is corroborated by CW2, who testified that all the top Carter's executives had access to the master spreadsheet detailing the accommodations. ¶63.

[ran] all of the auditing and [gave] the direction to auditing." ¶61. Thus, although

Defendants attack CW1 for having no "understanding of Carter's accounting

treatment for accommodations," Br. 82, the Complaint does not offer CW1 as an

expert on Carter's accounting practices. However, CW1 could, and did, testify as

to the roles, explained *supra*, that Casey and North played in the accommodations

scheme.[27]

　　　　*Collectively*, these detailed allegations demonstrate that the Individual

Defendants knew the accommodations were improperly booked. *See Tellabs*, 551

U.S. at 322-23 ("The inquiry… is whether all of the facts alleged, *taken

collectively*, give rise to a strong inference of scienter"); *see also Aldridge v. A.T.

Cross Corp.*, 284 F.3d 72, 83 (1st Cir. 2002) ("[T]that the defendants published

statements when they knew facts suggesting the statements were inaccurate or

misleadingly incomplete is classic evidence of scienter.")

　　　　Regarding the OshKosh deception, the Complaint also establishes actual

knowledge. Defendants claim that the Complaint only contains "conclusory 'must-

have-known' allegations," Br. 48, but quote only a handful of paragraphs and

---

[27] Moreover, both Casey and North were former employees of PwC. ¶11.
Accordingly, Defendants may not assert the Complaint fails to allege that
*Defendants* "had any knowledge of the accounting principles relating to" the
accounting rules they are accused of violating. *Rosenberg v. Gould*, 554 F.3d 962,
966 (11th Cir. 2009).

ignore numerous detailed allegations describing Defendants' awareness of the OshKosh growth fabrication.

For example, CW3 stated that the Defendants received specific information, no later than the summer of 2006, demonstrating that the Defendants knew the public representations they made about OshKosh were false. ¶212. CW1 provided corroborating testimony that Casey and Rowan knew of the problems with OshKosh around that same time, describing how the "Fall sell-through" alerted the Defendants months in advance that their redesigned line for Fall 2006 would be a failure. ¶216. Speaking from personal knowledge, CW1 further relayed how Rowan and Casey specifically instructed CW1 to make public representations concealing these problems. ¶217; *see also* ¶218 (CW1 expressing ethical discomfort with their instruction). And, because CW1 was present at budget meetings, CW1 knew that prior to at least the October 25, 2006 earnings call, "management discussed [OshKosh growth] in-depth and made the decision to make statements *that were not supported by the current budget or orders by the wholesale channel*." ¶250. These detailed allegations are anything but the "conclusory" allegations of scienter on which the Defendants argue the Complaint

is based.[28]

## B.    The Complaint Establishes Defendants' Recklessness

In addition to the specific allegations demonstrating actual knowledge of the entire scheme by Defendants, the Complaint also establishes, at the very least, Defendants' recklessness.

### 1.    Core Operations

As key executive officers, the Individual Defendants are deemed to have known of both the manipulation of accommodations, and the OshKosh growth deception through the core operations doctrine.  The core operations doctrine holds that "if the subject-matter of the alleged misstatements is sufficiently 'significant' to a defendant company, it may be possible for knowledge of contradictory information (and thus, scienter) to be imputed to individual defendants *even in the absence* of specific information contradicting their public statements."  *In re eSpeed, Inc. Sec. Litig.*, 457 F. Supp. 2d 266, 293 (S.D.N.Y. 2006) (emphasis added); *see also In re Friedman's, Inc. Sec. Litig.*, 385 F. Supp. 2d 1345, 1363

---

[28] Defendants cite to a string of cases regarding knowledge about asset impairment, Br. 49 at n. 17, which are completely irrelevant to the Complaint's allegations describing how Defendants knew their misstatements of OshKosh's growth prospects were false when made.  The Complaint does not allege, despite Defendants' strained attempts to rewrite it, that Defendants should have known about OshKosh's asset impairment, or that the goodwill associated with the acquisition should have been written down sooner.

(N.D. Ga. 2005) (denying motion to dismiss where plaintiffs alleged controller's position demonstrated his knowledge of adverse facts affecting important business segments); *Towne Servs.,* 184 F. Supp. 2d at 1325 (imputing knowledge of facts relating to core operations of company to company's key officers).

As the court in *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 489 (S.D.N.Y. 2004) explained:

> [I]f facts that contradict a high-level officer's public statements were available when the statements were made, it is reasonable to conclude that the speaker had intimate knowledge of those facts or should have known of them. Accordingly, if a plaintiff can plead that a defendant made false or misleading statements when contradictory facts of critical importance to the company either were apparent, or should have been apparent, an inference arises that high-level officers and directors had knowledge of those facts by virtue of their positions with the company.

Accordingly, the Individual Defendants are not entitled to "ignore reasonably available data that would have indicated that [public] statements were materially false or misleading." *Id*. at 491. As explained *supra*, pp. 14-16, Defendants were in possession of existing facts about OshKosh demonstrating that customer reaction to their redesigned lines was negative, and sales from advance wholesale orders were down. As high-level officers of the Company, the Individual Defendants may not claim ignorance of facts such as the "Fall Sell-

through," *supra* pp. 15-16, that made their misstatements materially false and misleading. Further, the OshKosh segment involved core Carter's operations – namely, the design and sales of children's clothing.[29]  Accordingly, the Individual Defendants were, at the very least, reckless with regard to the OshKosh claims.

Moreover, this Circuit has explicitly recognized that "certain types of fraud…undeniably *require* the participation of senior management." *Mizzaro*, 544 F.3d at 1249 (emphasis added).  Courts have repeatedly drawn the inference that facts critical to a business's core operations generally are so apparent that their knowledge may be attributed to the Company and its key officers. *See Schultz v. Applica Inc.*, 488 F. Supp. 2d 1219, 1226 n.3 (S.D. Fla. 2007) (imputing to CEO knowledge or reckless disregard of GAAP violations in key segment of company).

Cases in this Circuit construing *Mizarro* come to a similar conclusion.  *See, e.g. Rosky v. Farha*, 2009 WL 3853592, at *5 (M.D. Fla. Mar. 30, 2009) (scienter supported by allegations that "'nothing within the Company' occurred without the knowledge of executive management,' that Individual Defendants 'knew and controlled everything that was going on,' and that…senior management…were

---

[29] *See, e.g.*, ¶196 (Carter's May 10, 2005 press release stating "[w]e are excited to combine two of America's most trusted children's apparel brands…. This investment is a vehicle for long-term growth and provides an opportunity to increase our share of the baby and young children's apparel market.")

'well aware of and encouraged' the unsound business practices which form the basis of Plaintiffs' allegations."); *Hubbard v. BankAtlantic Bancorp, Inc.,* 2009 WL 3261941, at *1 (S.D. Fla. May 12, 2009) (confidential witness allegations that individual defendants "knew, or were reckless in not knowing, about [fraud] because they were at meetings where such deficiencies were discussed and regularly received reports…detailing such deficiencies during the Class Period" support scienter).

Here, because the manipulation of the accommodation payments required the participation of senior management, the Individual Defendants (all senior managers) were, at the very least, reckless.  The smoothing of the Company's core financials through manipulation of the accommodations occurred over a period of almost *six years*, ¶7, and resulted in repeated falsifications in Carter's SEC reports that were signed by Rowan and Casey.  ¶9.  Moreover, the Complaint establishes that the flux balance sheet, as well as the master spreadsheet detailing accommodation payments, were all made available to the Individual Defendants, and that "there wasn't a thing that was done from a finance perspective without [Casey] reviewing it, editing it and approving it."  ¶¶63, 64, 129.  Further, Pacifico admits that he "was involved in setting up accommodations, they are a fundamental part of the retail business."  Pacifico Br. 2.  Given the nature and

length of the fraud, it strains credulity to assert that senior management was not involved. *Cf. Hubbard*, 2009 WL 3261941, at *3 n.6 (complaint alleging defendant was "responsible for determining, reviewing and monitoring loan loss reserves" made it "reasonable that a person would think that [defendant] either knew or was reckless in not knowing that the loss reserves were materially understated and being manipulated."); *In re Northpoint Commc'ns Group, Inc., Sec. Litig.*, 221 F. Supp. 2d 1090, 1104 (N.D. Cal. 2002) (strong inference of scienter when allegations of fraud "speak to practices falling neatly within [individual defendants'] presumptive bailiwicks.")

In other words, the manipulation of the Company's core financials "simply [could not] be carried out by low-level employees acting on their own." *Mizzaro*, 544 F.3d at 1249. The proposed "opposing inference," Ind. Defs. Br. 18 – that the manipulation of accommodations was perpetuated by rogue salespeople – is not as compelling as the inference that the Individual Defendants, given their integral roles in the Company, knew, or were severely reckless in not knowing, that the core financials of the Company (including net sales) were materially misstated for nearly six years. *Tellabs*, 551 U.S. at 314; *see also Atlas Air*, 324 F. Supp. 2d at 496 (discussing roles of CEO and CFO and that they made public statements and signed SEC filings as evidence of scienter); *Berson v. Applied Signal Tech., Inc.*,

527 F.3d 982, 988-89 (9th Cir. 2008) ("[CEO] Yancey and [CFO] Doyle were directly responsible for Applied Signal's day-to-day operations…so it is hard to believe that they would not have known about stop-work orders that allegedly halted tens of millions of dollars of the company's work...it would be 'absurd to suggest' that top management was unaware of them."). There is simply no rational reason to believe that salespeople – who solely "focus in on…getting the orders," ¶70, would have the motive or ability to orchestrate the multi-year manipulation of accommodations.

