IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

|  |  |  |
|---|---|---|
| In re CARTER'S, INC. SECURITIES LITIGATION, | : : : : : : | CIVIL ACTION NO. 1:08-CV-02940-AT |

## **ORDER**

This matter is before the Court on Defendant PricewaterhouseCoopers LLP's (hereinafter "PwC") Motion to Dismiss Plaintiff's Second Amended Complaint, [Doc. 112], and Plaintiff's Unopposed Motion for Oral Argument on Defendant's Motion to Dismiss, [Doc. 119]. Plaintiff's claims against PwC stem from a securities class action complaint against Carter's, Inc., certain Carter's officers and directors, and Carter's outside auditor PwC, for an alleged fraudulent financial "smoothing" scheme involving the improper "booking" of accommodations.[1] The Lead Plaintiff[2] alleges that PwC, as Carter's auditor, is liable under § 10(b) of the Federal Securities Exchange Act, for recklessly

---

[1] An "accommodation," also known as "margin" support," is a standard feature of the retail industry. "In other words, like other companies in the retail industry, Carter's has arrangements with its customers such that it "supports" a certain amount of the customers' costs in selling Carter's products. Because Carter's is, in effect, paying the customer to help sell its goods, the total net sale made to the customer is consequently lowered by the amount that Carter's has used to support the customer's costs." (SAC ¶ 59.)

[2] Plymouth County Retirement System brought this securities class action on behalf of all purchasers of Carter's securities between March 16, 2005 and November 10, 2009 (hereinafter "the Class Period"). Scott Mylroie filed a separate but identical action in November, 2009, and the cases were consolidated by the Court on March 15, 2010. Plymouth County Retirement System was designated as the Lead Plaintiff for the class on March 13, 2009.

disregarding Carter's "smoothing" of its financials with respect to accommodations booking (hereinafter "the Accommodations Fraud") and issuing unqualified audit opinions attesting to the validity of Carter's financial statements.

## I. BACKGROUND

The pleading requirements of Federal Rule of Civil Procedure 9(b) and the heightened pleading requirements under the Private Securities Litigation Reform Act of 1995 (PSLRA), 15 U.S.C. § 78u-4(b) were addressed at length in the Court's[3] March 17, 2011, Order on the Defendants' prior motions to dismiss, as well as the factual background of the alleged fraud as set forth in the First Amended Complaint. (*See* Doc. 90 at 1-21 (factual background); 21-24, 34-36 (pleading standards)). Plaintiff filed its securities fraud complaint on September 19, 2008, as amended on May 12, 2009 (hereinafter "The First Amended Complaint"). (Docs. 1, 23.) Each Defendant moved to dismiss the complaint. On March 17, 2011, the Court dismissed Plaintiff's First Amended Complaint based on a lack of particularity and failure to allege a strong inference of scienter, but granted Plaintiff leave to amend on the basis that "a more carefully drafted complaint might state a claim." (Doc. 90 at 89-90.) Plaintiff filed a 221 page, 407 paragraph Second Amended Complaint on July 20, 2011 (hereinafter "SAC"). (Doc. 97.) Plaintiff entered into a settlement agreement with Carter's and the Individual Defendants which was approved by this Court, and final judgment was

---

[3] This case was originally assigned to the Hon. Owen J. Forrester. The case was reassigned to the undersigned on March 21, 2011. (*See* Doc.)

entered as to these Defendants on June 1, 2012. (*See* Docs. 129-130.) Defendant PwC filed its Motion to Dismiss the Second Amended Complaint on January 9, 2012. (Doc. 112.)

## II. ANALYSIS

PwC's sole argument in support of its Motion to Dismiss is that Plaintiff's SAC fails to adequately plead scienter against PwC under the heightened pleading requirements of the PSLRA, 15 U.S.C. § 78u-4(b). Plaintiff asserts that the allegations of the SAC, "viewed *collectively*, establish that PwC could only have failed to uncover the Accommodations Fraud by either intentionally permitting it to occur, or by grossly deviating from the standards of ordinary care that a *reasonable* auditor would have applied." (Pl.'s Resp. at 15-16 (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007) (holding that the court must determine whether "all the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard.").[4] Plaintiff argues that PwC's acts and omissions *viewed collectively* in combination with the sheer magnitude of the resulting required financial restatements demonstrating the materiality of the fraud, give rise to a strong inference that PwC's audits were so deficient they "amounted to