### 2.    Rowan and Casey's Certification of Carter's Financial Statements Establishes Recklessness

Plaintiffs properly allege both Rowan and Casey certified the accuracy of Carter's financial statements during the Class Period. ¶34, 36. Allegations that an individual signing a Sarbanes-Oxley certification "'had reason to know, or should have suspected, due to the presence of glaring accounting irregularities or other 'red flags,' that the financial statements contained material misstatements or omissions'" are independently sufficient to establish scienter. *Mizzaro*, 544 F.3d at 1252 (citation omitted).

As explained above, Rowan and Casey had "reason to know," under the core operations doctrine, of the accounting irregularities in the Company's core financials. Moreover, contrary to Defendants' assertions that the Complaint

alleges no "red flags," Br. 85, multiple "red flags" would have put Rowan and Casey on notice of the financial smoothing through the manipulation of accommodations, including: (1) grossly overstated accounts receivable, ¶174; (2) material overstatement of earnings, ¶102;[30] (3) material weaknesses in Carter's internal controls, ¶¶58-63; and with respect to Rowan, a wholly inappropriate relationship between Casey and North, and PwC, that undermined any meaningful independence by the Company's outside auditor. ¶94. Indeed, these same factors led North's replacement, Westenberger, to uncover the accommodations manipulations only a few short months after being hired.

Although Defendants try to downplay the significance of the overstated A/R (one of the biggest red flags of the fraud), and accuse Plaintiffs of "[picking] the metric that will yield the highest percentage values, which is a pleading strategy that adds nothing to the inference of scienter," Br. 85 n.31, it is Defendants that are artfully selecting the most convenient metric to hide evidence of their scienter. A/R, far from being an irrelevant metric, represents the amount outstanding from a completed sale. Therefore, it not only directly affects the Company's liquidity (meaning it is a core financial metric certain to be tracked by management), but it

---

[30] *Rosky*, 2009 WL 3853592, at *6 (Sarbanes-Oxley certifications probative of scienter when company later restated earnings).

also immediately reflects any manipulation of accommodations, which ordinarily would reduce the amount outstanding from the sale.  *See* ¶76.

Moreover, because of the nature of "smoothing," whose purpose is not so much to inflate earnings as it is to manipulate those earnings in order to give the impression of consistent financial success, net earnings – the metric Defendants would use – actually hides the impact of the manipulation because it looks at the *cumulative* effect on earnings, as opposed to the *periodic* effect that would reveal the manipulation.  *See* ¶114.  For the same reason, Defendants misleadingly focus on the wrong "motive" when they argue that "a motive to inflate earnings by a mere 3% over half a decade is facially implausible."  Br. 9.

### C.   The Complaint's Allegations of Motive and Opportunity Further Support Scienter

As shown below, the Complaint establishes that the Defendants had ample motive and opportunity to commit their fraudulent scheme.  Although Defendants erroneously urge this Court to consider these allegations "on their own," Br. 86, when properly considered *collectively* with the allegations demonstrating that Defendants either knew, or were severely reckless in not knowing about their scheme, pp. 81-91, *supra*, these additional allegations of motive and opportunity further support a strong inference of scienter here.  *Tellabs*, 551 U.S. 308, 322-23; *see also Mizzaro*, 544 F.3d at 1238-39 (a court must "'consider the complaint in its

92

entirety'"); *Edward J. Goodman Life Income Trust v. Jabil Circuit, Inc.*, 595 F.

Supp. 2d 1253, 1272 (M.D. Fla. 2009) ("motive and opportunity to commit fraud

provides circumstantial evidence of severe recklessness.")

### 1.    Each Individual Defendant Had The Financial Incentive To Fraudulently Manipulate Accommodations

Under *Tellabs*, "personal financial gain may weigh heavily in favor of a

scienter inference." *Tellab*s, 551 U.S. at 325.  Each Individual Defendant stood to

profit significantly from manipulating Carter's financials using accommodations.

First, each Individual Defendant stood to receive annual bonuses based on Carter's

earnings, giving them an incentive to manipulate those earnings in order to attain

the requisite performance goals.  ¶¶8, 79-88.  *See In re Paincare Holdings Sec.*

*Litig.*, 541 F. Supp. 2d 1283, 1293 (M.D. Fla. 2008) (fact that "bonuses were tied

to the Company's earnings" indicative of scienter). CW1 testified that Defendants

were especially concerned with meeting these internal earnings targets.  ¶¶12, 105.

Second,  each  Individual  Defendant  also  received  significant  amounts  of

"performance based" stock options that would vest only if the Company's earnings

per share achieved certain growth goals.  ¶93.  Third, each Individual Defendant's

significant insider trading during the Class Period, ¶293, coupled with Carter's

requirement that its named executives "own a certain multiple of their base salary

in Carter's stock," ¶91, provide clear incentive for the Individual Defendants to artificially inflate the value of that stock.

The Defendants' arguments to the contrary are misguided. For example, Carter's characterizes the financial incentives received by the Individual Defendants as meaningless to the scienter inquiry. Br. 86-88. However, Defendants cannot dispute that a significant portion of the Individual Defendants' compensation was premised on earnings the Complaint alleges they manipulated. ¶81. Nor do Defendants dispute that the performance bonuses the Individual Defendants received were sometimes *double* their base salaries. ¶¶80, 88 (listing annual bonuses as high as $2.9M). These excessive incentives give rise to a strong inference of scienter. *See Barrie v. Intervoice-Brite, Inc*., 397 F.3d 249, 261 (5th Cir. 2005) (finding scienter where, *inter alia*, executive "received $597,870 – 175% of his annual salary – as a reward for achieving the Company's targeted revenues and earnings."). Moreover, Defendants' distinction between "internal, non-public performance goals" and "the Company's ability to meet the public guidance…provided to Wall Street," Br. 88, is meaningless – the financial incentive created by tying bonuses to performance goals remains, whether those

goals are internal and/or public.[31]

The inference of scienter in Rowan's case, in particular, is further bolstered because Rowan's bonuses were *also* tied to OshKosh's performance.   ¶202. Defendants attempt to minimize this by asserting that "Mr. Rowan's bonus incentives were triggered by Carter's results, of which OshKosh was only a fraction." Br. 56.  However, Defendants ignore that those significant bonuses (of "$500K in 2005, $1M in 2006, and $1M in 2007") were contingent on Carter's earnings, *as well as* "other *qualitative* performance targets related to the integration of OshKosh, the Company's recently acquired division." ¶202 (emphasis added). Accordingly, Rowan's incentive package further supports his scienter.

Similarly, Defendants' argument that Casey's motivation to commit fraud because he was "vying for the CEO job" is irrelevant, Br. 89, is unconvincing when considered in the totality of the circumstances.   Courts have found that personal ambition provides evidence of scienter.  *See In re Ibis Tech. Sec. Litig.*, 422 F. Supp. 2d 294, 317 (D. Mass. 2006) (finding scienter when company

---

[31] Defendants' motive for appearing to meet Wall Street expectations, on the other hand, was to instill the public's false confidence in management and Carter's performance, enabling  Defendants to further perpetuate the fraud by claiming OshKosh as a growth engine – which the market believed because of management's falsely perceived credibility.  The "growth engine" then had the desirable effect of artificially pumping up Carter's stock price, and the Defendants all profited handsomely by dumping stock at inflated prices. ¶¶4-6, 280-81.

president "understood the significance of the stock offering to Ibis' future and therefore to his own position as head of the company.")

### 2.    Defendants' Insider Trading Supports an Inference of Scienter

"Personal financial gain may weigh heavily in favor of a scienter inference." *Tellabs*, 551 U.S. at 325. The Complaint details the Defendants' sales of more than 1.5 million shares of Carter's stock for proceeds of more than $43 million by July 24, 2007, when the truth about OshKosh was revealed. ¶280. The Defendants' insider sales, which liquidated a substantial amount of each Defendant's total holdings,[32] show that they made a significant proportion of these sales during the period in which they were effusively describing the purported OshKosh growth opportunity and before the whole truth about OshKosh was revealed on July 24, 2007. ¶293. *See In re PSS World Med., Inc. Sec. Litig.*, 250 F. Supp. 2d 1335, 1349 (M.D. Fla. 2002) (scienter established where defendants "knew of or recklessly disregarded the actual finances, markets and present and future business prospects for PSSI, each preferring instead to engage in

---

[32] "By the end of the Class Period, Rowan had sold 1.2 million shares, making a profit of $37 million, which accounted for 33% of his total holdings; Casey had sold 163,000 shares (profit of $4.5 million) accounting for 22% of his holdings; Pacifico had sold 190,000 shares (profit of $5.1 million) accounting for 29% of his holdings; and Whetzel had sold 307,000 shares (profit of $8 million) accounting for 44% of his holdings. ¶293.

misrepresentations in an effort to artificially inflate the stock price.").  That the Defendants profited handsomely from their scheme to (1) foster false confidence in the Company and management by smoothing earnings and making Carter's appear to be more consistently successful than it really was, ¶4; and (2) preying on that false investor confidence by falsely portraying OshKosh as a "growth engine" for Carter's, is strong support for Defendants' scienter.[33]

### (a)   The Individual Defendants' Retention of Some Shares Does Not Eliminate the Inference of Scienter

Defendants argue that the percentage of shares they sold does not support a showing of scienter, because Defendants sold "less than half" of their total holdings.  Br. 51.  But courts have held that trades of similar magnitude – Rowan's sales of 33% of his holdings, Casey's sale of 22% of his holdings, Pacifico's sale of 29% of his holdings, and Whetzel's sales of 44% of his holdings – contribute to a strong inference of scienter, as such trades are "not insignificant percentages." *See, e.g., In re Oxford Health Plans, Inc. Sec. Litig.*, 187 F.R.D. 133, 140 (S.D.N.Y. 1999) (finding strong inference of scienter for sales of as low as 11% of

---

[33] Although Defendants argue that such insider trading is insufficient to establish scienter, standing alone, Br. 10, the trades are nevertheless compelling evidence of scienter when viewed in conjunction with the Individual Defendants' actual knowledge of the OshKosh fraud, and with the allegations that Rowan stood to receive bonus payments specifically tied to the OshKosh fraud. ¶202; *Tellabs*, 551 U.S. at 322-23.

holdings); *see also Marksman Partners L.P. v. Chantal Pharms. Corp.*, 927 F. Supp. 1297, 1313 (C.D. Cal. 1996) (20% sufficient, "especially where the dollar amounts involved are high.") (citations omitted).  The various cases Defendants rely on to argue the contrary are distinguishable, or of dubious validity.[34]

Moreover, although Carter's claims that the specific monetary proceeds

---

[34] *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1092 (9th Cir. 2002), Br. 50, 52, has been effectively abrogated by the Supreme Court in *Tellabs*.  *See South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008) ("[*Tellabs*] permits a series of less precise allegations to be read together to meet the PSLRA requirement, the prior holding[] of [*In re Vantive*] notwithstanding. Vague or ambiguous allegations are now properly considered as a part of a holistic review when considering whether the complaint raises a strong inference of scienter….In assessing the allegations holistically as required by Tellabs, the federal courts certainly need not close their eyes to circumstances that are probative of scienter viewed with a practical and common-sense perspective.").