---

[4] *See also New Mexico State Inv. Council v. Ernst & Young LLP*, 641 F.3d 1089, 1095 (9th Cir. 2011) (conducting two-part inquiry for scienter under *Tellabs*: "first, we determine whether any of the allegations, standing alone, are sufficient to create a strong inference of scienter; second, if no individual allegation is sufficient, we conduct a "holistic" review of the same allegations to determine whether the insufficient allegations combine to create a strong inference of intentional conduct or deliberate recklessness.")).

3

no audit at all."[5] (*See* Pl's Resp. at 12-25 (citing *In re Software Toolworks, Inc. Sec. Litig.*, 50 F.3d 615, 628 (9th Cir. 1994)). *See also In re Friedman's, Inc. Sec. Litig.*, 385 F.Supp.2d 1345 (N.D. Ga. 2005); *In re Sunterra Corp. Sec. Litig.*, 199 F.Supp.2d 1308, 1337 (M.D.Fla.2002). In particular, as discussed more fully below, Plaintiff points to PWC's alleged pattern of willful blindness to GAAP[6] and GAAS[7] violations, disregard of red flags sufficient to alert a reasonable auditor to fraud, and manifest failure to undertake the active independent examination role required of an independent public accountant in the face of Carter's massive misstatements of income, adjustments, and expenses. Thus, the question before the Court is whether the allegations in the SAC, viewed in their totality and in light of all the evidence in the record, allow the Court to draw a strong inference, at least as compelling as any opposing inference, that PwC either knowingly or recklessly defrauded investors by issuing false audit opinions in violation of Rule 10b–5(b).

Plaintiff's allegations that PwC possessed the required scienter for a fraud claim, namely that PwC was deliberately reckless in not knowing about the "smoothing" of financials and improper booking of accommodations, are as follows:

---

[5] Plaintiffs may create a "strong inference" of scienter by circumstantial evidence alone, thus the lack of direct evidence connecting the defendants to the alleged fraud is not fatal to the plaintiff's claims. *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1249 (11th Cir. 2008) (citing *Tellabs*, 551 U.S. 323 (explaining that the plaintiff need not provide allegations "of the 'smoking-gun' genre")).
[6] GAAP stands for Generally Accepted Accounting Principles.
[7] GAAS stands for Generally Accepted Auditing Standards.

- **Magnitude & Materiality of the Carter's Fraud**: The alleged Accommodations Fraud occurred over a period of at least five and a half years (SAC ¶¶ 81- 86.)  PwC conducted annual audits and quarterly reviews of Carter's financial statements, and for fiscal years 2004 to 2008 issued unqualified or "clean" opinions as to accuracy of the financial statements. (SAC ¶¶ 43, 189-93.) According to the allegations of Plaintiff's SAC, Carter's Accounts Receivable (hereinafter "A/R") were manipulated and overstated during the five year Class Period by more than 20% in at least three fiscal years, and in a range from 8.3% to 26.5% over the entire Class Period. (*See* SAC ¶¶ 81 -86, 93, 144-155, 212; *see also* Superseding Criminal Indictment as to Joseph M. Elles and Joseph Pacifico, 1:11-CR-445-JEC, Doc. 50 ¶ 4(e).)  These allegations are confirmed by the Securities Exchange Commission's action against certain Carter's executives, and Carter's own January 15, 2010 financial Restatement. (*Id.*)  The government's investigation into Carter's Accommodations Fraud revealed the increasing dollar volume of accommodations given to Kohl's[8] that were improperly booked in the wrong fiscal period:  2004 - $3,073,000; 2005 - $3,784,000; 2006 - $4,404,000; 2007 - $12,968,000; 2008 - $18,927,000; 2009- $18,400,000. (SAC ¶¶ 163, 231.)  Plaintiff alleges that Carter's admitted and confirmed that its financial statements were not prepared in accordance with Generally Acceptable Accounting Principles (GAAP) and contained materially false and misleading

---

[8] Carter's allocated in its budget for Kohl's, its largest customer, millions of dollars in accommodations based on historical trends. (SAC ¶ 99, 231.)