Similarly, Defendants' other citations regarding the stock percentages necessary to show scienter, Br. 50, Ind. Defs. Br. 10, are all distinguishable.  *See, e.g., Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 54 (2d Cir. 1995) (no finding of scienter where only one out of four defendants sold shares during Class Period); *In re Prestige Brands Holding, Inc.*, 2006 WL 2147719, at *5 (S.D.N.Y. July 10, 2006) (no finding of scienter where only two out of four defendants sold shares during Class Period);  *Frazier v. VitalWorks, Inc.*, 341 F. Supp. 2d 142, 163 (D. Conn. 2004) (plaintiffs failed to provide any contextual information regarding total number of shares to determine whether sales were suspicious); *In re Keyspan Corp. Sec. Litig.*, 383 F. Supp. 2d 358, 382-83 (E.D.N.Y. 2003) (plaintiffs failed to specify the exact percentages of holdings defendants sold); *Ronconi v. Larkin*, 253 F.3d 423, 435 (9th Cir. 2001) (Defendants here sold significantly more (22% to 44%) than the threshold amounts in *Ronconi*); *Edward J. Goodman Life Income Trust v. Jabil Circuit*, 594 F.3d 783, 793 (11th Cir. 2010) (in contrast to numerous allegations of defendants' personal knowledge of fraud here, rejecting proposition that sale of large numbers of stock established scienter where there were *no* facts in the complaint evidencing personal knowledge of fraud).

Defendants gained from insider trading is "irrelevant," Br. 51 n.18, courts generally hold otherwise. *See Alfus v. Pyramid Tech. Corp.*, 764 F. Supp. 598, 605 (N.D. Cal. 1991) (collective sales of 271,459 shares totaling over $4.5 million sufficient to raise inference of scienter); *In re Gupta Corp. Sec. Litig.*, 900 F. Supp. 1217, 1231-32 (N.D. Cal. 1994) (six defendants' sales totaling approximately $4.2 million sufficient to support inference of scienter). Indeed, sales for far less profit than the amounts here have been found to establish scienter. *See Rubinstein v. Collins*, 20 F.3d 160, 169 (5th Cir. 1994) (insider sales for $760,599 constituted a "suspicious" amount and was "presumptively probative of bad faith and scienter").

Defendants also accuse Plaintiffs of "artificially exaggerating" the volume of the insider sales by "unduly" lengthening the class period to wrongly include such sales. Br. 52. However, Defendants admit that the actions alleged in the Complaint encompass a "five and one-half year period," Br. 66; and the Complaint's facts (aside from insider sales), including that the Restatement spans five and a half years, necessarily dictate a Class Period of that length.[35]  For the same reason, no appropriate frame of reference (five and a half years) for the

---

[35] In contrast, the Defendants cite cases where the length of the class period was unsupported by the other facts alleged, *Vantive*, 283 F.3d at 1092, or where the class period was clearly calculated to "sweep as many [insider] stock sales into their total as possible," *Malin v. XL Capital Ltd.*, 499 F. Supp. 2d 117, 150 (D. Conn. 2007).

Defendants' prior trading history exists – the Class Period starts only a few months after the Company went public, ¶3 – rendering Defendants' arguments that the Complaint fails to make such a comparison, Br. 52, n. 20, disingenuous.

### (b)   Rowan's Personal Circumstances Do Not Defeat the Inference of Scienter

Defendants argue that Rowan's substantial stock sales are explained by his retirement from Carter's, Br. 53.   Until the truth about OshKosh's growth prospects was finally revealed, however, Rowan had given no indication that he was ready to retire.   Indeed, at least one analyst covering Carter's was of the view that Rowan had been forced to step down because of the OshKosh failure, and not because he had been planning to retire from old age.   ¶291 ("we do believe that the under-performance of the OshKosh division since its acquisition in 2005 may have played a role in [Rowan's] and the Board's decision for him to retire at the current time.")   In this context, Rowan's trades cannot be plausibly linked to any genuine retirement plans in advance of the full disclosure of the truth, therefore, this proposed competing inference does not outweigh the strong inference of scienter raised by the Complaint as a whole.   *Cf. Bay v. Palmisano*, 2002 WL 31415713, at *10 (E.D. La. Oct. 24, 2002) (finding no inference of scienter from insider trading where defendant "had made public [in a Form 8-K filed with the SEC] his intent, in connection with his retirement, estate planning, and diversification goals, to sell

approximately forty percent of his stake in OCA in an orderly manner over the course of four years.")  Defendants' reliance on *In re Corning Sec. Litig*, Br. 53, is accordingly misplaced – there, the defendant had announced his retirement *before* the "open window for insider sales."  2004 WL 1056063, at *28 (W.D.N.Y. Apr. 9, 2004); *see also Wietschner v. Monterey Pasta Co*., 294 F. Supp. 2d 1102, 1109 (N.D. Cal. 2003) (retirement announced March 25, 2002 negated scienter inference when class period started six months *after* announcement).

### (c)    Defendant's Trading Plans Do Not Justify Their Insider Trades

Defendants also attempt to rebut the strong inference of scienter from the their suspicious trades by claiming that the trades were all executed in a trading window, or pursuant to a 10b5-1 plan.  Br. 54.  Courts are well aware, however, that such trading is not a magic cloak, and does not completely insulate defendants from liability.  *See In re Immucor Inc. Sec. Litig*., 2006 WL 3000133, at *18 n.8 (N.D. Ga. Oct. 4, 2006) (Duffey, J.) ("[t]he Court does not hold that securities trading pursuant to a Rule 10b5-1 plan can never give rise to a strong inference of scienter. The Court acknowledges the possibility that a clever insider might 'maximize' their gain from knowledge of an impending price drop over an extended amount of time, *and seek to disguise their conduct with a 10b5-1 plan*.") (emphasis added).  The *Immucor* court further noted that any "unusual benefit" to

101

the defendants from trading, even when pursuant to a trading plan, would be relevant to a finding of scienter. *See id*. Here, Defendants may not take advantage of their trading plans in order to hide clear evidence of their scienter – all the Defendants reaped massive proceeds during the Class Period.[36]   *See* pp. 22-25, *supra*.

Moreover, "the existence of a Rule 10b5-1 Trading Plan is an *affirmative defense* that must be pled and proved." *Freudenberg v. E*Trade Fin. Corp*., 2010 WL 1904314, at *26 (S.D.N.Y. May 11, 2010) (citing 17 C.F.R. § 240.10b5-1(c) (1)(i)). Significantly, Defendants ignore that "[t]rading plans are not a cognizable defense to scienter allegations on a motion to dismiss *[when] they [are] adopted during the Class Period*." *Id*. (emphasis added), *see also Cent. Laborers' Pension Fund v. Integrated Elec. Servs. Inc.*, 497 F.3d 546, 554 (5th Cir. 2007) (rejecting defendant's attempt to use 10b5-1 plan as a "non-suspicious explanation" because

---

[36]   *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1037 (9th Cir. 2002), Br. 54, is easily distinguishable. There, only one insider sold stock according to a 10b5-1 plan, *retaining 98.6%* of his holdings, much more than the percentages retained by the multiple Defendants who sold here. *See id*. ("That no inference of fraudulent intent arises from the timing of Gantz's modestly proportioned sales is further reinforced by the fact that Gantz was the *only* insider to sell PathoGenesis common stock during the class period. *All other directors and officers fully retained their holdings*….[o]ne insider's well timed sales do not support the 'strong inference' required by the [PSLRA] where the rest of the equally knowledgeable insiders act in a way inconsistent [with fraud].") (Emphasis added, citations omitted).

defendant entered into plan during the class period); *In re Biogen Idec, Inc. Sec. Litig.*, 2008 WL 4810045, at *14 (D. Mass. Oct. 25, 2007) (same). Here, the length of the Class Period (five and a half years) makes it extremely likely that the Defendants entered into all their trading plans during the Class Period. Notably, Defendants fail to mention *when* they adopted their plans, and public records indicate that at least some of the shares they sold were under plans adopted within the Class Period. *See* ¶293 (sales under plans adopted on December 8, 2004; June 2, 2006; and August 28, 2009). With respect to these plans, at least, Defendants' affirmative defense fails, and they may not use their plans to rebut the inference of scienter. Indeed, trading plans adopted during the Class Period in order to dispose of "significant amounts of stock…*may evidence* scienter." *Freudenberg*, 2010 WL 1904314, at *26 (emphasis added).