5

statements when Carter's restated its Class Period financials for 18 successive quarters. (SAC ¶¶ 89, 93, 95, 99.)

"Drastic overstatement of accounts, or other red flags, combined with alleged violations of GAAS or GAAP may be enough to establish the requisite level scienter." *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1267-68 (11th Cir. 2006) (citing *In re Eagle Bldg. Tech. Inc., Sec. Litig.*, 319 F.Supp.2d 1318, 1328 (S.D.Fla.2004) (finding sufficient particularity where fraudulent contracts made up 74% of the company's business, financial statements had 60 out of 75 line items restated, and red flags included inter alia, purchase order discrepancies in the hundreds of thousands, delivery discrepancies of 50% of goods, and post-dated license agreements); *In re Friedman's, Inc., Sec. Litig.*, 385 F.Supp.2d 1345, 1365-66 (N.D.Ga.2005) and *In re Hamilton Bankcorp., Inc., Sec. Litig.*, 194 F.Supp.2d 1353 (S.D.Fla.2002)). The sheer magnitude of the restatements of Carter's financial statements suggests that PwC should have known or was severely reckless not to know that its unqualified audits were misleading. *See In re Sunbeam Sec. Litig.*, 89 F. Supp. 2d 1326, 1344-45 (S.D. Fla. 1999) (citing *In re Leslie Fay Cos., Inc.*, 835 F.Supp. 167, 175 (S.D.N.Y.1993) ("[i]n cases where small accounting errors only ripple through the corporate books, a court may conclude ... that an accountant's failure to discover his client's fraud was not sufficiently reckless to sustain a [§] 10–b5 claim. On the other hand, when tidal waves of accounting fraud are alleged, it may be determined that the accountant's

failure to discover his client's fraud raises an inference of scienter on the face of the pleading.")).

- **Violations of GAAP & GAAS**: Plaintiff alleges that PwC failed to comply with GAAP and GAAS in issuing its "clean opinions" for 2004, 2005, 2006, 2007, and 2008, by recklessly disregarding significant weaknesses in Carter's internal controls relating to the way Carter's booked accommodation payments. (SAC ¶ 196, 222-230.) The SAC details numerous purported GAAP and GAAS violations, including PwC's failure to exercise independent professional judgment and skepticism when conducting its audits, failure to conduct substantive audit tests normally performed by reasonable auditors in connection with sales, and failure to obtain sufficient competent evidence to support a reasonable basis for its opinions.[9] (SAC ¶¶ 198-210, 215.)

"The Financial Accounting Standards of GAAP and the antifraud rules promulgated under § 10(b) of the 1934 Act serve similar purposes, and courts have often treated violations of the former as indicative that the latter were also violated." *Ziemba v. Cascade Intern., Inc.*, 256 F.3d 1194 (11th Cir. 2001) (quoting *Malone v. Microdyne Corp.*, 26 F.3d 471, 478 (4th Cir. 1994)). "[I]n many cases the most plausible means to prevail on a section 10(b) claim against

---

[9] The Court notes that the allegations in the SAC related to the listing of the relevant GAAS and GAAP that Plaintiff alleges were violated are the same as those included in the First Amended Complaint. While it is true that "GAAP and GAAS violations alone are not enough to establish a strong inference of scienter," the Court finds that, as detailed herein that, where "such dereliction of responsibility is accompanied by other 'red flags' which the auditor chooses to ignore," the additional allegations against PwC when viewed collectively are enough to establish scienter in this case. *In re Sunterra Corp. Sec. Litig.*, 199 F. Supp. 2d 1308, 1333 (M.D. Fla. 2002).

an auditor without that ever-elusive 'smoking gun' document or admission will be to show how specific and not insignificant accounting violations collectively raise an inference of scienter." *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 281 (3d Cir. 2006) (citing *In re IKON Office Solutions, Inc.*, 277 F.3d 658, 677 n. 26 (3rd. Cir. 2002) and *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 694 (6th Cir.2004) ("[W]hen the alleged accounting errors are sufficiently basic and large, their existence, in combination with other factors, may support the requisite scienter inference.") (citation omitted)).  Indeed,