**D.    The Stock Repurchase Program Further
Supports an Inference of Scienter**

Courts commonly recognize that companies may repurchase stock as part of a scheme to inflate the stock price. *See, e.g.*, *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 928 (9th Cir. 2003) (examining allegations and reversing dismissal); *Takara Trust v. Molex Inc.*, 429 F. Supp. 2d 960, 981 n.13 (N.D. Ill. 2006) ("[d]efendants also argue that Molex's stock repurchase near in time to the Krehbiels' sales negates an inference

103

of fraud.  A company's stock repurchase, however, does not automatically negate a defendant's stock sale, *as the company's repurchase may artificially inflate the stock price by decreasing the available shares*") (emphasis added); *In re Guilford Mills, Inc. Sec. Litig.*, 1999 WL 33248953, at *5 (S.D.N.Y. July 21, 1999) ("Defendants also argue that [the company's share repurchase] during the Class Period shows that the Company had no motive to commit fraud. *This appears to the Court to be a non-sequitur....Buying back stock...does not in and of itself refute the strong inference of scienter [raised by the other allegations]*") (emphasis added).

Even though Defendants argue that it would be "backwards," Br. 56, for senior management to buy back shares at inflated prices, Defendants fail to grasp the obvious and logical motive – a repurchase program would further inflate Carter's stock price (and did, raising the stock price 30% in three months, ¶¶5, 266), leading to an even larger payoff when management dumped their stock, prior to the truth about OshKosh finally being revealed.  Indeed, Defendants timed the repurchase program to coincide with a negative guidance announcement (although still reassuring the market that OshKosh had very strong growth prospects and that the Company had no problems with any of its OshKosh customers, even though Macy's had already abandoned the line).  *See* ¶¶262-263.  In this way, Defendants

were able to: (1) extend their fraud by months; (2) pump up the price at least 32%,[37] ¶278; and (3) maximize their eventual profit from dumping shares. Thus, contrary to Defendants' assertions, the Complaint allegations demonstrate that the share repurchase program was an integral part of Defendants' fraudulent scheme, and does nothing to rebut (and in fact enhances) the strong inference of scienter raised by the Complaint.

Defendants argue that the strong inference of scienter is undermined because management did not "'dump' their stock prior to the end of the alleged Class Period," Br. 57. The Complaint does not allege, however, that the Defendants liquidated *all* their shares, but rather that they made substantial profits of approximately $30 million from the repurchase program. ¶277. Indeed, it would have been unrealistic for the key officers of the Company to liquidate their entire holdings, as that would have sent an undesirable signal to the market that management had no confidence in the Company, and it is entirely likely that the Defendants were barred from liquidating their entire holdings. *See* ¶91 (Carter's named executives required to "own a certain multiple of their base salary in Carter's stock.").

---

[37] The Defendants admitted that they were "each heavily invested in Carter's stock and [they] don't like the stock being depressed either." ¶261.

### E.   __Other Factors Supporting Defendants' Scienter__

The Complaint contains numerous additional allegations supporting a strong inference of scienter.  For example, Carter's is being investigated by the United States Attorney's Office in connection with the accommodations claims. ¶115.  *Cf. Eastwood Enters., LLC v. Farha*, 2009 WL 3157668, at *4 (M.D. Fla. Sept. 28, 2009) ("investigations into [defendant] by various government agencies only serve to bolster the inference of scienter at this stage of this action.").  Moreover, the Restatement itself – meant to cure violations of GAAP – is yet another indication of scienter.  *See Rosky*, 2009 WL 3853592, at *6 ("When a corporation's own internal investigation leads to the announcement of a restatement of historical financial results, this 'establish[es] a strong inference that the company itself believes that fraud' occurred.") (citations omitted).  While Defendants argue that GAAP violations, standing alone, are insufficient to establish scienter, "a violation of GAAP…can raise an inference of scienter when the defendants also ignored 'red flags' warning them of the accounting irregularities." *Edward J. Goodman Life Income Trust*, 594 F.3d at 792.  As discussed *supra*, pp. 14-28, 35-36, the Complaint establishes actual knowledge of such irregularities, and is replete with "red flags" that would have revealed the manipulation of accommodations to the Individual Defendants.

Moreover, the Restatement provides further evidence that Defendants were fraudulently "smoothing" the Company's core financials to meet Wall street expectations, which, as explained *supra*, Defendants used to falsely obtain the credibility in the market that was necessary for them to successfully tout the OshKosh "growth" story. *See* ¶¶103-104 (demonstrating that in both 2005 and 2006, the restated EPS (adjusted for one-time, non-recurring events per the originally reported adjustment amounts) was less than Company guidance, while the originally reported adjusted EPS was greater than Company guidance.)

Finally, the sheer duration of the fraud, which was ongoing for more than *half a decade*, is further evidence that the Defendants were, at the least, reckless in not knowing about both the fraudulent manipulation of accommodations, and the OshKosh misrepresentations. *See In re Rent-Way Sec. Litig.*, 209 F. Supp. 2d 493, 507 (W.D. Pa. 2002) (finding, *inter alia*, duration of two fiscal years "probative of scienter.")

## F.    The Complaint Establishes PwC's Scienter

PwC was Carter's "independent" auditor at all relevant times, since at least the Company's IPO to the present, and was required to routinely interact with the Defendants to discuss, among other things, the adequacy of the Company's internal controls. (¶¶41, 142). As Carter's outside auditor, PwC was required to perform

an integrated audit of Carter's in accordance with PCAOB Auditing Standards, meaning that PwC opined on both the effectiveness of internal control over financial reporting and the consistency of the financial statements with GAAP. ¶173. And, as part of its annual audits, PwC was also required by GAAS to perform meaningful, substantive audit tests and to objectively evaluate the results of those tests to gain assurance that the accounting for A/R and Carter's other core financials (including net sales) would not cause a material error in the financial statements. ¶165; AU § 316.

Throughout its longstanding Carter's engagement, PwC opined that: (1) each of the Company's Annual Reports "present[ed] fairly, in all material respects, the financial position of [Carter's]" in conformity with GAAP; (2) Carter's "maintained, in all material respects, effective internal control over financial reporting"; and (3) its audits were conducted in conformity with GAAS. (¶¶149-153, 157). However, in its amended 10-K/A reflecting the restatement of *five and a half years'* of Carter's core financials, the Company admitted: (i) deficiencies in its internal controls associated with customer accommodations processes that constituted material weaknesses; and (ii) the need to restate prior period consolidated financial statements, because "various customer accommodations [were booked] in incorrect fiscal periods" and "[t]he deferrals [of the

accommodation payments] resulted in the overstatement of net sales and net income in certain of the Affected Periods and the understatement of net sales and net income in certain of the Affected Periods." ¶107. In other words, the Company admitted that the Company's top executives overrode controls to manipulate accommodation payments in order to maintain a desired consistency of reported financial results. Moreover, Carter's also admitted that it had to make a "2003 cumulative adjustment to retained earnings in the amount of $3.1 million," meaning that it started 2004 with a material overstatement, and that its 2003 financials were *also* materially false and misleading. *Id*.

### 1. Scienter Standard Applicable to PwC

With respect to auditor liability, a plaintiff need not demonstrate that an auditor knew of or participated in the fraudulent scheme, but adequately alleges scienter against an auditor by pleading facts that create a "strong inference" that the auditor acted with "severe recklessness." *Ziemba v. Cascade Int'l, Inc.,* 256 F.3d 1194, 1202 (11th Cir. 2001); *see also Maiden v. Merge Techs.*, 2008 WL 4643538, at *3 (E.D. Wis. Oct. 20, 2008) (a plaintiff alleging a violation of Section 10(b) and Rule 10b-5 against an independent auditor such as PwC must satisfy the requirements of the PSLRA by alleging with specificity that the accounting practices were so deficient that "the audit amounted to no audit at all, *or an*

*egregious refusal to see the obvious, or to investigate the doubtful, or that the accounting judgments which were made were such that no reasonable accountant would have made the same decisions if confronted with the same facts*.") (citation omitted, emphasis added).

"Whether a strong inference of scienter arises from the pleaded facts is a specific inquiry to be determined on a case-by-case basis after a review of the *totality* of the factual allegations in the complaint." *In re Pegasus Wireless Corp. Sec. Litig.*, 2009 WL 3055210, at *4 (S.D. Fla. Sept. 21, 2009).

### 2.    The Detailed GAAP and GAAS Violations and the Duration of the Fraud are Evidence of PwC's Scienter

PwC argues that GAAP and GAAS violations, alone, do not create a strong inference of PwC's scienter. PwC Br. 18. While not all GAAP violations standing alone give rise to a strong inference of an auditor's scienter, the GAAP violations at Carter's which took place continuously over a period of almost *six years* without detection, support a strong inference of scienter here. The "*number*, size, timing, nature, *frequency*, and context" of GAAP violations or a restatement may contribute to an inference that an auditor acted with scienter. *In re AFC Enters., Inc. Sec. Litig.*, 348 F. Supp. 2d 1363, 1372 (N.D. Ga. 2004) (emphasis added); *see also In re Rent-Way Sec. Litig.*, 209 F. Supp. 2d 493, 507 (W.D. Pa. 2002) (finding, *inter alia*, duration of two fiscal years "probative of scienter.")

Indeed, "[i]n many cases the most plausible means to prevail on a section 10(b) claim against an auditor without that ever-elusive 'smoking gun' document or admission will be to show how specific and not insignificant accounting violations *collectively* raise an inference of scienter." *In re Suprema Specialties Inc. Sec. Litig.*, 438 F.3d 256, 281 (3d Cir. 2006)(citations omitted). Thus, facts suggesting the "defendants recklessly disregarded the deviance from GAAP" may establish scienter. *In re Friedman's, Inc. Sec. Litig.*, 385 F. Supp. 2d 1345, 1361 (N.D. Ga. 2005) (citation omitted). Moreover, when a company's GAAP errors violate an internal accounting policy *or an obvious and simple accounting principle*, an inference of scienter is raised. *See In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 638 (E.D. Va. 2000) ("[I]f the GAAP rules and MicroStrategy accounting policies Defendants are alleged to have violated are relatively simple, it is more likely that the Defendants were aware of the violations and consciously or intentionally implemented or supported them, or were reckless in this regard.")