> alleged GAAP violations combined with a profound overstatement of financial results of a company may establish severe recklessness. *Carley Capital Group v. Deloitte & Touche, L.L.P.*, 27 F.Supp.2d 1324, 1339–40 (N.D.Ga.1998); *Gross v. Medaphis Corp.*, 977 F.Supp. 1463, 1472 (N.D.Ga.1997). The issuance of a restatement may also contribute to the establishment of scienter. Where the "number, size, timing, nature, frequency, and context of the [GAAP violations] or restatement are taken into account, the balance of the inferences to be drawn from such allegations may shift significantly in favor of scienter." *In re MicroStrategy, Inc. Securities Litigation*, 115 F.Supp.2d 620, 635 (E.D.Va.2000); *see, e.g., Rosen v. Textron, Inc.*, 321 F.Supp.2d 308, 322–23 (D.R.I.2004); *In re Hayes Lemmerz Intern., Inc. Equity Securities Litigation*, 271 F.Supp.2d 1007, 1018 (E.D.Mich.2003).

*In re AFC Enterprises, Inc. Sec. Litig.*, 348 F. Supp. 2d 1363, 1372 (N.D. Ga. 2004).  The accounting violations set forth by Plaintiff here, as detailed more fully herein, surpass an inference of ordinary negligence as suggested by PwC; they reasonably suggest at a minimum that PwC willfully turned a blind eye to evidence of the fraud at Carter's.

- **<u>Failure to Perform Basic Auditing Practices/Tests:</u>** Plaintiff alleges that PwC failed to (1) notice and/or investigate suspicious discrepancies in Carter's quarterly flux balance sheet/income statements, (SAC ¶¶ 218-222); and (2) obtain customer confirmations (a basic test in the retail industry) of Carter's Accounts Receivable and related sales terms, (SAC ¶¶ 202, 230, 232).

<u>Flux balance sheets:</u> According to the SAC, Carter's quarterly "flux balance sheets" detailed every line item on the Company's balance sheet and contained "very specific language" regarding accommodations for each customer account. The flux balance sheet detailed the reserve taken for each accommodation by account, accompanied by an explanation for each accommodation, revealing how the money was distributed on a quarterly basis, and included comparables from quarters and years past. (SAC ¶¶ 218-19.) PWC routinely received and should have reviewed Carter's quarterly flux balance sheets, containing a break down of all of Carter's reserve accounts, including accommodations. (SAC ¶ 220.) According to confidential witness statements cited in the SAC,[10] the flux balance sheets showed obvious inconsistencies and discrepancies by as much as 40% per customer account. (SAC ¶ 220.) The major inconsistencies should have triggered PwC's scrutiny and discovery of Accomodations Fraud. (SAC ¶¶220-221.)

---

[10] CW1 is a former Vice President of Investor Relations who worked at Carter's from 2003 through March 2009. CW1 reported directly to the Executive Vice-President and Chief Financial Officer of Carter's, and was responsible for interfacing with investors, being the Company's spokesperson and presenting financial results to investors as well as analysts. In this capacity, CW 1 attended many of the meetings where the preparation of the financial statements and analyst calls were discussed. (SAC ¶ 60.)

In addition, the SAC incorporates allegations of the SEC's complaint against Joseph Elles relating to questions raised by Elles' "Manager" about the timing of a $5.75 million accommodation taken by Kohl's in March, 2007, at the end of the first quarter of Carter's fiscal year. The Complaint further alleges that in a string of emails in the first fiscal quarter of 2007, both Carter's President and CFO expressly advised Elles that "charging accommodations for one year in the following year" was not allowed and that "[i]f you're striking new deals for 2007 sales, we'll provide for those commitments in 2007." (SAC ¶ 167.) While the SEC Complaint details Elles' alleged attempts to cover up the Accommodations Fraud, these allegations additionally indicate or raise an inference that certain discrepancies with the accommodations were also noticed within the Company and should have been likewise reviewed closer by PwC.

Plaintiff alleges that "had PwC actually reviewed the flux balance sheets with the appropriate rigor, PwC would have been alerted to the suspicious shifting of accommodations between accounts" that other employees and managers observed that in turn would have led PwC to discover the Accommodations Fraud. (SAC ¶ 221.)