With regard to GAAS, the Third Circuit observed in *Suprema*, 438 F.3d at 279 (citations omitted):

> When a professional opinion is issued to the investing public by those in a position to know more than the public, there is an obligation to disclose data indicating that the opinion may be doubtful. When that opinion is

> based on underlying materials which on their face or under the circumstances suggest that they cannot be relied on without further inquiry, then the failure to investigate further may "support an inference that when [the defendant] expressed the opinion it had no genuine belief that it had the information on which it could predicate that opinion."

As shown below, PwC relied exclusively on "material which on their face or under the circumstances suggest that they cannot be relied on without further inquiry," especially Defendants' facile reassurances and representations.

### (a)    GAAP Violations

Here, there were numerous and serious GAAP violations of fundamental accounting rules that occurred repeatedly over almost six years, all of which PwC recklessly ignored. (¶¶57-58, 210-239). *First*, GAAP requires a restatement of previously issued financial statements, such as the one here, to correct material accounting errors or irregularities "that existed *at the time* the financial statements were prepared." Statement of Financial Accounting Standards ("SFAS") 154; *see also* ¶¶116-119, 126-127. Carter's restatement, therefore, is an admission that its financial statements were materially misstated and violated GAAP. SFAS 154.2.h, j.

*Second*, Carter's financial "smoothing" through the manipulation of accommodation payments, *see* pp.8-10, *supra*, resulted in improper revenue

recognition that misstated such core financial figures as net sales, earnings and accounts receivable, in violation of GAAP.  Proper revenue recognition is a cornerstone of GAAP, requiring Carter's to properly recognize revenue by timely reducing sales in accordance with the accommodation obligations due to its customers.  *See* SFAS 5 (Accounting for Contingencies); *see also* ¶¶128, 130; *MicroStrategy,* 115 F. Supp. 2d at 638 (violations of simple and fundamental GAAP rules make recklessness more likely).

### (b)    GAAS Violations

*First*, PwC violated GAAS by failing to exercise professional skepticism when conducting its annual audits.  *See* AU 230 (Due Professional Care, requiring PwC to conduct its audit with a "questioning mind" and critically assess audit evidence.)  The Complaint describes with particularity the kinds of audit evidence that PwC failed to critically assess.  For example, CW1 stated that PwC obtained Carter's quarterly "flux" balance sheets during it annual audits.  ¶180.  These flux balance sheets "were very detailed and broke down all the reserves" *including* accommodations.  *Id*.  Moreover, the flux balance sheets showed obvious inconsistencies – including fluctuations of *40%* – in account balances that revealed Carter's was moving accommodation dollars between client accounts.

*Id*.; *see also Danis*, 73 F. Supp. 2d at 942 ("conditions readily discoverable by a third party suggests that an auditor…was likely aware of those conditions").

Another instance of audit evidence that PwC failed to question were customers' receivables. Indeed, it wasn't the supposedly independent accountant, but Westenberger, Carter's new CFO, who uncovered the manipulation of accommodations (only months after joining Carter's, ¶¶97-99) by asking Kohl's, one of Carter's biggest clients, about an outstanding receivable. ¶¶26, 98. Had PwC exhibited the requisite professional skepticism by questioning the suspicious activity on the flux balance sheets, or unsupportable receivables from Kohl's, PwC would have identified Carter's GAAP violations related to the accommodation payments.

*Second*, PwC violated GAAS when it failed to obtain sufficient competent evidence to support a reasonable basis for its unqualified audit opinions. *See* AU 326 (Evidential Matter). Notably, GAAS prohibits auditors from relying exclusively on oral and written representations of management as a "substitute for the application of those auditing procedures necessary to afford a reasonable basis for an opinion regarding the financial statements under audit." AU 333.02. Here, however, CW2 observed that PwC relied on oral representations from North to the effect of "we've got it under control," as evidence adequate to support issuing an

unqualified audit opinion. ¶146. Indeed, PwC's absolute reliance on management representation is exemplified by PwC's bizarre and tautological argument that it could not have uncovered Defendants' manipulations of accommodations because "such Accommodations were never communicated to it," PwC Br. 12, which is a highly implausible inference from the facts alleged, and tantamount to stating that PwC could not have uncovered the fraud because Defendants failed to tell them about it. Relatedly, PwC was further observed to "allow certain things to slide" rather than obtaining sufficient competent audit evidence. ¶144. Indeed, CW2, an experienced financial professional, observed that PwC's audit testing was not as extensive or rigorous as other audits CW2 had witnessed at prior companies. ¶146.

*Third*, PwC issued unqualified audit opinions on materially misstated financials over a nearly six year period, demonstrating the inadequacy of its audits in violation of GAAS. *See* AU 316.01 (Consideration of Fraud in the Financial Statement, requiring PwC to perform an audit giving reasonable assurance that Carter's financial statements were free of material misstatement caused by error or fraud); ¶165. Specifically, PwC was willfully blind to (and failed to mitigate) the following risk factors for fraud: (1) North and Casey were both former PwC auditors who were both very familiar with PwC's audit procedures, ¶¶11, 139; (2) management's commitment to aggressive and unrealistic forecasts, ¶¶167-168; and

115

(3) the lack of segregation between the internal and external audit departments, which both reported to North. ¶168. *See South Cherry Street, LLC v. Hennessee Group LLC*, 573 F.3d 98, 109 (2d. Cir. 2009) (allegations of an auditor's "egregious refusal to see the obvious, or to investigate the doubtful" can create a strong inference of its scienter).

### 3.    PwC's Failure to Heed Multiple "Red Flags" is Evidence of Its Scienter

"'Red flags' are those facts which come to the attention of an auditor which would place a reasonable auditor on notice that the audited company was engaged in wrongdoing to the detriment of its investors." *In re Sunterra Corp. Sec. Litig.*, 199 F. Supp. 2d 1308, 1333 (M.D. Fla. 2002) (citation omitted). "A complaint will usually survive a motion to dismiss if plaintiffs have alleged the existence of 'red flags' sufficiently attention-grabbing to have alerted a reasonable auditor to the audited company's shenanigans." *Id.*; *see also In re Oxford Health Plans, Inc., Sec. Litig.*, 51 F. Supp. 2d 290, 295-96 (S.D.N.Y. 1999) ("red flags," in connection with GAAP and GAAS violations, were sufficient to give rise to a strong inference that the auditor was deliberately reckless).

PwC makes a confusing and circular argument that "[a]s a threshold matter, a 'red flag' cannot suggest scienter unless the auditor was aware of it," even admitting that "many of the alleged 'red flags' did *not* come to PwC's attention."

PwC Br. 20 (emphasis in original). PwC strangely posits that much like Schrodinger's hypothetical cat, red flags do not exist unless observed by the auditor. This argument strips the applicable standard of any meaning – under PwC's tautology, an auditor accused of recklessness could *never* miss red flags that would otherwise alert a reasonable auditor to the existence of fraud, for there would *be* no red flags unless observed by the accused, who could (ergo) never be reckless because it would have uncovered the fraud by noticing the flags. In other words, PwC's proposed standard would allow an auditor to avoid 10(b) liability simply by claiming not to have noticed any red flags. The absurd outcome of PwC's "subjective accountant" standard clearly demonstrates how that standard is erroneous. Rather, the common sense interpretation is that red flags are those factors recklessly overlooked by PwC, which would have alerted a *reasonable auditor* to the existence of fraud – *i.e.*, the standard is objective, not subjective. *See, e.g., Grand Lodge of Pa. v. Peters*, 550 F. Supp. 2d 1363, 1372 (M.D. Fla. 2008) ("red flags [must be] sufficient to place *a reasonable auditor* on notice that the client was committing wrongful acts to the detriment of its investors," citing *Sunterra*, 199 F. Supp. 2d at 1333-34) (emphasis added). PwC implicates its own recklessness by emphasizing that it did, indeed, miss "many of the alleged" red flags, PwC Br. 20, that would have placed a reasonable auditor on notice.

117

### (a)    Carter's Grossly Overstated A/R

Carter's Restatement reveals that its A/R was grossly overstated, by $21 million (24.1%), $25 million (26.5%), $17 million (18%) and $7 million (8.3%) in the 2008, 2007, 2006 and 2005 fiscal years, respectively. ¶174. As explained in the Restatement itself, when net sales are overstated, accounts receivable are also overstated, because the A/R – representing the amount outstanding from a completed sale – fails to reflect the true value of the sale, which should have been discounted by the accommodation amount. *See* ¶76. Although PwC argues that A/R is merely "the metric that will yield the highest percentage values" and "adds nothing to the inference of scienter," PwC Br. 21-22 n.16, A/R is the *most* appropriate metric here, because of the nature of the fraud. The purpose of "smoothing" is not so much to inflate earnings as it is to manipulate those earnings in order to give the impression of consistent financial success, therefore, net earnings – the metric Defendants would use – actually blunts the impact of the manipulation because it looks at the *cumulative* effect on earnings, as opposed to the *periodic* effect that would reveal the manipulation. *See* ¶114. It is exactly this periodic effect that A/R captures.

A glaring example of overstated A/R, and the eventual catalyst for uncovering the accommodations fraud, involved Kohl's. Kohl's was one of

Carter's largest customers, and likely the "Initial Customer" referred to in Carter's Restatement. *See* ¶¶26, 98, 128. As noted in Carter's amended Form 10-K/A, receivables from Kohl's accounted for the majority of Carter's A/R during the Class Period. *See, e.g.*, Green Decl. Ex. 25, p. 42 (89% and 82% of Carter's A/R as of January 3, 2009 and December 29, 2007 were attributable to Kohl's.)