<u>Customer confirmations:</u>  Plaintiff alleges that "PwC should have sent accounts receivable confirmations to Carter's customers in connection with PwC's audit of Carter's A/R in order to confirm the accuracy and completeness of Carter's A/R balances."  (SAC ¶ 202.)  According to the SAC, customer confirmations are a standard accounting/auditing practice. (SAC ¶ 226.)  In fact,

10

Carter's new CFO Westenberger helped uncover the Accommodations Fraud merely by confirming with Kohl's its expected accommodations. (SAC ¶¶ 26, 232.)

- **Red Flags:** PwC allegedly disregarded several specific "red flags" that would have placed a reasonable auditor on notice that Carter's was engaged in wrongdoing to the detriment of its investors in spite of multiple risk alerts that related to Carter's internal controls, internal audits, and disclosures. (SAC ¶¶ 185-86.) Specifically, these red flags include (1) grossly overstated A/R over a period of almost six years, (¶¶ 212-14); (2) Carter's material overstatement of earnings of $3.1 million at the end of 2003, (¶216); (3) the obvious manipulation of dollars among reserve accounts on the quarterly flux balance sheets, (¶¶ 218-221, 231-32); and (4) the multiple material weaknesses in internal controls[11] identified in Carter's financial Restatement and the absence of any written policy on accommodations payments, (¶¶ 228-230).

<u>Material weakness in internal controls:</u> Carter's financial Restatement concluded that "management identified . . . control deficiencies in its internal

---

[11] "Auditing Standard ("AS") No. 2, *An Audit of Internal Control Over Financial Reporting Performed in Conjunction with an Audit of the Financial Statements*, . . . states that "[m]aintaining effective internal control over financial reporting means that no material weaknesses exist; therefore, the objective of the audit of internal control over financial reporting is to obtain reasonable assurance that no material weaknesses exist as of the date specified in management's assessment." (AS 2 ¶ 4.) A material weakness is a significant deficiency that "results in more than a remote likelihood that a material misstatement of the annual or interim financial statements will not be prevented or detected."15 (AS 2 ¶ 10) . . . In an audit of internal control over financial reporting, the auditor must obtain sufficient competent evidence about the design and operating effectiveness of controls over all relevant financial statement assertions related to all significant accounts and disclosures in the financial statements. . . . (AS 2, ¶ 27.)" (SAC ¶¶ 222, 224.)

controls associated with customer accommodations processes that constitute material weaknesses." (SAC ¶ 225.) One of the material weaknesses identified was Revenue Recognition:

> The control over the timing of the recording of customer accommodations was improperly designed and was not effective in capturing the accuracy, completeness, and timing of accommodations arrangements. The controls that had been in place focused primarily on the review of internal Company documentation and the representations of members of the sales organization to ensure deductions taken by customers were valid and authorized; however, the controls were not effective in recording completely and accurately the accommodations arrangements in the appropriate accounting periods.

(SAC ¶ 226.)

Plaintiff's allegations raise the strong inference that this fundamental weakness in internal corporate fiscal controls would have been discovered by PwC but for its laissez-faire approach to essential fiscal control processes. Thus, Plaintiff alleges that PwC ignored the lack of a written policy regarding accommodations procedure in the face of a tidal wave of accommodation payments. Plaintiff alleges that PwC disregarded the absence of procedures to capture, review, approve, and record all accommodation arrangements in the appropriate accounting period, and the lack of comprehensive procedures for authorizing accommodations, including tiered accommodations approval level, all things that were later identified in Carter's amended financial Restatement. (SAC ¶¶ 227, 228.) According to both Joseph Elles, the alleged mastermind of

the Accommodations Fraud, and CW2[12], there were no controls in place to adequately track Carter's growing accommodations. (SAC ¶¶ 172, 228.) According to the SAC, incorporating the allegations of the SEC complaint against Elles, "Carter's accounting department monitored and booked accommodations primarily by using information and documents obtained from Carter's sales department." (SAC ¶ 162.) Many of the details concerning the negotiated accommodations were memorialized in emails. (SAC ¶¶ 163, 171.) Carter's acknowledged its lack of written policies and internal controls in its filings with the SEC. (SAC ¶¶ 144-157.)