Under GAAS, a reasonable auditor would have confirmed Carter's A/R *with Kohl's* during its annual audits, especially for such an important customer, which would have revealed the manipulation of the accommodation payments that directly affects A/R. *See* AU 330.34 (Confirmation of Accounts Receivable). This is because the confirmation process is designed to confirm the existence of actual customer receivables and the obligations related to those receivables, *including* margin support arrangements. *See* AU 330.11, ¶190 ("confirmations are utilized in an effort to obtain *third-party corroboration* regarding outstanding customer indebtedness. In addition to providing *independent evidence* regarding the validity and accuracy of customer balances, *confirmations are used to confirm sales terms and conditions, which may disclose the propriety of recognized revenue*.") (emphasis added).

Instead, it took a third party – Westenberger – to do PwC's job. ¶26. That a newcomer uncovered the accommodation payments manipulations within a few

months of being hired, simply by asking a major customer to corroborate A/R, while PwC failed to uncover the fraud over the course of nearly six audit years, leads to the inevitable conclusion that PwC's supposed "audit" was "so deficient that it amounted to no audit at all." *Grand Lodge of Pa.*, 550 F. Supp. 2d at 1372; *see also Danis v. USN Commc'ns, Inc.*, 73 F. Supp. 2d 923, 942 (N.D. Ill. 1999) ("conditions readily discoverable by a third party suggests that an auditor…was likely aware of those conditions").

### (b)    Flux Balance Sheets

Carter's tracked and recorded all reserve accounts, including accommodations, in quarterly flux balance sheets, which showed the breakout of the accommodation reserves and how certain accommodation reserves moved up and down between quarters. ¶180. PwC routinely received these quarterly flux balance sheets. *Id.* CW1, neither a CPA nor an auditor, was present at budget meetings, which PwC also attended, and stated that CW1 saw obvious inconsistencies in recorded accommodations on the flux balance sheets, where one account would be up by as much as 40% and one would be down. ¶¶129, 180. PwC, again, remained blind to the obvious manipulation, and failed to question or investigate the discrepancies. *See Danis*, 73 F. Supp. 2d at 942 ("conditions

readily discoverable by a third party suggests that an auditor…was likely aware of those conditions").

PwC argues that the accommodation payment manipulations plainly evident on the quarterly flux balance sheets do not constitute "the type of fraud alleged to have occurred at Carter's, *i.e.*, deferring Accommodations into later fiscal periods." PwC Br. 23. Notably, PwC does not provide a citation to the Complaint for this mischaracterization of the alleged fraud. Indeed, PwC once again just parrots Carter's. *See* PwC Br. 4 ("[t]he undisclosed arrangements resulted in the deferral of Accommodations into later periods") (quoting 10K/A). In contrast, the Complaint describes the manipulation of accommodations to "smooth" earnings, meaning that "the Defendants cherry picked particular quarters in which to book the accommodation payments." ¶8. It is more than plausible that, to facilitate the "smoothing," Defendants engaged in derivative manipulations of the accommodations, including transferring amounts between customer accounts as reflected on the flux balance sheet. In any event, such glaring discrepancies would have, at the least, prompted questioning and further investigation by a reasonable auditor, instead of PwC's blind acceptance. *See South Cherry Street*, 573 F.3d at 109 (allegations of an auditor's "egregious refusal to see the obvious, or to investigate the doubtful" can create a strong inference of its scienter).

(c)     **Material Weaknesses in Internal Controls**

Accommodation payments are a standard feature in the retail industry, and because they reduce net sales, a core financial metric, they have a direct impact on Carter's financial reporting.  ¶57, *see also* Pacifico Br. 2 ("accommodations…are a fundamental part of the retail business.")  As part of opining on management's assessment of internal controls over financial reporting, therefore, a reasonable auditor would have obtained an understanding of the controls over accommodation payments.  ¶¶150, 163 (quoting Auditing Standard 5).  More specifically, a reasonable auditor would have tested management's assessment by evaluating the design and operating effectiveness of the controls governing accommodation payments.  *Id*.  Carter's Restatement, however, confirmed the existence of material weaknesses in revenue recognition and the control environment over customer accommodations, caused by controls that failed to ensure the accuracy, completeness, and timing of accommodation payments.  ¶186.

Indeed, the glaring lack of internal controls at Carter's was obvious even to non-accountants – both CW1 and CW2 expressed concern over the lack of controls at Carter's, including controls over reporting accommodations.  ¶¶59, 62.  CW1 expressed increasing discomfort over time: "the longer and longer I stayed at the [C]ompany there's some things that I started seeing and would question that

122

seemed to be at least skirting the gray zone in terms of controls in the audit process and the accounting process."  PwC's purported audit testing over almost six years, however, failed to arouse any skepticism on its part regarding the obvious lack of controls over accommodations.

### 4. PwC's Lack of Independence Creates a Strong Inference of Scienter

PwC's "egregious refusal to see the obvious, or to investigate the doubtful," *South Cherry Street*, 573 F.3d at 109, is even more damning in light of PwC's clear lack of independence.  Although PwC was required to "be without bias with respect to the client since otherwise [it] would lack that impartiality necessary for the dependability of [its] findings," and adopt "a judicial impartiality that recognizes an obligation for fairness…[to] those who may otherwise rely…upon the independent auditor report," AU 220.02, PwC was neither independent in fact or appearance.  *See* AU 220.03 ("Independent auditors should not only be independent in fact; they should avoid situations that may lead outsiders to doubt their independence.")

The importance of an auditor's independence to its role as a "public watchdog" was underscored by the Supreme Court in *United States v. Arthur Young & Co.*, 465 U.S. 805, 817-18 (1984):

> By certifying the public reports that collectively depict a
> corporation's financial status, the independent auditor
> assumes *a public responsibility transcending any
> employment relationship with the client*. The independent
> public accountant performing this special function owes
> ultimate allegiance to the corporation's creditors and
> stockholders, as well as to the investing public. This
> "public watchdog" function demands that the accountant
> *maintain total independence* from the client at all times
> and requires complete fidelity to the public trust.

Courts have recognized that an auditor's close relationship with management

can impair independence and objectivity. *See In re Enron Corp. Sec., Deriv. &*

*ERISA Litig.*, 235 F. Supp. 2d 549, 673-74 (S.D. Tex. 2002):

> Furthermore, Arthur Andersen's close relationship with
> Enron's management also impaired the auditor's
> independence and objectivity in its audits of Enron
> during the Class Period. The complaint points to more
> than three hundred accounting and finance positions at
> Enron, many in mid-level and senior management, that
> were filled with former Arthur Andersen auditors and
> professionals. The complaint comments that Enron
> Defendants were comfortable with this fact because they
> knew the Arthur Andersen auditors *were less likely to
> question improper accounting if done by their former co-
> workers and bosses, who were now officers and
> managers at Enron*. (Emphasis added).

Here, PwC utterly failed to be the public's "watchdog." PwC's failure to

"see the obvious or investigate the doubtful," as evidenced by its numerous GAAS

violations and blindness to obvious red flags, was a direct result of its complacency

where management was concerned, and its concomitant willingness to "allow

124

certain things to slide." ¶179.  This complacency, in turn, was a product of PwC's

inappropriate relationship with Carter's management.[38]

Just as in *Enron*, 235 F. Supp. 2d at 673-74, key financial positions at

Carter's were filled with former PwC auditors.  Casey, Carter's CFO, was formerly

a senior manager at the Connecticut office of PwC's predecessor company, Price

Waterhouse LLP, and North, Carter's VP of Finance, was a former PwC auditor at

the same Connecticut office.  ¶11.  Not coincidentally, PwC's Connecticut office

was responsible for auditing Carter's.  *Id*.  Moreover, prior to joining Carter's,

Casey was the lead accountant responsible for *the Carter's account*.

Indeed, the majority of Carter's finance and accounting personnel were

Casey's former PwC colleagues. ¶66.  One of these former colleagues, Christina

DeMarvel, was in charge of Carter's internal audit department and reported

directly to North, in a further example of a conflict of interest.

It was obvious to Carter's employees that PwC lacked even the appearance

of an independent relationship with management.  *See, e.g.*,  ¶¶11, 61, 66, 145,

189.  CW2 directly observed the control that Carter's financial executives exerted

---

[38]  Contrary to PwC's assertions, therefore, Plaintiffs are not alleging scienter
"based solely on the fact that former accounting firm employees work [at
Carter's],"  PwC Br. 14, but instead show how that fact led to a biased auditor
relationship.

over *both* internal auditors and the purportedly independent PwC, such that North, as VP of Finance, would supervise *both* internal and external audit functions at Carter's, with PwC reporting directly to him. ¶61 ("[North] is the one that runs all of the auditing and gives the direction to auditing.")  CW2, a finance professional, felt that it was completely inappropriate for any auditing personnel to report to the Company's internal finance officers – basically, the auditors had to report to the very people they were auditing – but even after the conflict was brought to management's attention, CW2 witnessed North "still giving direction" to the audit team as their manager. *Id*.  CW1, who was present at management's "clearance calls" with PwC, observed that Casey and North spent hours capitalizing on their close relationship with PwC, particularly with Don Brenner, the engagement partner for the Carter's account, whom CW1 recalled "allow[ed] certain things to slide."  ¶¶11, 144.  CW2 corroborated this account, observing that the PwC auditors had "a very easy relationship" with the finance executives, and that "if North said 'we've got it under control' then PwC would take his word for it and not actually perform the additional testing." ¶¶145, 146.

In other words, PwC's lack of independence biased its objectivity, and led it to rely excessively on management's representations that things were "under control," because those representations were coming from former colleagues. *Id*.;

*see also Enron*, 235 F. Supp. 2d at 673-74 (external auditors "were less likely to question improper accounting if done by their former co-workers and bosses, who were now officers and managers.")    CW2, who had worked in finance at other companies, observed that PwC was not as extensive in their testing as other auditors were, in CW2's prior experience at those companies.