In the context of the totality of the evidence alleged in the SAC, these red flags go beyond merely rehashing the GAAP and GAAS violations and thus provide an additional basis on which to infer the requisite scienter. (*See* Doc. 90 at 59 (citing *Garfield*, 466 F.3d at 1268.))

- **Lack of Due Care/Professional Independence/Skepticism on the Part of PwC:** Plaintiff alleges that PwC failed to exercise due professional care and professional skepticism in accordance with AU 230.[13] Specifically Plaintiff

---

[12] CW 2 was a former Manager of Financial Analysis at Carter's from October 2006 through December 2008. In this capacity, CW 2 analyzed Carter's budgeting models, was responsible (among other things) for the reporting of financials, and helped prepare the presentation "books" of financials given to the Board of Directors at their meetings with management. CW 2 reported to the Vice President of Finance, who in turn reported to Carter's CFO. (SAC ¶ 62.)

[13] Paragraph 177 of the SAC alleges that "PwC also had an obligation under AU 230 to exercise "due professional care" in the performance of its Carter's audits – specifically, AU 230.07 required PwC to "to exercise professional skepticism." AU 230.07 states that "[p]rofessional skepticism is an attitude that includes a questioning mind and a critical assessment of audit evidence." In addition, AU 230.09 requires that, "[i]n exercising professional skepticism, the auditor should not be satisfied with less than persuasive evidence because of a belief that management is honest."" (SAC ¶ 177.)

alleges that PwC's failure stems from its blind acceptance of the word of Carter's executives Casey and North, both former employees/auditors at PwC, and its reckless or deliberate disregard of several glaring red flags that should have alerted a truly independent[14] auditor to the existence of the Accommodations Fraud. (SAC ¶ 178.) CW1, who participated in "clearance calls"[15] with Casey and North and others, observed that if "PwC auditors had any questions regarding any of the numbers, North would say 'I'll take care of this' and PwC would 'accept' it, that the PwC auditors would always agree with North's resolution of issues, and that it was "obvious that North's previous colleagues at PwC permitted him to handle accounting issues without PwC's involvement." (SAC ¶ 180.) In addition, CW2[16] observed PwC's lenciency in their audits of Carter's financials and less extensive and rigorous testing of Carter's internal controls as compared to other auditors with whom (s)he had experience at other companies. (SAC ¶ 184.)

The SAC includes additional details with respect to each of the above allegations. Plaintiff argues that these detailed allegations, collectively, support a strong inference that PwC possessed the necessary scienter and thus, preclude

---

[14] The Court notes that allegations regarding the lack of independence standing alone would not demonstrate the necessary scienter on the part of PwC. However, the allegations, considered in combination the Plaintiff's other allegations as detailed herein provide further support for the inference of recklessness on the part of PwC.

[15] These clearance calls took place in the 9th floor "fishbowl" conference room in Carter's Atlanta Offices usually the night before Carter's quarterly earnings calls. The PwC auditors located in Connecticut always participated by phone.

[16] Cw2 allegedly sat very close to Christina DeMarvel, Carter's head of Internal Audit who interfaced with PwC on a regular basis. CW2 thus overheard conversations between DeMarvel and Don Brenner, the PwC partner in charge of the Carter's audits. (SAC ¶¶ 183-84.)

the Court's granting Defendant's motion to dismiss. The Court finds that Plaintiff's SAC alleges more than just PwC's failure to adhere to GAAP and GAAS in its audits as was previously found with respect to the allegations in the First Amended Complaint.[17] Plaintiff's SAC alleges not only GAAP and GAAS violations, but that PWC either recklessly disregarded a number of red flags which would have exposed the purported fraud.  Here, the allegations in the SAC detail the magnitude of the misstatements, the lack of internal controls as recognized by Carter's Restatement of its financials, and the specific GAAP and GAAS violations with respect to the accommodations as later revealed by company executives after a routine customer confirmation (as compared to a full audit). *C.f., Public Employees' Retirement Ass'n of Colo. V. Deloitte & Touch LLP*, 551 F.3d 305, 313-316 (4th Cir. 2009) (finding that where auditor raised issues numerous times with management, designed a customer confirmation process to verify the company's reported income by contacting third-party vendors, and received letters confirming amounts the allegations did not give rise to an inference that the auditor was complicit in the fraud that was being