PwC argues that CW2's direct observations were not "tied to the Accommodations issue."   PwC Br. 16.   However, the Complaint does not offer CW2's testimony for any specific auditing knowledge "tied to the Accommodations issue" – rather, CW2's direct observations of the interactions between PwC and Carter's finance executives demonstrates PwC's complete lack of independence in its overall auditing relationship with management.   This lack of independence prevented PwC from the rigorous testing and questioning a reasonable auditor was required to undertake in its role as the "public watchdog." *Arthur Young & Co.*, 465 U.S. at 817.

Accordingly, Lead Plaintiff has adequately alleged that PwC was reckless, in that its "audit" of Carter's amounted to no audit at all.   PwC's alternate inferences, PwC Br. 25, are both wildly implausible: (1) that it failed to detect any material financial misstatements because, in essence, Carter's did not tell them about the accommodations fraud (relying on *Carter's* investigation, "the facts resulting in the

127

misstatements were concealed from PwC") only demonstrates PwC's continuing willingness to stick its head in the sand and accept anything Carter's represents; and (2) that PwC was negligent, is belied by its biased auditing relationship with Carter's management which resulted, *inter alia*, in PwC auditors reporting directly to Carter's VP of Finance and admittedly missing several glaring red flags that would have been obvious to a reasonable auditor, and were obvious even to third parties such as CW1 (flux balance sheet discrepancies) and Westenberger (corroboration of actual A/R with customers), *see* pp. 107-27, *supra*.

## VI.    The Complaint Establishes Loss Causation With Respect to the OshKosh Claims[39]

"[T]o establish loss causation, a plaintiff must allege that the subject of the fraudulent statement or omission was the cause of the actual loss suffered, *i.e.*, that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." *Paincare,* 541 F. Supp. 2d at 1293-94 (M.D. Fla. 2008) (citing *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005)).  The liberal notice pleading standard of Rule 8 of the Federal Rules of Civil Procedure applies to allegations of loss causation.  *See Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346 (2005) (with regard to pleading loss

---

[39]  Defendants do not contest loss causation with respect to the misrepresentations and omissions regarding accommodations.

causation, "the Federal Rules of Civil Procedure require only 'a short and plain statement of the claim showing that the pleader is entitled to relief.'") (quoting Fed. R. Civ. P. 8(a)(2)).   The Supreme Court in *Dura* noted that the pleading requirements for loss causation "are not meant to impose a great burden upon a plaintiff," *Id.* at 347, and that a plaintiff need only allege "a causal connection between the material misrepresentation and the loss." *Id.* at 342.

For pleading purposes, loss causation exists "if the risk that caused the loss was within the zone of risk concealed by the misrepresentations and omissions alleged by a disappointed investor." *Freudenberg*, 2010 WL 1904314, at *27 (citing *Lentell*, 396 F.3d at 173).   Indeed:

> [N]either the Supreme Court in *Dura*, nor any other court addressing the loss causation pleading standard require a corrective disclosure be a "mirror image" tantamount to a confession of fraud.   Because corporate wrongdoers rarely admit that they committed fraud, "it cannot ordinarily be said that a drop in the value of a security is 'caused' by the misstatements or omissions made about it, as opposed to the underlying circumstance that is concealed or misstated." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir.2005). Thus, the "relevant truth" required under Dura is not that a fraud was committed per se, but that the "truth" about the company's underlying condition, when revealed, causes the "economic loss." *Id.* at *28.

Moreover, courts recognize that partial disclosures can satisfy the loss causation requirement. *See Dura*, 544 U.S. at 342 (loss causation met where shares

sold after "the relevant truth begins to *leak* out") (emphasis added);  *see also In re Vivendi Universal, S.A. Sec. Litig.*, 605 F. Supp. 2d 586, 599-60 (S.D.N.Y. 2009) (same).  Thus, it is "clear that a corrective disclosure need not take the form of a single announcement, but rather, can occur through a series of disclosing events," like the three disclosures here. *Bristol Myers*, 586 F. Supp. 2d at 165; *see also In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 283 (S.D.N.Y. 2008) ("[L]oss causation may be premised on partial revelations that do not uncover the complete extent of the falsity of specific prior statements.").

The Complaint adequately alleges that Plaintiffs' losses were caused by Defendants' misrepresentations and omissions regarding the OshKosh growth opportunity.  *See, e.g.*, ¶¶237, 257-258, 285, 286, 288, 299-303.  The partial disclosures in July 2006 and February 2007, and the final disclosure in July 2007 all demonstrate that the market placed great importance on OshKosh's growth prospects as touted by Defendants.  Each of these disclosures revealed that the OshKosh growth opportunity was not what Defendants had represented and resulted in a significant drop in stock price as artificial inflation was removed, on trading that was much heavier in volume than the daily average during the Class

Period.[40]  ¶¶237, 257-258, 285, 286, 288.

Defendants do not contest that the relevant disclosures caused significant stock drops, but argue that neither the July 26, 2006 nor the February 13, 2007 disclosures "revealed anything but newly revised forecasts," and therefore cannot be "corrective."  Br. 60.

### 1.  The July 26, 2006 Disclosure was Corrective

With respect to the July 26, 2006 disclosure, the Complaint alleges:  (1) the decrease in earnings guidance was specifically "due to lower than expected falls sales from OshKosh," ¶237; (2) Rowan admitted on the July 26, 2006 earnings call that "Carter's had positioned [OshKosh fall figures] too high,"  *see id*.; and (3) at least one analyst, shortly after the disclosure, linked the lower guidance to a decrease in expected OshKosh revenue, see ¶242 (questioning OshKosh growth and stating "Management led us to believe the lower revenue guidance was from

---

[40]  Not surprisingly, Defendants make no mention of the volume of stock traded following the corrective disclosures alleged in the Complaint.  For example, 4.4 million shares were traded the day following the last disclosure, compared to an average of only 753,000 shares/day during the Class Period.  This disparity is further evidence that the disclosures were not simply "negative financial disclosure[s]," Br. 59, but instead relate directly to Defendants' material misrepresentations about the growth prospects of OshKosh.  *See Atlas Air*, 324 F. Supp. 2d at 498 (finding loss causation adequate alleged where, *inter alia*, "shares of [the company] declined by 30% on trading that was ten times the typical daily volume for the stock.")

the exit of further unprofitable businesses and that the repositioning [of OshKosh] was being received warmly by all major accounts – including Macy's West.").

Contrary to Defendants' assertion that "Plaintiffs fail to identify any information withheld from earlier disclosures that was revealed in, or 'corrected' by [the disclosures]", Br. 60, these allegations all tie the cause of the loss from the July 26, 2006 disclosure to Defendants' misrepresentations regarding OshKosh's growth prospects in February 2006, which – as set forth at pp. 15-18 – were demonstrably false when made.  *See, e.g.*, ¶222 ("Fall '06 product is materially better"); ¶224 ("Most importantly we significantly upgraded the product for Fall '06….We are projecting a double-digit increase for Fall '06"); ¶226 ("We had good, very good customer feedback"); ¶228 ("we've continued to deliver strong organic growth at Carter's. We've moved quickly to correct the Oshkosh business….We're getting good support for the product and planning double digit growth….What we love about Oshkosh it's going to enable us to continue putting up good revenue and earnings growth numbers for the foreseeable future.")

## 2.     The February 13, 2007 Disclosure was Corrective

Similarly, the Complaint alleges with respect to the February 13, 2007 disclosure that: (1) at least one analyst covering Carter's anticipated, based on Defendants' misrepresentations about OshKosh's growth prospects on the previous

earnings call, that "management will give you reason to believe that OshKosh is improving when they provide forward booking numbers on the [February earnings] call as on the last call management communicated double-digit improvement in 1H:07 unit bookings," ¶256; (2) the February disclosure itself stated that "[o]ur fiscal 2007 estimates assume no growth in comparable store sales, fewer store openings *and less contribution from our OshKosh wholesale segment than previously planned*," ¶257; and (3) on the February 2007 earnings call, Pacifico explicitly stated that "Oshkosh wholesale, sales were down 12% due to our decision to close unprofitable accounts last year and our positioning of the price model too high for our holiday '06 as we mentioned on the last call." ¶264.

Thus, the Complaint ties this disclosure of OshKosh's lack of growth to Defendants' prior false statements about increased bookings and growth prospects. *See, e.g.*, ¶245 ("[W]e have materially changed the spring '07 [OshKosh] agenda, and we're excited about the possibilities there. *Our bookings are up there. It's the first time in OshKosh's five or six-year recent history that there's not been a decline in that business*"); ¶248 ("We made a lot of changes based on fall and it has significantly improved the product by also changing the positioning and pricing for spring '07. *Our spring bookings are up 10% in dozens and 3% in dollars. Our summer bookings show further improvement and we are projecting*

*they will be up double-digits.* Our customers have provided a lot of positive feedback for our creative expansion of the core items and key priceline"); ¶250 ("now that we have an opportunity to turn the OshKosh business around, that would be the growth vehicle for [Carter's].")

### 3.    The July 24, 2007 Disclosure was Corrective

Finally, despite Defendants' argument that the July 24, 2007 disclosure is not corrective because the Complaint "includes no allegation that the impairment charge should have been recorded earlier," Br. 60, the Complaint alleges that the "corrective truth" was not the impairment charge, *per se*, but the concomitant announcement that OshKosh wholesale sales had plummeted *45%* from the same period the prior year, and the acknowledgement by management, belatedly, that OshKosh had no growth prospects at all.  ¶¶286-288.  Thus, this disclosure directly relates to the Complaint's core allegations that Defendants fraudulently omitted key information indicating that OshKosh had no growth prospects, while simultaneously reassuring the market of OshKosh's purported growth opportunities.

Accordingly, the Complaint sufficiently pleads that Defendants' fraudulent misrepresentations regarding the OshKosh growth opportunity were the "cause of the actual loss suffered" by Plaintiffs.  *Paincare*, 541 F. Supp. 2d at 1293-94.