---

[17] Typically, pleading sufficient facts to support a strong inference of scienter by an outside auditor is difficult because outsider auditors have more limited information than, for example, the company executives who oversee the audit. Thus, in examining allegations of scienter, courts have looked at a range of factors for potential "red flags," including the interaction of auditors with company executives and the breadth and scope of the auditor's deviation from GAAP or GAAS. *New Mexico State Inv. Council v. Ernst & Young LLP*, 641 F.3d 1089, 1097-98 (9th Cir. 2011) (citing *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 235 F.Supp.2d 549, 673–85 (S.D.Tex.2002)). The "red flag" doctrine guides the GAAP and GAAS inquiries: the more facts alleged that should cause a reasonable auditor to investigate further before making a representation, the more cogent and compelling a scienter inference becomes. *In re Countrywide Financial Corp. Sec. Litig.*, 588 F.Supp.2d 1132, 1197 (C.D. Calif. 2008); *see also DSAM Global Value Fund v. Altris Software, Inc.*, 288 F.3d 385, 389 (9th Cir.2002). Similarly, the more likely an auditor would have discovered the truth if a reasonable audit had been conducted, the stronger the scienter inference. *In re Countrywide*, 588 F.Supp.2d at 1198.

concealed by the company). Accordingly, the SAC "puts this failure in a broader context with allegations that, taken together, paint a portrait of an audit so reckless that a jury could infer intent to defraud." *See In re Sunbeam Sec. Litig.*, 89 F. Supp. 2d 1326, 1344-45 (S.D. Fla. 1999) (quoting *Jacobs v. Coopers & Lybrand, L.L.P.*, 1999 WL 101772, *14 (S.D.N.Y. Mar.1, 1999)).

While PwC argues that these allegations raise, at most, an inference of negligence or even gross negligence, the Court concludes that the cumulative effect and totality of the allegations support a strong inference that PwC's audit amounted to no audit at all, or an egregious refusal to see the obvious, or investigate the doubtful. *See In re Eagle Bldg. Technologies, Inc., Sec. Litig.*, 319 F. Supp. 2d 1318, 1327 (S.D. Fla. 2004) ( "Some courts have held that a plaintiff, in satisfying the high bar of recklessness, "must prove that the accounting practices were so deficient that the audit amounted to no audit at all, or an egregious refusal to see the obvious, or to investigate the doubtful, or that the accounting judgments which were made were such that no reasonable accountant would have made the same decision if confronted with the same facts."). Based on this holistic view of the allegations in their totality, the Court finds that a reasonable person would deem PwC's severe recklessness in issuing unqualified audits at least as plausible as PwC's innocent or negligent ignorance of the Accommodations Fraud perpetrated and concealed by Carter's officers and executives. *See Tellabs*, 551 U.S. at 324 (2007).

The Court has not overlooked PwC's assertions that the fraud was committed by officers and executives who hid information from and lied to the Company and its auditors about Carter's finances, and that PwC performed its audits in good faith under the circumstances. The Court is not suggesting that Plaintiff's Section 10(b) claim will necessarily survive a properly supported summary judgment motion after the benefit of full discovery. At the pleading stage, however, Plaintiff is entitled to the benefit of all reasonable inferences based on the totality of the allegations in the SAC Complaint that also raise a strong inference of reckless malfeasance on PwC's part. Based on this "holistic" view, the Court finds that a compelling inference of PwC's scienter here is "at least as strong as an opposing inference." *Id.* at 325.

### III. Conclusion

For the foregoing reasons, Defendant PricewaterhouseCoopers LLP's Motion to Dismiss Plaintiff's Second Amended Complaint [Doc. 112] is **DENIED,** and Plaintiff's Unopposed Motion for Oral Argument on Defendant's Motion to Dismiss [Doc. 119] is **DENIED AS MOOT**.

**IT IS SO ORDERED** this 28th day of August, 2012.

_____
**AMY TOTENBERG**
**UNITED STATES DISTRICT JUDGE**