134

Therefore, Defendants' argument that "[a] timely disclosure of current earnings results or newly revised forecasts or estimates is simply insufficient to establish loss causation *where those results fail to correct any prior statement*," Br. 60, is irrelevant. *See W. Palm Beach Firefighters' Pension Fund v. Startek, Inc.*, 2008 WL 4838671, at *7 (D. Colo. Nov. 6, 2008) (rejecting argument that partial disclosures, including "[t]he announcement of reduced earnings in spring 2004," did not "correct any misrepresentations").

In *Silverman v. Motorola, Inc.*, 2008 WL 4360648, at *15 (N.D. Ill. Sept. 23, 2008), a case very similar to this one, the defendants argued that "plaintiffs have not adequately pleaded loss causation because the alleged material misrepresentations concern the delay in bringing Motorola's 3G cell phones to market, and that the January 4, 2007, press release that preceded the drop in stock price says nothing about Motorola's 3G cellular phones, much less that their delayed launch caused Motorola to miss its sales projections." The court, rejecting the argument, explained:

> We believe that the defendants read the loss causation requirement too narrowly. The possibility that other forces can contribute to a decline in value of the plaintiff's securities always exists. There is no requirement at the pleading stage that a plaintiff "affirmatively rule out those other factors in its complaint; rather that burden arises at trial." [citation omitted]. At this early stage, we find that plaintiffs have

met their burden. The price of the stock dropped after the earnings warning issued on January 4, 2007. Although this warning did not single out the delay in marketing the 3G phones as the cause, *it did indicate that below forecasted sales and earnings were a problem primarily in the Mobile Devices division.* It is not unreasonable to assume that the market was aware of the absence of 3G phones in retail outlets during the all-important holiday season which had just ended, and attributed some or all of the weak sales to the 3G phones, *particularly in light of the importance Motorola had placed on the 3G phones in earlier phone calls. See, e.g., In re Motorola Sec. Litig.*, 505 F. Supp. 2d 501, 546 (N.D. Ill. 2007) (holding that earnings disclosure in case of still-concealed fraud could serve as a corrective disclosure in which "the relevant truth begins to leak out"). *Id.* at *15 (emphasis added).

Here, as in *Motorola*, the disclosures of "revised forecasts," Br. 60, served as partial corrective disclosures in which the "relevant truth begins to leak out," "particularly in light of the importance," *id.* at *15, that the Defendants placed on OshKosh's growth in earlier earnings calls. Accordingly, Defendants' argument fails.[41]

---

[41] For the same reasons, the Individual Defendants' argument that "Plaintiffs fail to allege how any 'untruth' regarding the OshKosh transaction was responsible for any loss," Ind. Defs. Br. 12, fails as well. And, although the Individual Defendants assert that (1) fluctuations in Carter's stock price and (2) that stock price "declined throughout the Class Period in amounts equal to or greater than the decline following the final July disclosure" negate loss causation, this illogical argument presumes that Plaintiffs can only plead loss causation if there is either a "steady" rise in stock price, followed by a sharp drop, or a perfectly flat plateau, followed by a large drop. This view is clearly not an accurate picture of fraud in

## VII.  **The Complaint Sufficiently Alleges a 20A Violation**

A defendant violates Section 20A of the Exchange Act, 15 U.S.C. § 78t-1, "by purchasing or selling a security while in possession of material, nonpublic information...to any person who, contemporaneously with the purchase or sale of securities that is the subject of [a violation of the Exchange Act], has purchased... or sold...securities in the same class." 15 U.S.C. § 78t-1(a); *Hubbard*, 625 F. Supp. 2d at 1279.

As explained above at pp. 22-23, *supra*, the Individual Defendants sold Carter's common stock during the Class Period while in possession of material information, known only to them, regarding the OshKosh growth opportunity (or lack thereof) and the fraudulent "smoothing" of the Company's core financials by the improper booking of accommodation payments.  Lead Plaintiff has also shown at pp. 50-107, 128-136, *supra*, that the Complaint sufficiently alleges a predicate violation under § 10(b).  Therefore, the Complaint has sufficiently alleged a claim under Section 20A.[42]

---

the real world, and ignores crucial aspects of Defendants' fraudulent scheme, such as the stock repurchase program, that bumped up stock prices and allowed the Defendants to maximize their profits.  *See* pp. 23-25, *supra*.  The argument also ignores that partial corrective disclosures during the Class Period account for the price drops preceding the final disclosure.

[42]  Defendants may not use trading plans or windows, Br. 60, to hide evidence of their fraudulent trading, especially when some of the plans were entered into

Defendants argue that Lead Plaintiff cannot assert a 20A claim against Rowan and Casey because the Complaint does not "allege a contemporaneous sale of stock" with respect to these Individual Defendants.  Br. 61.  However, Lead Plaintiff is not required to demonstrate contemporaneous trading with *every* Defendant in order to allege a 20A claim against *all* Defendants.  *See Plumbers & Pipefitters Local 572 Pension Fund v. Cisco Sys., Inc.*, 2004 WL 5326262, at *5 (N.D. Cal. May 27, 2004) ("Plaintiffs…have alleged that they made at least one trade contemporaneously with at least one of Defendants' trades during the Class Period.  There is no requirement that Plaintiffs establish a contemporaneous  trade for each and every one of Defendants' trades during the Class Period.")

Moreover, Lead Plaintiff has also alleged that other Class members purchased Carter's common stock contemporaneously with Defendants' sales of stock during the Class Period, including with Rowan and Casey.  ¶349; *see In re Openwave Sys. Sec. Litig.*, 528 F. Supp. 2d 236, 256 & n.12 (S.D.N.Y. 2007) (finding contemporaneousness adequately alleged where plaintiffs specifically

---

during the Class Period, ¶293, raising an issue of fact as to their legitimacy.  *See Cent. Laborers' Pension Fund,* 497 F.3d at 554.  In any event, trading pursuant to a plan does not insulate defendants from liability. *See Immucor*, 2006 WL 3000133, at*18 n.8 (noting "the possibility that a clever insider might 'maximize' their gain from knowledge of an impending price drop over an extended amount of time, and seek to disguise their conduct with a 10b5-1 plan"); *see also* pp. 101-03, *supra*.

alleged dates on which insider sales occurred and further averred that putative class members had purchased shares contemporaneously with those sales).

## VIII.  The Complaint Sufficiently Alleges a 20(a) Violation

Section 20(a) of the Securities Exchange Act, 15 U.S.C. § 78t(a), "imposes derivative liability on persons that control primary violators of the Act." *Laperriere v. Vesta Ins. Group, Inc.*, 526 F.3d 715, 721 (11th Cir. 2008) (per curiam).  The elements of a Section 20(a) claim are (1) that a primary violation of the Act was committed by the company; (2) that the individual defendants had the power to control the general business affairs of the company; and (3) that the individual defendants "had the requisite power to directly or indirectly control or influence the specific corporate policy that resulted in primary liability."  *Mizzaro*, 544 F.3d at 1237 (quoting *Theoharous v. Fong*, 256 F.3d 1219, 1227 (11th Cir. 2001)).

Defendants' sole argument that Lead Plaintiff fails to allege a 20(a) violation is based on their assertion that the Complaint does not sufficiently allege a predicate violation under § 10(b).  *See* Br. 61; Ind. Defs. Br. 24.  Defendants, therefore, waive any argument that Lead Plaintiff has failed to meet any of the remaining elements of a 20(a) claim.  *See Mizzaro,* 544 F.3d at 1254 ("arguments not made are waived") (citation omitted).  As shown above at pp. 50-107, 128-136,

*supra*, the Complaint does, indeed, sufficiently allege a primary violation under §

10(b).    Accordingly, Lead Plaintiff has stated a claim under Section 20(a) for

control person liability.

## CONCLUSION

For the foregoing reasons, Lead Plaintiff respectfully requests that the Court

deny Defendants' motions to dismiss Plaintiffs' claims in their entirety.

DATED:  June 14, 2010

**EVANGELISTA & ASSOCIATES, LLC**

By:  /s/ David J. Worley
David J. Worley
James M. Evangelista
One Glenlake Parkway, Suite 700
Atlanta , GA 30328
Tel: (404) 478-7195
Fax: (404) 478-7139

*Liaison Counsel for Lead Plaintiff and the Class*

**LABATON SUCHAROW LLP**
Christopher Keller
Jonathan Gardner
Angelina Nguyen
140 Broadway
New York, New York 10005
Tel:  (212) 907-0700
Fax:  (212) 818-0477

*Lead Counsel for Lead Plaintiff
Plymouth County Retirement System
and the Class*

**GLANCY BINKOW
& GOLDBERG LLP**
Lionel Z. Glancy
Michael Goldberg
1801 Avenue of the Stars, Suite 311
Los Angeles, California  90067
Tel:  (310) 201-9150
Fax:  (310) 201-9160
Email: info@glancylaw.com

*Counsel for Plaintiffs*

**FINKELSTEIN THOMPSON LLP**
Donald J. Enright
1050 30th Street, NW
Duvall Foundry
Washington, DC 20007
Tel: (202) 337-8000
Fax: (202) 337-8090
Email:
mmclellan@finkelsteinthompson.com

*Attorneys for Plaintiff Scott Mylroie*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 14, 2010 I electronically filed:

- LEAD PLAINTIFF'S OMNIBUS MEMORANDUM OF LAW IN OPPOSITION TO THE DEFENDANTS' MOTIONS TO DISMISS

with the Clerk of Court using the CM/ECF system which will automatically send

email notification to all counsel who have appeared in this matter.

DATED: June 14, 2010

**EVANGELISTA & ASSOCIATES, LLC**

By:  /s/ David J. Worley_____
David J. Worley (Ga. Bar No. 776665)
